JOHN A. MOE, II (SBN 66893)
john.moe@dentons.com
ANDREA C. CHANG (SBN 235011)
andrea.chang@dentons.com
DENTONS US LLP
601 South Figueroa Street
Suite 2500
Los Angeles, CA 90017-5704
Telephone: 213 623 9300
Facsimile: 213 623 9924

Attorneys for
Secured Creditor Preferred Bank

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

In re,

SDRES PARTNERS, LLC,

Debtor.

Case No. 8:26-BK-11744-SC

Chapter 11

**DECLARATION OF ROBERT W. GUTZMAN, MAI, IN SUPPORT OF PREFERRED BANK'S MOTION FOR RELIEF FROM AUTOMATIC STAY AND RELIEF FROM TURNOVER BY PREPETITION RECEIVER**

Date: September 16, 2026
Time: 1:30 p.m.
Place: Courtroom 5C – Virtual
411 West Fourth Street
Santa Ana, CA 92701

Dentons US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
213 623 9300

I, Robert W. Gutzman, MAI, declare that if called as a witness, I would and could competently testify, based on my own personal notes, as follows:

1. I am a Senior Vice President at CBRE Valuation & Advisory Services, with an office address of 400 South Hope Street, Suite 2500, Los Angeles, California 90071-1549. I am an MAI and a California Certified General Real Estate Appraiser, Identification Number AG025646. A copy of my Resume is attached at the end of both Appraisals.

2. I prepared Appraisals of two properties for Preferred Bank. More specifically, I prepared an Appraisal for the real property located at 210 South Orange Grove Avenue, Pasadena, California 91105, and I prepared an Appraisal for the real property at 244-248 South Orange Grove Boulevard, Pasadena, California 91105. Julian Uribe, who also is a Certified Appraiser at CBRE, assisted me in the Appraisal of the 244-248 property. The Appraisals included my personal inspection of both properties.

3. A copy of my Appraisal for the 210 South Orange Grove Property is attached as Exhibit "JJ."[1] A copy of my Appraisal for the 244-248 South Orange Grove Property is attached as Exhibit "KK."

4. In each Appraisal, I included a summary description of each of the properties, and a valuation, which are as follows:

a. As to the 210 South Orange Grove Property, it is a 1925-built, two-story, single-tenant office building with a detached unit (converted garage). The subject building area is 7,315 net rentable square feet on a 30,029-square-foot (0.69-acre) site. The appraised value is $5,080,000.

b. As to the 244-248 South Orange Grove Property, it is a 1927-built, eight-unit apartment complex. It was previously used as dormitory housing at

---

[1] The Exhibit references *follow* in order the Exhibits attached to the concurrently filed Declaration of Lingchu Lin, Exhibits "A" through "II."

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

Ambassador College, converted to apartments in 2007. The improvements are situated on a 0.83-acre site. The subject is 75.0 percent occupied with two vacant units. The appraised value is $5,250,000.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of August, 2026, in Los Angeles, California.

CBRE Valuation and Advisory Services
ROBERT W. GUTZMAN, MAI

Robert W. Gutzman, MAI

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

# Exhibit JJ

CBRE Valuation & Advisory Services

# Appraisal Report

210 South Orange Grove Boulevard
Pasadena, California 91105

Prepared for: Dentons
CBRE File No.: CB26US076590-2

cbre.com/valuation

CBRE Valuation & Advisory Services

CBRE

400 S. Hope St. Ste. 2500
Los Angeles, CA 90071-1549

T (213) 613-3683
F (213) 613-3005

www.cbre.com/valuation

Date of Report: August 20, 2026

John A. Moe II, Esq.
DENTONS
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017

RE: Appraisal of:
210 South Orange Grove Boulevard
Pasadena, Los Angeles County, California 91105
CBRE File No.: CB26US076590-2

Dear Mr. Moe:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the referenced property. Our analysis is presented in the following Appraisal Report.

The subject is a 1925-built, two-story, single-tenant office building with a detached unit (converted garage). The subject totals 7,315 net rentable square feet on a 30,029-square-foot (0.69-acre) site. The subject is more fully described, legally and physically, within the enclosed report.

Based on the analysis contained in the following report, the market value of the subject property is concluded as follows:

**MARKET VALUE CONCLUSION**

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| As Is | Leased Fee Interest | July 30, 2026 | $5,080,000 |

Compiled by CBRE

This Appraisal Report is subject to Extraordinary Assumptions and/or Hypothetical Conditions; please refer to the Executive Summary section of this report for further discussion and analysis.

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value. The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of

the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. As a condition to being granted the status of an intended user, any intended user who has not entered into a written agreement with CBRE in connection with its use of our report agrees to be bound by the terms and conditions of the agreement between CBRE and the client who ordered the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to any non-intended users does not extend reliance to any such party, and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).

It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if CBRE can be of further service, please contact us.

Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES

Robert W. Gutzman, MAI
Senior Vice President
CA Certification No.: AG025646
Phone: 213.613.3683
Email: bob.gutzman@cbre.com

# Certification

We certify to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.
3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.
4. Robert W. Gutzman, MAI, has not provided any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.
5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
8. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Uniform Standards of Professional Appraisal Practice.
9. Robert W. Gutzman, MAI, has made a personal inspection of the property that is the subject of this report.
10. No one provided significant real property appraisal assistance to the person signing this certification.
11. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
13. As of the date of this report, Robert W. Gutzman, MAI, has completed the continuing education program for Designated Members of the Appraisal Institute.

Robert W. Gutzman, MAI
CA Certification No.: AG025646

# Subject Photographs




Aerial view



East view of subject



North view of Orange Grove. Subj. to right.



South view of Orange Grove. Subj. to left.



Northwest view of subject



South view of water feature and subj bldg.



East view of parking lot from porte-cochère



Interior common area



Interior common area



Bathroom



Kitchen



Second floor with stairs in background



Office



Basement



Basement



Northwest view of converted garage



Interior of garage ground floor



Office on second floor of garage



Office on second floor of garage

# Executive Summary

| | | |
|---|---|---|
| **Location** | 210 South Orange Grove Boulevard<br>Pasadena, Los Angeles County, CA 91105 | |
| **Parcel Number(s)** | 5713-013-057 | |
| **Client** | Dentons | |
| **Highest and Best Use** | | |
| As If Vacant | Multifamily | |
| As Improved | Office | |
| **Property Rights Appraised** | Leased Fee Interest | |
| **Date of Inspection** | July 30, 2026 | |
| **Estimated Exposure Time** | 12 Months | |
| **Estimated Marketing Time** | 12 Months | |
| **Primary Land Area** | 0.69 AC | 30,029 SF |
| **Zoning** | WGSP-1B, West Gateway Specific Plan | |
| **Improvements** | | |
| Property Type | Office | |
| Number of Buildings | 2 | |
| Number of Stories | 2 | |
| Gross Building Area | 8,358 SF | |
| Net Rentable Area | 7,315 SF | |
| Year Built | 1925 | |
| Effective Age | 25 Years | |
| Remaining Economic Life | 25 Years | |
| Condition | See Text | |
| **Financial Indicators** | | |
| Current Occupancy | 100% | |
| Stabilized Occupancy | 96% | |
| Stabilized Credit Loss | 1.0% | |
| Overall Capitalization Rate | 5.00% | |

| CONCLUDED MARKET VALUE | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value** |
| As Is | Leased Fee Interest | July 30, 2026 | $5,080,000 |

Compiled by CBRE

## Extraordinary Assumptions

An extraordinary assumption is defined as "an assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

- The site size was taken from a Los Angeles County Assessor map. The subject's building areas were taken from the subject lease provided to us. We assume that these figures/descriptions are correct. However, we are not licensed surveyors and make no guarantee or warranty. We encourage the client to research this issue further if needed. We reserve the right to amend the valuation should new information surface.
- We were provided estimated costs to repair the subject property along with delinquent property tax amounts. We were also provided delinquent amounts owed for the fees associated with the Homeowner Homeowners Owners Association (HOA, sometimes called a Property Owners Association (POA)). We are not experts in this area and assume these costs are accurate. We reserve the right to amend our analysis should new information be provided.
- We have been provided two title reports for the subject property around the date of value. The older of the two is a March 26, 2026 title report prepared by Orange Coast Title Company. The more recent is a July 14, 2026 title report prepared by First American Title Insurance Company. There are numerous title items which are discussed in the body of this report. However, we note that there are several covenants, conditions, and restrictions (CCRs) and easements listed. Many of these are not discussed in detail, we were not given information on them, and several easements are reportedly of indeterminate location. We assume no liability for clear title to the property. We assume that there are no adverse easements or encroachments, or the like, which would have an impact on the value or marketability of the subject property. However, we are not title experts and make no guarantee or warranty. If needed, we encourage the client to research this issue further. We reserve the right to amend our analysis should new information be provided.
- We have not been provided a current environmental report in connection with this assignment. We assume that there are no environmental hazards which would affect the marketability or market value of the subject in any way.
- The subject was designated a Landmark by the City of Pasadena on April 21, 2008. (It does not appear to be on the National Register of Historic Places or designated by the State of California.) It is our understanding that this City of Pasadena designation "recognizes and legally protects certain areas, buildings, structures, objects, natural features, and works of art which have significant historic, cultural, architectural, and aesthetic value...." The City also states: "Designation brings about design review of exterior alterations (and designated interiors)....designated landmarks may take advantage of incentives such as the State Historical Building Code (SHBC), which provides flexibility in complying with portions of the building code." Also, the designation reportedly does not restrict the use of the property: "Designation has no effect whatsoever on uses permitted by the Zoning Code. In some cases, a landmark may have some non-conforming uses, such as small offices, within certain residential areas." We assume this designation does not impact the subject's marketability or value in any way. However, we are not experts in this area and make no guarantee or warranty. If needed, we encourage the client to research this issue further. We reserve the right to amend our analysis should new information be provided.
- The subject's legal description may have changed over the years. Also, the property at one time was part of the larger Ambassador College campus. We do not know if any of the subject

---

[1] The Appraisal Foundation, *USPAP, 2024 Edition* (Effective January 1, 2024)

buildings encroach on other lots or vice versa. We assume there are no encroachments or other issues that would affect the subject's marketability or value in any way. However, we are not experts in this area and make no guarantee or warranty. If needed, we encourage the client to research this issue further. We reserve the right to amend our analysis should new information be provided.

- The subject reportedly generates income from a license for grandstand seating for the Rose Parade. The agreement has a one-year term, with provisions for either party to terminate the agreement under certain circumstances and with adequate notice. We note that while the license is for one year, this license has been renewed for over 20 years. We also assume that the subject property owner has the ability to license this area since the subject property is part of a Homeowners Owners Association (HOA, sometimes called a Property Owners Association (POA)). Finally, we note that the 2026 license agreement provided to us, which was signed by both an authorized agent of SDRES (the subject property owner) and the seating company, does not indicate the subject property address and does not have a legal description or map. We assume this information is correct and reserve the right to amend our analysis should new information be provided.

The use of these extraordinary assumptions may have affected the assignment results.

## Hypothetical Conditions

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purposes of analysis." [2]

- None noted

## Market Volatility

Recent military action between an Israeli/U.S. coalition and Iran has heightened global economic uncertainty and risks. The situation remains extremely fluid with a variety of possible outcomes. Impacts on real estate are highly dependent on both the length and scope of the conflict. Beyond the duration and scope of the conflict, potential risks include the impact on energy infrastructure in the Gulf states and the transit of oil and gas through the Strait of Hormuz. There are implications for global supply chains, as well as the cost of capital and capital markets activity.

Amid increased uncertainty, the Fed will likely hold interest rates steady as it assesses the economic implications. At the long end of the yield curve, investors have remained more concerned about inflation than growth since the conflict began. Long-term rates may drop if the Middle East conflict escalates and/or economic conditions worsen, which would likely drive more capital to safe havens.

Experience has shown that consumer and investor behavior can quickly change during periods of heightened volatility. Lending or investment decisions should consider the potential for a continuation of recent volatility, which may affect market conditions disproportionately, depending on asset class.

It is important to note that the conclusions set out in this report are valid as at the valuation date only. Where appropriate, we recommend that the valuation is closely monitored, as we continue to track how markets respond to evolving events.

---

[2] The Appraisal Foundation, *USPAP, 2024 Edition* (Effective January 1, 2024)

## Ownership and Property History

| OWNERSHIP SUMMARY | |
|---|---|
| Item | Current |
| **Current Ownership** | |
| Owner: | SDRES Partners, LLC |
| Sale in Last 3 Years?: | No |
| **Pending Sale** | |
| Under Contract: | No |
| **Current Listing** | |
| Currently Listed For Sale: | No |
| Compiled by CBRE | |

CBRE is unaware of any arm's length ownership transfers of the property within three years prior to the date of value. Further, the property was not reportedly being offered for sale as of the date of value.

## Exposure/Marketing Time

Current appraisal guidelines require an estimate of a reasonable time-period in which the subject could be brought to market and sold. This reasonable time frame can either be examined historically or prospectively. In a historical analysis, this is referred to as exposure time. Exposure time always precedes the date of value, with the underlying premise being the time a property would have been on the market prior to the date of value, such that it would sell at its appraised value as of the date of value. On a prospective basis, the term marketing time is most often used. The exposure/marketing time is a function of price, time, and use. It is not an isolated estimate of time alone. In consideration of these factors, we have analyzed the following:

- exposure periods for comparable sales used in this appraisal;
- exposure/marketing time information from the *PwC Real Estate Investor Survey*; and

The following table presents the information derived from these sources.

| EXPOSURE/MARKETING TIME DATA | | |
|---|---|---|
| | Exposure/Mktg. (Months) | |
| Investment Type | Range | Average |
| Comparable Closed Sales Data | 5.0 - 18.0 | 11.5 |
| *PwC National Suburban Office Market* 2Q, 2026 | 6.0 - 15.0 | 10.9 |
| **CBRE Exposure Time Estimate** | **12 Months** | |
| **CBRE Marketing Period Estimate** | **12 Months** | |
| Various Sources Compiled by CBRE | | |

# Table of Contents

Certification ........ iii
Subject Photographs ........ iv
Executive Summary ........ viii
Table of Contents ........ xii
Scope of Work ........ 1
Area Analysis ........ 4
Site Analysis ........ 10
Improvements Analysis ........ 13
Zoning ........ 15
Tax Assessment Data ........ 16
Market Analysis ........ 17
Highest and Best Use ........ 19
Sales Comparison Approach ........ 20
Income Capitalization Approach ........ 24
Reconciliation of Value ........ 31
Assumptions and Limiting Conditions ........ 33

ADDENDA
Comparable Sales
Comparable Rents
Title Report
Qualifications

# Scope of Work

This Appraisal Report is intended to comply with the real property appraisal development and reporting requirements set forth under Standards Rule 1 and 2 of USPAP. The scope of the assignment relates to the extent and manner in which research is conducted, data is gathered, and analysis is applied.

## Intended Use Of Report

This appraisal is to be used for bankruptcy litigation and no other use is permitted.

## Client

The client is Dentons.

## Intended User Of Report

This appraisal is to be used by Dentons. No other user(s) may rely on our report unless as specifically indicated in this report.

> Intended users are those who an appraiser intends will use the appraisal or review report. In other words, appraisers acknowledge at the outset of the assignment that they are developing their expert opinions for the use of the intended users they identify. Although the client provides information about the parties who may be intended users, ultimately it is the appraiser who decides who they are. This is an important point to be clear about: The client does not tell the appraiser who the intended users will be. Rather, the client tells the appraiser who the client needs the report to be speaking to, and given that information, the appraiser identifies the intended user or users. It is important to identify intended users because an appraiser's primary responsibility regarding the use of the report's opinions and conclusions is to those users. Intended users are those parties to whom an appraiser is responsible for communicating the findings in a clear and understandable manner. They are the audience. [3]

## Reliance Language

Reliance on any reports produced by CBRE under this Agreement is extended solely to parties and entities expressly acknowledged in a signed writing by CBRE as Intended Users of the respective reports, provided that any conditions to such acknowledgement required by CBRE or hereunder have been satisfied. Parties or entities other than Intended Users who obtain a copy of the report or any portion thereof (including Client if it is not named as an Intended User), whether as a result of its direct dissemination or by any other means, may not rely upon any opinions or conclusions contained in the report or such portions thereof, and CBRE will not be responsible for any unpermitted use of the report, its conclusions or contents or have any liability in connection therewith.

## Purpose of the Appraisal

The purpose of this appraisal is to develop an opinion of the market value of the subject property.

---

[3] Appraisal Institute, *The Appraisal of Real Estate, 15th ed.* (Chicago: Appraisal Institute, 2020), 40.

## Definition of Value

The current economic definition of market value agreed upon by agencies that regulate federal financial institutions in the U.S. (and used herein) is as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their own best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [4]

## Interest Appraised

The value estimated represents the Leased Fee Interest as defined below:

> *Leased Fee Interest* - The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. [5]

## Extent to Which the Property is Identified

The property is identified through the following sources:

- postal address
- assessor's records
- title report

## Extent to Which the Property is Inspected

CBRE inspected the subject, as well as its surrounding environs on the previously indicated date of inspection.

## Type and Extent of the Data Researched

CBRE reviewed the following:

- applicable tax data
- zoning requirements
- flood zone status
- comparable data

---

[4] 12 CFR, Part 34, Subpart C-Appraisals, 34.42(h).

[5] Appraisal Institute, *The Dictionary of Real Estate Appraisal, 7th ed.* (Chicago: Appraisal Institute, 2022), 105.

## Type and Extent of Analysis Applied

CBRE, Inc. analyzed the data gathered through the use of appropriate and accepted appraisal methodology to arrive at a probable value indication via each applicable approach to value. The steps required to complete each approach are discussed in the methodology section.

## Statement of Competency

The appraisers have the appropriate knowledge, education, and experience to complete this assignment competently.

## Appraisal Methodology

In appraisal practice, an approach to value is included or omitted based on its applicability to the property type being valued and the quality and quantity of information available.

### Cost Approach

The cost approach is based on the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

### Sales Comparison Approach

The sales comparison approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject. Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, etc., or economic units of comparison such as gross rent multiplier. Adjustments are applied to the physical units of comparison derived from the comparable sale. The unit of comparison chosen for the subject is then used to yield a total value. Economic units of comparison are not adjusted, but rather analyzed as to relevant differences, with the final estimate derived based on the general comparisons.

### Income Capitalization Approach

The income capitalization approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

### Methodology Applicable to the Subject

In valuing the subject, we have used the sales comparison approach and the income capitalization approach, both of which are used by buyers and sellers of properties like the subject. The cost approach is not applicable in the estimation of market value due to the age/depreciation of the improvements. Also, buyers and sellers of properties like the subject do not use the cost approach in estimating value.

# Area Analysis




## CITY OF PASADENA

The subject property is located in the City of Pasadena. Pasadena is located approximately ten miles northeast of downtown Los Angeles. The city encompasses approximately 23 square miles and is one of the larger incorporated cities in Los Angeles County. It is bounded on the north by the unincorporated community of Altadena and the San Gabriel Mountains; on the east by the cities of Sierra Madre and Arcadia; on the south by the cities of South Pasadena and San Marino; and on the west by the community of Eagle Rock (City of Los Angeles), and the cities of Glendale and La Canada.




Pasadena is a major commercial market area within Los Angeles County. In the office segment, the city is home to a significant number of corporate headquarters, back-office users, and research and development/high-technology companies. The city is also a major residential district, particularly for workers employed in downtown Los Angeles and the Tri-Cities (Burbank, Glendale, and Pasadena). The city is generally built out and future development will occur primarily through the redevelopment process.

## Local Government/Land Use Controls

The city of Pasadena has a council-manager form of government. The city provides its own police and fire departments, as well as its own school district. Preservation/rehabilitation of existing buildings and restrictions on development are strongly entrenched local political values. New development in the city is subject to a relatively rigorous approval process.

## Access

Pasadena is served by several major freeways. The Foothill Freeway (Interstate 210) traverses the city in an east/west direction. This freeway runs from the north San Fernando Valley to the eastern portion of Los Angeles County. On the west side of Pasadena, the Foothill Freeway connects to the Ventura Freeway (State Route 134), which continues westward through Glendale and the San Fernando Valley. The Long Beach Freeway (Interstate 710) extends from Long Beach to Alhambra (south of Pasadena). For many years, it was slated to be connected to the 210 Freeway to the north. Due to intense community opposition, the 710/210 connector was officially deleted from the highway grid, and approved/signed by Governor Gavin Newsom in October 2019. In August 2022, the northern part of the freeway stub—

approximately 50 acres—from Union Street to Columbia Street, was approved to be relinquished and transferred back to the City of Pasadena by the California Transportation Commission.

The Pasadena Freeway (State Route 110) provides direct access between the southern portion of Pasadena to downtown Los Angeles, continuing to the South Bay. This freeway is particularly significant in that it makes Pasadena one of the most accessible areas to downtown Los Angeles.

Within the city, there are numerous surface streets providing local access. Primary east/west streets include Washington, Orange Grove, Colorado, Del Mar, and California boulevards. North/south primary arterials are Fair Oaks, Los Robles, Lake, Allen avenues, and Sierra Madre, San Gabriel, and Rosemead boulevards.

Mass transportation is provided by local and regional bus lines. Los Angeles Metro's A Line light rail commuter line (previously known as the Gold Line and then the L Line) provides access between Pasadena and southward to downtown Los Angeles, extending to Long Beach. The A Line also extends eastward to Azusa.

Phase 2B of the Foothill Extension, running between Azusa and the Pomona–North Metrolink station in Pomona, is currently under construction, with a current estimated completion in the summer of 2025.

The nearest station is located at 340 North Lake Avenue. It is located in the median of the 210 Freeway at Lake Avenue.

Passenger and commercial airline service to Pasadena is provided by the Burbank Airport (located 14 miles northwest of the city) and Los Angeles International Airport (located 24 miles southwest of the city).

## Land Use Patterns

The city of Pasadena is dominated by residential uses, but has a strong office, retail, and industrial base.

There are four major concentrations of office space in the city. Lake Avenue, which traverses the central portion of the city in a north/south direction, is the primary office corridor. Office development on this street extends south from the Foothill (210) Freeway to California Boulevard. Office buildings in this corridor are generally mid- to high-rise structures. Other concentrations of office space in the city are along Los Robles Avenue, in the Hastings Ranch area, and along Colorado Boulevard.

Retail development in Pasadena is centered in three distinct areas. At the westerly end of the city is Old Town (also called Old Pasadena), a major retail/entertainment/tourist draw in the San Gabriel Valley. Old Town is characterized by renovated retail/commercial buildings along Colorado and Fair Oaks boulevards, with industrial buildings converted to retail occupancy on secondary arterials.

## One Colorado

The largest project in Old Town is the 277,000-square-foot One Colorado development. This project involved the rehabilitation and integration of a series of older one- and two-story retail/commercial buildings into a cohesive retail center. It encompasses the full city block bounded by Colorado Boulevard, Fair Oaks Avenue, Union Street, and De Lacey Avenue. Tenants in this development include Allbirds, Anthropologie, Nike, Place Vendome, Sushi Roku, and an IPIC Theater (now closed).

## Paseo Colorado

Just outside of Old Town, TrizecHahn completed a redevelopment of the Plaza Pasadena regional mall. Originally an enclosed two-level mall, the project was unsuccessful. It was largely deconstructed, with a two-story open-air retail center opened in September 2001 and 387 loft-style apartment units completed

in March 2002. Rebranded as Paseo Colorado, the development was anchored by Macy's. The prior owner (DDR) achieved approvals to demolish the existing Macy's building and develop a freestanding mid-rise hotel building (Hyatt Place) and an additional seven-story mixed-use retail/residential building. DDR subsequently sold the property to another party. This party completed the 189-room Hyatt Place hotel in 2018 and also developed the mixed-use building.

## South Lake Avenue Corridor

The second major retail area in the city is the South Lake Avenue Corridor. This area extends south from Green Street/Cordova Avenue to California Avenue. While only five blocks long, it is a heavily trafficked pedestrian retail core that overlaps with the Lake Avenue office buildings. Located in this area are high-end retailers, shopping arcades, and a Macy's department store.

## Hastings Ranch

The third retail area of Pasadena, known as Hastings Ranch, is at the east end of the city. It is primarily located on Foothill Boulevard in proximity to Rosemead Boulevard. There are four shopping centers in this area. These include two supermarket-anchored neighborhood centers, a community retail center anchored by Sears and Marshall's, and a power retail center anchored by Best Buy, Dick's Sporting Goods, and Nordstrom Rack.

In addition to these retail nodes, primary arterials, including Washington Boulevard, Foothill Boulevard/Walnut Street, Colorado Boulevard, Arroyo Parkway, and North Lake Avenue are improved with a wide variety of retail uses.

## Other

Industrial development in Pasadena is located along the Foothill Freeway (Interstate 210) corridor and in the northeast portion of the city. Occupancy is largely characterized by research and development companies that specialize in high-technology industries. Prior to the collapse of the technology sector, Internet firms were a growing component of the local economy.

As noted, residential development accounts for a large portion of the land use in Pasadena. In general, residential uses are comprised of single-family homes with apartment buildings along major streets and in the central area of the city. Affordable housing is in the northwest and central portions of the city, with luxury homes in the western and southern portions of the city.

Pasadena also has two world-renowned educational facilities, the Art Center College of Design and the California Institute of Technology (Caltech). The Jet Propulsion Laboratory (JPL) is a division of Caltech that is supported by the National Aeronautics and Space Administration (NASA). It is partially located in Pasadena and partially located in La Cañada-Flintridge.

Pasadena is also home to the Norton Simon Museum. Finally, the Rose Bowl, with the annual football game/parade and other sporting events is one of the defining characteristics of the city.

## Immediate Surroundings

The subject is located on part of the former Ambassador College campus, which is located within the block bounded by Del Mar Boulevard on the south, Orange Grove Boulevard on the west, Green Street on the north, and Saint John Avenue on the east. The subject's street address is 210 South Orange Grove Boulevard in Pasadena. It is located on the east side of Orange Grove Boulevard north of Del Mar Boulevard.




Directly north of the subject are two two-story apartment buildings. Continuing north are residential uses along Orange Grove Boulevard followed by commercial development on Green Street and Colorado Boulevard leading to the Old Pasadena area.

East of the subject is a multifamily residential development. Continuing east of the subject, but still within the campus, is the portion of the campus purchased by Maranatha High School. Maranatha High School, a non-denominational Christian high school, was founded in 1965 and was previously located in Arcadia and Sierra Madre until its move. Maranatha is a college preparatory high school for grades nine through twelve with a student enrollment of approximately 525 students. Continuing east is the stump of the 210/710 (Foothill) Freeway.

South of the subject are five single family residences located on the east side of Orange Grove Boulevard extending south to Del Mar Boulevard. Southeast of the subject are two apartment buildings with a street address of 244-248 South Orange Grove Boulevard, although the apartments do not have frontage on Orange Grove. Farther south, uses are multifamily residential along Orange Grove Boulevard and generally single-family residential along feeder streets.

West of the subject are multi-family residences that front on Orange Grove Boulevard. Continuing west are single-family residences along feeder streets.

Direct access to the subject parking area is via a driveway north of the subject property; it appears to be an access easement just north of the subject. The driveway that runs directly from Orange Grove Boulevard to the subject's porte-cochère does not appear to be in current use.

Regional access is provided by the 210/710 (Foothill) Freeway with on- and off-ramps located approximately one block to the east. On- and off-ramps for the Ventura (134) Freeway are located less than one mile to the northwest at Orange Grove Boulevard.

This is a residential neighborhood, with single-family residences dominating, and some multifamily residential uses interspersed. The Foothill (210) Freeway is less than one mile to the west, and can be accessed by on- and off-ramps at West Mountain Street.

## Conclusion

The subject neighborhood is generally built out, with limited vacant and/or under-improved land in the immediate area. Overall, the subject neighborhood is considered to be stable, with limited changes in its relative desirability.

# Site Analysis

The following chart summarizes the salient characteristics of the subject site.

**SITE SUMMARY AND ANALYSIS**

| **Physical Description** | | |
|---|---|---|
| Site Area | 0.69 Acres | 30,029 Sq. Ft. |
| Excess Land Area | None | |
| Surplus Land Area | None | |
| Shape | Irregular but generally rectangular | |
| Topography | Generally flat. Front yard slightly slopes down to the west. South part of site slopes slightly down to the south. | |
| Parcel Number(s) | 5713-013-057 | |
| Zoning District | WGSP-1B, West Gateway Specific Plan | |
| Flood Map Panel No. & Date | 065050 - 06037C1375F | 26-Sep-08 |
| Flood Zone | X | |
| Adjacent Land Uses | Residential | |
| Earthquake Zone | Not in Alquist-Priolo Fault Zone | |

| **Other** | Yes | No | Unknown |
|---|---|---|---|
| Detrimental Easements | | | x |
| Encroachments | | | x |
| Deed Restrictions | | | x |
| Reciprocal Parking Rights | | | x |

Various sources compiled by CBRE

## Title Reports

We have been provided two title reports for the subject property around the date of value. The older of the two is a March 26, 2026 title report prepared by Orange Coast Title Company. The more recent is a July 14, 2026 title report prepared by First American Title Insurance Company. There are numerous title items which are called out in the title reports. A partial list is provided below. (Note that we received a title report for both the subject property and 244-248 S. Orange Grove. The items below pertain to one and/or both properties.)

- Covenants, conditions, and restrictions (CCRs)
- Easements for utility, roadway, walkway, incidental purposes
- Driveway easement
- Homeowner association called out
- Landmark designation
- Landscaping easement
- Ingress/egress easement
- Construction easement
- Parking easement agreement
- Public utility, water line, reciprocal access easement
- Notice of default

- Notice of trustee's sale
- Grant deed
- Financing statement
- Deed of trust

Many of these are not discussed in detail, we were not given information on them, and several easements are reportedly of indeterminate location. We assume no liability for clear title to the property. We assume that there are no adverse easements or encroachments, or the like, which would have an impact on the value or marketability of the subject property. However, we are not title experts and make no guarantee or warranty. We reserve the right to amend our analysis should new information be provided.

It is recommended that the client/reader obtain a current title policy outlining all easements and encroachments on the property, if any, prior to making a business decision.

## Covenants, Conditions and Restrictions

See above. We do not know the nature of the covenants, conditions or restrictions that affect the site. For our purposes, we assume they do not affect the marketability, value, or highest and best use. It is recommended that the client/reader obtain a copy of all covenants, conditions and restrictions, if any, prior to making a business decision. We reserve the right to amend our analysis should new information be provided.

## Homeowners Association

The subject is part of a Homeowners Association (HOA, sometimes called a Property Owners Association (POA)) including several other adjacent and nearby parcels, formerly owned and operated collectively as the Ambassador College. As will be addressed later, it is our understanding that the subject ownership is delinquent in paying the assessments. The current delinquent amount is $7,987,05 per the client.

## Rose Parade Easement

The subject property generates additional income from an easement for Rose Parade grandstand seating along its South Orange Grove Avenue frontage. The agreement has a one-year term that automatically renews each year, with provisions for either party to terminate the agreement under certain circumstances and with adequate notice. For purposes of this analysis, we assume this income will extend into the future. This item is addressed in the valuation section of this report. We reserve the right to amend our analysis should new information be provided.

## Environmental Issues

CBRE was not provided a current Environmental Site Assessment (ESA). The appraiser is not qualified to detect the existence of potentially hazardous material or underground storage tanks which may be present on or near the site. The existence of hazardous materials or underground storage tanks may affect the value of the property. For this appraisal, CBRE, Inc. has specifically assumed that the property is not affected by any hazardous materials that may be present on or near the property.

## Comments and Conclusion

The subject site is of adequate size, shape and access to accommodate legally allowed uses. There are no known factors that would prevent the site from development to its highest and best use, as if vacant, or are adverse to the existing use of the site.

## Plat Map



# Improvements Analysis

The following chart shows a summary of the improvements.

| IMPROVEMENTS SUMMARY AND ANALYSIS | | |
|---|---|---|
| Property Type | Office | |
| Number of Buildings | 2 | |
| Number of Stories | 2 | |
| Gross Building Area | 8,358 SF | |
| Net Rentable Area | 7,315 SF | Excludes basement but includes detached bldg |
| Main bldg w/o basement | 6,151 SF | |
| Basement | 1,043 SF | |
| Detached bldg | 1,164 SF | |
| Parking Improvements | Surface | |
| Parking Spaces: | 12 striped surface spaces + 2 in driveway + 2 in garage, but garage spaces currently cannot be used as this space is built out. May also have some pkg spaces via easement; indeterminate, however. | |
| Year Built | 1925 | |
| Actual Age | 101 Years | |
| Effective Age | 25 Years | |
| Total Economic Life | 50 Years | |
| Remaining Economic Life | 25 Years | |
| Functional Utility | Typical | |

Source: Various sources compiled by CBRE

**IMPROVEMENT DESCRIPTION & CONDITION RATING**

| Improvement Summary | Description | Comparative Rating (After Repairs) |
|---|---|---|
| Foundation | Perimeter concrete | Average |
| Frame | Assumed wood frame | Average |
| Exterior Walls | Stucco | Average |
| Interior Walls | Mix of painted lath/plaster or lath/plaster, wood paneling | Average |
| Roof | Clay tile and built-up composition | Average |
| Ceiling | Painted lath/plaster or drywall | Average |
| HVAC System | Minisplit units (heat pump). Assumed adequate | Average |
| Exterior Lighting | Assumed adequate | Average |
| Interior Lighting | Commercial fixtures, some hanging fixtures | Average |
| Flooring | Hardwood, carpet, marble, tile | Average |
| Plumbing | Assumed adequate | Average |
| Stairwells | Two | Average |
| Elevators | One, currently not working | Average |
| Basement | Concrete floors. Bank-style vault door and room is part of basement. | Average |
| Smoke Detectors | Not noted | N/A |
| Sprinkler System | Not noted | N/A |
| Furnishings | Not included | N/A |
| Parking | Surface and 2-car garage | Average |
| Landscaping | Landscaped grounds and water feature | Average |

Source: Various sources compiled by CBRE

The gross building area of 8,358 square feet and the net rentable building area of 7,315 is from the subject lease.

It should be noted that the Los Angeles County Assessor's records indicate the building area is 6,450 square feet, which would typically exclude basement and parking areas. (The lease indicates the main building by itself, less the basement is (7,194 – 1,043) 6,151 square feet.) We assume the lease is accurate and reserve the right to amend our analysis should new information be provided.

## Condition Analysis

We first appraise the property as if it was in average condition. Hence, the ratings in the chart above. Then, later in the report, we deduct the costs to repair provided to us in order to arrive at an "as is" value.

CBRE was not provided a Property Condition Assessment (PCA). We are not building inspectors and make no warranty or guarantee. If needed, we encourage the client obtain a PCA prior to making a business decision.

Based on information provided by the client or representative, the property requires the following repairs:

| | |
|---|---|
| Tree Trimming: | $ 5,428 |
| Roofing: | $60,000 |
| Repaint exterior: | $30,000 |
| Total: | $95,428 |

(The exterior painting estimate provided to us is $90,000, which is for the subject property as well as the apartment property at 244-248 South Orange Grove Boulevard. The subject property is 7,315 net square feet and the apartment property is 14,128 net square feet. Therefore, we have apportioned the painting cost based on the pro rata square footages, equal to one-third for the subject property and two-thirds for the apartment property.)

The tenant representative, Doug Friedman, indicates that since the landlord did not do any of the work required of the landlord (i.e., lessor), he did it himself over the past couple of years. His last/latest work was completed in about May 2026 where he had the irrigation lines repaired and removed a tree in the front yard. He also had the pergola (near the water feature) rebuilt in early 2026 due to extensive termite damage. He also did roof patching in February 2026 since there were substantial leaks during the past rainy season (i.e., winter of 2025-26). He indicated that these rain leaks caused significant damage including, but not limited to, the kitchen ceiling essentially collapsed. He had the entire kitchen ceiling repaired. This is reportedly only a partial list of work the tenant did because the lessor did not do its work.

Per our discussion with the Receiver, Byron Moldo, he indicates the last of the work was done on (or billed by the tenant) on June 6, 2026.

## Conclusion

As indicated above, we first appraise the property as if it was in average condition. Then we deduct the costs to repair provided to us in order to arrive at an "as is" value. Overall, there are no known factors, other than described herein, that could be considered to adversely impact the marketability of the improvements.

# Zoning

The following chart summarizes the subject's zoning requirements.

| ZONING SUMMARY | |
|---|---|
| Current Zoning | WGSP-1B, West Gateway Specific Plan |
| Legally Conforming | No - See Comments |
| Uses Permitted | Residential and some commercial, generally with a CUP |
| Zoning Change | Not likely |
| Source: Planning Dept. | |

Per the City of Pasadena planner, the WGSP-1B zone (West Gateway Specific Plan) is focused on residential uses. Some commercial uses, including office, are allowed with a conditional use permit (CUP). Parking requirements are three spaces for every 1,000 square feet of gross floor area (which includes the basement and the second floor of the garage structure but not the ground floor of the garage, per the City planner). This means the subject requires 24 spaces for the subject. The subject appears to be a legal, nonconforming use of the site due to below-code parking. However, we are not zoning experts and make no guarantee or warranty. We encourage the client to discuss this with the planning department if further details are needed.

# Tax Assessment Data

The following summarizes the assessor's assessed value and taxes, and does not include any furniture, fixtures, or equipment.

**AD VALOREM TAX INFORMATION**

| Assessor Parcel Number | 2025-2026 |
|---|---|
| 5713-013-057 | $8,330,682 |
| Subtotal | $8,330,682 |
| % of Assessed Value | 100% |
| Final Assessed Value | $8,330,682 |
| Effective Tax Rate | 1.1484% |
| **Total Taxes** | **$95,671.96** |

Source: Assessor's Office

We were provided a July 14, 2026 title report prepared by First American Title Insurance Company. It indicates "defaulted taxes for the fiscal years 2023, 2024 and 2025...." It indicates the "amount to redeem" as $295,200.55, which is valid through August 2026. We assume this figure is accurate but reserve the right to amend our analysis should new information be provided. We deduct the above-indicated figure from our value estimate as it is a cost that is required to be paid.

If the subject sold for the value estimate in this report, a reassessment at that value would most likely occur, with tax increases limited to two percent annually thereafter until the property is sold again. The consequences of this reassessment have been considered in the appropriate valuation sections.

# Market Analysis

The subject property is an office building in Pasadena. In the pages below, we provide an office market overview.

CBRE

FIGURES | LOS ANGELES OFFICE | Q2 2026

# Market fundamentals remain challenged as space givebacks weigh on the market

▲25.8% ▼(432K) ▼253K ▼1.8M ▼$4.12

## Market Overview

Net absorption was negative 432,000 sq. ft. in Q2 2026, continuing the pattern of sustained space giveback. Vacancy increased by 150 basis points (bps) year-over-year while availability rose by 100 bps. Cumulative negative absorption over the last 12 months totaled approximately 3.0 million sq. ft. Average asking rents increased by 1.0% year-over-year.

Supply remained limited: 253,000 sq. ft. of new construction delivered during the quarter, and the development pipeline held at a restrained 1.8 million sq. ft. under construction, effectively constraining near-term additions to inventory. With overall demand still challenged, the combination of negative absorption and steady deliveries continued to push vacancy higher, reaching 25.8% in Q2 2026. Landlords remained in a tenant-favorable market, and elevated availability is expected to keep pressure on effective rents even as headline asking rates hold broadly flat.





© 2026 CBRE, INC.

## Vacancy

In Q2 2026, overall vacancy across the Los Angeles market reached 25.7%, with direct vacancy at 23.6% and sublease vacancy contributing an additional 2.1%. Vacancy conditions varied meaningfully across submarkets. East Downtown Los Angeles recorded the highest overall vacancy at 58.3%, followed by Downtown Los Angeles at 35.3% and Hollywood/Wilshire Corridor at 28.0%. San Gabriel Valley and Mid Counties remained the tightest submarkets in the region, with an overall vacancy of 9.2% and 9.7%, respectively.

In Q2 2026, Class A sublease vacancy was 2.5%, while Class B sublease vacancy was 1.1%, a 10-bps increase. Across the tracked Los Angeles office submarkets, sublease vacancy totaled 4.7 million sq. ft. in Q2 2026. West Los Angeles led all submarkets in sublease availability at 1.5 million sq. ft., followed by South Bay at 768,000 sq. ft., and together accounted for nearly half of the market's total sublease vacancy. At the other end of the spectrum, San Gabriel Valley and Mid-Counties carried minimal sublease exposure at just 0.3% each.

Figure 1: Vacancy Rate by Class




Source: CBRE Research, Q2 2026

## Asking Rent

In Q2 2026, the overall average asking rent was $4.12, slightly above the 2025 annual average of $4.10. This reflects a 0.2% quarter-over-quarter decline from Q1 2026 but increased by 1.0% year-over-year relative to Q2 2025. Class A rates stood at $4.38 in Q2 2026, consistently sitting above both the overall market at $4.12 and Class B space at $3.16.

In Q2 2026, West Los Angeles commanded the highest asking rents, with Class A at $5.88, followed by East Downtown where Class A asking rates reached $4.95. Core submarkets such as Downtown Los Angeles, Tri-Cities, Hollywood/Wilshire Corridor, and South Bay formed a mid-priced tier, with Class A rents between $3.59 and $3.97. More cost-effective options were available in Mid-Counties, San Fernando Valley, and San Gabriel Valley, where Class A ranged from $2.84 to $2.91.

Figure 2: Average Direct Asking Rate by Class




Source: CBRE Research, Q2 2026



© 2026 CBRE, INC.

## Net Absorption

Net absorption across Los Angeles deteriorated quarter-over-quarter, declining from negative 283,000 sq. ft. in Q1 2026 to negative 431,000 sq. ft. in Q2 2026. On a year-to-date basis, Los Angeles has recorded negative 714,000 sq. ft. of net absorption through the first half of 2026.

Absorption was driven primarily by the South Bay submarket with negative 165,000 sq. ft., followed by Hollywood/Wilshire Corridor recording negative 87,000 sq. ft., and Downtown Los Angeles with negative 84,000 sq. ft. Partially offsetting these losses, Tri Cities was the only submarket to record positive absorption with 47,000 sq. ft.




Source: CBRE Research Q2 2026

## Construction Activity

In Q2 2026, the market had 1.8 million sq. ft. under construction and 253,000 sq. ft. of space delivered, with 659,000 sq. ft. completed year-to-date in 2026. Under construction volume declined 5.1% quarter-over-quarter from 1.9 million sq. ft. in Q1 2026 and was 21.9% lower year-over-year than the 2.3 million sq. ft. underway in Q2 2025. Deliveries fell 37.7% quarter-over-quarter from 406,000 sq. ft. in Q1 2026, following a year with no completions in 2025.

By submarket, West Los Angeles carried the highest construction pipeline, with 982,500 sq. ft. underway, followed by Hollywood/Wilshire Corridor at 692,300 sq. ft. and South Bay with 76,000 sq. ft. Market dynamics continue to reflect a cautious development environment, as rising construction costs, tighter financing conditions, and persistently elevated vacancy levels temper new supply commitments across most submarkets. Looking ahead, the thinning pipeline suggests deliveries will remain constrained through 2027, which may gradually support rent stabilization in supply-limited corridors as demand recovers.




Source: CBRE Research Q2 2026


© 2025 CBRE, INC.

## Leasing Activity

Total leasing activity across Los Angeles reached 4.5 million sq. ft. in Q2 2026, declining 12.4% from 5.1 million sq. ft. in the prior quarter, but remaining 16.3% above the 3.8 million sq. ft. recorded in Q2 2025. Despite the quarterly decrease, the year-over-year comparison reflected continued improvement in occupier demand.

West Los Angeles posted the highest Q2 2026 leasing volume at 1.7 million sq. ft., followed by Tri-Cities with 824,000 sq. ft., Downtown Los Angeles with 520,000 sq. ft., South Bay with 456,000 sq. ft., San Fernando Valley with 407,000 sq. ft., Hollywood/Wilshire Corridor with 225,000 sq. ft., Mid-Counties with 186,000 sq. ft., San Gabriel Valley with 69,000 sq. ft., and East Downtown with 67,000 sq. ft.




Source: CBRE Research, Q2 2026

Leasing by Submarket (% of Total Activity)




Source: CBRE Research, Q2 2026

| Industry | Sq. Ft. Leased | Transaction Type | Address | Submarket |
|---|---|---|---|---|
| Confidential Life Science | 146,000 | Renewal / Expansion | 28515 Westinghouse Pl, Valencia | San Fernando Valley |
| PwC | 138,000 | New Lease | 2121 Avenue of the Stars, Century City | West Los Angeles |
| Confidential Legal Services | 114,000 | Renewal / Expansion | 2029 Century Park E, Century City | West Los Angeles |
| New Cingular Wireless PCS | 108,000 | Renewal | 12911 183rd St, Cerritos | Mid Counties |
| Confidential Financial Services | 108,000 | Renewal / Expansion | 2049 Century Park E, Century City | West Los Angeles |
| Arrowhead Pharmaceuticals | 98,000 | Renewal / Expansion | 177 E Colorado Blvd, Pasadena | Tri Cities |
| iHeart Media | 60,000 | Renewal | 3400 W Olive Ave, Burbank | Tri-Cities |



© 2026 CBRE, INC.

## Market Statistics by Class

Figure 5: Market Statistics by Class

| Property Class | Net Rentable Area (SF) | Total Vacancy (%) | Total Availability (%) | Direct Availability (%) | Sublease Availability (%) | Avg. Direct Asking Rate ($/SF FSG/mth) | Current Quarter Net Absorption (SF) | YTD Net Absorption (SF) | Deliveries (SF) | Under Construction (SF) |
|---|---|---|---|---|---|---|---|---|---|---|
| Class A | 152.37M | 27.9 | 32.8 | 29.2 | 3.6 | 4.38 | (34,000) | (133,000) | 253,000 | 1.78M |
| Class B | 59.88M | 20.0 | 24.2 | 22.2 | 2.0 | 3.16 | (291,000) | (474,000) | 0 | 0 |
| **Total** | **218.25M** | **25.8** | **30.5** | **27.3** | **3.2** | **4.12** | **(432,000)** | **(714,000)** | **253,000** | **1.78M** |

Source: CBRE Research, Q2 2025.

## Market Statistics by Submarket

Figure 6

| Submarket | Net Rentable Area (SF) | Total Vacancy (%) | Total Availability (%) | Direct Availability (%) | Sublease Availability (%) | Avg. Direct Asking Rate | Class A Asking Rent ($/SF FSG/mth) | Current Quarter Net Absorption (SF) | YTD Net Absorption (SF) | Deliveries (SF) | Under Construction (SF) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Downtown Los Angeles | 31.68M | 35.3 | 39.6 | 36.4 | 3.2 | 3.71 | 3.87 | (84,000) | (155,000) | 0 | 0 |
| East Downtown | 7.10M | 58.3 | 59.2 | 54.1 | 5.1 | 4.69 | 4.95 | 0 | 80,000 | 0 | 0 |
| Hollywood/Wilshire Corridor | 20.49M | 28.0 | 31.9 | 29.9 | 2.0 | 3.03 | 3.63 | (87,000) | (154,000) | 0 | 692,000 |
| Mid Counties | 4.91M | 9.7 | 14.5 | 13.8 | 0.7 | 2.82 | 2.39 | (14,000) | (30,000) | 0 | 0 |
| San Fernando Valley | [illegible] | 20.9 | 24.3 | 20.8 | 3.5 | 2.77 | 2.91 | (48,000) | (43,000) | 0 | 0 |
| San Gabriel Valley | 10.86M | 9.2 | 11.4 | 11.0 | 0.4 | 2.54 | 2.84 | (30,000) | (91,000) | 0 | 0 |
| South Bay | 33.35M | 24.0 | 28.7 | 25.5 | 3.2 | 3.30 | 3.59 | (165,000) | (125,000) | 0 | 76,000 |
| Tri Cities/Glendale | 28.82M | 26.5 | 30.9 | 28.1 | 2.8 | 3.83 | 3.97 | 47,000 | 119,000 | 0 | 0 |
| West Los Angeles | 58.77M | 23.0 | 29.6 | 25.3 | 4.0 | 5.68 | 5.88 | (51,000) | (316,000) | 253,000 | 1.02M |
| **Total** | **218.25M** | **25.8** | **30.5** | **27.3** | **3.2** | **4.12** | **4.38** | **(432,000)** | **(714,000)** | **253,000** | **1.78M** |

Source: CBRE Research, Q2 2025.


© 2025 CBRE, INC.

Snapshot | Greater Los Angeles Office | Q2 2026

# Quarterly Snapshot

## Submarket & District Breakdown

REPORT



Table: Key Market Statistics

| Market Area | Bldg. Count | NRA | Direct Vacant SF | Sublease Vacant SF | Overall Vacant SF | Direct Vacancy Rate | Overall Vacancy Rate | Overall Available SF | Overall Availability Rate | FSG Asking Rate (Class A) | FSG Asking Rate | Net Absorption | Net Absorption YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Arcadia/Monrovia | 21 | 1,485,147 | 206,029 | 14,161 | 220,190 | 13.9% | 14.8% | 289,151 | 19.5% | $3.65 | $3.21 | (7,959) | (19,190) |
| Burbank | 73 | 8,976,487 | 2,416,327 | 308,736 | 2,725,063 | 26.9% | 30.4% | 3,017,436 | 33.8% | $4.45 | $4.34 | (33,778) | 195,678 |
| Glendale | 54 | 6,748,092 | 1,892,647 | 63,519 | 1,956,166 | 28.0% | 29.0% | 2,500,353 | 37.1% | $3.40 | $3.42 | 15,877 | (90,254) |
| North Hollywood | 11 | 1,267,803 | 339,328 | 117,713 | 457,041 | 26.8% | 36.0% | 487,442 | 38.4% | $3.81 | $3.60 | (6,105) | (31,861) |
| Pasadena | 70 | 8,851,089 | 1,867,556 | 107,207 | 1,974,763 | 21.1% | 22.3% | 2,279,884 | 25.8% | $4.07 | $3.82 | 88,990 | 98,477 |
| Studio City | 6 | 324,401 | 81,669 | 0 | 81,669 | 25.2% | [illegible] | 87,203 | 26.9% | $4.27 | $3.93 | 1,987 | 144 |
| Universal City | 5 | 1,166,572 | 211,714 | 0 | 211,714 | 18.1% | 18.1% | 217,622 | 18.7% | $3.13 | $3.03 | (11,519) | (34,218) |
| **TRI-CITIES** | **240** | **28,819,591** | **7,015,270** | **611,336** | **7,626,606** | **24.3%** | **26.5%** | **8,899,151** | **30.9%** | **$3.97** | **$3.83** | **47,493** | **118,776** |
| Bunker Hill | 11 | 6,961,751 | 2,317,834 | 52,335 | 2,370,169 | 33.3% | 34.0% | 2,660,398 | 38.3% | $4.13 | $4.03 | 38,871 | 15,177 |
| City West | 5 | 1,636,113 | 247,567 | 222,005 | 469,572 | 15.1% | 28.7% | 469,572 | 28.7% | $2.74 | $2.87 | (5,824) | (5,824) |
| Financial | 28 | 18,699,415 | 6,408,665 | 325,688 | 6,734,353 | [illegible] | 36.0% | 7,651,002 | 40.9% | $3.82 | $3.70 | (139,865) | (103,803) |
| South Park | 15 | 4,378,431 | 1,496,442 | 107,152 | 1,603,594 | 34.2% | 36.6% | 1,747,613 | 39.9% | $3.71 | $3.39 | 23,254 | (60,556) |
| **DOWNTOWN LOS ANGELES** | **69** | **31,675,710** | **10,470,508** | **707,180** | **11,177,688** | **33.1%** | **35.3%** | **12,534,585** | **39.6%** | **$3.87** | **$3.71** | **(83,564)** | **(155,006)** |
| Arts District | 24 | 2,082,737 | 1,062,102 | 152,482 | 1,214,584 | 51.0% | [illegible] | 1,250,394 | 60.0% | $5.26 | $5.17 | (15,892) | (1,238) |
| Fashion District | 6 | 1,977,890 | 1,130,595 | 163,955 | 1,294,550 | 57.2% | [illegible] | 1,302,973 | 65.9% | $5.25 | $4.76 | 127 | (2,770) |
| Historic Core | 12 | 2,646,200 | 1,554,655 | 0 | 1,554,655 | 58.8% | 58.8% | 1,567,474 | 59.2% | $4.55 | $4.39 | 15,751 | 78,132 |
| Little Tokyo | 6 | 397,085 | 66,460 | 10,156 | 76,616 | 16.7% | 19.3% | 82,056 | 20.7% | $3.29 | $3.18 | 0 | 5,769 |
| **EAST DOWNTOWN** | **48** | **7,103,912** | **3,813,812** | **326,593** | **4,140,405** | **53.7%** | **58.3%** | **4,202,897** | **59.2%** | **$4.95** | **$4.69** | **(14)** | **79,893** |
| Hollywood | 69 | 6,442,994 | 1,598,998 | 137,883 | 1,736,881 | 24.8% | 27.0% | 2,011,060 | 31.2% | $4.84 | [illegible] | (86,939) | (72,248) |
| Mid Wilshire | 41 | 8,094,918 | 2,036,491 | 23,632 | 2,060,123 | [illegible] | 25.4% | 2,397,140 | 29.6% | $2.64 | $2.64 | 17,854 | 34,652 |
| Miracle Mile | 20 | 4,353,612 | 1,415,881 | 84,154 | 1,500,035 | 32.5% | 34.5% | 1,658,558 | 38.1% | $4.53 | $4.47 | (15,326) | (99,655) |
| Park Mile | 16 | 1,601,798 | 423,231 | 10,121 | 433,352 | 26.4% | 27.1% | 479,555 | 29.9% | $3.06 | $2.94 | (2,550) | (16,439) |
| **HOLLYWOOD/WILSHIRE CORRIDOR** | **146** | **20,493,322** | **5,474,601** | **255,790** | **5,730,391** | **26.7%** | **28.0%** | **6,546,313** | **31.9%** | **$3.63** | **$3.63** | **(86,961)** | **(153,690)** |

 © 2026 CBRE, INC

Table: Key Market Statistics

| Market Area | Bldg. Count | NRA | Direct Vacant SF | Sublease Vacant SF | Overall Vacant SF | Direct Vacancy Rate | Overall Vacancy Rate | Overall Available SF | Overall Availability Rate | FSG Asking Rate (Class A) | FSG Asking Rate | Net Absorption | Net Absorption YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Canoga Park | 4 | 158,704 | 12,684 | 0 | 12,684 | 8.0% | 8.0% | 16,816 | 10.6% | $0.00 | $1.75 | 4,664 | 4,664 |
| Chatsworth | 13 | 1,122,068 | 66,640 | 0 | 66,640 | 5.9% | 5.9% | 89,582 | 8.0% | $0.00 | $2.44 | 3,760 | 72,059 |
| Encino | 32 | 3,507,307 | 650,460 | 18,779 | 669,239 | 18.5% | 19.1% | 761,945 | 21.7% | $2.75 | $2.75 | (18,106) | 5,453 |
| Mission Hills | 4 | 158,730 | 12,441 | 0 | 12,441 | 7.8% | 7.8% | 16,316 | 10.3% | $2.75 | $2.75 | 2,877 | 5,679 |
| Northridge | 3 | 336,989 | 28,492 | 0 | 28,492 | 8.5% | 8.5% | 28,492 | 8.5% | $2.65 | $2.65 | 0 | 0 |
| Palmdale | 6 | 368,616 | 17,462 | 0 | 17,462 | 4.7% | 4.7% | 18,652 | 5.1% | $0.00 | $1.78 | 320 | (454) |
| Panorama City | 2 | 152,444 | 2,558 | 0 | 2,558 | 1.7% | 1.7% | 2,558 | 1.7% | $3.00 | $3.00 | 0 | 0 |
| Sherman Oaks | 26 | 2,743,750 | 604,076 | 48,754 | 652,830 | 22.0% | 23.8% | 691,136 | 25.2% | $3.82 | $3.48 | (43,134) | (68,864) |
| Tarzana | 14 | 713,769 | 175,886 | 2,259 | 178,145 | 24.[illegible]% | 25.0% | 182,576 | 25.6% | $2.25 | $2.70 | 27,463 | 26,606 |
| Valencia | 40 | 2,827,327 | 614,459 | 5,891 | 620,350 | 21.7% | 21.9% | 753,730 | 26.7% | $2.99 | $2.89 | 29,559 | (12,363) |
| Van Nuys | 29 | 1,641,865 | 283,318 | 400 | 283,718 | 17.[illegible]% | 17.3% | 367,750 | 22.4% | $2.98 | $2.65 | (12,089) | 1,654 |
| West Hills | 9 | 944,217 | 93,758 | 61,642 | 155,400 | 9.9% | 16.5% | 246,297 | 26.1% | $2.58 | $2.56 | (1,636) | (21,932) |
| Woodland Hills | 58 | 7,589,341 | 1,626,177 | 328,264 | 1,954,441 | 21.4% | 25.8% | 2,240,112 | 29.5% | $2.71 | $2.61 | (41,332) | (55,280) |
| **SAN FERNANDO VALLEY** | **240** | **22,265,127** | **4,188,411** | **465,989** | **4,654,400** | **18.8%** | **20.9%** | **5,415,962** | **24.3%** | **$2.91** | **$2.77** | **(47,648)** | **(42,778)** |
| 210 Corridor | 25 | 2,048,093 | 222,402 | 9,540 | 231,942 | 10.9% | 11.3% | 325,343 | 15.9% | $2.75 | $2.54 | 2,491 | (9,369) |
| Alhambra | 26 | 1,284,319 | 54,623 | 0 | 54,623 | 4.3% | 4.3% | 57,185 | 4.5% | $2.27 | $2.49 | (7,561) | (10,977) |
| City of Industry | 20 | 1,422,474 | 58,942 | 8,853 | 67,795 | 4.1% | 4.8% | 86,751 | 6.1% | $2.38 | $2.39 | (7,679) | (8,384) |
| Covina | 6 | 299,351 | 32,043 | 0 | 32,043 | 10.7% | 10.7% | 52,658 | 17.6% | $2.35 | $2.20 | (9,998) | (9,998) |
| Diamond Bar | 22 | 1,295,827 | 95,335 | 6,435 | 101,770 | 7.4% | 7.9% | 158,450 | 12.2% | $3.20 | $2.71 | (2,995) | (17,089) |
| El Monte | 21 | 1,289,493 | 78,725 | 0 | 78,725 | 6.1% | 6.1% | 116,813 | 9.1% | $3.05 | $2.11 | (4,051) | (11,733) |
| Monterey Park | 12 | 919,393 | 228,999 | 3,395 | 232,394 | 24.9% | 25.[illegible]% | 235,195 | 25.6% | $3.17 | $2.90 | (5,253) | 3,082 |
| Pomona | 19 | 1,376,198 | 107,444 | 0 | 107,444 | 7.8% | 7.8% | 110,579 | 8.0% | $2.05 | $2.38 | 7,700 | (23,699) |
| South El Monte | 2 | 74,241 | 0 | 0 | 0 | 0.0% | 0.0% | 986 | 1.3% | $0.00 | $2.25 | 0 | 0 |



© 2026 CBRE, INC.

Table: Key Market Statistics

| Market Area | Bldg. Count | NRA | Direct Vacant SF | Sublease Vacant SF | Overall Vacant SF | Direct Vacancy Rate | Overall Vacancy Rate | Overall Available SF | Overall Availability Rate | FSG Asking Rate (Class A) | FSG Asking Rate | Net Absorption | Net Absorption YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| West Covina | 13 | 848,323 | 80,493 | 9,592 | 90,085 | 9.5% | 10.6% | 95,773 | 11.3% | $2.70 | $2.30 | (2,937) | (2,937) |
| **SAN GABRIEL VALLEY** | **166** | **10,867,712** | **959,006** | **37,815** | **996,821** | **8.8%** | **9.2%** | **1,239,733** | **11.4%** | **$2.84** | **$2.54** | **(30,283)** | **(91,104)** |
| Artesia | 1 | 82,516 | 27,140 | 0 | 27,140 | 32.9% | 32.9% | 27,140 | 32.9% | $2.45 | $2.45 | 3,212 | 5,978 |
| Cerritos | 16 | 1,522,770 | 223,055 | 9,160 | 232,215 | 14.6% | 15.2% | 432,924 | 28.4% | $3.01 | $3.17 | 885 | 7,003 |
| Downey | 7 | 398,362 | 34,933 | 0 | 34,933 | 8.8% | 8.8% | 38,906 | 9.8% | $0.00 | $2.82 | (14,836) | (10,230) |
| La Mirada | 2 | 145,531 | 12,674 | 0 | 12,674 | 8.7% | 8.7% | 14,472 | 9.9% | $0.00 | $2.64 | (3,584) | (3,688) |
| Lakewood | 5 | 218,930 | 19,080 | 0 | 19,080 | 8.7% | 8.7% | 25,692 | 11.7% | $0.00 | $2.48 | 0 | (3,085) |
| Norwalk | 5 | 715,631 | 19,057 | 0 | 19,057 | 2.7% | 2.7% | 29,645 | 4.1% | $2.63 | $2.09 | 1,278 | 4,647 |
| City of Commerce | 15 | 1,000,124 | 68,876 | 4,727 | 73,603 | 6.9% | 7.4% | 79,496 | 7.9% | $2.83 | $2.73 | (4,500) | (31,068) |
| Santa Fe Springs | 7 | 424,454 | 38,049 | 0 | 38,049 | 9.0% | 9.0% | 38,049 | 9.0% | $0.00 | $1.81 | 1,665 | 290 |
| Whittier | 7 | 406,204 | 20,211 | 0 | 20,211 | 5.0% | 5.0% | 27,840 | 6.9% | $3.50 | $3.06 | 1,802 | 226 |
| **MID-COUNTIES** | **65** | **4,914,522** | **463,075** | **13,887** | **476,962** | **9.4%** | **9.7%** | **714,164** | **14.5%** | **$2.89** | **$2.82** | **(14,078)** | **(29,927)** |
| 190th Corridor | 35 | 2,953,357 | 293,028 | 22,016 | 315,044 | 9.9% | 10.7% | 411,171 | 13.9% | $3.28 | $3.01 | 14,988 | 12,825 |
| Beach Cities | 14 | 1,147,854 | 154,424 | 0 | 154,424 | 13.5% | 13.5% | 185,024 | 16.1% | $3.50 | $3.64 | (852) | 27,938 |
| Downtown Long Beach | 24 | 4,157,302 | 1,070,866 | 216,254 | 1,287,120 | 25.8% | 31.0% | 1,375,812 | 33.1% | $2.97 | $2.72 | (54,394) | (82,446) |
| El Segundo | 83 | 11,673,251 | 2,637,574 | 309,453 | 2,947,027 | 22.6% | 25.2% | 3,578,282 | 30.7% | $4.13 | $4.14 | 17,241 | 171,590 |
| Inglewood | 5 | 754,125 | 161,887 | 0 | 161,887 | 21.5% | 21.5% | 245,153 | 32.5% | $5.50 | $4.37 | 0 | 0 |
| Joint Geographic Location | 13 | 1,058,582 | 128,631 | 0 | 128,631 | 12.2% | 12.2% | 131,946 | 12.5% | $2.53 | $2.47 | (16,849) | (52,995) |
| LAX | 12 | 2,997,314 | 1,333,456 | 12,846 | 1,346,302 | 44.5% | 44.9% | 1,380,940 | 46.1% | $2.58 | $2.32 | (45,123) | (55,135) |
| Suburban Long Beach | 51 | 4,351,344 | 929,778 | 95,330 | 1,025,108 | 21.4% | 23.6% | 1,250,698 | 28.7% | $3.01 | $2.85 | (78,470) | (125,128) |
| Palos Verdes | 7 | 261,148 | 14,673 | 0 | 14,673 | 5.6% | 5.6% | 19,189 | 7.3% | $0.00 | $2.54 | (200) | (1,682) |
| Torrance | 67 | 3,997,896 | 515,405 | 112,287 | 627,692 | 12.9% | 15.7% | 994,214 | 24.9% | $3.46 | $2.84 | (1,817) | (19,646) |
| **SOUTH BAY** | **311** | **33,362,173** | **7,239,722** | **768,186** | **8,007,908** | **21.7%** | **24.0%** | **9,572,429** | **28.7%** | **$3.59** | **$3.30** | **(165,476)** | **(124,879)** |



© 2026 CBRE, INC

Table: Key Market Statistics

| Market Area | Bldg. Count | NRA | Direct Vacant SF | Sublease Vacant SF | Overall Vacant SF | Direct Vacancy Rate | Overall Vacancy Rate | Overall Available SF | Overall Availability Rate | FSG Asking Rate (Class A) | FSG Asking Rate | Net Absorption | Net Absorption YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beverly Hills | 36 | 3,337,400 | 633,959 | 35,894 | 669,853 | 19.0% | 20.1% | 815,831 | 24.4% | $5.28 | $5.08 | (11,784) | (41,713) |
| Beverly Hills Triangle | 31 | 3,284,408 | 471,726 | 57,285 | 529,011 | 14.4% | 16.1% | 704,760 | 21.5% | $8.41 | $8.30 | (5,280) | 32,491 |
| Brentwood | 20 | 3,414,709 | 700,579 | 66,820 | 767,399 | 20.5% | 22.5% | 849,248 | 24.9% | $4.77 | $4.45 | (3,920) | 85 |
| Century City | 18 | 10,601,289 | 1,083,404 | 182,705 | 1,266,109 | 10.2% | 11.3% | 2,462,711 | 23.2% | $7.48 | $7.48 | 93,574 | (2,083) |
| Culver City | 59 | 4,643,237 | 1,363,446 | 50,690 | 1,414,136 | 29.4% | 30.5% | 1,684,835 | 36.3% | $6.66 | $6.07 | (146,324) | (181,773) |
| Fox Hills | 45 | 3,123,443 | 811,431 | 140,420 | 951,851 | 26.0% | 30.5% | 1,072,155 | 34.3% | $3.58 | $3.51 | 33,344 | 17,023 |
| Marina Del Rey | 26 | 2,122,342 | 554,224 | 121,200 | 675,424 | 26.1% | 31.8% | 720,259 | 33.9% | $5.65 | $5.10 | 6,389 | (74,921) |
| Olympic Corridor | 28 | 3,537,212 | 909,015 | 33,995 | 943,010 | 25.7% | 26.7% | 1,159,786 | 32.8% | $5.34 | $5.23 | (7,218) | 81,041 |
| Playa Vista | 49 | 6,374,733 | 1,500,138 | 170,616 | 1,670,754 | 23.5% | 26.2% | 2,061,692 | 32.3% | $5.44 | $5.33 | 94,739 | 45,837 |
| Santa Monica | 98 | 9,990,018 | 2,229,004 | 428,625 | 2,657,629 | 22.3% | 26.6% | 3,525,168 | 35.3% | $5.99 | $5.87 | (197,376) | (270,032) |
| West Hollywood | 21 | 2,446,288 | 334,841 | 103,620 | 438,461 | 13.7% | 17.9% | 587,883 | 24.0% | $5.07 | $5.09 | 66,123 | 43,657 |
| West LA | 11 | 910,735 | 428,950 | 25,055 | 454,005 | 47.1% | 49.9% | 462,957 | 50.8% | $5.38 | $5.11 | 13,375 | 37,733 |
| Westwood | 28 | 4,984,936 | 980,011 | 74,530 | 1,054,541 | 19.7% | 21.2% | 1,273,616 | 25.5% | $4.72 | $4.65 | 13,283 | (2,986) |
| **WEST LOS ANGELES** | **470** | **58,770,750** | **12,000,728** | **1,491,455** | **13,492,183** | **20.4%** | **23.0%** | **17,380,901** | **29.6%** | **$5.88** | **$5.68** | **(51,075)** | **(315,641)** |
| **LOS ANGELES TOTALS** | **1,755** | **218,252,819** | **51,625,133** | **4,678,231** | **56,303,364** | **23.7%** | **25.8%** | **66,506,135** | **30.5%** | **$4.38** | **$4.12** | **(431,606)** | **(714,156)** |

 © 2026 CBRE, INC

## Submarket Map




Source: CBRE Research Q4 2025 Location Intelligence

## Definitions

Available Sq. Ft.: Space in a building, ready for occupancy, can be occupied or vacant. Average Asking Lease Rate: A calculated average that includes net and gross lease rate, weighted by their corresponding available square footage. Building Area: The total floor area sq. ft. of the building, typically taken at the "drip line" of the building. Full Service Gross (FSG) Rate: The landlord assumes responsibility for all the operating expenses and taxes for the property. Gross Activity: All lease transactions completed within a specified time period. Net Absorption: The change in Occupied Sq. Ft. from one period to the next. Positive absorption is reflected when a lease is signed, which may not coincide with the date of occupancy. Rentable Area: The Building Area minus the elevator core, flues, pipe shafts, vertical ducts, balconies and stairwell areas. Vacant Sq. Ft.: Space that is not occupied.

## Survey Criteria

Includes all Class A and B office buildings 30,000 sq. ft. and greater in size in Los Angeles County. Owner-user buildings are not included in the survey. This survey excludes medical office buildings. Buildings which have begun construction as evidenced by site excavation or foundation work.

## Contacts


Sr. Field Research Analyst

Sr. Field Research Analyst

David Cannon
Sr. Field Research Analyst
+1 818 502 6700

Rachel Stein
Field Research Analyst
+1 818 502 6700

Wheeler Smith
Field Research Analyst
+1 213 613 3333
wheeler.smith@cbre.com

Michael Maloney
Field Research Analyst

Alex Hall
Field Research Manager

Rick Cozart
Field Research Manager
+1 909 418 2000

Taylor Coyne
Research Director
taylor.coyne@cbre.com


© Copyright 2026 All rights reserved. Information contained herein, including projections, has been obtained from sources believed to be reliable, but has not been verified for accuracy or completeness. CBRE, Inc. makes no guarantee, warranty or representation about it. Any reliance on such information is solely at your own risk. This information is exclusively for use by CBRE clients and professionals and may not be reproduced without the prior written permission of CBRE's Global Chief Economist.

CBRE

## Conclusion

Per CBRE research, the subject's Pasadena office submarket market has an overall availability rate of 25.8 percent. CoStar statistics show Pasadena's current office vacancy at 13.1 percent and a somewhat more robust, increasing market. The rent comparables, which are found later in this report, range from 0.0 to 100.0 percent vacant, and average 17.1 percent vacant.

However, single-tenant office buildings like the subject tend to have lower vacancy levels. The subject is currently 0.0 percent vacant, i.e., it is 100.0 percent leased to one tenant for a ten-year, eight-month lease.

# Highest and Best Use

In appraisal practice, the concept of highest and best use represents the premise upon which value is based. The four criteria the highest and best use must meet are:

- legally permissible;
- physically possible;
- financially feasible; and
- maximally productive.

The highest and best use analysis of the subject is discussed below.

## As Vacant

The property is zoned for a variety of residential uses. Offices are allowed with a conditional use permit (CUP). The site is of sufficient size to accommodate various types of development. The immediate area includes mostly residential land uses. Considering the surrounding land uses, location attributes, legal restrictions and other factors, it is our opinion that a multifamily oriented development to maximum density limits would be reasonable and appropriate. However, we note that the subject is a designated Pasadena landmark, and there are various easements throughout the subject site of indeterminate locations. This would make the actual development of multifamily difficult if not impossible. But our "as if vacant" discussion ignores these conditions and only focuses on the land. Therefore, it is our opinion that the highest and best use would be for multifamily use, time and circumstances warranting, and if the easements could be moved, extinguished, or developed around.

## As Improved

The subject is improved with a building that has been converted from a single-family residence to office use and is leased as an office property. The use is legally permissible and physically possible. The improvements contribute value to the property and based on our analysis, the use is financially feasible and is the maximally productive use. (Due to the fact that there is a ten-year, eight-month lease in place, and the fact that the property has been converted to office use, the subject property would not be of interest a potential buyer to convert back to use as a home.)

Therefore, it is our opinion that the highest and best use of the subject, as improved, is for continued use as-is.

# Sales Comparison Approach

The following map and table summarize the comparable data used in the valuation of the subject.

We first value the subject as if it is in average condition with no deferred maintenance, and we exclude the Rose Parade income. Later in the report, we address these issues.



| SUMMARY OF COMPARABLE SALES | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Transaction | | Year | Bldg Area | Sale | Price | | |
| No. | Property Address | Type | Date | Built | (SF) | Price | Per SF | Land SF | OAR |
| 1 | 234 North El Molino Avenue, Pasadena | Sale | Feb-26 | 1982 | 5,012 | $2,500,000 | $499 | 10,450 | N/A |
| 2 | 1191 East Walnut Street, Pasadena | Sale | Mar-26 | 1955 | 2,160 | $1,050,000 | $486 | 5,550 | 5.89% |
| 3 | 463 Martelo Avenue, Pasadena | Sale | Dec-25 | 1946 | 3,600 | $1,600,000 | $444 | 10,140 | N/A |
| 4 | 1600 Huntington Drive, South Pasadena | Sale | Nov-25 | 1981 | 18,517 | $7,250,000 | $392 | 37,150 | N/A |
| 5 | 224 North Fair Oaks Avenue, Pasadena | Sale | Aug-24 | 1985 | 18,665 | $8,175,000 | $438 | 14,610 | N/A |
| Subject | 210 South Orange Grove Boulevard, Pasadena | --- | --- | 1925 | 7,315 | --- | --- | 30,029 | --- |

Compiled by CBRE

## Discussion

### Sale One

This is the February 2026 sale of a 5,012-square-foot, two-story office building located at 234 North El Molino Avenue in Pasadena. It is on the east side of El Molino just north of East Walnut Street. It was built in 1982. The sale price was $2,500,000 or $499 per square foot.

### Sale Two

This is the March 2026 sale of a 2,160-square-foot office building (former single-family residence and associated structures) located at 1191 East Walnut Street in Pasadena. The property sold for $1,050,000 or $486 per square foot. The building had been fully renovated in 2022 and was well maintained.

### Sale Three

This is the December 2025 sale of a 3,600-square-foot building located at 463 Martelo Avenue at the southwest corner of Villa Street in Pasadena north of the Foothill (210) Freeway. The property was built in 1946 and could be used as an open office plan building or a single-tenant organization hall facility. The property was sold for $1,600,000 or $444 per square foot.

### Sale Four

This is the November 2025 sale of an office building located at 1600 Huntington Drive in South Pasadena. The improvements consist of a two-story office building that was built in 1981. The building is 18,517 square feet and is located on the northeast corner of Huntington Drive and Fair Oaks Avenue. The property was listed for sale as an owner-user or investment property. The property was vacant and listed for about 14 months at $9,780,000 and finally sold for a significantly lower price, $7,250,000, or $392 per square foot to a law firm, due to the motivated seller.

### Sale Five

This is the August 2024 sale of a three-story office building located on the northeast corner of Fair Oaks Avenue and Walnut Street in Pasadena. The listing broker indicated that the property was purchased by an owner-user. He indicated the third floor was vacant at the time of sale. The broker said the first floor and second floor are leased to two different tenants and the property was 46 percent occupied at the time of sale. The sale price was $8,175,000, or $438 per square foot.

## Summary of Adjustments

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

**SALES ADJUSTMENT GRID**

| Comparable Number | 1 | 2 | 3 | 4 | 5 | Subject |
|---|---|---|---|---|---|---|
| Transaction Type | Sale | Sale | Sale | Sale | Sale | --- |
| Transaction Date | Feb-26 | Mar-26 | Dec-25 | Nov-25 | Aug-24 | --- |
| Year Built | 1982 | 1955 | 1946 | 1981 | 1985 | 1925 |
| Bldg Area (SF) | 5,012 | 2,160 | 3,600 | 18,517 | 18,665 | 7,315 |
| Sale Price | $2,500,000 | $1,050,000 | $1,600,000 | $7,250,000 | $8,175,000 | --- |
| Price Per SF | $499 | $486 | $444 | $392 | $438 | --- |
| Land SF | 10,450 | 5,550 | 10,140 | 37,150 | 14,610 | 30,029 |
| OAR | N/A | 5.89% | N/A | N/A | N/A | --- |
| Price Per SF | $499 | $486 | $444 | $392 | $438 | |
| Property Rights Conveyed | 0 | 0 | 0 | 0 | 0 | |
| Financing Terms | 0 | 0 | 0 | 0 | 0 | |
| Conditions of Sale | 0 | 0 | 0 | Inferior<br>Motivated seller of a vacant property | 0 | |
| Market Conditions (Time) | 0 | 0 | 0 | 0 | 0 | |
| Location | 0 | 0 | Sl. Inferior | 0 | 0 | |
| Size | Superior<br>Smaller square footage | Superior<br>Smaller square footage | Superior<br>Smaller square footage | Inferior<br>Larger square footage | Inferior<br>Larger square footage | |
| Age/Condition | 0 | Sl. Superior<br>Fully renovated 2022 | Inferior<br>Inferior condition | 0 | 0 | |
| Other | 0 | Sl. Inferior<br>Square footage is spread across three structures | Inferior<br>While could be used as open office plan, the layout/appeal is inferior | 0 | 0 | |
| **Overall Adjustment** | **Superior** | **Superior** | **Inferior** | **Inferior** | **Inferior** | |

Compiled by CBRE

## Conclusion

As shown above, we would expect the subject to be below Sales One and Two, so below $486 per square foot. We would also expect the subject to be above Sales Three through Five, so above $444 per square foot.

The following chart presents the valuation conclusion:

**SALES COMPARISON APPROACH**

| Square Footage | X | Value Per SF | = | Value |
|---|---|---|---|---|
| 7,315 | X | $475 | = | $3,474,625 |

| | |
|---|---|
| Value | $3,474,625 |
| Less: Lost Rent | ($219,450) |
| Value | $3,255,175 |
| **Rounded** | **$3,260,000** |
| **Value Per SF** | **$446** |

Compiled by CBRE

The lost rent charted above is discussed in the income capitalization approach section of the report.

## Additional Data Point

In addition to the comparables analyzed above, we are aware of an additional data point, which is discussed in the following paragraphs. While we did not use it as a comparable sale as it is not a closed transaction and is being marketed as both an office property and a multifamily development site, it is provided for general informational purposes.

This is the current listing of a two-story office building located at 115 North El Molino Avenue in Pasadena. It is 9,350 square feet and is listed for sale at an asking price of $4,670,000, or approximately $499 per square foot. The building has two stories and is built out as a single-tenant professional office with low pile carpet, drop tile ceiling, and traditional professional office layout with perimeter private offices. The property is also being listed as a potential multifamily development site.

While this is a not comparable per se, it has been provided for general informational purposes.

# Income Capitalization Approach

We first value the subject as if it is in average condition with no deferred maintenance, and we exclude the Rose Parade income. Later in the report, we address these issues.

## Subject Rent Roll

The subject's single-tenant lease is summarized below.

| LEASE ABSTRACT | | |
|---|---|---|
| Lessor | | SDRES Partners, LLC |
| Lessee | | Clear Mind Full Heart |
| Building Size (NRA SF) | | 7,315 |
| Lease Commence Date | | See text for details |
| Lease Term (Base Lease) | | 10 years, 8 months |
| Remaining Lease Term (Base Lease) | | 128 months |
| No. & Term of Options | | 2 options @ 5 years each |
| Contract Rental Rate | $/SF/Yr. | Total $/Yr. |
| Months 1 - 8 | $0.00 | $0.00 |
| Months 9 - 20 | $36.00 | $263,340.00 |
| Months 21 - 32 | $37.08 | $271,240.20 |
| Months 33 - 44 | $38.19 | $279,377.40 |
| Months 45 - 56 | $39.34 | $287,758.68 |
| Months 57 - 68 | $40.52 | $296,391.48 |
| Months 69 - 80 | $41.73 | $305,283.24 |
| Months 81 - 92 | $42.99 | $314,441.76 |
| Months 93 - 104 | $44.28 | $323,874.96 |
| Months 105 - 116 | $45.60 | $333,591.24 |
| Months 117 - Expiration | $46.97 | $343,599.00 |
| Escalations | | 3.0%/year |
| Lessor Expenses | | Structural components; outdoor water feature & landscaping; HOA fees |
| Lessee Expenses | | All utilities and R&M (except water feature & landscaping); increase over base year property taxes and insurance. No reimbursements due in Year 1. |
| Lessor Work Obligation | | Lessor to complete work prior to lease commencement. See lease for details. |
| % Rent Clause: | | None |

Source: Lease

As discussed below, the lease will technically commence on or about October 4, 2026. Per our discussion with the Receiver, Byron Moldo, he indicates the last of the work was done on (or billed by the tenant) on June 6, 2026. He indicates that 120 days from this date will be the date of the lease commencement.

Per the terms of page one (Paragraph 4) of the first amendment of the lease, it indicates that the ten-year, eight-month lease commences "upon the date that is one hundred twenty (120) days following the date the Lessor delivers the Premises to the Lessee in the condition required under Paragraph 51

("Commencement Date")…." We assume this means that, since the Receiver indicates the Lessor's Work was done on June 6, 2026, the lease commences 120 days later, or on October 4, 2026.

During these 120 days (i.e., roughly four months), it appears that the tenant does not have to pay rent because the lease has not technically commenced.

Additionally, in Paragraph 53 of the "Addendum to Lease" the text states: "Beginning on the Commencement Date, Rent is abated for the first 8 months of the Term." We assume this means the eight months from October 4, 2026 to June 4, 2027, the rent is abated. In other words, the tenant does not have to pay rent until June 4, 2027.

However, we are not attorneys and are not making a legal conclusion. We make no guarantee or warranty and reserve the right to amend our analysis should new information be provided.

We address this loss of rent later in direct capitalization summary later in this section of the report. We have also incorporated this lost rent in the sales comparison approach.

## Rent Comparables

The following map and table summarize the comparable rental data used in the valuation of the subject.



**SUMMARY OF COMPARABLE RENTALS**

| No. | Location | Year Built | Occ. | NRA (SF) | Tenant | Lease Area (SF) | Lease Date | Term (Yrs) | Rent/SF/Month | Reimbursements | Annual Escalations |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 390 East Walnut Street, Pasadena | 1920 | 100% | 3,659 | Office | 3,659 | Apr-26 | 5.0 Yrs. | $3.50 | Modified Gross | 3% |
| 2 | 918 East Green Street, Pasadena | 1935 | 100% | 18,465 | Office | 3,058 | Aug-25 | 5.0 Yrs. | $2.65 | Modified Gross | N/A |
| 3 | 33-37 East Union Street, Pasadena | 1908 | 100% | 19,125 | Office | 646 | Jan-25 | 3.0 Yrs. | $3.25 | Modified Gross | 3% |
| 4 | 766 East Colorado Boulevard, Pasadena | 1918 | 66% | 21,028 | Office | 3,210 | Feb-26 | 5.0 Yrs. | $3.50 | Modified Gross | CPI |
| 5 | 117 East Colorado Boulevard, Pasadena | 1906 | 87% | 85,906 | Office | 1,544 | May-24 | 5.0 Yrs. | $3.30 | Modified Gross | 3% |
| 6 | 151 North Madison Avenue Pasadena | 1928 | 0% | 8,451 | Office | 8,451 | Asking | Negot. | $2.85 | Modified Gross | CPI |
| Subj. | 210 South Orange Grove Boulevard, Pasadena | 1925 | 100% | 7,315 | Office | 7,315 | Current | 10.7 Yrs. | $3.00 PSF | Modified Gross | 3% |

Compiled by CBRE

## Discussion

While originally built as a mansion, the subject was converted to office use years ago and has been continuously operated as such for many years. The starting rent for the current tenant is $3.00 per square foot per month, modified gross.

Comparable One is at 390 East Walnut Street in Pasadena. This single tenant office building consists of 3,659 square feet which leased in April of 2026 with a starting rental rate of $3.50 per square foot per month, modified gross for a five-year lease with annual increases. The building is a freestanding office with wood siding and is located immediately next to the Westin and a surface parking lot near the Pasadena City Hall and Pasadena Courthouse.

Comparable Two is at 918 East Green Street in Pasadena. It is the August 2025 lease of 3,058 square feet of office space with a starting rental rate of $2.65 per square foot per month, modified gross, for a five-year lease.

Comparable Three is at 33-37 East Union Street in Pasadena. This comparable is on the north side of Union Street, east of Fair Oaks Avenue. It is the January 2025 lease of 646 square feet of office space with a starting rental rate of $3.25 per square foot per month, modified gross, for a three-year lease with annual increases.

Comparable Four is at 766 East Colorado Boulevard in Pasadena. In February 2026, a 3,210-square-foot office space leased at $3.50 per square foot per month, modified gross. The five-year lease term has annual CPI increases.

Rent Comparable Five is at 117 East Colorado Boulevard in Pasadena. It is the May 2024 lease of 1,544 square feet of office space with a starting rental rate of $3.30 per square foot per month, modified gross, for a five-year lease with annual increases.

Rent Comparable Six is at 151 North Madison Avenue in Pasadena. This was previously owner-occupied by Fuller Theology Seminary for their IT department and has been vacant for the past 24 months according to property representatives. The property is listed for lease with an asking rent of $2.85 per square foot, modified gross. During this time, an offer from a nearby property owner was received, who indicated wanting to purchase the property. The current status of negotiations (if any) is unknown.

The comparables bracket the subject in terms of quality, condition, location, and size. The subject would be expected to achieve a rate within this range. We have concluded to $3.00 per square foot per month, modified gross, for the subject property.

## Market Rent Conclusion / Potential Gross Rental Income

We conclude to $3.00 per square foot per month, modified gross (MG). The annual potential gross rental income is (7,315 rentable square feet x $3.00 x 12 months) $263,340.

## Vacancy/Collection Loss

Per CBRE research, the subject's Pasadena office submarket market has an overall availability rate of 25.8 percent. However, CoStar statistics show Pasadena's current office vacancy at 13.1 percent. The rent comparables range from 0.0 to 100.0 percent vacant, and average 17.1 percent vacant. However, single-tenant office buildings like the subject tend to have lower vacancy levels.

The subject is currently 0.0 percent vacant and has had solid occupancy over the years. We estimate the long-term vacancy/collection loss factor at 5.0 percent for this single-tenant property.

## Rose Parade Income

The subject generates yearly income from a license for grandstand seating for the Rose Parade. The agreement has a one-year term, with provisions for either party to terminate the agreement under certain circumstances and with adequate notice. We address this item later in Reconciliation section of this report.

## Expenses

Historic expenses for the subject property were not available. We provide expense comparables below.

**EXPENSE COMPARABLE**

| Comparable Number | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| Location | SoCal | SoCal | SoCal | SoCal | CoStar - Burbank / Glendale / Pasadena |
| Expense Year | 2025 | 2025 | 2024 | 2025 | 2025 |
| NRA (SF) | 12,500 | 6,832 | 8,459 | 8,197 | 1&2 Star Office |
| *Revenues* | $/SF | $/SF | $/SF | $/SF | $/SF |
| **Effective Gross Income** | **$25.58** | **$32.24** | **$30.72** | **$58.98** | |
| *Expenses* | | | | | |
| Real Estate Taxes | $2.31 | $4.02 | $4.33 | $6.00 | $3.96 |
| Property Insurance | $0.74 | $1.50 | $0.51 | $0.95 | $0.70 |
| Utilities | $1.08 | $1.00 | $1.95 | $0.00 | $2.75 |
| Repairs & Maintenance | $2.06 | $2.50 | $1.70 | $0.67 | $1.48 |
| Landscaping & Security | | | | | |
| Management Fee | $1.15 | $0.97 | $0.00 | $1.60 | |
| HOA | | | | | |
| **Total Operating Expenses** | **$7.34** | **$9.99** | **$8.49** | **$9.22** | **$8.89** |
| Operating Expenses Excluding Taxes | $5.03 | $5.97 | $4.16 | $3.22 | $4.93 |
| Operating Expense Ratio | 28.7% | 31.0% | 27.6% | 15.6% | N/A |
| Management Fee (% of EGI) | *4.5%* | *3.0%* | *0.0%* | *2.7%* | *N/A* |

Compiled by CBRE

Our direct capitalization analysis below uses the following expenses:

- Real Estate Taxes – Based on the 1.1484 percent effective tax rate figure from the Assessor

- Insurance – $9,654.61 ($1.32 per square foot per year) per document provided by property management
- Utilities – Tenant's responsibility
- Repairs/Maintenance – Tenant's responsibility except for landscaping and water feature maintenance
- Landscaping/Water Feature – $0.50 per square foot per year
- Management – 3.00% of effective gross income (EGI)
- HOA – $11,211.84 per year per document provided by Receiver's property manager
- Replacement Reserves – $0.10 per square foot per year

## Direct Capitalization

Direct capitalization is a method used to convert a single year's estimated stabilized net operating income into a value indication.

Only one sale in the sales in the sales comparison approach (Sale Two) indicated a capitalization rate. This is not surprising as smaller buildings like this often do not have a capitalization rate or the information is not disclosed. Therefore, we have also provided additional capitalization rate sales below.

**COMPARABLE CAPITALIZATION RATES**

| Sale | Sale Date | Sale Price $/SF | OAR |
|---|---|---|---|
| 2 | Mar-26 | $486 | 5.89% |
| *Add'l Cap Rate Data Points* | | | |
| A | Apr-26 | $401 | 3.81% |
| B | Jan-26 | $660 | 5.25% |
| C | Oct-24 | $896 | 3.95% |
| **Indicated OAR:** | | | **3.95%-5.89%** |

Compiled by CBRE

The capitalization rate data charted above shows an approximate range of four to six percent.

Comparable Sale Two has a higher cap rate as the property is laid out as three structures (a reconfigured house, an accessory office/dwelling unit, and office/storage unit) which increases the risk to the income stream.

Capitalization Rate Sale A is the April 2026 sale of a 1984-built, 15,458-square-foot office property located at 815 South Central Avenue in Glendale. The sale price was $5,800,000 and the cap rate was 3.81 percent for this multitenant property. The 25 tenants were on short-term leases, with the buyer planning on being a partial owner-user which drove the capitalization rate down.

Capitalization Rate Sale B is the January 2026 sale of a 1973-built, 12,426-square-foot medical office building located at 401 (aka 393) South Fair Oaks Avenue in Pasadena. The sale price was $8,200,000 and the capitalization rate was 5.25 percent. The lease on this single-tenant building reportedly is to expire in August 2026, thus increasing the cap rate somewhat.

Capitalization Rate Sale C is the October 2024 sale of a 1952-built, 1,562-square-foot office building located at 1369-1371 Foothill Boulevard in La Canada. The sale price was $1,400,000 and the capitalization rate was 3.95 percent. This is a small building (i.e., desirable for a potential owner-user) located in a desirable city, which is reflected in the cap rate.

The results of the *PwC Real Estate Investor Survey* are summarized in the following chart.

| OVERALL CAPITALIZATION RATES | | |
|---|---|---|
| Investment Type | OAR Range | Average |
| *PwC National Suburban Office Market* | | |
| 2Q, 2026 | 5.00% - 10.00% | 8.00% |
| Compiled by CBRE | | |

Overall, a capitalization rate within the range of the above-charted data points is reasonable. The PwC data is on a national basis and therefore its capitalization rate data is higher than a single-tenant property in Southern California.

While the subject has a single-tenant lease with over 10 years remaining, it is not a credit tenant that would attract institutional buyers. Conversely, it is an architecturally significant building located in a campus-like setting in a desirable part of Pasadena.

## Direct Capitalization Summary

A summary of the direct capitalization is illustrated in the following chart.

Note that we have addressed the lost rent in this chart. A hypothetical buyer of the subject would understand that it would receive no rent from the tenant until June 4, 2027, or about 10 months from our July 30, 2026 date of value.

## DIRECT CAPITALIZATION SUMMARY

| | | $/SF/Yr | Total |
|---|---|---|---|
| **Income** | | | |
| Potential Rental Income | | $36.00 | $263,340 |
| Vacancy | 4.00% | (1.44) | (10,534) |
| Credit Loss | 1.00% | (0.36) | (2,633) |
| **Subtotal** | | **$0.00** | **$0** |
| **Total Other Income** | | **$0.00** | **$0** |
| **Effective Gross Income** | | **$34.20** | **$250,173** |
| **Expenses** | | | |
| Real Estate Taxes | | $5.27 | 38,586 |
| Property Insurance | | 1.32 | 9,655 |
| Utilities | | 0.00 | 0 |
| Repairs & Maintenance | | 0.00 | 0 |
| Landscaping/Water Feature | | 0.50 | 3,658 |
| Management Fee | 3.00% | 1.03 | 7,505 |
| HOA | | 1.53 | 11,212 |
| Replacement Reserves | | 0.10 | 732 |
| **Total Operating Expenses** | | **$9.75** | **$71,347** |
| **Operating Expense Ratio** | | | 28.52% |
| **Net Operating Income** | | **$24.45** | **$178,826** |
| **OAR** | | ÷ | **5.00%** |
| Value | July 30, 2026 | | $3,576,527 |
| Less: Lost Rent | 10 mos x 7,315 SF x $3.00/SF/Mo | | ($219,450) |
| Value | | | $3,357,077 |
| **Rounded** | | | **$3,360,000** |
| **Value Per SF** | | | **$459** |

Compiled by CBRE

# Reconciliation of Value

The value indications from the approaches to value are summarized below. These value estimates exclude the Rose Parade income and other costs/deductions to the property. Those are addressed later in this section of the report.

**SUMMARY OF VALUE CONCLUSIONS**

| Appraisal Premise | Date of Value | Sales Comparison Approach | Income Capitalization Approach | Reconciled Value |
|---|---|---|---|---|
| Current Value, But Doesn't Address Other Items | July 30, 2026 | $3,260,000 | $3,360,000 | $3,360,000 |

Compiled by CBRE

In valuing the subject, the Income Approach is considered most reliable and is given primary emphasis given its appeal to the investment community, with secondary emphasis placed on the Sales Comparison Approach.

Below, we address the above-mentioned items to arrive at an "as is" value estimate.

## Rose Parade Income

The subject generates yearly income from a license for grandstand seating for the Rose Parade. The agreement has a one-year term, with provisions for either party to terminate the agreement under certain circumstances and with adequate notice. The 2026 agreement provided to us indicates $130,000 license income to the owner of the subject property.

We note that while the license is for one year, this license has been renewed for over 20 years. We also assume that the subject property owner has the ability to license this area since the subject property is part of a Homeowners Owners Association (HOA, sometimes called a Property Owners Association (POA)). Finally, we note that the license agreement, which was signed by both an authorized agent of SDRES (the subject property owner) and the seating company, does not indicate the subject property address and does not have a legal description or map. We assume this information is correct and reserve the right to amend our analysis should new information be provided.

Based on the long-standing nature of this income stream, and the fact that the Rose Parade will almost certainly continue into the foreseeable future, we have capitalized this annual income at the same 5.00 percent capitalization rate as used in the income capitalization approach. While the subject's Rose Parade income, with a perpetually renewing one-year contract could be considered to place upward pressure on the capitalization rate, the Rose Parade income has been very stable over 20+ years, which indicates that no upward pressure on the capitalization rate should be given.

To this capitalization rate, we add the 1.1484 percent real property tax rate as the property value to a buyer, and as taxed by the assessor, would take this into account. Therefore, the additional value from this income stream is: $130,000 ÷ 0.061484 = $2,114,371.

## Other Deductions

The subject property has several items which must be addressed. They are listed below and deducted from our initial value conclusion to arrive at an "as is" value.

| | |
|---|---|
| Delinquent Real Estate Taxes: | $295,200.55 |
| Roofing: | $ 57,760.00 |
| Exterior Painting: | $ 30,000.00 |
| Delinquent HOA: | $ 7,987.05 |
| Tree Trimming: | $ 5,428.00 |
| Total: | $396,375.60 |

We have been provided these costs from the client or its representatives and assume they are correct. Note that there may be some items which have already been paid for or are in the process of being paid for/reimbursed as of when we inspected the subject. We have not included these items as a hypothetical buyer of the subject property would not incur these costs. There may also be other items that we are not aware of. We reserve the right to amend our analysis should new information be provided.

## Market Value "As Is"

Taking into account all of the above-cited items, the subject's "as is" value is:

$3,360,000 + $2,114,371 – $396,375.60 = $5,077,995.40, rounded to **$5,080,000**.

Based on the foregoing, the market value of the subject has been concluded as follows:

**MARKET VALUE CONCLUSION**

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| As Is | Leased Fee Interest | July 30, 2026 | $5,080,000 |

Compiled by CBRE

# Assumptions and Limiting Conditions

CBRE, Inc. through its appraiser (collectively, "CBRE") has inspected through reasonable observation the subject property. However, it is not possible or reasonably practicable to personally inspect conditions beneath the soil and the entire interior and exterior of the improvements on the subject property. Therefore, no representation is made as to such matters.

1. The report, including its conclusions and any portion of such report (the "Report"), is as of the date set forth in the letter of transmittal and based upon the information, market, economic, and property conditions and projected levels of operation existing as of such date. The dollar amount of any conclusion as to value in the Report is based upon the purchasing power of the U.S. Dollar on such date. The Report is subject to change as a result of fluctuations in any of the foregoing. CBRE has no obligation to revise the Report to reflect any such fluctuations or other events or conditions which occur subsequent to such date.
2. Unless otherwise expressly noted in the Report, CBRE has assumed that:

(i) Title to the subject property is clear and marketable and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. CBRE has not examined title records (including without limitation liens, encumbrances, easements, deed restrictions, and other conditions that may affect the title or use of the subject property) and makes no representations regarding title or its limitations on the use of the subject property. Insurance against financial loss that may arise out of defects in title should be sought from a qualified title insurance company.

(ii) Existing improvements on the subject property conform to applicable local, state, and federal building codes and ordinances, are structurally sound and seismically safe, and have been built and repaired in a workmanlike manner according to standard practices; all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; and the roof and exterior are in good condition and free from intrusion by the elements. CBRE has not retained independent structural, mechanical, electrical, or civil engineers in connection with this appraisal and, therefore, makes no representations relative to the condition of improvements. CBRE appraisers are not engineers and are not qualified to judge matters of an engineering nature, and furthermore structural problems or building system problems may not be visible. It is expressly assumed that any purchaser would, as a precondition to closing a sale, obtain a satisfactory engineering report relative to the structural integrity of the property and the integrity of building systems.

(iii) Any proposed improvements, on or off-site, as well as any alterations or repairs considered will be completed in a workmanlike manner according to standard practices.

(iv) Hazardous materials are not present on the subject property. CBRE is not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater, mold, or other potentially hazardous materials may affect the value of the property.

(v) No mineral deposit or subsurface rights of value exist with respect to the subject property, whether gas, liquid, or solid, and no air or development rights of value may be transferred. CBRE has not considered any rights associated with extraction or exploration of any resources, unless otherwise expressly noted in the Report.

(vi) There are no contemplated public initiatives, governmental development controls, rent controls, or changes in the present zoning ordinances or regulations governing use, density, or shape that would significantly affect the value of the subject property.

(vii) All required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be readily obtained or renewed for any use on which the Report is based.

(viii) The subject property is managed and operated in a prudent and competent manner, neither inefficiently, nor super-efficiently.

(ix) The subject property and its use, management, and operation are in full compliance with all applicable federal, state, and local regulations, laws, and restrictions, including without limitation environmental laws, seismic hazards, flight patterns, decibel levels/noise envelopes, fire hazards, hillside ordinances, density, allowable uses, building codes, permits, and licenses.

(x) The subject property is in full compliance with the Americans with Disabilities Act (ADA). CBRE is not qualified to assess the subject property's compliance with the ADA, notwithstanding any discussion of possible readily achievable barrier removal construction items in the Report.

(xi) All information regarding the areas and dimensions of the subject property furnished to CBRE are correct, and no encroachments exist. CBRE has neither undertaken any survey of the boundaries of the subject property, nor reviewed or confirmed the accuracy of any legal description of the subject property.

Unless otherwise expressly noted in the Report, no issues regarding the foregoing were brought to CBRE's attention, and CBRE has no knowledge of any such facts affecting the subject property. If any information inconsistent with any of the foregoing assumptions is discovered, such information could have a substantial negative impact on the Report and any conclusions stated therein. Accordingly, if any such information is subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. CBRE assumes no responsibility for any conditions regarding the foregoing, or for any expertise or knowledge required to discover them. Any user of the Report is urged to retain an expert in the applicable field(s) for information regarding such conditions.

3. CBRE has assumed that all documents, data and information furnished by or on behalf of the client, property owner or owner's representative are accurate and correct, unless otherwise expressly noted in the Report. Such data and information include, without limitation, numerical street addresses, lot and block numbers, Assessor's Parcel Numbers, land dimensions, square footage area of the land, dimensions of the improvements, gross building areas, net rentable areas, usable areas, unit count, room count, rent schedules, income data, historical operating expenses, budgets, and related data. Any error in any of the above could have a substantial impact on the Report and any conclusions stated therein. Accordingly, if any such errors are subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. The client and intended user should carefully review all assumptions, data, relevant calculations, and conclusions of the Report and should immediately notify CBRE of any questions or errors within 30 days after the date of delivery of the Report.

4. CBRE assumes no responsibility (including any obligation to procure the same) for any documents, data or information not provided to CBRE, including, without limitation, any termite inspection, survey or occupancy permit.

5. All furnishings, equipment and business operations have been disregarded with only real property being considered in the Report, except as otherwise expressly stated and typically considered part of real property.

6. Any cash flows included in the analysis are forecasts of estimated future operating characteristics based upon the information and assumptions contained within the Report. Any projections of income, expenses and economic conditions utilized in the Report, including such cash flows, should be considered as only estimates of the expectations of future income and expenses as of the date of the Report and not predictions of the future. This Report has been prepared in good faith, based on CBRE's current anecdotal and evidence-based views of the commercial real estate market. Although CBRE believes its views reflect market conditions on the date of this Report, they are subject to significant uncertainties and contingencies, many of which are beyond CBRE's control. In addition, many of CBRE's views are opinion and/or projections based on CBRE's subjective analyses of current market circumstances. Actual results are affected by a number of factors outside the control of CBRE, including without limitation fluctuating economic, market, and property conditions. Actual results may ultimately differ from these projections, and CBRE does not warrant any such projections. Further, other firms may have different opinions, projections and analyses, and actual market conditions in the future may cause CBRE's current views to later change or be incorrect. CBRE has no obligation to update its views herein if its opinions, projections, analyses or market circumstances later change.

7. The Report contains professional opinions and is expressly not intended to serve as any warranty, assurance or guarantee of any particular value of the subject property. Other appraisers may reach different conclusions as to the value of the subject property. Furthermore, market value is highly related to exposure time, promotion effort, terms, motivation, and conclusions surrounding the offering of the subject property. The Report is for the sole purpose of providing the intended user with CBRE's independent professional opinion of the value of the subject property as of the date of the Report. Accordingly, CBRE shall not be liable for any losses that arise from any investment or lending decisions based upon the Report that the client, intended user, or any buyer, seller, investor, or lending institution may undertake related to the subject property, and CBRE has not been compensated to assume any of these risks. Nothing contained in the Report shall be construed as any direct or indirect recommendation of CBRE to buy, sell, hold, or finance the subject property.

8. No opinion is expressed on matters which may require legal expertise or specialized investigation or knowledge including, but not limited to, environmental, social, and governance principles ("ESG"), beyond that customarily employed by real estate appraisers. Any user of the Report is advised to retain experts in areas that fall outside the scope of the real estate appraisal profession for such matters.

9. CBRE assumes no responsibility for any costs or consequences arising due to the need, or the lack of need, for flood hazard insurance. An agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

10. Acceptance or use of the Report constitutes full acceptance of these Assumptions and Limiting Conditions and any special assumptions set forth in the Report. It is the responsibility of the user of the Report to read in full, comprehend and thus become aware of all such assumptions and limiting conditions. CBRE assumes no responsibility for any situation arising out of the user's failure to become familiar with and understand the same.
11. The Report applies to the property as a whole only, and any pro ration or division of the title into fractional interests will invalidate such conclusions, unless the Report expressly assumes such pro ration or division of interests.
12. The allocations of the total value estimate in the Report between land and improvements apply only to the existing use of the subject property. The allocations of values for each of the land and improvements are not intended to be used with any other property or appraisal and are not valid for any such use.
13. The maps, plats, sketches, graphs, photographs, and exhibits included in this Report are for illustration purposes only and shall be utilized only to assist in visualizing matters discussed in the Report. No such items shall be removed, reproduced, or used apart from the Report.
14. The Report shall not be duplicated or provided to any unintended users in whole or in part without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Exempt from this restriction is duplication for the internal use of the intended user and its attorneys, accountants, or advisors for the sole benefit of the intended user. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Finally, the Report shall not be made available to the public or otherwise used in any offering of the property or any security, as defined by applicable law. Any unintended user who may possess the Report is advised that it shall not rely upon the Report or its conclusions and that it should rely on its own appraisers, advisors and other consultants for any decision in connection with the subject property. CBRE shall have no liability or responsibility to any such unintended user.

# Addenda



© [illegible] CBRE, INC.

# Addendum A

## Comparable Sales



Sale 1



Sale 2



Sale 3



Sale 4





Sale 5



Additional Data Point

# Addendum B

## Comparable Rents



Rent 1



Rent 2



Rent 3



Rent 4




Rent 5



Rent 6

# Addendum C

## Title Report

**Updated July 14, 2026**

# First American Title Insurance Company
## National Commercial Services

**9255 Towne Centre Drive, Suite 200
San Diego, CA 92121**

Jayden Lee
Preferred Bank
601 S Figueroa St Fl 48
Los Angeles, CA 90017
Phone: (213)891-1188
Fax: (213)622-0369

Customer Reference: 210 South Orange Grove Boulevard

Title Officer: Linda Slavik
Phone: (858)410-3873
Email: lslavik@firstam.com

Property: 210 South Orange Grove Boulevard, Pasadena, CA

## PRELIMINARY REPORT

In response to the above referenced application for a policy of title insurance, this company hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Exhibit A attached. *The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.* Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit A. Copies of the policy forms should be read. They are available from the office which issued this report.

**Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of June 30, 2026 at 7:30 A.M.

The form of Policy of title insurance contemplated by this report is:

To Be Determined

A specific request should be made if another form or additional coverage is desired.

Title to said estate or interest at the date hereof is vested in:

SDRES Partners LLC, a California limited liability company

The estate or interest in the land hereinafter described or referred to covered by this Report is:

A Fee as to Parcel 1, an Easement as to Parcels 2, 3, 4, 5 and 6.

The Land referred to herein is described as follows:

(See attached Legal Description)

At the date hereof exceptions to coverage in addition to the printed Exceptions and Exclusions in said policy form would be as follows:

1. General and special taxes and assessments for the fiscal year 2026-2027, a lien not yet due or payable.

2. General and special taxes and assessments for the fiscal year 2025-2026.

| | |
|---|---|
| First Installment: | $47,835.98, DELINQUENT |
| Penalty: | $4,783.59 |
| Second Installment: | $47,835.98, DELINQUENT |
| Penalty: | $4,793.59 |
| Tax Rate Area: | 07500 |
| A. P. No.: | 5713-013-057 |

3. The lien of defaulted taxes for the fiscal years 2023, 2024 and 2025, and any subsequent delinquencies.

| | |
|---|---|
| Tax Rate Area: | 07500 |
| A. P. No.: | 5713-013-057 |
| Amount to redeem: | $291,717.03 |
| Valid through: | July 2026 |
| Amount to redeem: | $295,200.55 |
| Valid through: | August 2026 |

**Please contact the tax office to verify the payoff amount.**

4. The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

5. Covenants, conditions, restrictions and easements in the document recorded as Book 32449, Page 143; in Book 32449, Page 152; in Book 32449, Page 166; in Book 32449, Page 173; in Book 34290, Page 121; in Book 34290, Page 86 and in Book 35539, Page 103, all of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition, or restriction, if any, indicating a preference, limitation, or discrimination based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, handicap, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, to the extent that such covenants, conditions or restrictions violate applicable state or federal laws. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

6. An easement for utility, roadway, walkway access and incidental purposes, recorded May 14, 2004 as Instrument No. 04-1227591 of Official Records.
In Favor of: Worldwide Church of God, a California non-profit religious corporation and Ambassador Acquisition Coalition Partners, LLC., a Delaware limited liability company
Affects: as described therein

The location of the easement cannot be determined from record information.

7. The terms and provisions contained in the document entitled "Memorandum of Post-Closing Obligations" recorded May 14, 2004 as Instrument No. 04-1227594 of Official Records.

8. An easement for utility and incidental purposes, recorded May 14, 2004 as Instrument No. 04-1227598 of Official Records.
In Favor of: Maranatha High School
Affects: as described therein

The location of the easement cannot be determined from record information.

9. The terms and provisions contained in the document entitled "Memorandum Post-Closing Obligations" recorded July 21, 2005 as Instrument No. 05-1721784 of Official Records.

10. The terms, provisions and easement(s) contained in the document entitled "Driveway Easement Agreement (Rankin Parcel)" recorded July 21, 2005 as Instrument No. 05-1721786 of Official Records.

11. Covenants, conditions, restrictions, easements, assessments, liens, charges, terms and provisions in the document recorded July 02, 2007 as Instrument No. 2007-1579024 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition or restriction indicating a preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status, national origin, sexual orientation, marital status, ancestry, source of income or disability, to the extent such covenants, conditions or restrictions violate Title 42, Section 3604(c), of the United States Codes. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

Note: You may wish to contact the homeowners association referred to in the above document for information regarding assessments, transfer requirements or other matters.

Document(s) declaring modifications thereof recorded March 03, 2009 as Instrument No. 2009-0297679 of Official Records.

Document(s) declaring modifications thereof recorded October 31, 2013 as Instrument No. 20131553283 of Official Records.

Document(s) declaring modifications thereof recorded March 12, 2015 as Instrument No. 20150270219 of Official Records.

Document(s) declaring modifications thereof recorded December 21, 2015 as Instrument No. 20151601451 of Official Records.

12. The terms and provisions contained in the document entitled "Memorandum of Site Development Agreement" recorded July 02, 2007 as Instrument No. 2007-1579027 of Official Records.

Document(s) declaring modifications thereof recorded November 12, 2008 as Instrument No. 2008-1995401 of Official Records.

13. The terms and provisions contained in the document entitled "Resolution No. 8850 Adopting a Declaration of Landmark Designation for 210 South Orange Grove Blvd." recorded May 02, 2008 as Instrument No. 20080779152 of Official Records.

14. An easement for landscaping and appurtenances and incidental purposes, recorded December 04, 2008 as Instrument No. 08-2131627 and Instrument No. 08-2131628, both of Official Records.
In Favor of: DB Pasadena Holdco LLC, a Delaware limited liability company
Affects: as described therein

The location of the easement cannot be determined from record information.

15. An easement for ingress, egress and incidental purposes, recorded December 19, 2008 as Instrument No. 08-2232727 of Official Records.
In Favor of: DB Pasadena Holdco LLC, a Delaware limited liability company
Affects: as described therein

The location of the easement cannot be determined from record information.

16. The terms, provisions and easement(s) contained in the document entitled "Construction Easement Agreement" recorded December 19, 2008 as Instrument No. 2008-2232728 of Official Records.

17. The terms, provisions and easement(s) contained in the document entitled "Parking Easement Agreement" recorded December 28, 2011 as Instrument No. 20111763712 of Official Records.

18. An easement shown or dedicated on the map of Tract No. 063103 recorded March 15, 2012 on file in Book 1369, Page 35 through 52, of Tract Maps.
For: Public utility, water line, reciprocal access and incidental purposes.

19. A deed of trust to secure an original indebtedness of $8,400,000.00 recorded June 16, 2017 as Instrument No. 20170671620 of Official Records.

| | |
|---|---|
| Dated: | June 08, 2017 |
| Trustor: | Cantor Group LLC, a California limited liability company |
| Trustee: | First American Title Insurance Company |
| Beneficiary: | Preferred Bank, a California banking corporation |

The above deed of trust states that it secures a line of credit. Before the close of escrow, we require evidence satisfactory to us that (a) all checks, credit cards or other means of drawing upon the line of credit have been surrendered to escrow, (b) the borrower has not drawn upon the line of credit since the last transaction reflected in the lender's payoff demand, and (c) the borrower has in writing instructed the beneficiary to terminate the line of credit using such forms and following such procedures as may be required by the beneficiary.

A document entitled "Absolute Assignment of Leases, Lease Guaranties, Rents, Issues and Profits" recorded June 16, 2017 as Instrument No. 20170671621 of Official Records, as additional security for the payment of the indebtedness secured by the deed of trust.

A document recorded June 16, 2017 as Instrument No. 20170671623 of Official Records, provides that the obligation secured by the deed of trust was assumed by SDRES Partners LLC, a California limited liability company.

A document recorded May 29, 2019 as Instrument No. 20190487919 of Official Records provides that the deed of trust or the obligation secured thereby has been modified.

A document recorded January 10, 2024 as Instrument No. 20240020404 of Official Records provides that the deed of trust or the obligation secured thereby has been modified.

A document recorded October 09, 2024 as Instrument No. 20240688400 of Official Records provides that the deed of trust or the obligation secured thereby has been modified.

A document recorded January 30, 2026 as Instrument No. 20260071282 of Official Records provides that Preferred Bank, a California banking corporation was substituted as trustee under the deed of trust.

A notice of default recorded January 30, 2026 as Instrument No. 20260071283 of Official Records.

A notice of trustee's sale recorded May 11, 2026 as Instrument No. 20260343605 of Official Records.

20. The effect of a document entitled "Grant Deed", recorded June 16, 2017 as Instrument No. 20170671622 of Official Records.

Said document contains an erroneous legal description.

21. A financing statement recorded June 27, 2017 as Instrument No. 20170712458 of Official Records.

| | |
|---|---|
| Debtor: | Cantor Group LLC |
| Secured party: | Preferred Bank |

An amendment to the financing statement was recorded December 04, 2017 as Instrument No. 20171391800 of Official Records.

A continuation statement was recorded March 29, 2022 as Instrument No. 20220345477 of Official Records.

22. A deed of trust to secure an original indebtedness of $400,000.00 recorded January 05, 2024 as Instrument No. 20240011708 of Official Records.

| | |
|---|---|
| Dated: | December 13, 2023 |
| Trustor: | SDRES Partners LLC, a California limited liability company |
| Trustee: | Stewart Title of California, Inc. |
| Beneficiary: | Preferred Bank, a California banking corporation |

Affects: The land and other property.

The above deed of trust states that it secures a line of credit. Before the close of escrow, we require evidence satisfactory to us that (a) all checks, credit cards or other means of drawing upon the line of credit have been surrendered to escrow, (b) the borrower has not drawn upon the line of credit since the last transaction reflected in the lender's payoff demand, and (c) the borrower has in writing instructed the beneficiary to terminate the line of credit using such forms and following such procedures as may be required by the beneficiary.

A document entitled "Absolute Assignment of Leases, Lease Guaranties, Rents, Issues and Profits" recorded January 05, 2024 as Instrument No. 20240011709 of Official Records, as additional security for the payment of the indebtedness secured by the deed of trust.

23. This item has been intentionally deleted.

24. An ALTA/NSPS survey of recent date which complies with the current minimum standard detail requirements for ALTA/NSPS land title surveys.

25. Any facts, rights, interests or claims which would be disclosed by a correct ALTA/NSPS survey.

26. Rights of parties in possession.

27. Water rights, claims or title to water, whether or not shown by the Public Records.

## INFORMATIONAL NOTES

**ALERT - CA Senate Bill 2 imposes an additional fee of $75 up to $225 at the time of recording on certain transactions effective January 1, 2018. Please contact your First American Title representative for more information on how this may affect your closing.**

1. According to the latest available equalized assessment roll in the office of the county tax assessor, there is located on the land a(n) Commercial Structure known as 210 South Orange Grove Boulevard, Pasadena, CA.

2. According to the public records, there has been no conveyance of the land within a period of twenty-four months prior to the date of this report, except as follows:

   None

3. This preliminary report/commitment was prepared based upon an application for a policy of title insurance that identified land by street address or assessor's parcel number only. It is the responsibility of the applicant to determine whether the land referred to herein is in fact the land that is to be described in the policy or policies to be issued.

4. Should this report be used to facilitate your transaction, we must be provided with the following prior to the issuance of the policy:

   A. WITH RESPECT TO A CORPORATION:
      1. A certificate of good standing of recent date issued by the Secretary of State of the corporation's state of domicile.
      2. A certificate copy of a resolution of the Board of Directors authorizing the contemplated transaction and designating which corporate officers shall have the power to execute on behalf of the corporation.
      3. A certificate of revivor and a certificate of relief from contract voidability issued by the Franchise Tax Board of the State of California.
      4. Requirements which the Company may impose following its review of the above material and other information which the Company may require.

   B. WITH RESPECT TO A CALIFORNIA LIMITED PARTNERSHIP:
      1. A certified copy of the certificate of limited partnership (form LP-1) and any amendments thereto (form LP-2) to be recorded in the public records;
      2. A full copy of the partnership agreement and any amendments;
      3. Satisfactory evidence of the consent of a majority in interest of the limited partners to the contemplated transaction;
      4. A certificate of revivor and a certificate of relief from contract voidability issued by the Franchise Tax Board of the State of California.
      5. Requirements which the Company may impose following its review of the above material and other information which the Company may require.

   C. WITH RESPECT TO A FOREIGN LIMITED PARTNERSHIP:
      1. A certified copy of the application for registration, foreign limited partnership (form LP-5) and any amendments thereto (form LP-6) to be recorded in the public records;
      2. A full copy of the partnership agreement and any amendment;
      3. Satisfactory evidence of the consent of a majority in interest of the limited partners to the contemplated transaction;

4. A certificate of revivor and a certificate of relief from contract voidability issued by the Franchise Tax Board of the State of California.
5. Requirements which the Company may impose following its review of the above material and other information which the Company may require.

D. WITH RESPECT TO A GENERAL PARTNERSHIP:

1. A certified copy of a statement of partnership authority pursuant to Section 16303 of the California Corporation Code (form GP-I), executed by at least two partners, and a certified copy of any amendments to such statement (form GP-7), to be recorded in the public records;
2. A full copy of the partnership agreement and any amendments;
3. Requirements which the Company may impose following its review of the above material required herein and other information which the Company may require.

E. WITH RESPECT TO A LIMITED LIABILITY COMPANY:

1. A copy of its operating agreement and any amendments thereto;
2. If it is a California limited liability company, a certified copy of its articles of organization (LLC-1) and any certificate of correction (LLC-11), certificate of amendment (LLC-2), or restatement of articles of organization (LLC-10) to be recorded in the public records;
3. If it is a foreign limited liability company, a certified copy of its application for registration (LLC-5) to be recorded in the public records;
4. With respect to any deed, deed of trust, lease, subordination agreement or other document or instrument executed by such limited liability company and presented for recordation by the Company or upon which the Company is asked to rely, such document or instrument must be executed in accordance with one of the following, as appropriate:
   (i) If the limited liability company properly operates through officers appointed or elected pursuant to the terms of a written operating agreement, such documents must be executed by at least two duly elected or appointed officers, as follows: the chairman of the board, the president or any vice president, and any secretary, assistant secretary, the chief financial officer or any assistant treasurer;
   (ii) If the limited liability company properly operates through a manager or managers identified in the articles of organization and/or duly elected pursuant to the terms of a written operating agreement, such document must be executed by at least two such managers or by one manager if the limited liability company properly operates with the existence of only one manager.
5. A certificate of revivor and a certificate of relief from contract voidability issued by the Franchise Tax Board of the State of California.
6. Requirements which the Company may impose following its review of the above material and other information which the Company may require.

F. WITH RESPECT TO A TRUST:

1. A certification pursuant to Section 18100.5 of the California Probate Code in a form satisfactory to the Company.
2. Copies of those excerpts from the original trust documents and amendments thereto which designate the trustee and confer upon the trustee the power to act in the pending transaction.
3. Other requirements which the Company may impose following its review of the material require herein and other information which the Company may require.

G. WITH RESPECT TO INDIVIDUALS:

1. A statement of information.

The map attached, if any, may or may not be a survey of the land depicted hereon. First American Title Insurance Company expressly disclaims any liability for loss or damage which may result from reliance on this map except to the extent coverage for such loss or damage is expressly provided by the terms and provisions of the title insurance policy, if any, to which this map is attached.

## LEGAL DESCRIPTION

Real property in the City of Pasadena, County of Los Angeles, State of California, described as follows:

Parcel 1:

Lot 10 of TRACT NO. 063103, in the City of Pasadena, as per map recorded in Book 1369 Pages 35 through 52 of Maps in the Office of the County Recorder of said County, amended pursuant to that certain Certificate of Correction recorded December 3, 2013 as Instrument No. 20131708591 of Official Records.

Parcel 2:

A reciprocal access easement over those areas set out on the map shown above.

Parcel 3:

An easement for the purposes herein stated and subject to the terms and provisions of that certain Consolidated Amended and Restated Driveway Easement Agreement (South Orange Grove Parcels) recorded December 5, 2013 as Instrument No. 20131716500 of Official Records, more particularly described as set out therein.

Parcel 4:

An easement for the purposes herein stated and subject to the terms and provisions of that certain Rose Parade Grandstand Easement Agreement (Orange Grove Avenue) recorded July 21, 2005 as Instrument Nos. 05-1721787 and 05-1721788 both of Official Records, more particularly described as set out therein.

Parcel 5:

An easement for the purposes herein stated and subject to the terms and provisions of that certain Parking Garage Easement Agreement recorded July 2, 2007 as Instrument No. 20071579026 of Official Records, more particularly described as set out therein.

Parcel 6:

An easement for the purposes herein stated and subject to the terms and provisions of that certain Parking Easement Agreement recorded December 28, 2011 as Instrument No. 20111763712 of Official Records, more particularly described as set out therein.

APN: 5713-013-057

**NOTICE**

Section 12413.1 of the California Insurance Code, effective January 1, 1990, requires that any title insurance company, underwritten title company, or controlled escrow company handling funds in an escrow or sub-escrow capacity, wait a specified number of days after depositing funds, before recording any documents in connection with the transaction or disbursing funds. This statute allows for funds deposited by wire transfer to be disbursed the same day as deposit. In the case of cashier's checks or certified checks, funds may be disbursed the next day after deposit. In order to avoid unnecessary delays of three to seven days, or more, please use wire transfer, cashier's checks, or certified checks whenever possible.

If you have any questions about the effect of this new law, please contact your local First American Office for more details.

## Privacy Policy

### We Are Committed to Safeguarding Customer Information

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our parent company, The First American Corporation, we have adopted this Privacy Policy to govern the use and handling of your personal information.

### Applicability

This Privacy Policy governs our use of the information which you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity. First American has also adopted broader guidelines that govern our use of personal information regardless of its source. First American calls these guidelines its *Fair Information Values*, a copy of which can be found on our website at www.firstam.com.

### Types of Information

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

- Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
- Information about your transactions with us, our affiliated companies, or others; and
- Information we receive from a consumer reporting agency.

### Use of Information

We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies, and escrow companies. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies, or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

### Former Customers

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

### Confidentiality and Security

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's *Fair Information Values*. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

**CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (02-03-10)
EXCLUSIONS**

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   (a) building; (d) improvements on the Land;
   (b) zoning; (e) land division; and
   (c) land use; (f) environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks:
   (a) that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   (b) that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
   (c) that result in no loss to You; or
   (d) that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5. Failure to pay value for Your Title.
6. Lack of a right:
   (a) to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   (b) in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

**LIMITATIONS ON COVERED RISKS**

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows: For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

| **Your Deductible Amount** | **Our Maximum Dollar Limit of Liability** |
|---|---|
| Covered Risk 16: 1% of Policy Amount or $2,500.00 (whichever is less) | $10,000.00 |
| Covered Risk 18: 1% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 19: 1% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 21: 1% of Policy Amount or $2,500.00 (whichever is less) | $5,000.00 |

**ALTA RESIDENTIAL TITLE INSURANCE POLICY (6-1-87)
EXCLUSIONS**

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning:
   (a) and use
   (b) improvements on the land
   (c) and division
   (d) environmental protection
   This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date.
   This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.
2. The right to take the land by condemning it, unless:
   (a) a notice of exercising the right appears in the public records on the Policy Date
   (b) the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking
3. Title Risks:
   (a) that are created, allowed, or agreed to by you

(b) that are known to you, but not to us, on the Policy Date -- unless they appeared in the public records
(c) that result in no loss to you
(d) that first affect your title after the Policy Date -- this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks

4. Failure to pay value for your title.
5. Lack of a right:
(a) to any land outside the area specifically described and referred to in Item 3 of Schedule A OR
(b) in streets, alleys, or waterways that touch your land
This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

**2006 ALTA LOAN POLICY (06-17-06)**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   i. the occupancy, use, or enjoyment of the Land;
   ii. the character, dimensions, or location of any improvement erected on the Land;
   iii. the subdivision of land; or
   iv. environmental protection;

   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

   b. Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   a. created, suffered, assumed, or agreed to by the Insured Claimant;
   b. not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c. resulting in no loss or damage to the Insured Claimant;
   d. attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
   e. resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   a. a fraudulent conveyance or fraudulent transfer, or
   b. a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

**2006 ALTA OWNER'S POLICY (06-17-06)**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   i. the occupancy, use, or enjoyment of the Land;
   ii. the character, dimensions, or location of any improvement erected on the Land;
   iii. the subdivision of land; or
   iv. environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

   b.Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   a. created, suffered, assumed, or agreed to by the Insured Claimant;
   b. not Known to the Company, not recorded in the Public Records at Date of Policy, but known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c. resulting in no loss or damage to the Insured Claimant;
   d. attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   e. resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   a. a fraudulent conveyance or fraudulent transfer; or
   b. a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (07-26-10)**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   i. the occupancy, use, or enjoyment of the Land;
   ii. the character, dimensions, or location of any improvement erected on the Land;
   iii. the subdivision of land; or
   iv. environmental protection;

   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.

   b. Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters

   a. created, suffered, assumed, or agreed to by the Insured Claimant;
   b. not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c. resulting in no loss or damage to the Insured Claimant;
   d. attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
   e. resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   a. a fraudulent conveyance or fraudulent transfer, or
   b. a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

**2021 ALTA LOAN POLICY (7-1-21)**
**EXCLUSIONS FROM COVERAGE**

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
      i. the occupancy, use, or enjoyment of the Land;
      ii. the character, dimensions, or location of any improvement on the Land;
      iii. the subdivision of land; or
      iv. environmental remediation or protection.
   b. any governmental forfeiture, police, regulatory, or national security power.
   c. the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.
   Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.
2. Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.
3. Any defect, lien, encumbrance, adverse claim, or other matter:
   a. created, suffered, assumed, or agreed to by the Insured Claimant;
   b. not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c. resulting in no loss or damage to the Insured Claimant;
   d. attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or

e. resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser or encumbrancer had been given for the Insured Mortgage at the Date of Policy.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business law.
5. Invalidity or unenforceability of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury law or Consumer Protection Law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction creating the lien of the Insured Mortgage is a:
   a. fraudulent conveyance or fraudulent transfer;
   b. voidable transfer under the Uniform Voidable Transactions Act; or
   c. preferential transfer:
      i. to the extent the Insured Mortgage is not a transfer made as a contemporaneous exchange for new value; or
      ii. for any other reason not stated in Covered Risk 13.b.
7. Any claim of a PACA-PSA Trust. Exclusion 7 does not modify or limit the coverage provided under Covered Risk 8.
8. Any lien on the Title for real estate taxes or assessments imposed by a governmental authority and created or attaching between the Date of Policy and the date of recording of the Insured Mortgage in the Public Records. Exclusion 8 does not modify or limit the coverage provided under Covered Risk 2.b. or 11.b.
9. Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.
7. Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, geothermal resources, uranium, clay, rock, sand and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

**2021 ALTA OWNER'S POLICY (7-1-21)**
**EXCLUSIONS FROM COVERAGE**

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
      i. the occupancy, use, or enjoyment of the Land;
      ii. the character, dimensions, or location of any improvement on the Land;
      iii. the subdivision of land; or
      iv. environmental remediation or protection.
   b. any governmental forfeiture, police, regulatory, or national security power.
   c. the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.
   Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.
2. Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.
3. Any defect, lien, encumbrance, adverse claim, or other matter:
   a. created, suffered, assumed, or agreed to by the Insured Claimant;
   b. not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c. resulting in no loss or damage to the Insured Claimant;
   d. attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 9 or 10); or
   e. resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser had been given for the Title at the Date of Policy.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction

vesting the Title as shown in Schedule A is a:
a. fraudulent conveyance or fraudulent transfer;
b. voidable transfer under the Uniform Voidable Transactions Act; or
c. preferential transfer:
i. to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
ii. for any other reason not stated in Covered Risk 9.b.

5. Any claim of a PACA-PSA Trust. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 8.
6. Any lien on the Title for real estate taxes or assessments imposed or collected by a governmental authority that becomes due and payable after the Date of Policy. Exclusion 6 does not modify or limit the coverage provided under Covered Risk 2.b.
7. Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.
7. Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, geothermal resources, uranium, clay, rock, sand and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

# Addendum D

## Qualifications

## QUALIFICATIONS OF ROBERT W. GUTZMAN, MAI

Senior Vice President
CBRE, INC., Valuation & Advisory Services
400 South Hope Street, 25th Floor
Los Angeles, California 90071
Phone: (213) 613-3683 Fax: (213) 613-3005 E-mail: bob.gutzman@cbre.com

## EDUCATION

Occidental College, Los Angeles, Bachelor of Arts in Economics

Professional Courses/Seminars: Litigation Seminar (numerous times); Real Estate Appraisal Principles; Basic Valuation Procedures; Basic Capitalization Theory/Techniques; Advanced Capitalization Theory/Techniques; Uniform Standards of Professional Appraisal Practice (every two years); Report Writing and Valuation Analysis; Advanced Applications; The Law and Value; Eminent Domain; Advanced Sales Comparison and Cost Approaches; Business Practices and Ethics (multiple times); Special Purpose Properties; Income Valuation of Small, Mixed-Use Properties; Subdivision Valuation; Appraiser as Expert Witness; Litigation Appraising; Condemnation Appraising; Federal and California Statutory and Regulatory Law Course; Uniform Appraisal Standards for Federal Land Acquisitions (i.e., Yellow Book); Real Estate Damages; IRS Summit; Partial Acquisitions; numerous other seminars and workshops

## LICENSES/CERTIFICATIONS/CERTIFICATES

Member, Appraisal Institute (MAI) – Designation Number 11482
California Certified General Real Estate Appraiser, Number AG025646
Appraisal Institute Litigation Certificate Program, Certificate of Completion

## EMPLOYMENT

| | |
|---|---|
| CBRE, Inc. – Valuation & Advisory Services<br>Senior Vice President, Los Angeles Office | 1993 to Present |
| IBAR Settlement Co., Inc.<br>Economist/Expert Witness, Pasadena | 1990 to 1993 |
| First Interstate Bank of California<br>Local Markets Analyst, Los Angeles | 1989 to 1990 |

## EXPERT WITNESS

Qualified as an expert witness in U.S. District Court, U.S. Bankruptcy Court, and California State Superior Court in real estate appraisal (civil and criminal court) and in forensic economics (civil court).

Testified before the Appeals Boards of Los Angeles, Orange, and San Diego counties.

## EXPERIENCE

Experience in appraising various property types including office buildings, retail centers, industrial properties, multi-family buildings (including low-income), golf courses, self-storage facilities, hospitality properties, gas stations, auto dealerships, car washes, vacant land (including underwater land parcels), skilled-nursing and assisted-living facilities, single-family residences, schools, studios, subdivisions, easements, and special-purpose properties.

Reports have been used for purchase and sale, financing, collateral management, estate purposes, property tax appeals, rental disputes, eminent domain proceedings, inverse condemnation, bankruptcies, and general real estate litigation.

Guest speaker for the Southern California Chapter of the Appraisal Institute.

## PARTIAL LIST OF SIGNIFICANT ASSIGNMENTS

2,700-acre Neverland Ranch, Santa Barbara County
Pacific Design Center, West Hollywood
Partial taking of 300-acre industrial property, Rialto
Grauman's Chinese Theatre, ground lease valuation
Valuation of 850 California properties for family trust
High-end SFR on 17 Mile Drive, Pebble Beach
LBI Media Studios, Burbank
Saks Fifth Avenue rent survey
Review of Queen Mary Complex, Long Beach
Upton Sinclair estate, Monrovia
High-identity boutique retail properties
Multiple cell-site installations across So. Cal.
Numerous wildfire cases across So. Cal.
Sheraton Hotel, Garden Grove
Northrop Grumman rent arbitration, San Diego
Luxury estate in Carmel Valley
Timeshare valuations and other appraisals in Hawaii

47 self-storage properties across the U.S. for class action suit
The Bradbury Building, Los Angeles
Harry Houdini estate, Los Angeles
Medical office buildings on Huntington Hospital campus
Norton Simon Museum, Pasadena
The Hammer Museum, Westwood
Multiple downtown L.A. properties valued for bankruptcy
Hilton Hotel Torrey Pines, La Jolla
David Murdock ranch, Ventura County
Alfred Mann estate, Beverly Hills Post Office area
Multiple landslide properties, Bel Air
Numerous eminent domain cases
Frank Capra ranch, San Diego County
Nuns' convent (475 acres), Tehachapi
Dow Chemical property, Alameda County
Multiple auto and truck dealerships
Assignments in HI, NY, NJ, NV, ID, OR, AZ, FL, MN, WI, etc.

## REPRESENTATIVE CLIENT TYPES

Clients include banks, law firms, individuals, government entities, insurance companies, trusts, REITs, arbitrators, mediators, non-profit entities, private businesses, public corporations, etc.

# Exhibit KK

CBRE Valuation & Advisory Services

# Appraisal Report

**8-UNIT MULTIFAMILY APARTMENT**

244-248 S. Orange Grove Boulevard
Pasadena, California 91105

Prepared for: Dentons US LLP
CBRE File No.: CB26US076590-1

**cbre.com/valuation**

CBRE

400 S. Hope St., Ste. 2500
Los Angeles, CA 90071-1549

T (213) 613-3683
F (213) 613-3005

www.cbre.com/valuation

Date of Report: August 24, 2026

Mr. John A. Moe II, Esq.
DENTONS US LLP
601 S. Figueroa Street Suite 2500
Los Angeles, California 90017

RE: Appraisal of an 8-Unit Multifamily Apartment
244-248 S. Orange Grove Boulevard
Pasadena, Los Angeles County, California
CBRE, Inc. File No. CB26US076590-1

Dear Mr. Moe:

At your request and authorization, CBRE, Inc. has prepared an appraisal of the market value of the referenced property. Our analysis is presented in the following Appraisal Report.

The subject is a 1927-built, eight-unit apartment complex. It was previously used as dormitory housing at Ambassador College, converted to apartments in 2007. The improvements are situated on a 0.83-acre site in Pasadena, Los Angeles County, California. More specifically, the property is located just east of Orange Grove Boulevard and just north of Del Mar Boulevard within the larger former Ambassador College campus. The subject is 75.0% occupied, with two vacant units. Within our valuation, we have assumed the subject can achieve stabilized occupancy within one month. The subject is more fully described, legally and physically within the enclosed report.

Due to the subject's year of construction being prior to 1995, the property falls under the California Assembly Bill 1482 Rent Controls and the City of Pasadena Rent Controls (Measure H). While the ordinance covers many items relating to tenancy and property operations, the major component of the ordinance deals with the maximum annual percentage rental rate increase allowed by landlords. Additional information pertaining to the California Assembly Bill 1482 Rent Controls and the City of Pasadena Rent Controls may be found in the Market Analysis section.

Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

**MARKET VALUE CONCLUSION - MULTIFAMILY**

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| As Is | Leased Fee Interest | August 5, 2026 | $5,250,000 |

Compiled by CBRE

This Appraisal Report is subject to Extraordinary Assumptions and/or Hypothetical Conditions; please refer to the Executive Summary section of this report for further discussion and analysis.

The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value. The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), and the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

The intended use and user of our report are specifically identified in our report as agreed upon in our contract for services and/or reliance language found in the report. As a condition to being granted the status of an intended user, any intended user who has not entered into a written agreement with CBRE in connection with its use of our report agrees to be bound by the terms and conditions of the agreement between CBRE and the client who ordered the report. No other use or user of the report is permitted by any other party for any other purpose. Dissemination of this report by any party to any non-intended users does not extend reliance to any such party, and CBRE will not be responsible for any unauthorized use of or reliance upon the report, its conclusions or contents (or any portion thereof).

It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if CBRE can be of further service, please contact us.

Respectfully submitted,

**CBRE - VALUATION & ADVISORY SERVICES**

Julian Uribe
First Vice President
CA Certification No. 3006320 (exp 4/2/2027)
Phone: (909) 509-2898
Email: Julian.Uribe@cbre.com

Robert W. Gutzman, MAI
Senior Vice President
CA Certification No.: AG025646
Phone: (213) 613-3683
Email: bob.gutzman@cbre.com

# Certification

We certify to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.
2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.
3. We have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.
4. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
5. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
6. This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.
7. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.
8. The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.
9. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
10. As of the date of this report, Robert W. Gutzman, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.
11. As of the date of this report, Julian Uribe has completed the Standards and Ethics Education Requirements for Candidates of the Appraisal Institute.
12. Julian Uribe and Robert W. Gutzman, MAI have made a personal inspection of the property that is the subject of this report.
13. No one provided significant real property appraisal assistance to the persons signing this report.
14. Robert W. Gutzman, MAI, has not provided services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment. Julian Uribe has provided services as an appraiser regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment with a prior date of value of September 22, 2023.

Julian Uribe
CA Certification No. 3006320 (exp 4/2/2027)

Robert W. Gutzman, MAI
CA Certification No.: AG025646

# Subject Photographs




Aerial view (green border outline is approximate)



View of 244 Building



View of 248 Building



View of Subject South Elevation



Subject Exterior Walkway and Exterior



Example of Unit Interior (248-102)



Example of Unit Kitchen (248-102)



Example of Unit Bedroom (248-102)



Example of Unit Bathroom (248-102)



Example of Unit Interior (244-103)



Example of Unit Kitchen (244-103)



Example of Unit Bedroom (244-103)



Example of Unit Bathroom (244-103)



Example of Fireplace



Example of In-Unit Washer/Dryer



Building 244 #104 Pool



Example of Private Patio (Unit 248-102)



Interior Stairway



Controlled Access

CBRE


Typical Basement Area


Example of In-Unit Smoke Detector


Example of Unit Air Condenser


Gas Meter (Master)


Subject Parking (Surface)

# Executive Summary

| | | |
|---|---|---|
| **Property Name** | 8-Unit Multifamily Apartment | |
| **Location** | 244-248 S. Orange Grove Boulevard<br>Pasadena, Los Angeles County, CA 91105 | |
| **Parcel Number(s)** | 5713-027-065 | |
| **Client** | Dentons US LLP | |
| **Highest and Best Use** | | |
| As If Vacant | Multifamily | |
| As Improved | Multifamily | |
| **Property Rights Appraised** | Leased Fee Interest | |
| **Date of Report** | August 24, 2026 | |
| **Date of Inspection** | August 5, 2026 | |
| **Estimated Exposure Time** | 4 - 9 Months | |
| **Estimated Marketing Time** | 4 - 9 Months | |
| **Primary Land Area** | 0.83 AC | 36,074 SF |
| **Zoning** | WGSP-1B | |
| **Improvements** | | |
| Property Type | Multifamily | (Multi-Family Walk-Up) |
| Number of Buildings | 2 | |
| Number of Stories | 2 | |
| Gross Building Area | 19,032 SF | |
| Net Rentable Area | 14,128 SF | |
| Number of Units | 8 | |
| Average Unit Size | 1,766 SF | |
| Year Built | 1927 | |
| Effective Age | 20 Years | |
| Remaining Economic Life | 30 Years | |
| Condition | See text | |
| **Financial Indicators** | | |
| Current Occupancy | 75.0% | |
| Stabilized Occupancy | 96.0% | |
| Stabilized Credit Loss | 1.0% | |
| Overall Capitalization Rate | 4.75% | |

| **Pro Forma Operating Data** | ***Total*** | ***Per Unit*** |
|---|---|---|
| Effective Gross Income | $460,544 | $57,568 |
| Operating Expenses | $174,968 | $21,871 |
| Expense Ratio | 37.99% | |
| Net Operating Income | $285,577 | $35,697 |

CBRE

| VALUATION | | Total | Per Unit |
|---|---|---|---|
| **Market Value As Is On** | **August 5, 2026** | | |
| Sales Comparison Approach | | $5,250,000 | $656,250 |
| Income Capitalization Approach | | $5,250,000 | $656,250 |

| CONCLUDED MARKET VALUE | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value** |
| As Is | Leased Fee Interest | August 5, 2026 | $5,250,000 |

Compiled by CBRE

## Market Volatility

Recent military action between an Israeli/U.S. coalition and Iran has heightened global economic uncertainty and risks. The situation remains extremely fluid with a variety of possible outcomes. Impacts on real estate are highly dependent on both the length and scope of the conflict. Beyond the duration and scope of the conflict, potential risks include the impact on energy infrastructure in the Gulf states and the transit of oil and gas through the Strait of Hormuz. There are implications for global supply chains, as well as the cost of capital and capital markets activity.

Amid increased uncertainty, the Fed will likely hold interest rates steady as it assesses the economic implications. At the long end of the yield curve, investors have remained more concerned about inflation than growth since the conflict began. Long-term rates may drop if the Middle East conflict escalates and/or economic conditions worsen, which would likely drive more capital to safe havens.

Experience has shown that consumer and investor behavior can quickly change during periods of heightened volatility. Lending or investment decisions should consider the potential for a continuation of recent volatility, which may affect market conditions disproportionately, depending on asset class.

It is important to note that the conclusions set out in this report are valid as at the valuation date only. Where appropriate, we recommend that the valuation is closely monitored, as we continue to track how markets respond to evolving events.

## Extraordinary Assumptions

An extraordinary assumption is defined as "An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions." [1]

- The gross building area and site size were taken from Los Angeles County Assessor information. The net rentable area was taken from information provided to us by the client. We assume that these figures/descriptions are correct. However, we are not licensed surveyors and make no guarantee or warranty. We encourage the client to research this issue further if needed. We reserve the right to amend the valuation should new information surface.
- We were provided estimated costs to repair the subject property along with delinquent property tax amounts. We were also provided delinquent amounts owed for the fees associated with the Homeowner Homeowners Owners Association (HOA, sometimes called a Property Owners Association (POA)). We

1. The Appraisal Foundation, USPAP, 2024 Edition (Effective January 1, 2024)

are not experts in this area and assume these costs are accurate. We reserve the right to amend our analysis should new information be provided.

- We have been provided two title reports for the subject property around the date of value. The older of the two is a March 20, 2026 title report prepared by Orange Coast Title Company. The more recent is a July 14, 2026 title report prepared by First American Title Insurance Company. There are numerous title items which are discussed in the body of this report. However, we note that there are several covenants, conditions, and restrictions (CCRs) and easements listed. Many of these are not discussed in detail, we were not given information on them, and several easements are reportedly of indeterminate location. We assume no liability for clear title to the property. We assume that there are no adverse easements or encroachments, or the like, which would have an impact on the value or marketability of the subject property. However, we are not title experts and make no guarantee or warranty. If needed, we encourage the client to research this issue further. We reserve the right to amend our analysis should new information be provided.
- The subject site is land-locked, and we assume the access provided is via easements over adjacent properties to the south (vehicle driveway to Del Mar Boulevard) or to the north and west.
- We have not been provided a current environmental report in connection with this assignment. We assume that there are no environmental hazards which would affect the marketability or market value of the subject in any way.
- The subject's legal description may have changed over the years. Also, the property at one time was part of the larger Ambassador College campus. We do not know if any of the subject buildings encroach on other lots or vice versa. We assume there are no encroachments or other issues that would affect the subject's marketability or value in any way. However, we are not experts in this area and make no guarantee or warranty. If needed, we encourage the client to research this issue further. We reserve the right to amend our analysis should new information be provided.

The use of these extraordinary assumptions may have affected the assignment results.

## Hypothetical Conditions

A hypothetical condition is defined as "a condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purposes of analysis." [2]

- None noted

## Ownership and Property History

The subject is currently vested in the name of SDRES PARTNERS LLC. Based on our search of CoStar, MLS, and an internet search, we were unable to find any listing, purchase option, pending sale, or under contract related information for any other transaction in the past three years. The appraiser is unaware of any ownership transfers of the property during the previous three years.

## Exposure/Marketing Time

Current appraisal guidelines require an estimate of a reasonable time period in which the subject could be brought to market and sold. This reasonable time frame can either be examined historically or prospectively. In a historical analysis, this is referred to as exposure time. Exposure time always precedes the date of value, with the underlying premise being the time a property would have been on the market prior to the date of value, such that it would sell at its appraised value as of the date of value. On a prospective basis, the term marketing time is most often used. The exposure/marketing time is a function of price, time, and

2. The Appraisal Foundation, USPAP, 2024 Edition (Effective January 1, 2024)

use. It is not an isolated estimate of time alone. In consideration of these factors, we have analyzed the following:

- exposure periods for comparable sales used in this appraisal;
- exposure/marketing time information from the CBRE, Inc. National Investor Survey and the PwC Real Estate Investor Survey; and

The following table presents the information derived from these sources.

**EXPOSURE/MARKETING TIME DATA**

| Investment Type | Exposure/Mktg. (Months) Range | | | Average |
|---|---|---|---|---|
| Comparable Sales Data | 0.0 | - | 9.0 | 4.3 |
| *PwC Apartment* | | | | |
| National Data | 3.0 | - | 12.0 | 6.3 |
| Local Market Professionals | 2.0 | - | 6.0 | 4.0 |
| Pacific Region - 1Q 2026 | 1.0 | - | 10.0 | 4.5 |
| **CBRE Exposure Time Estimate** | **4 - 9 Months** | | | |
| **CBRE Marketing Period Estimate** | **4 - 9 Months** | | | |

Various Sources Compiled by CBRE

# Table of Contents


Certification ..... i
Subject Photographs ..... ii
Executive Summary ..... vii
Table of Contents ..... xi
Scope of Work ..... 1
Area Analysis ..... 4
Site Analysis ..... 10
Improvements Analysis ..... 12
Zoning ..... 15
Tax Assessment Data ..... 16
Market Analysis ..... 17
Highest and Best Use ..... 30
Sales Comparison Approach ..... 31
Income Capitalization Approach ..... 37
Reconciliation of Value ..... 48
Assumptions and Limiting Conditions ..... 49

ADDENDA

A Improved Sale Data Sheets
B Operating Data
C Title Report
D Qualifications




CBRE

# Scope of Work

This Appraisal Report is intended to comply with the real property appraisal development and reporting requirements set forth under Standards Rule 1 and 2 of USPAP. The scope of the assignment relates to the extent and manner in which research is conducted, data is gathered, and analysis is applied.

## Intended Use Of Report

This appraisal is to be used for bankruptcy litigation and no other use is permitted.

## Client

The client is Dentons.

## Intended User Of Report

This appraisal is to be used by Dentons. No other user(s) may rely on our report unless as specifically indicated in this report.

> Intended users are those who an appraiser intends will use the appraisal or review report. In other words, appraisers acknowledge at the outset of the assignment that they are developing their expert opinions for the use of the intended users they identify. Although the client provides information about the parties who may be intended users, ultimately it is the appraiser who decides who they are. This is an important point to be clear about: The client does not tell the appraiser who the intended users will be. Rather, the client tells the appraiser who the client needs the report to be speaking to, and given that information, the appraiser identifies the intended user or users. It is important to identify intended users because an appraiser's primary responsibility regarding the use of the report's opinions and conclusions is to those users. Intended users are those parties to whom an appraiser is responsible for communicating the findings in a clear and understandable manner. They are the audience. [3]

## Reliance Language

Reliance on any reports produced by CBRE under this Agreement is extended solely to parties and entities expressly acknowledged in a signed writing by CBRE as Intended Users of the respective reports, provided that any conditions to such acknowledgement required by CBRE or hereunder have been satisfied. Parties or entities other than Intended Users who obtain a copy of the report or any portion thereof (including Client if it is not named as an Intended User), whether as a result of its direct dissemination or by any other means, may not rely upon any opinions or conclusions contained in the report or such portions thereof, and CBRE will not be responsible for any unpermitted use of the report, its conclusions or contents or have any liability in connection therewith.

## Purpose of the Appraisal

The purpose of this appraisal is to develop an opinion of the market value of the subject property.

---

[3] Appraisal Institute, The Appraisal of Real Estate, 15th ed. (Chicago: Appraisal Institute, 2020), 40.

## Definition of Value

The current economic definition of market value agreed upon by agencies that regulate federal financial institutions in the U.S. (and used herein) is as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. buyer and seller are typically motivated;
2. both parties are well informed or well advised, and acting in what they consider their own best interests;
3. a reasonable time is allowed for exposure in the open market;
4. payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [4]

## Interest Appraised

The value estimated represents the Leased Fee Interest as defined below:

> *Leased Fee Interest* - The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. [5]

### Extent to Which the Property is Identified

The property is identified through the following sources:

- postal address
- assessor's records
- title report

### Extent to Which the Property is Inspected

CBRE inspected the subject, as well as its surrounding environs on the previously indicated date of inspection.

### Type and Extent of the Data Researched

CBRE reviewed the following:

- applicable tax data
- zoning requirements
- flood zone status
- comparable data

---

[4] 12 CFR, Part 34, Subpart C-Appraisals, 34.42(h).

[5] Appraisal Institute, *The Dictionary of Real Estate Appraisal, 7th ed.* (Chicago: Appraisal Institute, 2022), 105.

### Type and Extent of Analysis Applied

CBRE, Inc. analyzed the data gathered through the use of appropriate and accepted appraisal methodology to arrive at a probable value indication via each applicable approach to value. The steps required to complete each approach are discussed in the methodology section.

## Statement of Competency

The appraisers have the appropriate knowledge, education and experience to complete this assignment competently.

## Appraisal Methodology

In appraisal practice, an approach to value is included or omitted based on its applicability to the property type being valued and the quality and quantity of information available.

### Cost Approach

The cost approach is based on the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

### Sales Comparison Approach

The sales comparison approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject. Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, etc., or economic units of comparison such as gross rent multiplier. Adjustments are applied to the physical units of comparison derived from the comparable sale. The unit of comparison chosen for the subject is then used to yield a total value. Economic units of comparison are not adjusted, but rather analyzed as to relevant differences, with the final estimate derived based on the general comparisons.

### Income Capitalization Approach

The income capitalization approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

### Methodology Applicable to the Subject

In valuing the subject, we have used the sales comparison approach and the income capitalization approach, both of which are used by buyers and sellers of properties like the subject. The cost approach is not applicable in the estimation of market value due to the age/depreciation of the improvements. Also, buyers and sellers of properties like the subject do not use the cost approach in estimating value.

# Area Analysis







## CITY OF PASADENA

The subject property is located in the City of Pasadena. Pasadena is located approximately ten miles northeast of downtown Los Angeles. The city encompasses approximately 23 square miles and is one of the larger incorporated cities in Los Angeles County. It is bounded on the north by the unincorporated community of Altadena and the San Gabriel Mountains; on the east by the cities of Sierra Madre and

Arcadia; on the south by the cities of South Pasadena and San Marino; and on the west by the community of Eagle Rock (City of Los Angeles), and the cities of Glendale and La Canada.




Pasadena is a major commercial market area within Los Angeles County. In the office segment, the city is home to a significant number of corporate headquarters, back-office users, and research and development/high-technology companies. The city is also a major residential district, particularly for workers employed in downtown Los Angeles and the Tri-Cities (Burbank, Glendale, and Pasadena). The city is generally built out and future development will occur primarily through the redevelopment process.

## Local Government/Land Use Controls

The city of Pasadena has a council-manager form of government. The city provides its own police and fire departments, as well as its own school district. Preservation/rehabilitation of existing buildings and restrictions on development are strongly entrenched local political values. New development in the city is subject to a relatively rigorous approval process.

## Access

Pasadena is served by several major freeways. The Foothill Freeway (Interstate 210) traverses the city in an east/west direction. This freeway runs from the north San Fernando Valley to the eastern portion of Los Angeles County. On the west side of Pasadena, the Foothill Freeway connects to the Ventura Freeway (State Route 134), which continues westward through Glendale and the San Fernando Valley. The Long

Beach Freeway (Interstate 710) extends from Long Beach to Alhambra (south of Pasadena). For many years, it was slated to be connected to the 210 Freeway to the north. Due to intense community opposition, the 710/210 connector was officially deleted from the highway grid, and approved/signed by Governor Gavin Newsom in October 2019. In August 2022, the northern part of the freeway stub—approximately 50 acres—from Union Street to Columbia Street, was approved to be relinquished and transferred back to the City of Pasadena by the California Transportation Commission.

The Pasadena Freeway (State Route 110) provides direct access between the southern portion of Pasadena to downtown Los Angeles, continuing to the South Bay. This freeway is particularly significant in that it makes Pasadena one of the most accessible areas to downtown Los Angeles.

Within the city, there are numerous surface streets providing local access. Primary east/west streets include Washington, Orange Grove, Colorado, Del Mar, and California boulevards. North/south primary arterials are Fair Oaks, Los Robles, Lake, Allen avenues, and Sierra Madre, San Gabriel, and Rosemead boulevards.

Mass transportation is provided by local and regional bus lines. Los Angeles Metro's A Line light rail commuter line (previously known as the Gold Line and then the L Line) provides access between Pasadena and southward to downtown Los Angeles, extending to Long Beach. The A Line also extends eastward to Azusa.

Phase 2B of the Foothill Extension, running between Azusa and the Pomona–North Metrolink station in Pomona, is currently under construction, with a current estimated completion in the summer of 2025.

The nearest station is located at 340 North Lake Avenue. It is located in the median of the 210 Freeway at Lake Avenue.

Passenger and commercial airline service to Pasadena is provided by the Burbank Airport (located 14 miles northwest of the city) and Los Angeles International Airport (located 24 miles southwest of the city).

## Land Use Patterns

The city of Pasadena is dominated by residential uses, but has a strong office, retail, and industrial base.

There are four major concentrations of office space in the city. Lake Avenue, which traverses the central portion of the city in a north/south direction, is the primary office corridor. Office development on this street extends south from the Foothill (210) Freeway to California Boulevard. Office buildings in this corridor are generally mid- to high-rise structures. Other concentrations of office space in the city are along Los Robles Avenue, in the Hastings Ranch area, and along Colorado Boulevard.

Retail development in Pasadena is centered in three distinct areas. At the westerly end of the city is Old Town (also called Old Pasadena), a major retail/entertainment/tourist draw in the San Gabriel Valley. Old Town is characterized by renovated retail/commercial buildings along Colorado and Fair Oaks boulevards, with industrial buildings converted to retail occupancy on secondary arterials.

## One Colorado

The largest project in Old Town is the 277,000-square-foot One Colorado development. This project involved the rehabilitation and integration of a series of older one- and two-story retail/commercial buildings into a cohesive retail center. It encompasses the full city block bounded by Colorado Boulevard, Fair Oaks Avenue, Union Street, and De Lacey Avenue. Tenants in this development include Allbirds, Anthropologie, Nike, Place Vendome, Sushi Roku, and an IPIC Theater (now closed).

## Paseo Colorado

Just outside of Old Town, TrizecHahn completed a redevelopment of the Plaza Pasadena regional mall. Originally an enclosed two-level mall, the project was unsuccessful. It was largely deconstructed, with a two-story open-air retail center opened in September 2001 and 387 loft-style apartment units completed in March 2002. Rebranded as Paseo Colorado, the development was anchored by Macy's. The prior owner (DDR) achieved approvals to demolish the existing Macy's building and develop a freestanding mid-rise hotel building (Hyatt Place) and an additional seven-story mixed-use retail/residential building. DDR subsequently sold the property to another party. This party completed the 189-room Hyatt Place hotel in 2018 and also developed the mixed-use building.

## South Lake Avenue Corridor

The second major retail area in the city is the South Lake Avenue Corridor. This area extends south from Green Street/Cordova Avenue to California Avenue. While only five blocks long, it is a heavily trafficked pedestrian retail core that overlaps with the Lake Avenue office buildings. Located in this area are high-end retailers, shopping arcades, and a Macy's department store.

## Hastings Ranch

The third retail area of Pasadena, known as Hastings Ranch, is at the east end of the city. It is primarily located on Foothill Boulevard in proximity to Rosemead Boulevard. There are four shopping centers in this area. These include two supermarket-anchored neighborhood centers, a community retail center anchored by Sears and Marshall's, and a power retail center anchored by Best Buy, Dick's Sporting Goods, and Nordstrom Rack.

In addition to these retail nodes, primary arterials, including Washington Boulevard, Foothill Boulevard/Walnut Street, Colorado Boulevard, Arroyo Parkway, and North Lake Avenue are improved with a wide variety of retail uses.

## Other

Industrial development in Pasadena is located along the Foothill Freeway (Interstate 210) corridor and in the northeast portion of the city. Occupancy is largely characterized by research and development companies that specialize in high-technology industries. Prior to the collapse of the technology sector, Internet firms were a growing component of the local economy.

As noted, residential development accounts for a large portion of the land use in Pasadena. In general, residential uses are comprised of single-family homes with apartment buildings along major streets and in the central area of the city. Affordable housing is in the northwest and central portions of the city, with luxury homes in the western and southern portions of the city.

Pasadena also has two world-renowned educational facilities, the Art Center College of Design and the California Institute of Technology (Caltech). The Jet Propulsion Laboratory (JPL) is a division of Caltech that is supported by the National Aeronautics and Space Administration (NASA). It is partially located in Pasadena and partially located in La Cañada-Flintridge.

Pasadena is also home to the Norton Simon Museum. Finally, the Rose Bowl, with the annual football game/parade and other sporting events is one of the defining characteristics of the city.

## Immediate Surroundings

The subject is located on part of the former Ambassador College campus, which is located within the block bounded by Del Mar Boulevard on the south, Orange Grove Boulevard on the west, Green Street on the north, and Saint John Avenue on the east.




- North: Adjacent to the north is a 21-unit, 2015-built condominium project located at 192 S. Orange Grove Blvd.
- South: Adjacent to the south is a 10-unit, 2014-built condominium project located at 363 W. Del Mar Blvd.
- West: Adjacent to the west are three single family residences with frontage along S. Orange Grove Blvd.
- East: Adjacent to the east is a 7-unit, 1930-built multifamily apartment.

## Conclusion

The subject neighborhood is generally built out, with limited vacant and/or under-improved land in the immediate area. Overall, the subject neighborhood is considered to be stable, with limited changes in its relative desirability.

Plat Map - Apartment Property




Site Analysis - Multifamily

CBRE

# Site Analysis

The following chart summarizes the salient characteristics of the subject site.

**SITE SUMMARY AND ANALYSIS**

| | | | |
|---|---|---|---|
| **Physical Description** | | | |
| Site Area | | 0.83 Acres | 36,074 Sq. Ft. |
| Excess Land Area | | None | |
| Surplus Land Area | | None | |
| Shape | | Irregular | |
| Topography | | Generally Level | |
| Parcel Number(s) | | 5713-027-065 | |
| Zoning District | | WGSP-1B | |
| Flood Map Panel No. & Date | | 06037C1375F | 26-Sep-08 |
| Flood Zone | | Zone X (Unshaded) | |
| Adjacent Land Uses | | Residential uses | |
| **Other** | **Yes** | **No** | **Unknown** |
| Detrimental Easements | | | X |
| Encroachments | | | X |
| Deed Restrictions | | | X |
| Reciprocal Parking Rights | | | X |

Source: Various sources compiled by CBRE

## Title Reports

We have been provided two title reports for the subject property around the date of value. The older of the two is a March 20, 2026 title report prepared by Orange Coast Title Company. The more recent is a July 14, 2026 title report prepared by First American Title Insurance Company. There are numerous title items which are called out in the title reports. A partial list is provided below. (Note that we received a title report for both the subject property and 210 S. Orange Grove. The items below pertain to one and/or both properties.)

- Covenants, conditions, and restrictions (CCRs)
- Easements for utility, roadway, walkway, incidental purposes
- Driveway easement
- Homeowner association called out
- Landmark designation
- Landscaping easement
- Ingress/egress easement
- Construction easement
- Parking easement agreement
- Public utility, water line, reciprocal access easement
- Notice of default

- Notice of trustee's sale
- Grant deed
- Financing statement
- Deed of trust

Many of these are not discussed in detail, we were not given information on them, and several easements are reportedly of indeterminate location. We assume no liability for clear title to the property. We assume that there are no adverse easements or encroachments, or the like, which would have an impact on the value or marketability of the subject property. However, we are not title experts and make no guarantee or warranty. We reserve the right to amend our analysis should new information be provided.

It is recommended that the client/reader obtain a current title policy outlining all easements and encroachments on the property, if any, prior to making a business decision.

## Covenants, Conditions and Restrictions

See above. We do not know the nature of the covenants, conditions or restrictions that affect the site. For our purposes, we assume they do not affect the marketability, value, or highest and best use. It is recommended that the client/reader obtain a copy of all covenants, conditions and restrictions, if any, prior to making a business decision. We reserve the right to amend our analysis should new information be provided.

## Homeowners Association

The subject is part of a Homeowners Association (HOA, sometimes called a Property Owners Association (POA)) including several other adjacent and nearby parcels, formerly owned and operated collectively as the Ambassador College. As will be addressed later, it is our understanding that the subject ownership is delinquent in paying the assessments. The current delinquent amount (per the Receiver's status report provided to us) is reportedly $29,704.

## Environmental Issues

CBRE was not provided a current Environmental Site Assessment (ESA). The appraiser is not qualified to detect the existence of potentially hazardous material or underground storage tanks which may be present on or near the site. The existence of hazardous materials or underground storage tanks may affect the value of the property. For this appraisal, CBRE, Inc. has specifically assumed that the property is not affected by any hazardous materials that may be present on or near the property.

## Conclusion

The subject site is of adequate size, shape and access to accommodate legally allowed uses. There are no known factors that negatively impact the marketability of the subject site.

# Improvements Analysis

The following chart shows a summary of the improvements.

| IMPROVEMENTS SUMMARY AND ANALYSIS | | |
|---|---|---|
| Property Type | Multifamily | (Multi-Family Mid/High Rise) |
| Number of Buildings | 2 | |
| Number of Stories | 2 | |
| Gross Building Area | 19,032 SF | |
| Net Rentable Area | 14,128 SF | |
| Number of Units | 8 | |
| Average Unit Size | 1,766 SF | |
| Development Density | 9.7 Units/Acre | |
| Parking Improvements | Surface | |
| Parking Spaces: | 17 | |
| Parking Ratio (spaces/unit) | 2.13 | |
| Year Built | 1927 | |
| Actual Age | 99 Years | |
| Effective Age | 20 Years | |
| Total Economic Life | 50 Years | |
| Remaining Economic Life | 30 Years | |
| Functional Utility | Typical | |

Source: Various sources compiled by CBRE

**UNIT MIX**

| Unit Mix/Type | Comments | No. Units | Percent of Total | Unit Size (SF) | NRA (SF) |
|---|---|---|---|---|---|
| 2BR/2.5BA | 244 - 103 | 1 | 12.5% | 1,747 | 1,747 |
| 2BR/2.5BA | 244 - 104 | 1 | 12.5% | 1,743 | 1,743 |
| 2BR/2.5BA | 244 - 203 | 1 | 12.5% | 1,790 | 1,790 |
| 2BR/2.5BA | 244 - 204 | 1 | 12.5% | 1,784 | 1,784 |
| 2BR/2.5BA | 248 - 101 | 1 | 12.5% | 1,747 | 1,747 |
| 2BR/2.5BA | 248 - 102 | 1 | 12.5% | 1,743 | 1,743 |
| 2BR/2.5BA | 248 - 201 | 1 | 12.5% | 1,790 | 1,790 |
| 2BR/2.5BA | 248 - 202 | 1 | 12.5% | 1,784 | 1,784 |
| Total/Average: | | 8 | 100.0% | 1,766 | 14,128 |

Source: Various sources compiled by CBRE

**IMPROVEMENT DESCRIPTION & RATING**

| Improvement Summary | Description | Comparative Rating |
|---|---|---|
| Foundation | Reinforced concrete | Average |
| Frame | Wood Frame | Average |
| Exterior Walls | Stucco | Average |
| Interior Walls | Textured and painted drywall | Average |
| Roof | Clay tile roofs | Average |
| Ceiling | Smooth finished with some wood beams | Average |
| HVAC System | Roof mounted HVAC units | Average |
| Interior Lighting | Reccessed and mounted fixtures | Average |
| Flooring | Finished wood | Average |
| Plumbing | Assumed adequate | Average |
| Stairwells | Multiple interior stairwells | Average |
| Elevators | None | Average |
| Smoke Detectors | Yes | Average |
| Sprinkler System | No | Average |
| Amenities | Fireplaces; small pool in one unit | Average |
| Furnishings | Personal property excluded | N/A |
| Parking | Surface parking | Average |
| Landscaping | Grass, trees, shrubs, water feature | Average |

Source: Various sources compiled by CBRE

## Condition Analysis

We first appraise the property as if it was in average condition. Hence, the ratings in the chart above. Then, later in the report, we deduct the costs to repair provided to us in order to arrive at an "as is" value.

CBRE was not provided a Property Condition Assessment (PCA). We are not building inspectors and make no warranty or guarantee. If needed, we encourage the client to obtain a PCA prior to making a business decision.

Based on information provided by the client or representative, the property requires the repairs charted below. Note that there may be some items which have already been paid for or are in the process of being paid for/reimbursed as of when we inspected the subject. We have not included these items as a hypothetical buyer of the subject property would not incur these costs. There may also be other items that we are not aware of. We reserve the right to amend our analysis should new information be provided.

| CONDITION ANALYSIS/DEFERRED MAINTENANCE | |
|---|---|
| Tree Trimming | $17,922 |
| Repaint Exterior | $60,000 |
| Roof Replacements (244 & 248) | $159,600 |
| Install Attic Insulation | $35,000 |
| Permit fees for 1 water heater and 244 pool | $800 |
| Replace breakers to bring electrical panels to code | $4,850 |
| Dryer vent and chimney cleaning | $3,000 |
| HVAC Maintenance | $1,800 |
| Repair/Replace water-damaged flooring/ceiling in 248-202, 244-104, and 244-204 | $15,000 |
| Testing for lead paint and asbestos | $2,500 |
| Reglaze tubs in 248-101 and 102 | $1,000 |
| Demo walls and replace doors in 244-104 to open basement access and restore unit to code compliance | $10,000 |
| Remove vines/growth over units' windows | $2,500 |
| Repair window screens | $750 |
| Service air vents/filters | $1,000 |
| Repair window handle 248-201 | $200 |
| Replace missing patio light cover 248-201 | $100 |
| Replace broken/clogged gutters and downspouts | $7,500 |
| Identify/Repair water leakage source in basement | $10,000 |
| Miscellaneous minor repairs | $5,000 |
| Chiller water fees due to Marantha HS | $4,359 |
| Subtotal | $342,881 |
| Total Deferred Maintenance: | $342,881 |

Source: Provided by the client

The exterior painting estimate provided to us is $90,000, which is for the subject property as well as the office property at 210 South Orange Grove Boulevard. The office property is 7,315 net square feet and the subject apartment property is 14,128 net square feet. Therefore, we have apportioned the painting cost based on the pro rata square footages, equal to two-thirds for the subject property and one-third for the office property.

## Conclusion

As indicated above, we first appraise the property as if it was in average condition. Then we deduct the costs to repair provided to us in order to arrive at an “as is” value. Overall, there are no known factors, other than described herein, that could be considered to adversely impact the marketability of the improvements.

# Zoning

The following chart summarizes the subject's zoning requirements.

| ZONING SUMMARY | |
|---|---|
| Current Zoning | WGSP-1B |
| Legally Conforming | No - See Comments |
| Uses Permitted | Residential and limited office |
| Zoning Change | Not likely |
| **Category** | **Zoning Requirement** |
| Parking Requirements | 2 covered spaces per unit 650 sq. ft. or larger; 1 covered space per unit less than 650 sq. ft. of net floor area. |
| Subject's Required Parking | **16 Covered Spaces** |
| Subject's Actual Parking | **17 Surface Spaces** |
| Source: City of Pasadena Planning & Zoning Dept. | |

The subject represents a legal non-conforming use due to a shortfall in covered parking.

Per the City of Pasadena planner, the WGSP-1B zone (West Gateway Specific Plan) is focused on residential uses. Some commercial uses, including office, are allowed with a conditional use permit (CUP). However, we are not zoning experts and make no guarantee or warranty. We encourage the client to discuss this with the planning department if further details are needed.

# Tax Assessment Data

The following table summarizes the actual and pro forma assessment values.

**AD VALOREM TAX INFORMATION - MULTIFAMILY**

| Parcel | Assessor's Parcel No. | Parcel Description | 2025/2026 | Pro Forma (Stabilized) |
|---|---|---|---|---|
| 1 | 5713-027-065 | 244-248 S. Orange Grove Boulevard | $8,330,681 | |
| Subtotal | | | $8,330,681 | $6,012,137 |
| Assessed Value @ | | | 100% | 100% |
| | | | $8,330,681 | $6,012,137 |
| General Tax Rate (per $100 A.V.) | | | 1.120618 | 1.120618 |
| General Tax: | | | $93,355 | $67,373 |
| Special Assessments: | | | 4,052 | 4,052 |
| Effective Tax Rate | | (per $100 A.V.) | 1.169263 | 1.188022 |
| **Total Taxes** | | | **$97,408** | **$71,426** |

Source: Los Angeles County Assessor's Office

We were provided a July 14, 2026, title report prepared by First American Title Insurance Company. It indicates "defaulted taxes for the fiscal years 2023, 2024 and 2025…." It indicates the "amount to redeem" as $300,227.44, which is valid through August 2026. We assume this figure is accurate but reserve the right to amend our analysis should new information be provided. We deduct the above-indicated figure from our value estimate as it is a cost that is required to be paid.

3. The lien of defaulted taxes for the fiscal years 2023, 2024 and 2025, and any subsequent delinquencies.

| | |
|---|---|
| Tax Rate Area: | 07500 |
| A. P. No.: | 5713-027-065 |
| Amount to redeem: | $296,684.31 |
| Valid through: | July 2026 |
| Amount to redeem: | $300,227.44 |
| Valid through: | August 2026 |

**Please contact the tax office to verify the payoff amount.**

If the subject sold for the value estimate in this report, a reassessment at that value would most likely occur, with tax increases limited to two percent annually thereafter until the property is sold again. The consequences of this reassessment have been considered in the appropriate valuation sections.

# Market Analysis

## Metropolitan Los Angeles-Long Beach-Glendale, CA Apartment Market Overview

### Recent Performance

The following table summarizes historical and projected performance for the overall metropolitan Los Angeles-Long Beach-Glendale, CA apartment market, as reported by RealPage.

| LOS ANGELES-LONG BEACH-GLENDALE, CA APARTMENT MARKET | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year Ending | Inventory (Units) | Completions (Units) | Occupied Stock (Units) | Occupancy | Effective Rent ($/Unit / Mo.) | Effective Rent Change | Net Absorption (Units) |
| 2016 | 1,089,664 | 9,366 | 1,043,898 | 95.8% | $2,069 | 4.64% | 4,569 |
| 2017 | 1,095,855 | 6,239 | 1,051,582 | 96.0% | $2,167 | 2.81% | 7,720 |
| 2018 | 1,104,049 | 8,355 | 1,063,862 | 96.4% | $2,261 | 3.63% | 12,340 |
| 2019 | 1,111,285 | 7,452 | 1,069,278 | 96.2% | $2,340 | 1.84% | 5,325 |
| 2020 | 1,122,109 | 11,296 | 1,070,829 | 95.4% | $2,225 | -5.53% | 1,549 |
| 2021 | 1,132,682 | 10,573 | 1,105,837 | 97.6% | $2,575 | 11.41% | 35,090 |
| 2022 | 1,140,402 | 7,720 | 1,095,584 | 96.1% | $2,799 | 6.73% | -10,309 |
| 2023 | 1,150,278 | 9,939 | 1,094,029 | 95.1% | $2,806 | -0.97% | -1,553 |
| 2024 | 1,157,264 | 6,986 | 1,104,493 | 95.4% | $2,807 | -0.50% | 10,456 |
| 2025 | 1,166,242 | 8,978 | 1,109,913 | 95.2% | $2,851 | -1.15% | 5,476 |
| *Q1 2026* | *1,168,187* | *1,945* | *1,112,698* | *95.3%* | *$2,854* | *-0.11%* | *2,813* |
| *Q2 2026* | *1,169,882* | *1,695* | *1,116,652* | *95.5%* | *$2,875* | *0.74%* | *3,893* |
| *Q3 2026** | *1,172,846* | *2,964* | *1,125,932* | *96.0%* | *$2,881* | *0.21%* | *8,695* |
| *Q4 2026** | *1,175,287* | *2,441* | *1,128,276* | *96.0%* | *$2,852* | *-1.01%* | *2,343* |
| 2026* | 1,175,287 | 9,045 | 1,128,276 | 96.0% | $2,852 | 0.00% | 18,013 |
| 2027* | 1,185,930 | 10,643 | 1,136,121 | 95.8% | $2,944 | 3.20% | 7,845 |
| 2028* | 1,190,471 | 4,541 | 1,139,281 | 95.7% | $3,023 | 2.70% | 3,160 |
| 2029* | 1,194,943 | 4,471 | 1,147,145 | 96.0% | $3,097 | 2.40% | 7,864 |
| 2030* | 1,199,241 | 4,299 | 1,151,271 | 96.0% | $3,168 | 2.30% | 4,127 |

* Future Projected Data according to RealPage

Source: RealPage, 2nd Quarter 2026

The Los Angeles-Long Beach-Glendale, CA apartment market consists of approximately 1,169,882 units of apartment space. The following observations are noted from the table above:

- As of 2nd Quarter 2026, there were approximately 1,116,652 units of occupied apartment space, resulting in an occupancy rate of 95.5% for the metro area. This reflects a small increase from the previous quarter's occupancy of 95.3%, and a small increase from an occupancy rate of 95.2% from last year.
- The area experienced positive 3,893 units of net absorption for the current quarter. This indicates an improvement from the previous quarter's positive 2,813 units of net absorption, and a decline from the positive 5,476 units of net absorption from last year.
- The area had completions of positive 1,695 units for the current quarter, which indicates a decrease from the previous quarter's completions of positive 1,945 units, and indicates a decline from completions of positive 8,978 units from last year.

- The area achieved average asking rent of $2,875 per unit, which indicates an increase from the previous quarter's asking rent of $2,854 per unit, and an increase from the asking rent of $2,851 per unit from last year.

## Historical Inventory – Market

**INVENTORY: LOS ANGELES-LONG BEACH-GLENDALE, CA APARTMENT MARKET**




* Future Projected Data according to RealPage

Source: RealPage, 2nd Quarter 2026

Inventory is projected to be 1,175,287 units at the end of the current year, which is an increase from the previous year's inventory of 1,166,242 units. Inventory for next year is projected to be 1,185,930 units, reflecting an increase from the current year.

## Historical Occupancy - Market

**OCCUPANCY: LOS ANGELES-LONG BEACH-GLENDALE, CA APARTMENT MARKET**




* Future Projected Data according to RealPage

Source: RealPage, 2nd Quarter 2026

At the end of the current year, the occupancy rate is projected to be 96.0%, which reflects an increase from the 95.2% occupancy rate at the end of last year. Occupancy for next year is projected to be 95.8%, reflecting a small decrease from the current year.

## Historical Net Absorption - Market

**NET ABSORPTION: LOS ANGELES-LONG BEACH-GLENDALE, CA APARTMENT MARKET**




* Future Projected Data according to RealPage

Source: RealPage, 2nd Quarter 2026

At the end of the current year, the area is projected to experience positive 18,013 units of net absorption, which indicates an improvement from the positive 5,476 units of net absorption for the previous year. The area is projected to experience positive 7,845 units of net absorption as of the end of next year, which indicates a decline from the current year.

## Historical Completions - Market

**COMPLETIONS: LOS ANGELES-LONG BEACH-GLENDALE, CA APARTMENT MARKET**




* Future Projected Data according to RealPage

Source: RealPage, 2nd Quarter 2026

The area is projected to achieve completions of positive 9,045 units for the current year, which indicates an improvement from the previous year's completions of positive 8,978 units. The area is projected to experience completions of positive 10,643 units as of the end of next year, which indicates an improvement from the current year.

## Historical Asking Rent - Market

EFFECTIVE RENT: LOS ANGELES-LONG BEACH-GLENDALE, CA APARTMENT MARKET




* Future Projected Data according to RealPage

Source: RealPage, 2nd Quarter 2026

The area is projected to achieve average asking rent of $2,852 per unit at the end of the current year, which indicates an increase from the previous year's asking rent of $2,851 per unit. The area is projected to achieve asking rent of $2,944 per unit by the end of next year, indicating an increase from the current year.

## Submarket Snapshot

The following table summarizes the supply of apartment units for each submarket within the Los Angeles-Long Beach-Glendale, CA market as of 2nd Quarter 2026.

**SUBMARKET SNAPSHOT**

| Submarket | Inventory (Units) | Completions* (Units) | Effective Rent ($/Unit / Mo.) | Occupancy |
|---|---|---|---|---|
| Antelope Valley | 14,090 | 0 | $1,896 | 95.9% |
| Brentwood/Westwood/Beverly Hills | 57,582 | 470 | $3,766 | 95.5% |
| Burbank/Glendale/Pasadena | 106,922 | 1,556 | $3,085 | 95.6% |
| Downtown Los Angeles | 59,541 | 772 | $2,839 | 94.2% |
| East Los Angeles | 49,752 | 0 | $2,107 | 96.8% |
| Hollywood | 96,543 | 799 | $3,002 | 95.1% |
| Long Beach | 74,335 | 217 | $2,823 | 96.1% |
| Mid-Wilshire | 127,118 | 1,499 | $2,817 | 95.2% |
| Northridge/Northwest San Fernando Valley | 37,694 | 324 | $2,420 | 96.0% |
| North San Gabriel Valley | 30,592 | 320 | $2,367 | 95.7% |
| Palms/Mar Vista | 46,518 | 497 | $3,361 | 95.6% |
| Santa Clarita Valley | 16,190 | 0 | $2,676 | 95.9% |
| Santa Monica/Marina del Rey | 49,616 | 488 | $3,881 | 95.6% |
| Sherman Oaks/North Hollywood/Encino | 49,007 | 249 | $2,725 | 95.4% |
| South Bay | 64,697 | 99 | $3,306 | 96.5% |
| Southeast Los Angeles | 39,844 | 0 | $2,590 | 96.1% |
| South Los Angeles | 126,356 | 1,288 | $2,931 | 94.4% |
| South San Gabriel Valley | 11,274 | 0 | $2,379 | 97.2% |
| Van Nuys/Northeast San Fernando Valley | 90,495 | 115 | $2,312 | 95.5% |
| Woodland Hills | 21,716 | 412 | $2,751 | 95.3% |

*Completions include trailing 4 quarters

Source: RealPage, 2nd Quarter 2026

## Burbank/Glendale/Pasadena Submarket

Important characteristics of the Burbank/Glendale/Pasadena apartment market are summarized below:

| BURBANK/GLENDALE/PASADENA APARTMENT SUBMARKET | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year Ending | Inventory (Units) | Completions (Units) | Occupied Stock (Units) | Occupancy | Effective Rent ($/Unit / Mo.) | Effective Rent Change | Net Absorption (Units) |
| 2016 | 99,915 | 602 | 95,319 | 95.4% | $2,285 | 4.32% | -217 |
| 2017 | 100,711 | 796 | 96,652 | 96.0% | $2,322 | 2.65% | 1,334 |
| 2018 | 101,843 | 1,132 | 97,993 | 96.2% | $2,424 | 1.73% | 1,342 |
| 2019 | 102,707 | 864 | 99,010 | 96.4% | $2,499 | 2.23% | 1,023 |
| 2020 | 103,045 | 338 | 98,119 | 95.2% | $2,342 | -6.37% | -893 |
| 2021 | 103,505 | 460 | 101,404 | 98.0% | $2,669 | 11.71% | 3,284 |
| 2022 | 103,967 | 462 | 100,110 | 96.3% | $2,935 | 7.01% | -1,295 |
| 2023 | 104,485 | 518 | 99,950 | 95.7% | $2,972 | 0.35% | -164 |
| 2024 | 105,016 | 531 | 99,986 | 95.2% | $3,058 | 1.94% | 35 |
| 2025 | 106,674 | 1,658 | 101,628 | 95.3% | $3,122 | 0.13% | 1,648 |
| Q1 2026 | 106,879 | 205 | 101,877 | 95.3% | $3,106 | -0.83% | 250 |
| Q2 2026 | 106,922 | 43 | 102,175 | 95.6% | $3,085 | -0.30% | 301 |
| Q3 2026* | 106,922 | 0 | 102,859 | 96.2% | $3,117 | 1.04% | 642 |
| Q4 2026* | 106,985 | 63 | 102,813 | 96.1% | $3,125 | 0.26% | -46 |
| 2026* | 106,985 | 311 | 102,813 | 96.1% | $3,125 | 0.10% | 1,071 |
| 2027* | 107,631 | 646 | 103,218 | 95.9% | $3,252 | 4.10% | 375 |
| 2028* | 107,812 | 181 | 103,284 | 95.8% | $3,350 | 3.00% | 64 |
| 2029* | 108,182 | 370 | 103,963 | 96.1% | $3,453 | 3.10% | 695 |
| 2030* | 108,534 | 352 | 104,301 | 96.1% | $3,554 | 2.90% | 339 |

*Future Projected Data according to RealPage

Source: RealPage, 2nd Quarter 2026

The Burbank/Glendale/Pasadena apartment submarket consists of approximately 106,922 units of apartment space. The current submarket inventory represents approximately 9.1% of the overall market inventory. The following observations were noted from the table above:

- As of 2nd Quarter 2026, there were approximately 102,175 units of occupied apartment space, resulting in an occupancy rate of 95.6% for the submarket. This reflects an increase from the previous quarter's occupancy of 95.3%, and a small increase from an occupancy rate of 95.3% from last year. The submarket occupancy is above the 95.5% market occupancy.
- The submarket experienced positive 301 units of net absorption for the current quarter. This indicates an improvement from the previous quarter's positive 250 units of net absorption, and a decline from the positive 1,648 units of net absorption from a year ago. Overall, the submarket has experienced positive 551 units of net absorption for the current year-to-date period. The submarket's current net absorption of positive 301 units is below the overall market net absorption of positive 3,893 units.
- The submarket had completions of positive 43 units for the current quarter, which indicates a decrease from the previous quarter's completions of positive 205 units, and a decrease from the completions of positive 229 units from last year.
- The submarket achieved average asking rent of $3,085 per unit, which indicates a decrease from the previous quarter's asking rent of $3,106 per unit, and a decrease from the asking rent of $3,122 per unit from last year. The submarket's current asking rent of $3,085 per unit compares favorably with the overall market asking rent of $2,875 per unit.

## Historical Inventory - Submarket

**INVENTORY: BURBANK/GLENDALE/PASADENA APARTMENT MARKET**




* Future Projected Data according to RealPage

Source: RealPage, 2nd Quarter 2026

Submarket Inventory is projected to be 106,985 units at the end of the current year, which is a small increase from the previous year's submarket inventory of 106,674 units. Inventory for next year is projected to be 107,631 units, reflecting a small increase from the current year.

## Historical Occupancy - Submarket

**OCCUPANCY: BURBANK/GLENDALE/PASADENA APARTMENT MARKET**




* Future Projected Data according to RealPage

Source: RealPage, 2nd Quarter 2026

Submarket occupancy is projected to be 96.1% at the end of the current year, which is an increase from the previous year's submarket occupancy of 95.3%. Submarket occupancy for next year is projected to be 95.9%, reflecting a small decrease from the current year.

## Historical Net Absorption - Submarket

**NET ABSORPTION: BURBANK/GLENDALE/PASADENA APARTMENT MARKET**




* Future Projected Data according to RealPage

Source: RealPage, 2nd Quarter 2026

Net absorption in the submarket is projected to be positive 1,071 units at the end of the current year, reflecting a decline from the previous year's net absorption of positive 1,648 units. Net absorption for next year is projected to be positive 375 units, indicating a decline from the current year.

## Historical Completions - Submarket

**COMPLETIONS: BURBANK/GLENDALE/PASADENA APARTMENT MARKET**




* Future Projected Data according to RealPage

Source: RealPage, 2nd Quarter 2026

The submarket is projected to achieve completions of positive 311 units at the end of the current year, which indicates a decline from the previous year's completions of positive 1,658 units. The submarket is projecting completions of positive 646 units for next year, which indicates an improvement from the current year.

## Historical Asking Rent - Submarket

**EFFECTIVE RENT: BURBANK/GLENDALE/PASADENA APARTMENT MARKET**




* Future Projected Data according to RealPage

Source: RealPage, 2nd Quarter 2026

The submarket is projected to achieve average asking of $3,125 per unit at the end of the current year, which is an increase from the previous year's asking rent of $3,122 per unit. The submarket is projected to achieve average asking rent of $3,252 per unit, reflecting an increase from the current year.

## New Construction

BURBANK/GLENDALE/PASADENA APARTMENT SUBMARKET- PROSPECTIVE AND UNDER CONSTRUCTION PROJECTS

| Submarket | Property Name | Address | City | Zip Code | Structure | Stories | Units | Property Status | Construction Start | Construction Finish |
|---|---|---|---|---|---|---|---|---|---|---|
| Burbank/Glendale/Pasadena | 101 North Brand Boulevard | 101 N Brand Blvd | Glendale | 91203 | Tower | 19 | 312 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 1045-1055 Locust Street | 1045-1055 Locust St | Pasadena | 91106 | Podium | 4 | 40 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 1112 North Columbus Avenue | 1112 N Columbus Ave | Glendale | 91202 | Podium | 4 | 24 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 1155 East Colorado Boulevard | 1155 E Colorado Blvd | Pasadena | 91106 | Podium | 6 | 148 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 117 East Fairview Avenue | 117 E Fairview Ave | Glendale | 91207 | Podium | 5 | 36 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 1303 North Central Avenue | 1303 N Central Ave | Glendale | 91202 | Podium | 6 | 149 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 1332 Colorado Boulevard | 1332 Colorado Blvd | Los Angeles | 90041 | Podium | 4 | 31 | Under Construction | Jan 2023 | May 2027 |
| Burbank/Glendale/Pasadena | 140 North Fair Oaks Avenue | 140 N Fair Oaks Ave | Pasadena | 91103 | Tower | 7 | 38 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 1433 Crestfield Drive | 1433 Crestfield Dr | Duarte | 91010 | Townhome/Row Home | 3 | 169 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 1642 South Central Avenue | 1642 S Central Ave | Glendale | 91204 | Podium | 5 | 31 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 236 Central | 236 N Central Ave | Glendale | 91203 | Tower | 8 | 682 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 253 South Los Robles Avenue | 253 S Los Robles Ave | Pasadena | 91101 | Podium | 6 | 90 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 270-282 North Los Robles Avenue | 270-282 N Los Robles Ave | Pasadena | 91101 | Podium | 6 | 105 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 3200 East Foothill Boulevard | 3200 E Foothill Blvd | Pasadena | 91107 | Podium | 4 | 550 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 340 North Central Avenue | 340 N Central Ave | Glendale | 91203 | Podium | 6 | 20 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 3411 Foothill Boulevard | 3411 Foothill Blvd | Glendale | 91214 | Podium | 5 | 87 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 345 West Cerritos Avenue | 345 W Cerritos Ave | Glendale | 91204 | Podium | 6 | 41 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 350 Cordova Street | 350 Cordova St | Pasadena | 91101 | Podium | 4 | 86 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 380 South Rosemead Boulevard | 380 S Rosemead Blvd | Pasadena | 91107 | Tower | 7 | 169 | Planned | Nov 2026 | Jun 2028 |
| Burbank/Glendale/Pasadena | 413-419 Irving Avenue | 413-419 Irving Ave | Glendale | 91201 | Podium | 4 | 33 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 4600 Ocean View Boulevard | 4600 Ocean View Blvd | La Canada Flintridge | 91011 | Townhome/Row Home | 3 | 30 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 4728 San Fernando Road | 4728 San Fernando Rd | Glendale | 91204 | Podium | - | 429 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 490 North Lake Avenue | 490 N Lake Ave | Pasadena | 91101 | Tower | 7 | 149 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 511 South Oak Knoll Avenue | 511 S Oak Knoll Ave | Pasadena | 91101 | Podium | 4 | 46 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 529-537 East Palm Avenue | 529-537 E Palm Ave | Burbank | 91501 | Podium | 4 | 24 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 555 North Mentor Avenue | 555 N Mentor Ave | Pasadena | 91106 | Podium | 3 | 42 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 600 Foothill Boulevard | 600 Foothill Blvd | La Canada Flintridge | 91011 | Podium | 5 | 67 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 601 North Brand Boulevard | 601 N Brand Blvd | Glendale | 91203 | Tower | 36 | 858 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 713 Locust Street | 713 Locust St | Pasadena | 91101 | Podium | 6 | 27 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 740-790 East Green Street | 740-790 E Green St | Pasadena | 91101 | Podium | 5 | 263 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 80 North Lake Avenue | 80 N Lake Ave | Pasadena | 91101 | Tower | 7 | 74 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 810 North Marengo Avenue | 810 N Marengo Ave | Pasadena | 91103 | Podium | 3 | 32 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 815 Fremont Avenue | 815 Fremont Ave | South Pasadena | 91030 | Podium | 5 | 56 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 820 North Central Avenue | 820 N Central Ave | Glendale | 91203 | Tower | 8 | 105 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | 83 North Lake Avenue | 83 N Lake Ave | Pasadena | 91101 | Podium | 6 | 54 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | Alexan Arroyo | 325 N Santa Anita Ave | Arcadia | 91006 | Tower | 8 | 359 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | Alexan Azalea | 150 N Santa Anita Ave | Arcadia | 91006 | Tower | 7 | 319 | Under Construction | May 2024 | Apr 2027 |
| Burbank/Glendale/Pasadena | AMLI Old Pasadena II | 100 Walnut St | Pasadena | 91103 | Tower | 7 | 975 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | Arcadia Town Center | Huntington Dr & Santa Anita Dr | Arcadia | 91007 | Podium | 5 | 181 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | Burbank Aero Crossings | 2311 N Hollywood Way | Burbank | 91505 | Tower | 7 | 862 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | Central Park | 86 S Fair Oaks Ave | Pasadena | 91105 | Podium | 6 | 84 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | CFT Gateway Center | 3452 E Foothill Blvd | Pasadena | 91107 | Wrap | 6 | 233 | Under Construction | Feb 2023 | Oct 2027 |
| Burbank/Glendale/Pasadena | Fairview Court | 1020 El Centro St | South Pasadena | 91030 | Garden | 4 | 108 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | Former Volvo Dealership | E Colorado Blvd & N San Marino Ave | Pasadena | 91107 | Podium | 4 | 150 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | Kenwood Gardens | 128 S Kenwood St | Glendale | 91205 | Podium | 5 | 40 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | Oak Park | W Olive Ave & W Colorado Blvd | Monrovia | 91016 | Garden | 6 | 296 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | Pacific Las Tunas Place | 9465 Las Tunas Dr | Temple City | 91780 | Podium | 4 | 46 | Under Construction | May 2025 | Jun 2027 |
| Burbank/Glendale/Pasadena | Seven Patios | 845 El Centro St | South Pasadena | 91030 | Podium | 3 | 57 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | The Derby | 233 E Huntington Dr | Arcadia | 91006 | Podium | 6 | 214 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | The Monroe | 701 S Myrtle Ave | Monrovia | 91016 | Podium | 5 | 204 | Pre-Planned | - | - |
| Burbank/Glendale/Pasadena | The Nor Brand | 1838 S Brand Blvd | Glendale | 91204 | Podium | 5 | 80 | Under Construction | Sep 2022 | Feb 2027 |
| Burbank/Glendale/Pasadena | The Pamplona | 2771 E Foothill Blvd | Pasadena | 91107 | Podium | 4 | 21 | Pre-Planned | - | - |

Source: RealPage, 2nd Quarter 2026

Overall, there is ample new product coming on line over the next two to three years. The majority of the projects are in the planned/proposed phase, with nine projects being recently completed.

### Government Regulation:

Local municipal rent control ordinances are generally more restrictive and take precedence over Assembly Bill 1482. Los Angeles County cities with rent control enacted prior to the state bill include Los Angeles, Santa Monica, West Hollywood, Beverly Hills, Inglewood and Culver City. In addition, unincorporated communities within Los Angeles County are already subject to more restrictive rent control.

### State of California Rent Control (Assembly Bill 1482)

State-wide land planning and regulations strongly emphasize affordable housing issues. There is government money available for subsidized housing project. Rent control is already in effect in many local jurisdictions. Court procedures regarding tenant-landlord disputes and government enforcement of housing codes are widely viewed as being biased against apartment property owners.

The subject property is located within California, which enacted state-wide rent control with the title Assembly Bill 1482 in October 2019. It exempts apartments that have been issued a certificate of occupancy within the previous 15 years. Under Assembly Bill 1482, landlords of residential real property are prohibited from, over the course of any 12-month period, increasing the gross rental rate for a dwelling or unit more than 5% plus the percentage change in the cost of living, or 10%, whichever is lower, of the lowest gross rental rate charged for the immediately preceding 12 months. The cost of living is defined as

the percentage change from April 1 of the prior year to April 1 of the current year in the regional Consumer Price Index for the residential real property is located, as published by the United States Bureau of Labor Statistics. The Consumer Price Index for the Los Angeles Metro Area is currently 3.7%. This would indicate a cap of 8.7% for annual rental increases.

The bill prohibits owners from increasing the gross rental rate for the unit in more than 2 increments over a 12-month period, after the tenant remains in occupancy over a 12-month period. The new law is retroactive and applies to all rent increases occurring on or after March 15, 2019. If an owner increased the rent by more than the permitted amount between March 15, 2019, and January 1, 2020, the applicable rent on January 1, 2020, shall be the rent as of March 15, 2019, plus the maximum permissible increase, and the owner shall not be liable to the tenant for any corresponding rent overpayment. The bill would authorize an owner who increased the rent by less than the amount specified above between March 15, 2019, and January 1, 2020, to increase the rent twice within 12 months of March 15, 2019, but not by more than the amount specified above.

This bill, with certain exceptions, prohibit landlords from terminating a tenancy without just cause. The bill requires, for certain just cause terminations that are curable, that the owner give a notice of violation and an opportunity to cure the violation prior to issuing the notice of termination. The bill, if the violation is not cured within the time period set forth in the notice, authorize a 3-day notice to quit without an opportunity to cure to be served to terminate the tenancy. The bill requires, for no-fault just cause terminations, that the landlord provide a direct payment of one month's rent to the tenant or waive in writing the payment of rent for the final month of the tenancy, prior to the rent becoming due. The bill requires the actual amount of relocation assistance or rent waiver provided to a tenant that fails to vacate after the expiration of the notice to terminate the tenancy to be recoverable as damages in an action to recover possession.

These provisions will last until January 1, 2030. Therefore, properties built between 2004 through 2015 will be eventually affected during the term of the bill.

**Due to its location and age, the subject property falls under the California Assembly Bill 1482.**

## City of Pasadena Rent Control (Measure H)

On December 12, 2022, the City has adopted a new law called the Pasadena Fair and Equitable Housing Charter Amendment (Measure H), which limits rent increases and evictions in the City of Pasadena. This rent control provision applies to property that (1) was built before February 1, 1995, (2) is not a condo or the only unit on the lot (is a multi-family residence), and (3) is not part of Pasadena's Inclusionary Housing program/Section 8/or the like.

**Rent control:** To the extent allowed by State law, rent increases shall be limited to 75% of inflation every year after a tenancy is established. If a landlord can prove that their operating expenses have increased, they can petition for a special one-time rent increase. If a tenant can prove that the services provided or quality of their unit has decreased, they can petition for a special one-time rent decrease.

# HOW MUCH CAN RENT BE LEGALLY RAISED?

- 2.25% is the Annual General Adjustment (AGA) effective October 1, 2025 through September 30, 2026
- 3% is the Annual General Adjustment (AGA) effective October 1, 2024 through September 30, 2025
- Landlords may only increase rents once every 12 months, with a written 30-day notice.
- Landlords are prohibited from raising the rent under specific circumstances, such as when there are significant habitability issues. *(Renters can report habitability concerns to Code Compliance if repairs are needed.)*

**Eviction protections:** Landlords would only be able to evict tenants after providing a reason ("just cause"). Some allowed reasons for evictions are "at fault" just causes like non-payment of rent, breach of lease, and refusal to give access for necessary repairs. Other reasons for evictions are "no fault" just causes like the landlord permanently removing the unit from the rental market, or a government order to vacate the unit.

**Relocation assistance:** If a tenant is evicted for a "no fault" reason, the amendment would provide additional help to the tenant. Landlords would have to pay relocation assistance to help them move, and if the landlord has a comparable unit available, the tenants being displaced would have first choice of that unit.

## APARTMENT MARKET CONCLUSION

Provided on the following pages are our conclusions for the Los Angeles County and Competitive Market/Subject apartment markets.

### Competitive Market/Subject

The overall occupancy characteristics of the subject and the competitive properties are good. Based on the survey of the local apartment market, the following local market operating characteristics were determined.

### Concessions

Within Southern California, concession availability varies from market to market and is dependent on supply and demand characteristics. In general, newly constructed projects offer greater concessions in order to increase the lease-up of a project, while older projects in established markets typically offer limited concessions. Concessions provided typically include free rent, reduced rent, or reduced security deposits. Items offered by the landlord may be offered on all unit types within a project, or only on specific units.

- Concessions are not prevalent in the local submarket. Therefore, no concessions have been modeled within our analysis.

### Lease Terms

Lease terms typically range from month-to-month to one-year occupancy. After the initial lease term, most leases automatically convert to a month-to-month lease. The length of the lease is determined by the

property owner, but may be negotiated by the tenant. Rental rates are generally higher for shorter occupancy periods with tenants in month-to-month leases typically charged a premium. Lease terms are also determined by the future lease expirations of a project. Most professional management companies attempt to stagger lease expirations throughout the year.

- The lease terms in the market range from month to month to 12 months with 12-month lease terms typical. Our analysis is based on 12-month leases.

### RUBS (Ratio Utility Billing System)

RUBS is a method of allocating utility costs in multi-unit properties. The system works by distributing the actual costs of the utility bills to each unit or residence based on an allocation formula determined by one or more factors including, number of occupants, square footage, number of bathrooms and number of water fixtures. RUBS is often used by property owners as a means of passing on utility costs to the tenants. In addition, by separating utility costs from the rent, utility conservation (especially water) is encouraged. In Southern California, the practice of RUBS is not uniform across all markets. Typically, newer projects in more upscale locations have adopted RUBS in their operations while older properties have not. Generally, this system is administered by a third party vendor and there are varying levels of tenant participation or penetration, often dependent on when the program commenced.

- The subject operates with a fixed utility reimbursement of $300 for 2 of the existing tenants. Therefore, we have modeled this utility reimbursement in the analysis.

### Vacancy Rate

The concluded vacancy rate is 4.0%. Primary support for this conclusion was the CBRE market survey as it pertains directly to the subject's immediate apartment market and its primary competitors. In addition to the vacancy rate, a 1.0% collection loss has been estimated, which results in a total vacancy and collection loss of 5.0%.

## Conclusion

The area apartment market and the local submarket are exhibiting stable occupancy levels and generally upward trending rental rates, while maintaining positive absorption in recent years. Considering the recent trends in absorption and the number of prospects for new construction, the local market area should maintain a stabilized occupancy position. The long-term projection for the subject submarket is for stable growth.

# Highest and Best Use

In appraisal practice, the concept of highest and best use represents the premise upon which value is based. The four criteria the highest and best use must meet are:

- legally permissible;
- physically possible;
- financially feasible; and
- maximally productive.

The highest and best use analysis of the subject is discussed below.

## As Vacant

The property is zoned for a variety of residential uses. Offices are allowed with a conditional use permit (CUP). The site is of sufficient size to accommodate various types of development. The immediate area includes mostly residential land uses. Considering the surrounding land uses, location attributes, legal restrictions and other factors, it is our opinion that a multifamily oriented development to maximum density limits would be reasonable and appropriate. However, we note that there are various easements throughout the subject site of indeterminate locations. This would make the actual development of multifamily difficult if not impossible. Therefore, it is our opinion that the highest and best use would be for multifamily use, time and circumstances warranting, and if the easements could be moved, extinguished, or developed around.

## As Improved

As improved, the subject is an eight-unit luxury apartment. It is legally allowed and the current use physically possible. The improvements continue to contribute value to the property and based on our analysis, the existing use is financially feasible. Based on the foregoing, the highest and best use of the property, as improved, is consistent with the existing use as an apartment development.

# Sales Comparison Approach

The following map and table summarize the comparable data used in the valuation of the subject.

8-Unit Multifamily Apartment
244-248 S Orange Grove Boulevard
Pasadena CA 91105

6-Unit Multifamily Property
324 S Rexford Dr
Beverly Hills, CA 90212

5-Unit Multifamily Apartment
9660 W. Olympic Boulevard
Beverly Hills, CA 90212

5-Unit Multifamily Apartment
160 S Grand Avenue
Pasadena, CA 91105

9-Unit Multifamily Apartment
301 Ashland Avenue
Santa Monica, CA 90405

318 N Oakhurst Dr
318 N Oakhurst Dr
Beverly Hills, CA 90210

7-Unit Multifamily Apartment
435 West California Boulevard
Pasadena, CA 91105



**SUMMARY OF COMPARABLE MULTIFAMILY SALES**

| No. | Property Name | Transaction Type | Transaction Date | YOC / Reno'd | No. Units | Avg. Unit Size | Actual Sale Price | Adjusted Sale Price [1] | Price Per Unit [1] | Occ. | NOI Per Unit | OAR | $/Unit Mo. | Units/ Acre | OER | EGIM | $/SF | Rooms/ Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 6-Unit Multifamily Property, 324 S Rexford Dr Beverly Hills, CA 90212 | Sale | Feb-26 | 1968 | 6 | 1,561 | $4,150,000 | $4,150,000 | $691,667 | 67% | $30,047 | 4.34% | $3,533 | 43.04 | 25.41% | 17.17 | $443 | 4.50 |
| 2 | Olympic Blvd. Apartments, 9660 W. Olympic Blvd. Beverly Hills, CA 90212 | Sale | Nov-25 | 1935 | 5 | 1,327 | $3,800,000 | $3,800,000 | $760,000 | 100% | $37,301 | 4.91% | $4,500 | 33.00 | 27.29% | 14.81 | $573 | 3.80 |
| 3 | 5-Unit Multifamily Apartment, 160 S. Grand Avenue Pasadena, CA 91105 | Sale | Sep-25 | 1906 | 5 | 1,188 | $3,300,000 | $3,300,000 | $660,000 | 100% | $23,082 | 3.50% | $3,115 | 9.06 | 35.00% | 18.59 | $555 | 3.80 |
| 4 | 9-Unit Multifamily Apartment, 301 Ashland Avenue Santa Monica, CA 90405 | Sale | Apr-25 | 1960 | 9 | 866 | $6,600,000 | $6,600,000 | $733,333 | 100% | $40,013 | 5.46% | $4,694 | 50.73 | 25.23% | 13.70 | $847 | 3.44 |
| 5 | 318 N Oakhurst Dr, 318 N Oakhurst Dr Beverly Hills, CA 90210 | Sale | Feb-25 | 1969 | 7 | 1,900 | $5,450,000 | $5,450,000 | $778,571 | 100% | $29,676 | 3.81% | $4,230 | 40.65 | 38.46% | 16.15 | $410 | 4.43 |
| 6 | 7-Unit Multifamily Apartment, 435 West California Boulevard Pasadena, CA 91105 | Sale | Dec-23 | 1951 | 7 | 1,709 | $5,850,000 | $5,850,000 | $835,714 | 71% | $37,954 | 4.54% | $4,556 | 13.65 | 26.93% | 16.09 | $489 | 4.00 |
| Subj. Pro Forma | 8-Unit Multifamily Apartment, 244-248 S. Orange Grove Boulevard Pasadena, CA 91105 | --- | --- | 1927 | 8 | 1,766 | --- | --- | --- | 96% | $35,697 | 4.75% | $5,050 | 9.66 | 37.99% | 11.40 | $372 | 4.00 |

[1] Adjusted sale price for cash equivalency, lease-up and/or deferred maintenance (where applicable)

Compiled by CBRE

The sales utilized represent the best data available for comparison with the subject. They were selected from our research of comparable improved sales within the city of Pasadena, Beverly Hills, and Santa Monica. These sales were also chosen based upon their age, quality, economic characteristics, and transaction dates.

## Discussion/Analysis of Improved Sales

### Improved Sale One

324 S Rexford Dr, Beverly Hills is a 6-unit multifamily property built in 1968. The unit mix consists of (3) 2BD/2BA and (3) 3BD/3BA units. All units feature ensuite bedrooms, eat-in kitchens, designated dining areas and in-unit washer/dryers. The property has 12 garage parking spaces. Each unit includes two tandem parking spaces in the assigned garages. Seller recently completed comprehensive earthquake retrofitting, upgraded the roof, and installed new AC systems for each unit. Two of the six units were delivered vacant. The in-place capitalization rate was reported at 4.34%. We estimate an approximate 12% below market rent level.

### Improved Sale Two

9660 W Olympic Blvd, Beverly Hills is a 5-unit multifamily property built in 1935. The unit mix consists of (2) 1BD/1BA, (2) 2BD/2BA and (1) 3BD/3BA townhome units. The property has two garage parking spaces. Broker expenses appear to be underreported; therefore, we applied typical operating expenses in our financial scenario. We estimate an approximate 12% below market rent level.

### Improved Sale Three

This comparable represents the sale of a 5-unit, 1906-built, two-story multifamily apartment project located at 160 S. Grand Avenue, Pasadena, California. The unit mix consists of one-bedroom and two-bedroom units. The site has 8 total parking spaces comprised of enclosed garage spaces. It is individually metered for gas and electricity. Project amenities are minimal but include on-site parking, common area pool, and landscaped grounds. There are 19 total rooms, with a 3.80 room average. This project is subject to the City of Pasadena Rent Stabilization Ordinance. The property was listed for $3,750,000 and sold in September 2025 for $3,300,000, or $660,000 per unit, and was 100% occupied at the time of sale. Based on existing income, the overall capitalization rate equates to 3.5%. The broker reported operating expenses reflected a less than 15% OER, which is low. We have forecast a 35% market operating expense ratio within our financial analysis. We have included a 5% vacancy and collection loss to the financial scenario.

### Improved Sale Four

This is a nine-unit multifamily property located at 301 Ashland Avenue in Santa Monica. It is located three blocks from the ocean. The property was built in 1960 but significantly renovated in 2021. The unit mix includes one-bedroom and two-bedroom units. There are 31 total rooms, or an average of 3.44 rooms per unit. The broker notes that approximately seven of the nine units were significantly renovated at a cost of $390,000. Unit renovations include new HVAC, installation of in-unit washer/dryer units, new flooring, cabinets, quartz countertops, stainless steel appliances, updated bathrooms, and lighting. The exterior was renovated at a cost of $535,000. Project amenities include as well as surface and tuck-under parking spaces.

The property was listed for sale in July 2024 at $6,700,000, and sold in April 2025 for $6,600,000, or $733,333 per unit. It is our understanding that there was favorable financing for the buyer and that they

assumed the prior in-place loan of approximately $3,550,000 at a fixed 3.3% interest rate over the next 7 years. Based on in-place income, the overall capitalization rate equates to 4.37%. Based on pro forma income, the overall capitalization rate equates to 5.46%. The broker pro forma reflects an approximate 17% upside in rental income.

## Improved Sale Five

This comparable represents the sale of a 7-unit, three-story, 1969-built multifamily apartment project located at 318 N Oakhurst Drive, with portions of the site in the city of Beverly Hills and the city of Los Angeles. The unit mix is comprised of six (4) 2BR/2BA and one (1) 5BR/3.5BA units. The site has 14 covered garage parking spaces. It is individually metered for gas and electricity. The project is subject to Los Angeles rent control. The broker reported the units to be in upgraded condition with laminate floors, newer kitchen cabinets, remodeled bathrooms, and inclusive of dishwasher, refrigerator and stove. The property was listed in October 2024 for $5,800,000 and sold in February 2025 for $5,450,000, or $778,571 per unit, and is 100% occupied. A 5% vacancy and collection loss to both financial scenarios. The contract rents are approximately 20% below market level. The capitalization rate is influenced upwards by its peripheral Beverly Hills location subject to the city of Los Angeles' rent stabilization ordinance.

## Improved Sale Six

This comparable represents the sale of a 7-unit, two-story multifamily apartment project located at 435 West California Boulevard, Pasadena. The property is positioned on a corner lot. The unit mix includes all two-bedroom units. The site has 14 total parking spaces, composed of surface and attached garage spaces. It is individually metered for gas and electricity. There are 28 total rooms, with a 4.00 room average. This project is subject to the City of Pasadena Rent Control (Measure H). The units feature hardwood floors, kitchens with stainless steel appliances, updated bathrooms, fireplaces, crown molding, wainscoting, patios and decks, central HVAC, dual-pane windows, tank-less water heaters, new lighting, and in-unit washer/dryer. The building systems include newer electrical panels, copper plumbing, updated drain and main sewer lines and newer pitched roofs. The property was listed for $6,100,000 and sold in December 2023 for $5,850,000, or $835,714 per unit, and was 71% occupied. A broker representative confirmed the price. Based on existing income, the overall capitalization rate equates to 4.54%. The broker pro forma reflects 4% upside in rents. Based on market income, the overall capitalization rate equates to 4.56%. We have included a 5% vacancy and collection loss to both financial scenarios.

## Summary of Adjustments

Based on our comparative analysis, the following chart summarizes the adjustments warranted to each comparable.

**MULTIFAMILY SALES ADJUSTMENT GRID**

| Comparable Number | 1 | 2 | 3 | 4 | 5 | 6 | Subj. Pro Forma |
|---|---|---|---|---|---|---|---|
| Transaction Type | Sale | Sale | Sale | Sale | Sale | Sale | --- |
| Transaction Date | Feb-26 | Nov-25 | Sep-25 | Apr-25 | Feb-25 | Dec-23 | --- |
| Year Built/Renovated | 1968 | 1935 | 1906 | 1960 | 1969 | 1951 | 1927 |
| No. Units | 6 | 5 | 5 | 9 | 7 | 7 | 8 |
| Avg. Unit Size | 1,561 | 1,327 | 1,188 | 866 | 1,900 | 1,709 | 1,766 |
| Actual Sale Price | $4,150,000 | $3,800,000 | $3,300,000 | $6,600,000 | $5,450,000 | $5,850,000 | --- |
| Adjusted Sale Price [1] | $4,150,000 | $3,800,000 | $3,300,000 | $6,600,000 | $5,450,000 | $5,850,000 | --- |
| Price Per Unit [1] | $691,667 | $760,000 | $660,000 | $733,333 | $778,571 | $835,714 | --- |
| Occupancy | 67% | 100% | 100% | 100% | 100% | 71% | 96% |
| NOI Per Unit | $30,047 | $37,301 | $23,082 | $40,013 | $29,676 | $37,954 | $35,697 |
| OAR | 4.34% | 4.91% | 3.50% | 5.46% | 3.81% | 4.54% | --- |
| Adj. Price Per Unit | $691,667 | $760,000 | $660,000 | $733,333 | $778,571 | $835,714 | |
| Property Rights Conveyed | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Financing Terms [1] | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Conditions of Sale | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Market Conditions (Time) | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | -10.0%<br>Declining market conditions since time of sale primarily due to rising interest rates | |
| Subtotal - Price Per Unit | $691,667 | $760,000 | $660,000 | $733,333 | $778,571 | $752,143 | |
| Location | -7.5%<br>Superior Beverly Hills location | -7.5%<br>Superior Beverly Hills location | 0.0%<br>Similar Pasadena location | -7.5%<br>Superior Santa Monica location and proximity to Pacific Ocean | -7.5%<br>Superior Beverly Hills location | 0.0%<br>Similar Pasadena location | |
| Project Size | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Age/Condition | -2.5%<br>Newer year of construction | 0.0% | 0.0% | -7.5%<br>Newer year of construction (-2.5%) and 7 of 9 units reported renovated (-5%) | -2.5%<br>Newer year of construction | 0.0% | |
| Quality of Construction | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Avg. Unit Size | 0.0% | 5.0%<br>Inferior avg. unit size | 5.0%<br>Inferior avg. unit size | 15.0%<br>Inferior avg. unit size | 0.0% | 0.0% | |
| Project Amenities | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Parking | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Unit Mix | -2.5%<br>Superior unit mix | 0.0% | 0.0% | 5.0%<br>Inferior unit mix | -2.5%<br>Superior unit mix | 0.0% | |
| Other | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | |
| Total Other Adjustments | -12.5% | -2.5% | 5.0% | 5.0% | -12.5% | 0.0% | Average |
| **Indicated Value Per Unit** | **$605,208** | **$741,000** | **$693,000** | **$770,000** | **$681,250** | **$752,143** | $707,100 |
| *Absolute Adjustment* | *12.5%* | *12.5%* | *5.0%* | *35.0%* | *12.5%* | *10.0%* | |

[1] Adjusted for cash equivalency, lease-up and/or deferred maintenance (where applicable)

Compiled by CBRE

## Effective Gross Income Multiplier Analysis

The EGIM reflects the relationship between effective gross annual income and sales price. The following illustrates the EGIM for each of the sales analyzed herein.

**EFFECTIVE GROSS INCOME MULTIPLIER ANALYSIS**

| Sale No. | Occupancy | OER | EGIM |
|---|---|---|---|
| 4 | 100% | 25.23% | 13.70 |
| 1 | 67% | 25.41% | 17.17 |
| 6 | 71% | 26.93% | 16.09 |
| 2 | 100% | 27.29% | 14.81 |
| 3 | 100% | 35.00% | 18.59 |
| ***Subject*** | ***95%*** | ***37.99%*** | --- |
| 5 | 100% | 38.46% | 16.15 |

Compiled by CBRE

Generally speaking, as occupancy levels and expense ratios increase, EGIMs tend to decrease. Based upon this relationship and given the subject's location and physical/economic characteristics, an EGIM towards the lower portion of the range would be expected.

## Sales Comparison Approach Conclusion

After adjustment, the comparables range from $605,208 per unit to $770,000 per unit, with an average of $707,100 . All of the presented comparables represent good substitute investments and shed light on the appraisal problem to be solved. We note that Sale No. 6 represents similar income characteristics (net operating income), similar Pasadena location generally, and required the least amount of net adjustments. The following chart presents the valuation conclusion:

**SALES COMPARISON APPROACH**

| Total Units | X | Value Per Unit | = | Value |
|---|---|---|---|---|
| 8 | X | $725,000 | = | $5,800,000 |
| 8 | X | $765,000 | = | $6,120,000 |

| **VALUE CONCLUSION** | | |
|---|---|---|
| **As If Stabilized Value** | | **$6,000,000** |
| Deferred Maintenance | | ($342,881) |
| Delinquent HOA | | ($18,038) |
| Delinquent Real Estate Taxes | | ($300,227) |
| Lease-up Deduction (2 Vacant Units) | | ($76,200) |
| **Indicated As Is Value** | **August 5, 2026** | **$5,262,653** |
| **Rounded** | | **$5,250,000** |
| **Value Per Unit** | | **$656,250** |
| **Value Per SF (NRA)** | | **$372** |

Compiled by CBRE

The lease-up deduction charted above is discussed in the income capitalization approach section of the report. The other items are addressed elsewhere in the report.

# Income Capitalization Approach

The following map and table summarize the primary comparable data used in the valuation of the subject.



313 S. Orange Grove Blvd



625 S. Orange Grove Blvd #3



111 S. Orange Grove Blvd #309



681 S. Orange Grove Blvd #3




**SUMMARY OF COMPARABLE TWO-BEDROOM RENTALS**

| Address | City | Year Built | # of Units | Occupancy | Lease Date | BR/BA | Unit SqFt | $/SF | $ |
|---|---|---|---|---|---|---|---|---|---|
| 313 S. Orange Grove Blvd | Pasadena | 1957 | 18 | 100% | Nov-25 | 2+2 | 1,452 | $2.96 | $4,300 |
| 625 S. Orange Grove Blvd #3 | Pasadena | 1965 | 8 | 100% | Aug-25 | 2+2.5 TH | 1,671 | $2.87 | $4,800 |
| 111 S. Orange Grove Blvd #309 | Pasadena | 1974 | 39 | 100% | Jun-26 | 2+2 | 1,713 | $2.92 | $4,998 |
| 681 S. Orange Grove Blvd #3 | Pasadena | 1959 | 6 | 83% | Available | 2+3 | 1,494 | $3.68 | $5,500 |

Compiled by CBRE

The rent comparables are all located within the city of Pasadena and represent recently leased and current asking rents. Overall, the comparables demonstrate that units like the subject property lease or are asking from $4,300 per month to a high of $5,500 per month. The last subject recent lease was in June 2025 for $4,500 per month (Unit No. 248-202). We have concluded to a base market rent of $5,000 per month.

Unit No. 244-104 has a large private patio with a pool. We have concluded a market rent for this unit at $5,500 per month ($500 premium for large patio/pool).

Unit No. 248-102 also has a large private patio, but no pool. We have concluded a market rent for this unit at $5,250 per month ($250 premium for large patio).

Overall, our market rent conclusions are reasonable and supported by leases of similar sized two-bedrooms within the local market.

## Rent Adjustments

Rent adjustments are sometimes necessary to account for differences in rental rates applicable to different units within similar floor plans due to items such as location within the property, view, and level of amenities. These rental adjustments may be in the form of rent premiums or rent discounts. The rental rates for the subject's units do not vary depending on location within the subject. Thus, no rent adjustments are required.

## Rent Roll Analysis

The subject's rent roll is illustrated as follows:

**APARTMENT RENT ROLL**

| Unit Information | | | | | | | | Rent Information | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Unit ID | Recent Lease | Unit Comment | Inspection | Rooms | Bedrooms | Baths | Unit Size | Vac | Act Rnt Unit | Mkt Rnt Unit | Forecast Unit | Forecast $/PSF | Fcast vs. Act Variance |
| 244 - 103 | | | X | 4.0 | 2.0 | 2.5 | 1,747 SF | | $5,592 | $5,000 | $5,592 | $3.20 | 0.00% |
| 244 - 104 | | Large Patio + Pool/Vacant | X | 4.0 | 2.0 | 2.5 | 1,743 SF | X | $5,500 | $5,500 | $5,500 | $3.16 | 0.00% |
| 244 - 203 | | | | 4.0 | 2.0 | 2.5 | 1,790 SF | | $5,800 | $5,000 | $5,800 | $3.24 | 0.00% |
| 244 - 204 | | | | 4.0 | 2.0 | 2.5 | 1,784 SF | | $4,601 | $5,000 | $4,601 | $2.58 | 0.00% |
| 248 - 101 | | | | 4.0 | 2.0 | 2.5 | 1,747 SF | | $4,806 | $5,000 | $4,806 | $2.75 | 0.00% |
| 248 - 102 | | Large Outdoor Patio | X | 4.0 | 2.0 | 2.5 | 1,743 SF | | $4,000 | $5,250 | $4,000 | $2.29 | 0.00% |
| 248 - 201 | | Vacant | | 4.0 | 2.0 | 2.5 | 1,790 SF | X | $5,000 | $5,000 | $5,000 | $2.79 | 0.00% |
| 248 - 202 | June 1, 2025 | | | 4.0 | 2.0 | 2.5 | 1,784 SF | | $4,500 | $5,000 | $4,500 | $2.52 | 0.00% |
| **8** | **Totals** | | **3** | **32.0** | | | **14,128 SF** | **2** | **$39,799** | **$40,750** | **$39,799** | | |
| **Totals Annual** | | | | | | | | | **$477,584** | **$489,000** | **$477,584** | | |
| **Average** | | | | **4.0** | | | **1,766 SF** | | **$4,975** | **$5,094** | **$4,975** | **$2.82** | |
| **Forecast vs. Actual Rents Variance:** | | | | | | | **0.00%** | | | | | | |
| **Actual vs. Market Rents Variance** | | | | | | | **2.39%** | | | | | | |
| **Market vs. Forecast Rents Variance:** | | | | | | | **2.39%** | | | | | | |
| **Actual Vacancy** | | | | | | | **25.00%** | | | | | | |

Compiled by CBRE

## Potential Rental Income Conclusion

Within this analysis, potential rental income is based upon in-place income as the subject is under rent control. The two vacant units are forecast at market. This method of calculating rental income is typical in the local market and reasonable.

## Operating History

The following table presents available operating data for the subject.

**OPERATING HISTORY**

| Year-Occupancy | 2026 Annualized (Jan '26 - Jun '26) Total | $/Unit | CBRE Estimate Total [2] | 95.0% $/Unit |
|---|---|---|---|---|
| **Income** | | | | |
| Net Rental Income | $165,881 | $20,735 | $453,704 | $56,713 |
| Other Income | - | - | - | - |
| RUBS/Utility Income | 7,200 | 900 | 6,840 | 855 |
| Effective Gross Income | $173,081 | $21,635 | $460,544 | $57,568 |
| **Expenses** | | | | |
| Real Estate Taxes | $0 | $0 | $71,426 | $8,928 |
| Property Insurance | 36,304 | 4,538 | 18,000 | 2,250 |
| Utilities | 26,454 | 3,307 | 32,000 | 4,000 |
| Administrative & General | 3,556 | 444 | 3,800 | 475 |
| Repairs & Maintenance | 185,374 | 23,172 | 16,000 | 2,000 |
| Management Fee [1] | 16,224 | 2,028 | 13,816 | 1,727 |
| Association Dues | 14,945 | 1,868 | 17,926 | 2,241 |
| Replacement Reserves | - | - | 2,000 | 250 |
| Operating Expenses | $282,858 | $35,357 | $174,968 | $21,871 |
| **Net Operating Income** | **($109,776)** | **($13,722)** | **$285,577** | **$35,697** |
| [1] *(Mgmt. typically analyzed as a % of EGI)* | *9.4%* | | *3.0%* | |

[2] *(Some revenue categories may reflect net figures)*

Source: Operating statements

We were provided a January through June 2026 Income and Expense statement. We have annualized the provided figures and considered both the historical figures and the expense comparables within our income and expense forecasts.

The HOA dues were reported for the subject to be $2,241 per unit per year. Therefore, we have forecast in line with this reported expense.

## Concessions

Rent concessions are not prevalent in the local market and they are currently not present at the subject. We have not modeled concessions in our analysis.

## Vacancy

The subject's estimated stabilized occupancy rate was previously discussed in the market analysis. The subject's vacancy is detailed as follows:

| VACANCY | | |
|---|---|---|
| Year | Total | % PGI |
| Current | ----- | 25% |
| **CBRE Estimate** | **$19,103** | **4%** |
| Compiled by CBRE | | |

## Credit Loss

The credit loss estimate is an allowance for nonpayment of rent or other income. The subject's credit loss is detailed as follows:

| CREDIT LOSS | | |
|---|---|---|
| Year | Total | % PGI |
| **CBRE Estimate** | **$4,776** | **1.0%** |
| Compiled by CBRE | | |

## Other Income

Other income is supplemental to that derived from leasing of the improvements. This includes categories such as forfeited deposits, after-hour utility charges, late charges, etc. The subject's income is detailed as follows:

| OTHER INCOME | | |
|---|---|---|
| Year | Total | $/Unit |
| 2026 Annualized (Jan '26 - Jun '26) | $0 | $0 |
| **CBRE Estimate** | **$0** | **$0** |
| Compiled by CBRE | | |

The subject does not report Other Income. Therefore, Other Income has not been forecast within our analysis.

## RUBS/Utility Income

The subject includes a RUBS program (Ratio Utility Billing System), whereby a portion of the utility expense is shared by tenants and reimbursed to the landlord on a pro rata basis. The subject's RUBS income is detailed as follows:

| RUBS/UTILITY INCOME | | |
|---|---|---|
| Year | Total | $/Unit |
| 2026 Annualized (Jan '26 - Jun '26) | $7,200 | $900 |
| **CBRE Estimate** | **$7,200** | **$900** |
| Compiled by CBRE | | |

Our forecast is based on the current collections, per the rent roll provided. The collection indicated in the rent roll provided for the month of July 2026 was listed as $300 per unit per month for 2 units (Unit Nos. 244-104 and 248-102). We have forecast in line with the current collections.

## Effective Gross Income

The subject's effective gross income is detailed as follows:

| EFFECTIVE GROSS INCOME | | |
|---|---|---|
| Year | Total | % Change |
| 2026 Annualized (Jan '26 - Jun '26) | $173,081 | --- |
| **CBRE Estimate** | **$460,544** | **166%** |
| Compiled by CBRE | | |

Our income and expense forecasts are reasonable and supported. It should be noted our forecast takes into account in-place rents plus vacant units at the concluded market rents.

## Operating Expense Analysis

### Expense Comparables

The following chart summarizes expenses obtained from comparable properties.

| EXPENSE COMPARABLES | | | | | |
|---|---|---|---|---|---|
| Comparable Number | 1 | 2 | 3 | 4 | Subject |
| Location | Los Angeles County | Los Angeles County | Los Angeles County | Los Angeles County | Pasadena, CA |
| Units | 11 | 10 | 12 | 11 | 8 |
| *Revenues* | $/Unit | $/Unit | $/Unit | $/Unit | $/Unit |
| Effective Gross Income | $24,700 | $35,618 | $32,385 | $49,007 | $57,568 |
| *Expenses* | | | | | |
| Real Estate Taxes | $932 | $2,736 | $3,568 | $10,873 | $8,928 |
| Property Insurance | 3,974 | 738 | 699 | 1,688 | 2,250 |
| Utilities | 1,091 | 1,462 | 1,977 | 43 | 4,000 |
| Administrative & General | 257 | 760 | 144 | 1,016 | 475 |
| Repairs & Maintenance | 1,918 | 2,832 | 2,075 | 187 | 2,000 |
| Management Fee [1] | 1,360 | 1,778 | 1,264 | 2,773 | 1,727 |
| Association Dues | - | - | - | - | 2,241 |
| Replacement Reserves | - | - | - | - | 250 |
| Operating Expenses | $9,532 | $10,306 | $9,727 | $16,580 | $21,871 |
| Operating Expense Ratio | 38.6% | 28.9% | 30.0% | 33.8% | 38.0% |
| [1] *(Mgmt. typically analyzed as a % of EGI)* | *5.51%* | *4.99%* | *3.90%* | *5.66%* | *3.00%* |
| *OPEX Excl. RETX & Reserves* | *$8,600* | *$7,570* | *$6,159* | *$5,707* | *$12,693* |

[2] The median total differs from the sum of the individual amounts.

Compiled by CBRE

The comparable data and projections for the subject are summarized as follows:

| OPERATING EXPENSES | | |
|---|---|---|
| Year | Total | $/Unit |
| 2026 Annualized (Jan '26 - Jun '26) | $282,858 | $35,357 |
| Expense Comparable 1 | N/A | $9,532 |
| Expense Comparable 2 | N/A | $10,306 |
| Expense Comparable 3 | N/A | $9,727 |
| Expense Comparable 4 | N/A | $16,580 |
| **CBRE Estimate** | **$174,968** | **$21,871** |

Compiled by CBRE

The subject's per unit operating expense pro forma is in line with the total per unit operating expenses indicated by the expense comparables. It also is supported by the actual operating history indicated above.

## Direct Capitalization

Direct capitalization is a method used to convert a single year's estimated stabilized net operating income into a value indication.

## Comparable Sales

The overall capitalization rates (OARs) confirmed for the comparable sales analyzed in the sales comparison approach are as follows:

**COMPARABLE CAPITALIZATION RATES**

| Sale | Sale Date | Sale Price $/Unit | Occupancy | Buyer's Primary Analysis | Operating Expense Ratio | OAR |
|---|---|---|---|---|---|---|
| 1 | Feb-26 | $691,667 | 67% | Pro Forma (Stabilized) | 25.41 | 4.34% |
| 2 | Nov-25 | $760,000 | 100% | Trailing Actuals | 27.29 | 4.91% |
| 3 | Sep-25 | $660,000 | 100% | Trailing Actuals | 35.00 | 3.50% |
| 4 | Apr-25 | $733,333 | 100% | Pro Forma (Stabilized) | 25.23 | 5.46% |
| 5 | Feb-25 | $778,571 | 100% | Trailing Actuals | 38.46 | 3.81% |
| 6 | Dec-23 | $835,714 | 71% | Trailing Actuals | 26.93 | 4.54% |
| **Indicated OAR:** | | | 95% | | 37.99% | **3.50%-5.46%** |

Compiled by: CBRE

The comparables range from an OAR of 3.50% to 5.46%. Given deteriorating market conditions over the last 12 months due to rising interest rates, we would expect the capitalization rate for the subject to be towards the middle to upper portion of the range indicated by the comparables.

## Published Investor Surveys

The results of the most recent investor surveys are summarized in the following chart.

**OVERALL CAPITALIZATION RATES**

| Investment Type | OAR Range | Average |
|---|---|---|
| *RealtyRates.com - 1st Qtr. 2026* | | |
| Apartments | 5.03% - 11.96% | 8.19% |
| Garden/Suburban TH | 5.03% - 10.93% | 7.52% |
| Hi-Rise/Urban TH | 5.51% - 11.96% | 8.31% |
| *PwC Apartment - 1st Qtr. 2026* | | |
| National Data | 4.25% - 6.50% | 5.25% |
| Pacific Region | 4.25% - 6.50% | 5.23% |
| **Indicated OAR:** | | **4.50%-5.00%** |

Compiled by: CBRE

## Capitalization Rate Conclusion

The following chart summarizes the OAR conclusions.

**OVERALL CAPITALIZATION RATE - CONCLUSION**

| Source | Indicated OAR |
|---|---|
| Comparable Sales | 3.50%-5.46% |
| Published Surveys | 4.50%-5.00% |
| **CBRE Estimate** | **4.75%** |

Compiled by: CBRE

Overall, the most recent sale comparable OAR's are reflective of market trends, interest rates, and buyers' expectations and motivations in the market. Our concluded overall capitalization rate (**4.75%**) falls towards the upper portion of the comparable range and is reasonable.

## Direct Capitalization Summary - Multifamily

A summary of the direct capitalization is illustrated in the following chart.

**DIRECT CAPITALIZATION SUMMARY**

| | | | $/Unit/Yr | Total |
|---|---|---|---|---|
| **Income** | | | | |
| Net Rental Income | | | $59,698 | $477,584 |
| Concessions | 0.00% | | 0 | - |
| **Adjusted Rental Income** | | | $59,698 | 477,584 |
| Vacancy | 4.00% | | (2,388) | (19,103) |
| Credit Loss | 1.00% | | (597) | (4,776) |
| **Net Rental Income** | | | $56,713 | $453,704 |
| Other Income | | | 0 | - |
| RUBS/Utility Income | | | 900 | 7,200 |
| Vacancy & Credit Loss | 5.00% | | (45) | (360) |
| **Effective Gross Income** | | | $57,568 | $460,544 |
| **Expenses** | | | | |
| Real Estate Taxes | | | $8,928 | $71,426 |
| Property Insurance | | | 2,250 | 18,000 |
| Utilities | | | 4,000 | 32,000 |
| Administrative & General | | | 475 | 3,800 |
| Repairs & Maintenance | | | 2,000 | 16,000 |
| Management Fee | 3.00% | | 1,727 | 13,816 |
| Association Dues | | | 2,241 | 17,926 |
| Replacement Reserves | | | 250 | 2,000 |
| **Operating Expenses** | | | **$21,871** | **$174,968** |
| **Operating Expense Ratio** | | | | 37.99% |
| **Net Operating Income** | | | **$35,697** | **$285,577** |
| **OAR** | | | ÷ | **4.75%** |
| **Indicated As Stabilized Value** | | | | **$6,012,137** |
| **Rounded** | | | | **$6,000,000** |
| Deferred Maintenance | | | | (342,881) |
| Delinquent HOA | | | | (18,038) |
| Delinquent Real Estate Taxes | | | | (300,227) |
| Lease-up Deduction (2 Vacant Units) | | | | (76,200) |
| **Indicated As Is Value** | | **August 5, 2026** | | **$5,262,654** |
| **Rounded** | | | | **$5,250,000** |
| **Value Per Unit** | | | | **$656,250** |
| **Value Per SF (NRA)** | | | | **$372** |

Compiled by CBRE

## Cost to Achieve Stabilized Operations

The subject has eight units, two of which are vacant, for a 75.0 percent occupancy. The subject currently has significant deferred maintenance that is being/will be worked on. Due to the current condition of the subject property, we assume the vacant units could not be leased until the majority (or all) of the deferred maintenance is complete. Also, the disclosures that would need to be made to a potential tenant in the subject's current condition would also have to include the sewage spills, etc., that have occurred recently.

For these reasons, we assume the subject units can be leased up six months from the date of value. Therefore, we have included a six-month lease-up deduction to arrive at our as-is value.

**LEASE-UP ADJUSTMENT**

| No. of Units To Stabilize | | Market Rent For Vacant Units ($/Unit/Mo.) | | Months to Stabilize | | Total Rent Loss Today |
|---|---|---|---|---|---|---|
| 2 | x | $5,250 | x | 6 | = | $63,000 |

| | | |
|---|---|---|
| **Total Rent Loss** | | **$63,000** |
| Plus: Leasing Commissions @ 5% of 12 mos. of rent income for both units | | 6,300 |
| **Total Costs to Lease-Up Prior to Profit** | | **$69,300** |
| Plus: Profit | 10% | 6,930 |
| **Total Lease-Up Costs** | | **$76,230** |
| **ROUNDED:** | | **$76,200** |

Compiled by: CBRE, Inc.

# Reconciliation of Value

The value indications from the approaches to value are summarized as follows:

**SUMMARY OF VALUE CONCLUSIONS - MULTIFAMILY**

| | As Is<br>August 5, 2026 |
|---|---|
| Sales Comparison Approach | $5,250,000 |
| Income Capitalization Approach | $5,250,000 |
| Reconciled Value | $5,250,000 |
| Compiled by CBRE | |

In valuing the subject, the Income Approach is considered most reliable and is given primary emphasis given its appeal to the investment community, with secondary emphasis placed on the Sales Comparison Approach.

Based on the foregoing, the market value of the subject has been concluded as follows:

**MARKET VALUE CONCLUSION - MULTIFAMILY**

| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
|---|---|---|---|
| As Is | Leased Fee Interest | August 5, 2026 | $5,250,000 |
| Compiled by CBRE | | | |

# Assumptions and Limiting Conditions

1. CBRE, Inc. through its appraiser (collectively, "CBRE") has inspected through reasonable observation the subject property. However, it is not possible or reasonably practicable to personally inspect conditions beneath the soil and the entire interior and exterior of the improvements on the subject property. Therefore, no representation is made as to such matters.
2. The report, including its conclusions and any portion of such report (the "Report"), is as of the date set forth in the letter of transmittal and based upon the information, market, economic, and property conditions and projected levels of operation existing as of such date. The dollar amount of any conclusion as to value in the Report is based upon the purchasing power of the U.S. Dollar on such date. The Report is subject to change as a result of fluctuations in any of the foregoing. CBRE has no obligation to revise the Report to reflect any such fluctuations or other events or conditions which occur subsequent to such date.
3. Unless otherwise expressly noted in the Report, CBRE has assumed that:
   (i) Title to the subject property is clear and marketable and that there are no recorded or unrecorded matters or exceptions to title that would adversely affect marketability or value. CBRE has not examined title records (including without limitation liens, encumbrances, easements, deed restrictions, and other conditions that may affect the title or use of the subject property) and makes no representations regarding title or its limitations on the use of the subject property. Insurance against financial loss that may arise out of defects in title should be sought from a qualified title insurance company.

   (ii) Existing improvements on the subject property conform to applicable local, state, and federal building codes and ordinances, are structurally sound and seismically safe, and have been built and repaired in a workmanlike manner according to standard practices; all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are in good working order with no major deferred maintenance or repair required; and the roof and exterior are in good condition and free from intrusion by the elements. CBRE has not retained independent structural, mechanical, electrical, or civil engineers in connection with this appraisal and, therefore, makes no representations relative to the condition of improvements. CBRE appraisers are not engineers and are not qualified to judge matters of an engineering nature, and furthermore structural problems or building system problems may not be visible. It is expressly assumed that any purchaser would, as a precondition to closing a sale, obtain a satisfactory engineering report relative to the structural integrity of the property and the integrity of building systems.

   (iii) Any proposed improvements, on or off-site, as well as any alterations or repairs considered will be completed in a workmanlike manner according to standard practices.

   (iv) Hazardous materials are not present on the subject property. CBRE is not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater, mold, or other potentially hazardous materials may affect the value of the property.

   (v) No mineral deposit or subsurface rights of value exist with respect to the subject property, whether gas, liquid, or solid, and no air or development rights of value may be transferred. CBRE has not considered any rights associated with extraction or exploration of any resources, unless otherwise expressly noted in the Report.

   (vi) There are no contemplated public initiatives, governmental development controls, rent controls, or changes in the present zoning ordinances or regulations governing use, density, or shape that would significantly affect the value of the subject property.

   (vii) All required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be readily obtained or renewed for any use on which the Report is based.

   (viii) The subject property is managed and operated in a prudent and competent manner, neither inefficiently, nor super-efficiently.

   (ix) The subject property and its use, management, and operation are in full compliance with all applicable federal, state, and local regulations, laws, and restrictions, including without limitation environmental laws, seismic hazards, flight patterns, decibel levels/noise envelopes, fire hazards, hillside ordinances, density, allowable uses, building codes, permits, and licenses.

   (x) The subject property is in full compliance with the Americans with Disabilities Act (ADA). CBRE is not qualified to assess the subject property's compliance with the ADA, notwithstanding any discussion of possible readily achievable barrier removal construction items in the Report.

(xi) All information regarding the areas and dimensions of the subject property furnished to CBRE are correct, and no encroachments exist. CBRE has neither undertaken any survey of the boundaries of the subject property, nor reviewed or confirmed the accuracy of any legal description of the subject property.

Unless otherwise expressly noted in the Report, no issues regarding the foregoing were brought to CBRE's attention, and CBRE has no knowledge of any such facts affecting the subject property. If any information inconsistent with any of the foregoing assumptions is discovered, such information could have a substantial negative impact on the Report and any conclusions stated therein. Accordingly, if any such information is subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. CBRE assumes no responsibility for any conditions regarding the foregoing, or for any expertise or knowledge required to discover them. Any user of the Report is urged to retain an expert in the applicable field(s) for information regarding such conditions.

4. CBRE has assumed that all documents, data and information furnished by or on behalf of the client, property owner or property owner's representative are accurate and correct, unless otherwise expressly noted in the Report. Such data and information include, without limitation, numerical street addresses, lot and block numbers, Assessor's Parcel Numbers, land dimensions, square footage area of the land, dimensions of the improvements, gross building areas, net rentable areas, usable areas, unit count, room count, rent schedules, income data, historical operating expenses, budgets, and related data. Any error in any of the above could have a substantial impact on the Report and any conclusions stated therein. Accordingly, if any such errors are subsequently made known to CBRE, CBRE reserves the right to amend the Report, which may include the conclusions of the Report. The client and intended user should carefully review all assumptions, data, relevant calculations, and conclusions of the Report and should immediately notify CBRE of any questions or errors within 30 days after the date of delivery of the Report.

5. CBRE assumes no responsibility (including any obligation to procure the same) for any documents, data or information not provided to CBRE, including, without limitation, any termite inspection, survey or occupancy permit.

6. All furnishings, equipment and business operations have been disregarded with only real property being considered in the Report, except as otherwise expressly stated and typically considered part of real property.

7. Any cash flows included in the analysis are forecasts of estimated future operating characteristics based upon the information and assumptions contained within the Report. Any projections of income, expenses and economic conditions utilized in the Report, including such cash flows, should be considered as only estimates of the expectations of future income and expenses as of the date of the Report and not predictions of the future. This Report has been prepared in good faith, based on CBRE's current anecdotal and evidence-based views of the commercial real estate market. Although CBRE believes its views reflect market conditions on the date of this Report, they are subject to significant uncertainties and contingencies, many of which are beyond CBRE's control. In addition, many of CBRE's views are opinion and/or projections based on CBRE's subjective analyses of current market circumstances. Actual results are affected by a number of factors outside the control of CBRE, including without limitation fluctuating economic, market, and property conditions. Actual results may ultimately differ from these projections, and CBRE does not warrant any such projections. Further, other firms may have different opinions, projections and analyses, and actual market conditions in the future may cause CBRE's current views to later change or be incorrect. CBRE has no obligation to update its views herein if its opinions, projections, analyses or market circumstances later change.

8. The Report contains professional opinions and is expressly not intended to serve as any warranty, assurance or guarantee of any particular value of the subject property. Other appraisers may reach different conclusions as to the value of the subject property. Furthermore, market value is highly related to exposure time, promotion effort, terms, motivation, and conclusions surrounding the offering of the subject property. The Report is for the sole purpose of providing the intended user with CBRE's independent professional opinion of the value of the subject property as of the date of the Report. Nothing contained in the Report shall be construed as any direct or indirect recommendation of CBRE to buy, sell, hold, or finance the subject property.

9. No opinion is expressed on matters which may require legal expertise or specialized investigation or knowledge including, but not limited to, environmental, social, and governance principles ("ESG"), beyond that customarily employed by real estate appraisers. Any user of the Report is advised to retain experts in areas that fall outside the scope of the real estate appraisal profession for such matters.

10. CBRE assumes no responsibility for any costs or consequences arising due to the need, or the lack of need, for flood hazard insurance. An agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

11. Acceptance or use of the Report constitutes full acceptance of these Assumptions and Limiting Conditions and any special assumptions set forth in the Report. It is the responsibility of the user of the Report to read in full, comprehend and thus become aware of all such assumptions and limiting conditions. CBRE assumes no responsibility for any situation arising out of the user's failure to become familiar with and understand the same.

12. The Report applies to the property as a whole only, and any pro ration or division of the title into fractional interests will invalidate such conclusions, unless the Report expressly assumes such pro ration or division of interests.
13. The allocations of the total value estimate in the Report between land and improvements apply only to the existing use of the subject property. The allocations of values for each of the land and improvements are not intended to be used with any other property or appraisal and are not valid for any such use.
14. The maps, plats, sketches, graphs, photographs, and exhibits included in this Report are for illustration purposes only and shall be utilized only to assist in visualizing matters discussed in the Report. No such items shall be removed, reproduced, or used apart from the Report.
15. The Report shall not be duplicated or provided to any unintended users in whole or in part without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Exempt from this restriction is duplication for the internal use of the intended user and its attorneys, accountants, or advisors for the sole benefit of the intended user. Also exempt from this restriction is transmission of the Report pursuant to any requirement of any court, governmental authority, or regulatory agency having jurisdiction over the intended user, provided that the Report and its contents shall not be published, in whole or in part, in any public document without the written consent of CBRE, which consent CBRE may withhold in its sole discretion. Finally, the Report shall not be made available to the public or otherwise used in any offering of the property or any security, as defined by applicable law. Any unintended user who may possess the Report is advised that it shall not rely upon the Report or its conclusions and that it should rely on its own appraisers, advisors and other consultants for any decision in connection with the subject property. CBRE shall have no liability or responsibility to any such unintended user.

# Addenda

# Addendum A

## Improved Sale Data Sheets

## Sale — Residential - Multi-unit Walk-up — No. 1




| | |
|---|---|
| Property Name | 6-Unit Multifamily Property |
| Address | 324 S Rexford Dr<br>Beverly Hills, CA 90212<br>United States |
| Government Tax Agency | Los Angeles |
| Govt./Tax ID | 4331-015-027 |

**Unit Mix Detail**

Rate Timeframe Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| 2BR/2BA | 3 | 50% | | N/A | N/A |
| 3BR/3BA | 3 | 50% | | N/A | N/A |
| Totals/Avg | 6 | | | $0 | N/A |

### Improvements

| | | | |
|---|---|---|---|
| Land Area | 0.139 ac | Status | Existing |
| Gross Building Area (GBA) | 9,368 sf | Year Built | 1968 |
| Total # of Units | 6 Unit | Year Renovated | N/A |
| Average Unit Size | 1,561 sf | Condition | Average |
| Floor Count | 2 | Exterior Finish | Stucco |
| Property Features | N/A | | |
| Project Amenities | N/A | | |
| Unit Amenities | N/A | | |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | N/A | Marketing Time | N/A |
| True Buyer | N/A | Buyer Type | N/A |
| Recorded Seller | N/A | Seller Type | N/A |
| True Seller | N/A | Primary Verification | N/A |
| Interest Transferred | Leased Fee | Type | Sale |
| Current Use | N/A | Date | 2/20/2026 |
| Proposed Use | N/A | Sale Price | $4,150,000 |
| Listing Broker | N/A | Financing | Market Rate Financing |
| Selling Broker | N/A | Cash Equivalent | $4,150,000 |
| Doc # | N/A | Capital Adjustment | $0 |
| | | Adjusted Price | $4,150,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
|---|---|---|---|---|---|
| 02/2026 | Sale | N/A | N/A | $4,150,000 | $691,667 / $443.00 |

## Sale — Residential - Multi-unit Walk-up — No. 1

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Pro Forma (Stabilized) | Eff Gross Inc Mult (EGIM) | 17.17 |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | 25.41% |
| Net Initial Yield/Cap. Rate | 4.34% | Adjusted Price / sf | $443.00 |
| Projected IRR | N/A | Adjusted Price / Unit | $691,667 |
| Actual Occupancy at Sale | 67% | | |

### Financial

| Revenue Type | Pro Forma Stabilized |
|---|---|
| Period Ending | N/A |
| Source | N/A |
| Price | $4,150,000 |
| Potential Gross Income | $254,400 |
| Economic Occupancy | 95% |
| Economic Loss | $12,720 |
| Effective Gross Income | $241,680 |
| Expenses | $61,400 |
| Net Operating Income | $180,280 |
| NOI / sf | $19.24 |
| NOI / Unit | $30,047 |
| EGIM | 17.17 |
| OER | 25.41% |
| Net Initial Yield/Cap. Rate | 4.34% |

### Map & Comments




324 S Rexford Dr, Beverly Hills is a 6-unit multifamily property built in 1968. The unit mix consists of (3) 2BD/2BA and (3) 3BD/3BA units. All units feature ensuite bedrooms, eat-in kitchens, designated dining areas and in-unit washer/dryers. The property has 12 garage parking spaces. Each unit includes two tandem parking spaces in the assigned garages. Seller recently completed comprehensive earthquake retrofitting, upgraded the roof, and installed new AC systems for each unit. Two of the six units were delivered vacant. The in-place capitalization rate was reported at 4.34%. We estimate an approximately 12% below market rent level.

## Sale | Residential - Other | No. 2



| | |
|---|---|
| Property Name | 5-Unit Multifamily Apartment |
| Address | 9660 W. Olympic Boulevard<br>Beverly Hills, CA 90212<br>United States |
| Government Tax Agency | N/A |
| Govt./Tax ID | 4330-011-006 |

**Unit Mix Detail**

Rate Timeframe Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| 1BR/1BA | 2 | 40% | | N/A | N/A |
| 2BR/2BA | 2 | 40% | | N/A | N/A |
| 3BR/3BA | 1 | 20% | | N/A | N/A |
| Totals/Avg | 5 | | | $0 | N/A |

### Improvements

| | | | |
|---|---|---|---|
| Land Area | 0.152 ac | Status | Existing |
| Gross Building Area (GBA) | 6,636 sf | Year Built | 1935 |
| Total # of Units | 5 Unit | Year Renovated | N/A |
| Average Unit Size | 1,327 sf | Condition | Average |
| Floor Count | 2 | Exterior Finish | Stucco |
| Property Features | N/A | | |
| Project Amenities | N/A | | |
| Unit Amenities | N/A | | |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | 9660 Lucky LLC | Marketing Time | 8 Month(s) |
| True Buyer | Dr. Soheil Saul Lahijani | Buyer Type | Private Investor |
| Recorded Seller | Feldman Holdings LLC | Seller Type | N/A |
| True Seller | The Roxbury Trust-2003 | Primary Verification | MLS / CoStar / Public Records |
| Interest Transferred | Leased Fee | **Type** | **Sale** |
| Current Use | N/A | **Date** | **11/25/2025** |
| Proposed Use | N/A | **Sale Price** | **$3,800,000** |
| Listing Broker | Brielle Bacal, Christie's International Real Estate | **Financing** | **Market Rate Financing** |
| Selling Broker | Brielle Bacal, Christie's International Real Estate | **Cash Equivalent** | **$3,800,000** |
| Doc # | 25-0846655 | **Capital Adjustment** | **$0** |
| | | **Adjusted Price** | **$3,800,000** |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
|---|---|---|---|---|---|
| 11/2025 | Sale | 9660 Lucky LLC | Feldman Holdings LLC | $3,800,000 | $760,000 / $572.63 |

# Sale — Residential - Other — No. 2

## Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | 14.81 |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | 27.29% |
| Net Initial Yield/Cap. Rate | 4.91% | Adjusted Price / sf | $572.63 |
| Projected IRR | N/A | Adjusted Price / Unit | $760,000 |
| Actual Occupancy at Sale | 100% | | |

## Financial

| Revenue Type | Market | Trailing Actuals |
|---|---|---|
| Period Ending | N/A | N/A |
| Source | N/A | Broker |
| Price | $3,800,000 | $3,800,000 |
| Potential Gross Income | $360,000 | $270,006 |
| Economic Occupancy | 95% | 95% |
| Economic Loss | $18,000 | $13,500 |
| Effective Gross Income | $342,000 | $256,506 |
| Expenses | $70,000 | $70,000 |
| Net Operating Income | $272,000 | $186,506 |
| NOI / sf | $40.99 | $28.11 |
| NOI / Unit | $54,400 | $37,301 |
| EGIM | 11.11 | 14.81 |
| OER | 20.47% | 27.29% |
| Net Initial Yield/Cap. Rate | 7.16% | 4.91% |

## Map & Comments




9660 W Olympic Blvd, Beverly Hills is a 5-unit multifamily property built in 1935. The unit mix consists of (2) 1BD/1BA, (2) 2BD/2BA and (1) 3BD/3BA townhome units. The property has two garage parking spaces. Broker expenses appear to be underreported; therefore, we applied typical operating expenses in our financial scenario. The property sold in November 2025 for $3,800,000, or $760,000 per unit. Based on existing income, the overall capitalization rate equates to 4.91%. The broker reported a 33% upside in rent potential. Based on market income, the overall capitalization rate equates to 7.16%.

## Sale — Residential - Multi-unit Walk-up — No. 3



| | |
|---|---|
| Property Name | 5-Unit Multifamily Apartment |
| Address | 160 S. Grand Avenue<br>Pasadena, CA 91105<br>United States |
| Government Tax Agency | Los Angeles |
| Govt./Tax ID | 5714-003-019 |

**Unit Mix Detail**

Rate Timeframe Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| 1BR/1BA | 1 | 20% | | N/A | N/A |
| 2BR/1BA | 3 | 60% | | N/A | N/A |
| 2BR/1BA | 1 | 20% | | N/A | N/A |
| Totals/Avg | 5 | | | $0 | N/A |

### Improvements

| | | | |
|---|---|---|---|
| Land Area | 0.552 ac | Status | Existing |
| Gross Building Area (GBA) | 5,941 sf | Year Built | 1906 |
| Total # of Units | 5 Unit | Year Renovated | N/A |
| Average Unit Size | 1,188 sf | Condition | Average |
| Floor Count | 2 | Exterior Finish | Stucco |
| Property Features | N/A | | |
| Project Amenities | N/A | | |
| Unit Amenities | N/A | | |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | GKST PROPERTIES LLC | Marketing Time | 6 Month(s) |
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | CARRAHER DUANE TRUST | Seller Type | Private Investor |
| True Seller | N/A | Primary Verification | MLS, CoStar, Public Records |
| Interest Transferred | Leased Fee | **Type** | **Sale** |
| Current Use | N/A | **Date** | **9/22/2025** |
| Proposed Use | N/A | **Sale Price** | **$3,300,000** |
| Listing Broker | Natalie Wycoff - 626.590.3599 | **Financing** | **Cash to Seller** |
| Selling Broker | Natalie Wycoff - 626.590.3599 | **Cash Equivalent** | **$3,300,000** |
| Doc # | 649330 | **Capital Adjustment** | **$0** |
| | | **Adjusted Price** | **$3,300,000** |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
|---|---|---|---|---|---|
| 09/2025 | Sale | GKST PROPERTIES LLC | CARRAHER DUANE TRUST | $3,300,000 | $660,000 / $555.46 |

# Sale — Residential - Multi-unit Walk-up — No. 3

## Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | 18.59 |
| Buyer's Primary Analysis | Price and Capitalization Analyses | Op Exp Ratio (OER) | 35.00% |
| Net Initial Yield/Cap. Rate | 3.50% | Adjusted Price / sf | $555.46 |
| Projected IRR | N/A | Adjusted Price / Unit | $660,000 |
| Actual Occupancy at Sale | 100% | | |

## Financial

| Revenue Type | Trailing Actuals |
|---|---|
| Period Ending | N/A |
| Source | Broker |
| Price | $3,300,000 |
| Potential Gross Income | $186,900 |
| Economic Occupancy | 95% |
| Economic Loss | $9,345 |
| Effective Gross Income | $177,555 |
| Expenses | $62,144 |
| Net Operating Income | $115,411 |
| NOI / sf | $19.43 |
| NOI / Unit | $23,082 |
| EGIM | 18.59 |
| OER | 35.00% |
| Net Initial Yield/Cap. Rate | 3.50% |

## Map & Comments




This comparable represents the sale of a 5-unit, 1906-built, two-story multifamily apartment project located at 160 S. Grand Avenue, Pasadena, California. The unit mix consists of one-bedroom and two-bedroom units. The site has 8 total parking spaces comprised of enclosed garage spaces. It is individually metered for gas and electricity. Project amenities are minimal but include on-site parking, common area pool, and landscaped grounds. There are 19 total rooms, with a 3.80 room average. This project is subject to the City of Pasadena Rent Stabilization Ordinance. The property was listed for $3,750,000 and sold in September 2025 for $3,300,000, or $660,000 per unit, and was 100% occupied at the time of sale. Based on existing income, the overall capitalization rate equates to 3.5%. The broker reported operating
expenses reflected a less than 15% OER, which is low. We have forecast a 35% market operating expense ratio within our financial analysis. We have included a 5% vacancy and collection loss to the financial scenario.

## Sale — Residential - Multi-unit Walk-up — No. 4



| | |
|---|---|
| Property Name | 9-Unit Multifamily Apartment |
| Address | 301 Ashland Avenue<br>Santa Monica, CA 90405<br>United States |
| Government Tax Agency | Los Angeles |
| Govt./Tax ID | 4287-022-017 |

**Unit Mix Detail**

Rate Timeframe Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| 1BR/1BA | 5 | 56% | 819 | N/A | N/A |
| 2BR/1BA | 4 | 44% | 925 | N/A | N/A |
| Totals/Avg | 9 | | | $0 | $0.00 |

### Improvements

| | | | |
|---|---|---|---|
| Land Area | 0.177 ac | Status | Existing |
| Net Rentable Area (NRA) | 7,795 sf | Year Built | 1960 |
| Total # of Units | 9 Unit | Year Renovated | N/A |
| Average Unit Size | 866 sf | Condition | Good |
| Floor Count | 2 | Exterior Finish | Stucco |

Property Features: Electric Wall Heaters, Exterior Stairwells, Flat Roofs, Under-building Parking

Project Amenities: Laundry Facility

Unit Amenities: Ceiling Fans, Garbage Disposal, Microwave Oven, Plank Flooring, Private Patios / Balconies, Range / Oven, Refrigerator, Washer / Dryer

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | Armanino Family Trust | Marketing Time | 9 Month(s) |
| True Buyer | Ramin Armani | Buyer Type | Private Investor |
| Recorded Seller | SYY GROUP LLC | Seller Type | Private Investor |
| True Seller | Seung Yeop Lee & You Kim | Primary Verification | Appraisal, Broker, Costar, Public Records, MLS |
| Interest Transferred | Leased Fee | Type | Sale |
| Current Use | MFR | Date | 4/23/2025 |
| Proposed Use | MFR | Sale Price | $6,600,000 |
| Listing Broker | Berkshire Hathaway/Lane Aronson (323)671-1233 | Financing | Market Rate Financing |
| Selling Broker | N/A | Cash Equivalent | $6,600,000 |
| Doc # | 228506 | Capital Adjustment | $0 |
| | | Adjusted Price | $6,600,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
|---|---|---|---|---|---|
| 04/2025 | Sale | Armanino Family Trust | SYY GROUP LLC | $6,600,000 | $733,333 / $846.70 |
| 02/2022 | Sale | SYY GROUP LLC | HSR Ashland LP | $7,100,000 | $788,889 / $910.84 |

## Sale — Residential - Multi-unit Walk-up — No. 4

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Pro Forma (Stabilized) | Eff Gross Inc Mult (EGIM) | 13.70 |
| Buyer's Primary Analysis | Price and Capitalization Analyses | Op Exp Ratio (OER) | 25.23% |
| Net Initial Yield/Cap. Rate | 5.46% | Adjusted Price / sf | $846.70 |
| Projected IRR | N/A | Adjusted Price / Unit | $733,333 |
| Actual Occupancy at Sale | 100% | | |

### Financial

| Revenue Type | Pro Forma Stabilized | Trailing Actuals |
|---|---|---|
| Period Ending | N/A | N/A |
| Source | Broker | Broker |
| Price | $6,600,000 | $6,600,000 |
| Potential Gross Income | $507,000 | $431,868 |
| Economic Occupancy | 95% | 95% |
| Economic Loss | $25,350 | $21,593 |
| Effective Gross Income | $481,650 | $410,275 |
| Expenses | $121,530 | $121,530 |
| Net Operating Income | $360,120 | $288,745 |
| NOI / sf | $46.20 | $37.04 |
| NOI / Unit | $40,013 | $32,083 |
| EGIM | 13.70 | 16.09 |
| OER | 25.23% | 29.62% |
| Net Initial Yield/Cap. Rate | 5.46% | 4.37% |

### Map & Comments




This is a nine-unit multifamily property located at 301 Ashland Avenue in Santa Monica. It is located three blocks from the ocean. The property was built in 1960 but significantly renovated in 2021. The unit mix includes one-bedroom and two-bedroom units. There are 31 total rooms, or an average of 3.44 rooms per unit. The broker notes that approximately seven of the nine units were significantly renovated at a cost of $390,000. Unit renovations include new HVAC, installation of in-unit washer/dryer units, new flooring, cabinets, quartz countertops, stainless steel appliances, updated bathrooms, and lighting. The exterior was renovated at a cost of $535,000. Project amenities include as well as surface and tuck-under parking spaces.

The property was listed for sale in July 2024 at $6,700,000, and sold in April 2025 for $6,600,000, or $733,333 per unit. It is our understanding that there was favorable financing for the buyer and that they assumed the prior in-place loan of approximately $3,550,000 at a fixed 3.3% interest rate over the next 7 years. Based on in-place income, the overall capitalization rate equates to 4.37%. Based on pro forma income, the overall capitalization rate equates to 5.46%. The broker pro forma reflects an approximate 17% upside in rental income. We have made attempts to confirm the sale with the broker, but were unable to confirm the details of the transaction.

## Sale — Residential - Multi-unit Garden — No. 5

| | |
|---|---|
| Property Name | 318 N Oakhurst Dr |
| Address | 318 N Oakhurst Dr<br>Beverly Hills, CA 90210<br>United States |
| Government Tax Agency | Los Angeles |
| Govt./Tax ID | 4335-015-003,004 |



**Unit Mix Detail**

Rate Timeframe Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| 2BR/2BA | 6 | 86% | 1,200-1,400 | N/A | N/A |
| 5BR/3.5BA | 1 | 14% | 5,300 | N/A | N/A |
| Totals/Avg | 7 | | | $0 | $0.00 |

### Improvements

| | | | |
|---|---|---|---|
| Land Area | 0.172 ac | Status | Existing |
| Net Rentable Area (NRA) | 13,300 sf | Year Built | 1969 |
| Total # of Units | 7 Unit | Year Renovated | N/A |
| Average Unit Size | 1,900 sf | Condition | Good |
| Floor Count | 3 | Exterior Finish | Concrete |
| Property Features | N/A | | |
| Project Amenities | N/A | | |
| Unit Amenities | N/A | | |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | Rublevich Family Trust, Resilience 3939 Trust | Marketing Time | 3 Month(s) |
| True Buyer | Michael Rublevich | Buyer Type | Private Investor |
| Recorded Seller | Golant Endeavors Llc | Seller Type | Private Investor |
| True Seller | William and Linda Golant | Primary Verification | Broker, Public Records, MLS, CoStar |
| Interest Transferred | Leased Fee | **Type** | **Sale** |
| Current Use | MFR | **Date** | **2/5/2025** |
| Proposed Use | N/A | **Sale Price** | **$5,450,000** |
| Listing Broker | Jordan Rubinstein: Century Park Realty | **Financing** | **Market Rate Financing** |
| Selling Broker | N/A | **Cash Equivalent** | **$5,450,000** |
| Doc # | 0073154 | **Capital Adjustment** | **$0** |
| | | **Adjusted Price** | **$5,450,000** |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
|---|---|---|---|---|---|
| 02/2025 | Sale | Rublevich Family Trust, Resilience 3939 Trust | Golant Endeavors Llc | $5,450,000 | $778,571 / $409.77 |

CBRE

## Sale — Residential - Multi-unit Garden — No. 5

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | 16.15 |
| Buyer's Primary Analysis | Static Capitalization Analysis | Op Exp Ratio (OER) | 38.46% |
| Net Initial Yield/Cap. Rate | 3.81% | Adjusted Price / sf | $409.77 |
| Projected IRR | 0.00% | Adjusted Price / Unit | $778,571 |
| Actual Occupancy at Sale | 100% | | |

### Financial

| Revenue Type | Market | Trailing Actuals |
|---|---|---|
| Period Ending | N/A | N/A |
| Source | N/A | N/A |
| Price | $5,450,000 | $5,450,000 |
| Potential Gross Income | $426,000 | $355,308 |
| Economic Occupancy | 95% | 95% |
| Economic Loss | $21,300 | $17,765 |
| Effective Gross Income | $404,700 | $337,543 |
| Expenses | $129,812 | $129,812 |
| Net Operating Income | $274,888 | $207,731 |
| NOI / sf | $20.67 | $15.62 |
| NOI / Unit | $39,270 | $29,676 |
| EGIM | 13.47 | 16.15 |
| OER | 32.08% | 38.46% |
| Net Initial Yield/Cap. Rate | 5.04% | 3.81% |

### Map & Comments




This comparable represents the listing of a 7-unit, three-story, 1969-built multifamily apartment project located at 318 N Oakhurst Drive, with portions of the site in the city of Beverly Hills and the city of Los Angeles. The unit mix is comprised of six (4) 2BR/2BA and one (1) 5BR/3.5BA units. The site has 14 covered garage parking spaces. It is individually metered for gas and electricity. The project is subject to Los Angeles rent control. The broker reported the units to be in upgraded condition with laminate floors, newer kitchen cabinets, remodeled bathrooms, and inclusive of dishwasher, refrigerator and stove. The property was listed in October 2024 for $5,800,000, or $828,571 per unit, and is 100% occupied. A 5% vacancy and collection loss to both financial scenarios. The contract rents are approximately 20% below market level. The capitalization rate is influenced upwards by its peripheral Beverly Hills location subject to the city of Los Angeles' rent stabilization ordinance.

## Sale — Residential - Multi-unit Walk-up — No. 6



| | |
|---|---|
| Property Name | 7-Unit Multifamily Apartment |
| Address | 435 West California Boulevard<br>Pasadena, CA 91105<br>United States |
| Government Tax Agency | Los Angeles |
| Govt./Tax ID | 5714-009-013 |

**Unit Mix Detail**

Rate Timeframe Monthly

| Unit Type | No. | % | Size (sf) | Rent | Rent / sf |
|---|---|---|---|---|---|
| 2BR/2BA | 7 | 100% | | N/A | N/A |
| Totals/Avg | 7 | | | $0 | N/A |

### Improvements

| | | | |
|---|---|---|---|
| Land Area | 0.513 ac | Status | Existing |
| Gross Building Area (GBA) | 11,962 sf | Year Built | 1951 |
| Total # of Units | 7 Unit | Year Renovated | N/A |
| Average Unit Size | 1,709 sf | Condition | Average |
| Floor Count | 2 | Exterior Finish | Stucco |
| Property Features | N/A | | |
| Project Amenities | N/A | | |
| Unit Amenities | N/A | | |

### Sale Summary

| | | | |
|---|---|---|---|
| Recorded Buyer | ALZ INVESTMENT LLC | Marketing Time | N/A |
| True Buyer | N/A | Buyer Type | Private Investor |
| Recorded Seller | CALIGROVE LLC | Seller Type | Private Investor |
| True Seller | N/A | Primary Verification | Broker, Public Records, MLS, CoStar |
| Interest Transferred | N/A | Type | Sale |
| Current Use | N/A | Date | 12/28/2023 |
| Proposed Use | N/A | Sale Price | $5,850,000 |
| Listing Broker | Realty Investment Advisors, Inc: Alexander Metaxas - 626-313-4901 | Financing | N/A |
| Selling Broker | Monica Hsu - 626.926.1385 | Cash Equivalent | $5,850,000 |
| Doc # | N/A | Capital Adjustment | $0 |
| | | Adjusted Price | $5,850,000 |

### Transaction Summary plus Five-Year CBRE View History

| Transaction Date | Transaction Type | Buyer | Seller | Price | Cash Equivalent Price/unit and /sf |
|---|---|---|---|---|---|
| 12/2023 | Sale | ALZ INVESTMENT LLC | CALIGROVE LLC | $5,850,000 | $835,714 / $489.05 |

CBRE

## Sale — Residential - Multi-unit Walk-up — No. 6

### Units of Comparison

| | | | |
|---|---|---|---|
| Static Analysis Method | Trailing Actuals | Eff Gross Inc Mult (EGIM) | 16.09 |
| Buyer's Primary Analysis | Price and Capitalization Analyses | Op Exp Ratio (OER) | 26.93% |
| Net Initial Yield/Cap. Rate | 4.54% | Adjusted Price / sf | $489.05 |
| Projected IRR | N/A | Adjusted Price / Unit | $835,714 |
| Actual Occupancy at Sale | 71% | | |

### Financial

| Revenue Type | Pro Forma Stabilized | Trailing Actuals |
|---|---|---|
| Period Ending | N/A | N/A |
| Source | Broker | Broker |
| Price | $5,850,000 | $5,850,000 |
| Potential Gross Income | $396,420 | $382,740 |
| Economic Occupancy | 92% | 95% |
| Economic Loss | $31,714 | $19,137 |
| Effective Gross Income | $364,706 | $363,603 |
| Expenses | $97,925 | $97,925 |
| Net Operating Income | $266,781 | $265,678 |
| NOI / sf | $22.30 | $22.21 |
| NOI / Unit | $38,112 | $37,954 |
| EGIM | 16.04 | 16.09 |
| OER | 26.85% | 26.93% |
| Net Initial Yield/Cap. Rate | 4.56% | 4.54% |

### Map & Comments




This comparable represents the sale of a 7-unit, two-story multifamily apartment project located at 435 West California Boulevard, Pasadena. The property is positioned on a corner lot, it also adorns a South Orange Grove Blvd address. The unit mix includes all two-bedroom units. The site has 14 total parking spaces, composed of surface and attached garage spaces. It is individually metered for gas and electricity. There are 28 total rooms, with a 4.00 room average. This project is subject to the City of Pasadena Rent Control (Measure H). The units feature hardwood floors, kitchens with stainless steel appliances, updated bathrooms, fireplaces, crown molding, wainscoting, patios and decks, central HVAC, dual-pane windows, tank-less water heaters, new lighting, and in-unit washer/dryer. The building systems include newer electrical panels, copper plumbing, updated drain and main sewer lines and newer pitched roofs. The property was listed for $6,100,000 and sold in December 2023 for $5,850,000, or $835,714 per unit, and was 71% occupied. A broker representative confirmed the price. Based on existing income, the overall capitalization rate equates to 4.54%. The broker pro forma reflects 4% upside in rents. Based on market income, the overall capitalization rate equates to 4.56%. We have included a 5% vacancy and collection loss to both financial scenarios.

CBRE

# Addendum B

## Operating Data

## 244 248 S Orange Grove Rent Roll

Exported On: 07/15/2026 01:52 PM

**Properties:** 244 and 248 S Orange Grove - 244 and 248 S Orange Grove Pasadena, CA 91123
**Units:** Active
**Include Advertised Rent:** Yes
**GL Accounts:** 4030-0000: Base Rent and 4151-0000: Utilities
**As of:** 07/15/2026
**Include Non-Revenue Units:** No

| Unit | Sqft | Status | Tenant | Deposit | Lease From | Lease To | Base Rent | Utilities | Total |
|---|---|---|---|---|---|---|---|---|---|
| 244 and 248 S Orange Grove - 244 and 248 S Orange Grove Pasadena, CA 91123 | | | | | | | | | |
| 244 S Orange Grove #104 | | Vacant-Unrented | | 0.00 | | | | | |
| 244 S Orange Grove #203 | | Current | Jo-Lynn Battany | 0.00 | 12/15/2024 | 12/14/2025 | 5,800.00 | 300.00 | 6,100.00 |
| 244 S Orange Grove Blvd #103 | | Current | Ann Paul | 0.00 | 01/01/2023 | 12/31/2023 | 5,591.63 | 0.00 | 5,591.63 |
| 244 S Orange Grove Blvd #204 | | Current | Steve Crist | 0.00 | 08/01/2018 | 07/31/2019 | 4,601.25 | 0.00 | 4,601.25 |
| 248 S Orange Grove #102 | | Current | Judy Moore | 0.00 | 02/15/2013 | 02/14/2014 | 4,000.00 | 300.00 | 4,300.00 |
| 248 S Orange Grove Blvd #201 | | Vacant-Unrented | | 0.00 | | | | | |
| 248 S Orange Grove Blvd #202 | | Current | Beth Andrews | 0.00 | 06/01/2025 | 05/31/2027 | 4,500.00 | 0.00 | 4,500.00 |
| 248 S. Orange Grove Blvd #101 | | Current | Vincent Rojas | 0.00 | 11/15/2007 | 11/14/2008 | 4,805.75 | 0.00 | 4,805.75 |
| **8 Units** | **0** | **75.0% Occupied** | | **0.00** | | | **29,298.63** | **600.00** | **29,898.63** |
| **Total 8 Units** | **0** | **75.0% Occupied** | | **0.00** | | | **29,298.63** | **600.00** | **29,898.63** |

# Income Statement

**Jalmar Properties Inc.**

**Properties:** 244 and 248 S Orange Grove - 244 and 248 S Orange Grove Pasadena, CA 91123

**Owned By:** South Orange Grove Receivership

**As of:** Jun 2026

**Level of Detail:** Detail View

**Include Zero Balance GL Accounts:** No

| Account Name | Selected Month | % of Selected Month | Year to Month End | % of Year to Month End |
|---|---|---|---|---|
| **Operating Income & Expense** | | | | |
| **Income** | | | | |
| **INCOME** | | | | |
| Utilities | 600.00 | 2.41 | 1,800.00 | 2.12 |
| **Total INCOME** | **600.00** | **2.41** | **1,800.00** | **2.12** |
| Base Rent | 24,798.63 | 99.51 | 77,011.29 | 90.88 |
| Prepaid Rent | -476.98 | -1.91 | 5,929.40 | 7.00 |
| **Total Operating Income** | **24,921.65** | **100.00** | **84,740.69** | **100.00** |
| **Expense** | | | | |
| **Administrative** | | | | |
| Postage/Delivery Costs | 10.95 | 0.04 | 10.95 | 0.01 |
| HOA Dues | 7,472.56 | 29.98 | 7,472.56 | 8.82 |
| **Total Administrative** | **7,483.51** | **30.03** | **7,483.51** | **8.83** |
| **Contract Services** | | | | |
| Fire Life & Safety | 1,168.36 | 4.69 | 1,298.36 | 1.53 |
| HVAC Repairs | 1,498.00 | 6.01 | 23,499.75 | 27.73 |
| Janitorial Contract | 640.00 | 2.57 | 640.00 | 0.76 |
| **Total Contract Services** | **3,306.36** | **13.27** | **25,438.11** | **30.02** |
| **Debt Service** | | | | |
| Penalties | 0.00 | 0.00 | 1,200.00 | 1.42 |
| **Total Debt Service** | **0.00** | **0.00** | **1,200.00** | **1.42** |
| **Grounds Maintenance** | | | | |
| Pool Service | 0.00 | 0.00 | 2,500.00 | 2.95 |
| **Total Grounds Maintenance** | **0.00** | **0.00** | **2,500.00** | **2.95** |
| **Insurance** | | | | |
| Fire & Liability Insurance | 18,152.12 | 72.84 | 18,152.12 | 21.42 |
| **Total Insurance** | **18,152.12** | **72.84** | **18,152.12** | **21.42** |
| **Unit Repairs** | | | | |
| Unit - Appliance Repair | 0.00 | 0.00 | 1,511.45 | 1.78 |
| Unit - Appliance Purchase | 1,910.87 | 7.67 | 4,205.32 | 4.96 |
| Unit - Bathroom Repairs | 0.00 | 0.00 | 676.00 | 0.80 |
| Unit - Plumbing | 880.00 | 3.53 | 4,199.64 | 4.96 |
| Unit - Other Repairs/ Maintenance | 605.00 | 2.43 | 2,255.00 | 2.66 |
| **Total Unit Repairs** | **3,395.87** | **13.63** | **12,847.41** | **15.16** |
| **Repairs &** | | | | |

## Income Statement

| Account Name | Selected Month | % of Selected Month | Year to Month End | % of Year to Month End |
|---|---|---|---|---|
| **Maintenance** | | | | |
| Boiler Repair | 0.00 | 0.00 | 103.75 | 0.12 |
| Locks/Keys | 65 00 | 0.26 | 1 927 38 | 2.27 |
| Pest Control | 0.00 | 0.00 | 27,160.00 | 32.05 |
| Roof Repairs | 4 500 00 | 18.06 | 11,800 00 | 13 92 |
| Maintenance Supplies | 1,849.78 | 7.42 | 2,226.46 | 2.63 |
| Misc. Repairs & Maintenance | 3,231 11 | 12.97 | 8,434 02 | 9 95 |
| **Total Repairs & Maintenance** | **9,645.89** | **38.70** | **51,651.61** | **60.95** |
| Pool Service | 250 00 | 1 00 | 250.00 | 0.30 |
| **Management Fees** | | | | |
| Property Management Fees | 2 500.00 | 10 03 | 8,112 09 | 9 57 |
| **Total Management Fees** | **2,500.00** | **10.03** | **8,112.09** | **9.57** |
| **Permits, Licenses, Fees, and Dues** | | | | |
| Business License | 297.27 | 1.19 | 566.81 | 0.67 |
| **Total Permits, Licenses, Fees, and Dues** | **297.27** | **1.19** | **566.81** | **0.67** |
| **Utilities** | | | | |
| Electricity - Landlord | 1 165.33 | 4.68 | 5,790.33 | 6.83 |
| Gas | 1,476.48 | 5.92 | 1,752.14 | 2.07 |
| Refuse | 1,075.13 | 4.31 | 5,684.62 | 6.71 |
| **Total Utilities** | **3,716.94** | **14.91** | **13,227.09** | **15.61** |
| **Total Operating Expense** | **48,747.96** | **195.60** | **141,428.75** | **166.90** |
| **NOI - Net Operating Income** | **-23.826.31** | **-95.60** | **-56,688.06** | **-66.90** |
| **Other Income & Expense** | | | | |
| **Other Expense** | | | | |
| Construction & Remediation | 519 00 | 2 08 | 519 00 | 0.61 |
| Remediation | 0.00 | 0.00 | 1,350.00 | 1.59 |
| **Total Other Expense** | **519.00** | **2.08** | **1,869.00** | **2.21** |
| **Net Other Income** | **-519.00** | **-2.08** | **-1,869.00** | **-2.21** |
| Total Income | 24 921 65 | 100.00 | 84,740.69 | 100.00 |
| Total Expense | 49,266.96 | 197.69 | 143,297.75 | 169.10 |
| Net Income | **-24,345.31** | **-97.69** | **-58,557.06** | **-69.10** |

# Addendum C

## Title Report

**Updated July 14, 2026**

**First American Title Insurance Company**
**National Commercial Services**
**9255 Towne Centre Drive, Suite 200**
**San Diego, CA 92121**

Jayden Lee
Preferred Bank
601 S Figueroa St Fl 48
Los Angeles, CA 90017
Phone: (213)891-1188
Fax: (213)622-0369

Customer Reference: 244 South Orange Grove Boulevard

Title Officer: Linda Slavik
Phone: (858)410-3873
Email: lslavik@firstam.com

Property: 244 South Orange Grove Boulevard, Pasadena, CA

## PRELIMINARY REPORT

In response to the above referenced application for a policy of title insurance, this company hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Exhibit A attached. *The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.* Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit A. Copies of the policy forms should be read. They are available from the office which issued this report.

**Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of June 30, 2026 at 7:30 A.M.

The form of Policy of title insurance contemplated by this report is:

To Be Determined

A specific request should be made if another form or additional coverage is desired.

Title to said estate or interest at the date hereof is vested in:

SDRES Partners LLC, a California Limited Liability Company

The estate or interest in the land hereinafter described or referred to covered by this Report is:

A Fee as to Parcel 1, an Easement as to Parcels 2, 3, 4, 5, 6 and 7.

The Land referred to herein is described as follows:

(See attached Legal Description)

At the date hereof exceptions to coverage in addition to the printed Exceptions and Exclusions in said policy form would be as follows:

1. General and special taxes and assessments for the fiscal year 2026-2027, a lien not yet due or payable.

2. General and special taxes and assessments for the fiscal year 2025-2026.

| | |
|---|---|
| First Installment: | $48,703.78, DELINQUENT |
| Penalty: | $4,870.37 |
| Second Installment: | $48,703.77, DELINQUENT |
| Penalty: | $4,880.37 |
| Tax Rate Area: | 07500 |
| A. P. No.: | 5713-027-065 |

3. The lien of defaulted taxes for the fiscal years 2023, 2024 and 2025, and any subsequent delinquencies.

| | |
|---|---|
| Tax Rate Area: | 07500 |
| A. P. No.: | 5713-027-065 |
| Amount to redeem: | $296,684.31 |
| Valid through: | July 2026 |
| Amount to redeem: | $300,227.44 |
| Valid through: | August 2026 |

**Please contact the tax office to verify the payoff amount.**

4. The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Taxation Code.

5. Covenants, conditions, restrictions and easements in the document recorded as Book 32449, Page 143; in Book 32449, Page 152; in Book 32449, Page 166; in Book 32449, Page 173; in Book 34290, Page 121; in Book 34290, Page 86 and in Book 35539, Page 103, All of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value, but deleting any covenant, condition, or restriction, if any, indicating a preference, limitation, or discrimination based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, handicap, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, to the extent that such covenants, conditions or restrictions violate applicable state or federal laws. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

6. The terms and provisions contained in the document entitled "Memorandum of Post-Closing Obligations" recorded May 14, 2004 as Instrument No. 04-1227594 of Official Records.

7. The terms, provisions and easement(s) contained in the document entitled "Utility Easement Agreement" recorded May 14, 2004 as Instrument No. 04-1227591 of Official Records.

8. The terms, provisions and easement(s) contained in the document entitled "Reciprocal Utility Easement Agreement" recorded May 14, 2004 as Instrument No. 04-1227598 of Official Records.

9. The terms and provisions contained in the document entitled "Memorandum of Post-Closing Obligations" recorded July 21, 2005 as Instrument No. 05-1721784 of Official Records.

10. The terms, provisions and easement(s) contained in the document entitled "Driveway Easement Agreement (Rankin Parcel)" recorded July 21, 2005 as Instrument No. 05-1721786 of Official Records.

11. Covenants, conditions, restrictions, easements, assessments, liens, charges, terms and provisions in the document recorded July 02, 2007 as Instrument No. 07-1579024 of Official Records, which provide that a violation thereof shall not defeat or render invalid the lien of any first mortgage or deed of trust made in good faith and for value but deleting any covenant, condition, or restriction, if any, indicating a preference, limitation, or discrimination based on race, color, religion, sex, gender, gender identity, gender expression, sexual orientation, familial status, marital status, disability, handicap, veteran or military status, genetic information, national origin, source of income as defined in subdivision (p) of Section 12955, or ancestry, to the extent that such covenants, conditions or restrictions violate applicable state or federal laws. Lawful restrictions under state and federal law on the age of occupants in senior housing or housing for older persons shall not be construed as restrictions based on familial status.

    Ambassador West Master Homeowners Association is referenced in the above mentioned document.

    Document(s) declaring modifications thereof recorded March 03, 2009 as Instrument no. 2009-297679 of Official Records.

    Document(s) declaring modifications thereof recorded October 31, 2013 as Instrument no. 20131553283 of Official Records.

Document(s) declaring modifications thereof recorded March 12, 2015 as Instrument No. 20150270219 of Official Records.

Document(s) declaring modifications thereof recorded December 21, 2015 as Instrument No. 20151601451 of Official Records.

12. The terms and provisions contained in the document entitled "Memorandum of Site Development Agreement" recorded July 02, 2007 as Instrument no. 2007-1579027 of Official Records.

Document(s) declaring modifications thereof recorded November 12, 2008 as Instrument no. 2008-1995401 of Official Records.

13. The terms and provisions contained in the document entitled "Resolution No. 8850 adopting a Declaration of landmark designation for 210 South Orange Grove Blvd." recorded May 02, 2008 as Instrument No. 20080779152 of Official Records.

14. The terms, provisions and easement(s) contained in the document entitled "Construction Easement Agreement (Lot A Portion)" recorded December 04, 2008 as Instrument No. 08-2131627 of Official Records.

15. The terms, provisions and easement(s) contained in the document entitled "Construction Easement Agreement (Adjustment Portion)" recorded December 04, 2008 as Instrument No. 08-2131628 of Official Records.

16. An easement for ingress, egress and incidental purposes in the document recorded December 19, 2008 as Instrument No. 08-2232727 of Official Records.

The location of the easement cannot be determined from record information.

17. The terms, provisions and easement(s) contained in the document entitled "Parking Easement Agreement" recorded December 28, 2011 as Instrument No. 11-1763713 of Official Records.

18. An easement shown or dedicated on the map of Tract No. 63103 recorded March 15, 2012 and on file in Book 1369, Page(s) 35 through 52, of Tract Maps.
For: Reciprocal parking, reciprocal access and incidental purposes.

19. A deed of trust to secure an original indebtedness of $8,400,000.00 recorded June 16, 2017 as Instrument No. 20170671625 of Official Records.

| | |
|---|---|
| Dated: | June 08, 2017 |
| Trustor: | Cantor Group LLC, a California Limited Liability Company |
| Trustee: | First American Title Insurance Company |
| Beneficiary: | Preferred Bank, a California Banking Corporation |

A document entitled "Absolute Assignment of Leases, Lease Guaranties, Rents, Issues and Profits" recorded June 16, 2017 as Instrument No. 20170671626 of Official Records, as additional security for the payment of the indebtedness secured by the deed of trust.

A document recorded June 16, 2017 as Instrument No. 20170671628 of Official Records, provides that the obligation secured by the deed of trust was assumed by SDRES Partners LLC, a California Limited Liability Company.

A document recorded May 29, 2019 as Instrument No. 20190487920, of Official Records provides that the Deed of Trust/Mortgage or the obligation secured thereby has been modified.

A document recorded January 16, 2024 as Instrument No. 20240020417, of Official Records provides that the Deed of Trust/Mortgage or the obligation secured thereby has been modified.

A document recorded October 09, 2024 as Instrument No. 20240688406, of Official Records provides that the Deed of Trust/Mortgage or the obligation secured thereby has been modified.

A document recorded January 30, 2026 as Instrument No. 20260071280 of Official Records provides that Fidelity National Title Company was substituted as trustee under the deed of trust.

A notice of default recorded January 30, 2026 as Instrument No. 20260071281 of Official Records.

A notice of trustee's sale recorded May 11, 2026 as Instrument No. 20260343596 of Official Records.

20. A financing statement recorded June 27, 2017 as Instrument No. 20170712457 of Official Records.

| | |
|---|---|
| Debtor: | Cantor Group LLC |
| Secured party: | Preferred Bank |

An amendment to the financing statement was recorded December 04, 2017 as Instrument No. 20171391801 of Official Records.

A continuation statement was recorded March 29, 2022 as Instrument No. 20220345458 of Official Records.

21. This item has been intentionally deleted.

22. A Deed of Trust to secure an original indebtedness of $400,000.00 recorded January 05, 2024 as Instrument No. 20240011708 of Official Records.

| | |
|---|---|
| Dated: | December 13, 2023 |
| Trustor: | SDRES Partners LLC, a California limited liability company |
| Trustee: | Stewart Title of California, Inc. |
| Beneficiary: | Preferred Bank, a California banking corporation |

| | |
|---|---|
| Affects: | The land and other property. |

A document entitled "Absolute Assignment of Leases, Lease Guaranties, Rents, Issues and Profits" recorded January 05, 2024 as Instrument No. 20240011709 of Official Records, as additional security for the payment of the indebtedness secured by the deed of trust.

23. An ALTA/NSPS survey of recent date which complies with the current minimum standard detail requirements for ALTA/NSPS land title surveys.

24. Any facts, rights, interests or claims which would be disclosed by a correct ALTA/NSPS survey.

25. Rights of parties in possession.

26. Water rights, claims or title to water, whether or not shown by the Public Records.

27. Lien for delinquent assessments in favor of Ambassador West Master Association

| | |
|---|---|
| Against: | SDRES Partners LLC, a California limited liability company |
| Amount: | $15,225.51, and any other amounts due thereunder |
| Recorded: | January 07, 2026 as Instrument No. 20260017885 of Official Records. |

## INFORMATIONAL NOTES

**ALERT - CA Senate Bill 2 imposes an additional fee of $75 up to $225 at the time of recording on certain transactions effective January 1, 2018. Please contact your First American Title representative for more information on how this may affect your closing.**

NOTE to proposed insured lender only: No Private transfer fee covenant, as defined in Federal Housing Finance Agency Final Rule 12 CFR Part 1228, that was created and first appears in the Public Records on or after February 8, 2011, encumbers the Title except as follows: None

1. According to the latest available equalized assessment roll in the office of the county tax assessor, there is located on the land a(n) Multiple Family Residence known as 244 South Orange Grove Boulevard, Pasadena, CA.

2. According to the public records, there has been no conveyance of the land within a period of twenty-four months prior to the date of this report, except as follows:

   None

3. This preliminary report/commitment was prepared based upon an application for a policy of title insurance that identified land by street address or assessor's parcel number only. It is the responsibility of the applicant to determine whether the land referred to herein is in fact the land that is to be described in the policy or policies to be issued.

4. Should this report be used to facilitate your transaction, we must be provided with the following prior to the issuance of the policy:

   A. WITH RESPECT TO A CORPORATION:
      1. A certificate of good standing of recent date issued by the Secretary of State of the corporation's state of domicile.
      2. A certificate copy of a resolution of the Board of Directors authorizing the contemplated transaction and designating which corporate officers shall have the power to execute on behalf of the corporation.
      3. A certificate of revivor and a certificate of relief from contract voidability issued by the Franchise Tax Board of the State of California.
      4. Requirements which the Company may impose following its review of the above material and other information which the Company may require.

   B. WITH RESPECT TO A CALIFORNIA LIMITED PARTNERSHIP:
      1. A certified copy of the certificate of limited partnership (form LP-1) and any amendments thereto (form LP-2) to be recorded in the public records;
      2. A full copy of the partnership agreement and any amendments;
      3. Satisfactory evidence of the consent of a majority in interest of the limited partners to the contemplated transaction;
      4. A certificate of revivor and a certificate of relief from contract voidability issued by the Franchise Tax Board of the State of California.
      5. Requirements which the Company may impose following its review of the above material and other information which the Company may require.

   C. WITH RESPECT TO A FOREIGN LIMITED PARTNERSHIP:
      1. A certified copy of the application for registration, foreign limited partnership (form LP-5) and any

amendments thereto (form LP-6) to be recorded in the public records;

2. A full copy of the partnership agreement and any amendment;
3. Satisfactory evidence of the consent of a majority in interest of the limited partners to the contemplated transaction;
4. A certificate of revivor and a certificate of relief from contract voidability issued by the Franchise Tax Board of the State of California.
5. Requirements which the Company may impose following its review of the above material and other information which the Company may require.

D. WITH RESPECT TO A GENERAL PARTNERSHIP:

1. A certified copy of a statement of partnership authority pursuant to Section 16303 of the California Corporation Code (form GP-I), executed by at least two partners, and a certified copy of any amendments to such statement (form GP-7), to be recorded in the public records;
2. A full copy of the partnership agreement and any amendments;
3. Requirements which the Company may impose following its review of the above material required herein and other information which the Company may require.

E. WITH RESPECT TO A LIMITED LIABILITY COMPANY:

1. A copy of its operating agreement and any amendments thereto;
2. If it is a California limited liability company, a certified copy of its articles of organization (LLC-1) and any certificate of correction (LLC-11), certificate of amendment (LLC-2), or restatement of articles of organization (LLC-10) to be recorded in the public records;
3. If it is a foreign limited liability company, a certified copy of its application for registration (LLC-5) to be recorded in the public records;
4. With respect to any deed, deed of trust, lease, subordination agreement or other document or instrument executed by such limited liability company and presented for recordation by the Company or upon which the Company is asked to rely, such document or instrument must be executed in accordance with one of the following, as appropriate:
   (i) If the limited liability company properly operates through officers appointed or elected pursuant to the terms of a written operating agreement, such documents must be executed by at least two duly elected or appointed officers, as follows: the chairman of the board, the president or any vice president, and any secretary, assistant secretary, the chief financial officer or any assistant treasurer;
   (ii) If the limited liability company properly operates through a manager or managers identified in the articles of organization and/or duly elected pursuant to the terms of a written operating agreement, such document must be executed by at least two such managers or by one manager if the limited liability company properly operates with the existence of only one manager.
5. A certificate of revivor and a certificate of relief from contract voidability issued by the Franchise Tax Board of the State of California.
6. Requirements which the Company may impose following its review of the above material and other information which the Company may require.

F. WITH RESPECT TO A TRUST:

1. A certification pursuant to Section 18100.5 of the California Probate Code in a form satisfactory to the Company.
2. Copies of those excerpts from the original trust documents and amendments thereto which designate the trustee and confer upon the trustee the power to act in the pending transaction.
3. Other requirements which the Company may impose following its review of the material require herein and other information which the Company may require.

G. WITH RESPECT TO INDIVIDUALS:

1. A statement of information.

The map attached, if any, may or may not be a survey of the land depicted hereon. First American Title Insurance Company expressly disclaims any liability for loss or damage which may result from reliance on

this map except to the extent coverage for such loss or damage is expressly provided by the terms and provisions of the title insurance policy, if any, to which this map is attached.

## LEGAL DESCRIPTION

Real property in the City of Pasadena, County of Los Angeles, State of California, described as follows:

Parcel 1:

Lot 12 of TRACT NO. 63103, in the City of Pasadena, as per map recorded in Book 1369 pages 35 through 52 of Maps in the Office of the County Recorder of said County, amended pursuant to that certain Certificate of Correction recorded December 3, 2013 as Instrument No. 20131708591 of Official Records.

Parcel 2:

A Reciprocal Access Easement over those areas set out on the map shown above.

Parcel 3:

An easement for the purposes herein stated and subject to the terms and provisions of that certain consolidated Amended and Restated Driveway Easement Agreement (South Orange Grove Parcels) Recorded December 5, 2013 as Instrument No. 20131716500 of Official Records, more particularly described as set out therein.

Parcel 4:

An easement for the purposes herein stated and subject to the terms and provisions of that certain Amended and Restated Driveway Easement Agreement (Del Mar Parcel) recorded December 5, 2013 as Instrument No. 20131716499 of Official Records, more particularly described as set out therein.

Parcel 5:

An easement for the purposes herein stated and subject to the terms and provisions of that certain Rose Parade Grandstand Easement Agreement (Orange Grove Avenue) recorded July 21, 2005 as Instrument Nos. 05-1721787 and 05-1721788 both of Official Records, more particularly described as set out therein.

Parcel 6:

An easement for the purposes herein stated and subject to the terms and provisions of that certain Parking Garage Easement Agreement recorded July 2, 2007 as Instrument No. 20071579026 of Official Records, more particularly described as set out therein.

Parcel 7:

An easement for the purposes herein stated and subject to the terms and provisions of that certain Parking Easement Agreement recorded December 28, 2011 as Instrument No. 20111763712 of Official Records, more particularly described as set out therein.

APN: 5713-027-065

**NOTICE**

Section 12413.1 of the California Insurance Code, effective January 1, 1990, requires that any title insurance company, underwritten title company, or controlled escrow company handling funds in an escrow or sub-escrow capacity, wait a specified number of days after depositing funds, before recording any documents in connection with the transaction or disbursing funds. This statute allows for funds deposited by wire transfer to be disbursed the same day as deposit. In the case of cashier's checks or certified checks, funds may be disbursed the next day after deposit. In order to avoid unnecessary delays of three to seven days, or more, please use wire transfer, cashier's checks, or certified checks whenever possible.

If you have any questions about the effect of this new law, please contact your local First American Office for more details.

## Privacy Policy

### We Are Committed to Safeguarding Customer Information

In order to better serve your needs now and in the future, we may ask you to provide us with certain information. We understand that you may be concerned about what we will do with such information - particularly any personal or financial information. We agree that you have a right to know how we will utilize the personal information you provide to us. Therefore, together with our parent company, The First American Corporation, we have adopted this Privacy Policy to govern the use and handling of your personal information.

### Applicability

This Privacy Policy governs our use of the information which you provide to us. It does not govern the manner in which we may use information we have obtained from any other source, such as information obtained from a public record or from another person or entity. First American has also adopted broader guidelines that govern our use of personal information regardless of its source. First American calls these guidelines its *Fair Information Values*, a copy of which can be found on our website at www.firstam.com.

### Types of Information

Depending upon which of our services you are utilizing, the types of nonpublic personal information that we may collect include:

Information we receive from you on applications, forms and in other communications to us, whether in writing, in person, by telephone or any other means;
Information about your transactions with us, our affiliated companies, or others; and
Information we receive from a consumer reporting agency.

### Use of Information

We request information from you for our own legitimate business purposes and not for the benefit of any nonaffiliated party. Therefore, we will not release your information to nonaffiliated parties except: (1) as necessary for us to provide the product or service you have requested of us; or (2) as permitted by law. We may, however, store such information indefinitely, including the period after which any customer relationship has ceased. Such information may be used for any internal purpose, such as quality control efforts or customer analysis. We may also provide all of the types of nonpublic personal information listed above to one or more of our affiliated companies. Such affiliated companies include financial service providers, such as title insurers, property and casualty insurers, and trust and investment advisory companies, or companies involved in real estate services, such as appraisal companies, home warranty companies, and escrow companies. Furthermore, we may also provide all the information we collect, as described above, to companies that perform marketing services on our behalf, on behalf of our affiliated companies, or to other financial institutions with whom we or our affiliated companies have joint marketing agreements.

### Former Customers

Even if you are no longer our customer, our Privacy Policy will continue to apply to you.

### Confidentiality and Security

We will use our best efforts to ensure that no unauthorized parties have access to any of your information. We restrict access to nonpublic personal information about you to those individuals and entities who need to know that information to provide products or services to you. We will use our best efforts to train and oversee our employees and agents to ensure that your information will be handled responsibly and in accordance with this Privacy Policy and First American's *Fair Information Values*. We currently maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

**CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (02-03-10)**
**EXCLUSIONS**

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   (a) building;
   (b) zoning;
   (c) land use;
   (d) improvements on the Land;
   (e) land division; and
   (f) environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks:
   (a) that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   (b) that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
   (c) that result in no loss to You; or
   (d) that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5. Failure to pay value for Your Title.
6. Lack of a right:
   (a) to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   (b) in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

**LIMITATIONS ON COVERED RISKS**

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows: For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

| **Your Deductible Amount** | **Our Maximum Dollar Limit of Liability** |
|---|---|
| Covered Risk 16: 1% of Policy Amount or $2,500.00 (whichever is less) | $10,000.00 |
| Covered Risk 18: 1% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 19: 1% of Policy Amount or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 21: 1% of Policy Amount or $2,500.00 (whichever is less) | $5,000.00 |

**ALTA RESIDENTIAL TITLE INSURANCE POLICY (6-1-87)**
**EXCLUSIONS**

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning:
   (a) and use
   (b) improvements on the land
   (c) and division
   (d) environmental protection
   This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date.
   This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.
2. The right to take the land by condemning it, unless:
   (a) a notice of exercising the right appears in the public records on the Policy Date
   (b) the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking
3. Title Risks:
   (a) that are created, allowed, or agreed to by you

(b) that are known to you, but not to us, on the Policy Date -- unless they appeared in the public records
(c) that result in no loss to you
(d) that first affect your title after the Policy Date -- this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks

4. Failure to pay value for your title.
5. Lack of a right:
   (a) to any land outside the area specifically described and referred to in Item 3 of Schedule A OR
   (b) in streets, alleys, or waterways that touch your land
   This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

**2006 ALTA LOAN POLICY (06-17-06)**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   i. the occupancy, use, or enjoyment of the Land;
   ii. the character, dimensions, or location of any improvement erected on the Land;
   iii. the subdivision of land; or
   iv. environmental protection;

   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

   b. Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   a. created, suffered, assumed, or agreed to by the Insured Claimant;
   b. not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c. resulting in no loss or damage to the Insured Claimant;
   d. attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
   e. resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   a. a fraudulent conveyance or fraudulent transfer, or
   b. a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof, (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

**2006 ALTA OWNER'S POLICY (06-17-06)**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   i. the occupancy, use, or enjoyment of the Land;
   ii. the character, dimensions, or location of any improvement erected on the Land;
   iii. the subdivision of land; or
   iv. environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   b.Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   a. created, suffered, assumed, or agreed to by the Insured Claimant;
   b. not Known to the Company, not recorded in the Public Records at Date of Policy, but known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c. resulting in no loss or damage to the Insured Claimant;
   d. attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   e. resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   a. a fraudulent conveyance or fraudulent transfer; or
   b. a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the public records.

**ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (07-26-10)**
**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

   i. the occupancy, use, or enjoyment of the Land;
   ii. the character, dimensions, or location of any improvement erected on the Land;
   iii. the subdivision of land; or
   iv. environmental protection;

   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.

   b. Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters

   a. created, suffered, assumed, or agreed to by the Insured Claimant;
   b. not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c. resulting in no loss or damage to the Insured Claimant;
   d. attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
   e. resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.
8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.
9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   a. a fraudulent conveyance or fraudulent transfer, or
   b. a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

**2021 ALTA LOAN POLICY (7-1-21)**
**EXCLUSIONS FROM COVERAGE**

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
      i. the occupancy, use, or enjoyment of the Land;
      ii. the character, dimensions, or location of any improvement on the Land;
      iii. the subdivision of land; or
      iv. environmental remediation or protection.
   b. any governmental forfeiture, police, regulatory, or national security power.
   c. the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.
   Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.
2. Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.
3. Any defect, lien, encumbrance, adverse claim, or other matter:
   a. created, suffered, assumed, or agreed to by the Insured Claimant;
   b. not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c. resulting in no loss or damage to the Insured Claimant;
   d. attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or

e. resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser or encumbrancer had been given for the Insured Mortgage at the Date of Policy.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business law.
5. Invalidity or unenforceability of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury law or Consumer Protection Law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction creating the lien of the Insured Mortgage is a:
   a. fraudulent conveyance or fraudulent transfer;
   b. voidable transfer under the Uniform Voidable Transactions Act; or
   c. preferential transfer:
      i. to the extent the Insured Mortgage is not a transfer made as a contemporaneous exchange for new value; or
      ii. for any other reason not stated in Covered Risk 13.b.
7. Any claim of a PACA-PSA Trust. Exclusion 7 does not modify or limit the coverage provided under Covered Risk 8.
8. Any lien on the Title for real estate taxes or assessments imposed by a governmental authority and created or attaching between the Date of Policy and the date of recording of the Insured Mortgage in the Public Records. Exclusion 8 does not modify or limit the coverage provided under Covered Risk 2.b. or 11.b.
9. Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.
7. Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, geothermal resources, uranium, clay, rock, sand and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

**2021 ALTA OWNER'S POLICY (7-1-21)**
**EXCLUSIONS FROM COVERAGE**

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
      i. the occupancy, use, or enjoyment of the Land;
      ii. the character, dimensions, or location of any improvement on the Land;
      iii. the subdivision of land; or
      iv. environmental remediation or protection.
   b. any governmental forfeiture, police, regulatory, or national security power.
   c. the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.

   Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.
2. Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.
3. Any defect, lien, encumbrance, adverse claim, or other matter:
   a. created, suffered, assumed, or agreed to by the Insured Claimant;
   b. not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c. resulting in no loss or damage to the Insured Claimant;
   d. attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 9 or 10); or
   e. resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser had been given for the Title at the Date of Policy.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction

vesting the Title as shown in Schedule A is a:

a. fraudulent conveyance or fraudulent transfer;
b. voidable transfer under the Uniform Voidable Transactions Act; or
c. preferential transfer:
   i. to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
   ii. for any other reason not stated in Covered Risk 9.b.

5. Any claim of a PACA-PSA Trust. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 8.
6. Any lien on the Title for real estate taxes or assessments imposed or collected by a governmental authority that becomes due and payable after the Date of Policy. Exclusion 6 does not modify or limit the coverage provided under Covered Risk 2.b.
7. Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

**EXCEPTIONS FROM COVERAGE**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.
7. Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, geothermal resources, uranium, clay, rock, sand and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

# Addendum D

## Qualifications

# PROFILES



VALUATION & ADVISORY SERVICES

## Julian Uribe

First Vice President, Los Angeles

**T** +1 213 613 3506
**M** +1 909 509 2898
**E** julian.uribe@cbre.com
CA Lic. 3006320

### Professional Experience

Julian Uribe is a First Vice President within the Multi-Housing Valuation Practice for the Los Angeles office, one of CBRE's largest valuation team nation-wide. Mr. Uribe is a graduate from California State Polytechnic University, Pomona, with an undergraduate degree in Finance, Real Estate, and Law. Prior to joining CBRE, he worked for a single-family residential development firm in the Inland Empire where he provided support with the acquisition of land parcels and analysis of market competition.

Since joining in March 2015, Mr. Uribe has appraised a wide variety of multifamily residential appraisals including: existing, mixed-use, value-add, co-living, affordable/low income, low income housing tax credit (LIHTC), historic, adaptive reuse, and senior housing properties. Project sizes range from private client/small balance loan (SBL) assets to institutional-level properties, located in Los Angeles, Orange, Ventura, Riverside, San Bernardino, and Kern Counties.

He produces and directly oversees the production of 200+ appraisal reports a year. He brings a unique perspective to the Los Angeles team as a first-generation Latin American and prides himself on his work ethic and ability to persevere through challenges. He comes from a family involved in various aspects of the real estate industry and has always had a passion for it. Away from the rigorous hours of the appraisal profession, he enjoys golf, travel, competing in triathlons, reading, self-improvement, mentoring, and spending time with family.

In 2022, Mr. Uribe was recognized as a Top 5 Producer for the Greater Los Angeles Area awarded to individuals who excel in production while maintaining high levels of client satisfaction. At the time he received his Certified General Real Estate Appraiser license, Mr. Uribe was the youngest to do so within the region in over 15 years and was recognized as the Pacific Southwest Region's Rookie of the Year, an award given to only six individuals nation-wide.

### Clients Represented

- AllianceBernstein, LP
- Deutsche Bank
- Goldman Sachs
- JP Morgan Chase Bank N.A.
- Kennedy Wilson
- KeyBank
- NorthMarq Capital
- NYL Investors, LLC
- Parkview Financial REIT, LP
- PNC Bank
- River City Bank
- U.S. Bank
- Umpqua Bank
- Walker & Dunlop
- Wells Fargo Bank
- Western Alliance Bank
- Financial Institutions, Life Companies, Investors, Developers, Law Firms

### Pro Affiliations / Accreditations

- Appraisal Institute, Candidate for Designation
- California Certified General Real Estate Appraiser, No. 3006320
- Hispanics Organized to Leverage our Advantage (HOLA)

### Education

- California State Polytechnic University, Pomona, California
  Bachelor of Science - Finance, Real Estate, and Law (FRL)



© 2025 CBRE, INC

# PROFILES

## Sample of Significant Assignments

- Shoreline Gateway East Tower (Proposed 35-Story Mixed-Use), Long Beach
- 888 Hilgard (58 Units. 67%Furnished/33%Unfurnished/Rent-Controlled). Los Angeles
- Panorama Tower (13-Story, Adaptive Reuse. Retail. and Excess Land). Panorama City
- Four Seasons Private Residences (59 high-end for-sale condominiums). Los Angeles
- Proposed 230-Unit Mixed-Use Apartment with 66,000 SF retail/office, West LA
- Marina Shores II - Proposed 281-Unit Mixed-Use Apartment with ground floor retail, Long Beach
- The Aliso (472-Unit Mixed-Use Apartment w/ 24,000 SF retail/office). DTLA
- LEVEL Furnished Living (303-Unit Mixed-Use Apartment with furnished and Transient Occupancy Units)
- SMB Hollywood (224 Unit Mixed-Use Apartment, 38 furnished 30-day stay units), Hollywood
- Olivewood Village (55 Age-Restricted Units + 9 for-sale condominiums + 81 market rate units)
- Linea Apartments (595-Unit Mixed-Use Multifamily), West LA
- The Wilmont (255-Unit Adaptive Reuse Conversion). Koreatown
- Ferrante Apartments Phase I & II (1,150-unit mixed-use apartment), DTLA
- 1775 Beloit Avenue (16-Unit Apartment operating as 48 Furnished Co-Living Suites). West LA
- Treehouse Hollywood (18-Unit Apartment operating as 60 Furnished Co-Living Suites). Hollywood
- Park Fifth High-Rise Apartments (347-Unit Mixed-Use Apartment w/ ground floor retail), DTLA
- Trademark Mid-Rise Apartments (313-Unit Mixed-Use Apartment w/ ground floor retail), DTLA
- Numerous 5-100+ Unit Proposed/Under Construction/New Construction Multifamily Properties
- Numerous 5-50+ Unit Properties (As Is. Value-Add. and Portfolios), Southern California


©2025 CBRE, INC

# QUALIFICATIONS OF ROBERT W. GUTZMAN, MAI

Senior Vice President
CBRE, INC., Valuation & Advisory Services
400 South Hope Street, 25th Floor
Los Angeles, California 90071
Phone: (213) 613-3683 Fax: (213) 613-3005 E-mail: bob.gutzman@cbre.com

## EDUCATION

Occidental College, Los Angeles, Bachelor of Arts in Economics

Professional Courses/Seminars: Litigation Seminar (numerous times); Real Estate Appraisal Principles; Basic Valuation Procedures; Basic Capitalization Theory/Techniques; Advanced Capitalization Theory/Techniques; Uniform Standards of Professional Appraisal Practice (every two years); Report Writing and Valuation Analysis; Advanced Applications; The Law and Value; Eminent Domain; Advanced Sales Comparison and Cost Approaches; Business Practices and Ethics (multiple times); Special Purpose Properties; Income Valuation of Small, Mixed-Use Properties; Subdivision Valuation; Appraiser as Expert Witness; Litigation Appraising; Condemnation Appraising; Federal and California Statutory and Regulatory Law Course; Uniform Appraisal Standards for Federal Land Acquisitions (i.e., Yellow Book); Real Estate Damages; IRS Summit; Partial Acquisitions; numerous other seminars and workshops

## LICENSES/CERTIFICATIONS/CERTIFICATES

Member, Appraisal Institute (MAI) – Designation Number 11482
California Certified General Real Estate Appraiser, Number AG025646
Appraisal Institute Litigation Certificate Program, Certificate of Completion

## EMPLOYMENT

| | |
|---|---|
| CBRE, Inc. – Valuation & Advisory Services<br>Senior Vice President, Los Angeles Office | 1993 to Present |
| IBAR Settlement Co., Inc.<br>Economist/Expert Witness, Pasadena | 1990 to 1993 |
| First Interstate Bank of California<br>Local Markets Analyst, Los Angeles | 1989 to 1990 |

## EXPERT WITNESS

Qualified as an expert witness in U.S. District Court, U.S. Bankruptcy Court, and California State Superior Court in real estate appraisal (civil and criminal court) and in forensic economics (civil court).

Testified before the Appeals Boards of Los Angeles, Orange, and San Diego counties.

## EXPERIENCE

Experience in appraising various property types including office buildings, retail centers, industrial properties, multi-family buildings (including low-income), golf courses, self-storage facilities, hospitality properties, gas stations, auto dealerships, car washes, vacant land (including underwater land parcels), skilled-nursing and assisted-living facilities, single-family residences, schools, studios, subdivisions, easements, and special-purpose properties.

Reports have been used for purchase and sale, financing, collateral management, estate purposes, property tax appeals, rental disputes, eminent domain proceedings, inverse condemnation, bankruptcies, and general real estate litigation.

Guest speaker for the Southern California Chapter of the Appraisal Institute.

## PARTIAL LIST OF SIGNIFICANT ASSIGNMENTS

2,700-acre Neverland Ranch, Santa Barbara County
Pacific Design Center, West Hollywood
Partial taking of 300-acre industrial property, Rialto
Grauman's Chinese Theatre, ground lease valuation
Valuation of 850 California properties for family trust
High-end SFR on 17 Mile Drive, Pebble Beach
LBI Media Studios, Burbank
Saks Fifth Avenue rent survey
Review of Queen Mary Complex, Long Beach
Upton Sinclair estate, Monrovia
High-identity boutique retail properties
Multiple cell-site installations across So. Cal.
Numerous wildfire cases across So. Cal.
Sheraton Hotel, Garden Grove
Northrop Grumman rent arbitration, San Diego
Luxury estate in Carmel Valley
Timeshare valuations and other appraisals in Hawaii
47 self-storage properties across the U.S. for class action suit
The Bradbury Building, Los Angeles
Harry Houdini estate, Los Angeles
Medical office buildings on Huntington Hospital campus
Norton Simon Museum, Pasadena
The Hammer Museum, Westwood
Multiple downtown L.A. properties valued for bankruptcy
Hilton Hotel Torrey Pines, La Jolla
David Murdock ranch, Ventura County
Alfred Mann estate, Beverly Hills Post Office area
Multiple landslide properties, Bel Air
Numerous eminent domain cases
Frank Capra ranch, San Diego County
Nuns' convent (475 acres), Tehachapi
Dow Chemical property, Alameda County
Multiple auto and truck dealerships
Assignments in HI, NY, NJ, NV, ID, OR, AZ, FL, MN, WI, etc.

## REPRESENTATIVE CLIENT TYPES

Clients include banks, law firms, individuals, government entities, insurance companies, trusts, REITs, arbitrators, mediators, non-profit entities, private businesses, public corporations, etc.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
601 S. Figueroa Street, Suite 2500, Los Angeles, CA 90017-5704

A true and correct copy of the foregoing document entitled (*specify*): DECLARATION OF ROBERT W. GUTZMAN, MAI, IN SUPPORT OF PREFERRED BANK'S MOTION FOR RELIEF FROM AUTOMATIC STAY AND RELIEF FROM TURNOVER BY PREPETITION RECEIVER
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 25, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) August 25, 2026, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) August 25, 2026, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**BY MESSENGER**
Hon. Scott C. Clarkson
U. S. Bankruptcy Court
Ronald Reagan Federal Building
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 25, 2026 | JoAn Mack | */s/ JoAn Mack* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

**SERVED VIA NOTICE OF ELECTRONIC FILING (NEF)**

- **Kyra E Andrassy** kandrassy@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Jessica L Bagdanov** jbagdanov@bg.law, ecf@bg.law
- **Ira David Kharasch** ikharasch@pszjlaw.com
- **Kenneth Misken** Kenneth.M.Misken@usdoj.gov
- **John A Moe** john.moe@dentons.com, kathryn.howard@dentons.com;derry.kalve@dentons.com;DOCKET.GENERAL.LIT.LOS@dentons.com
- **Byron Z Moldo** bmoldo@ecjlaw.com, aantonio@ecjlaw.com,dperez@ecjlaw.com,scarson@ecjlaw.com
- **Walter Whitman Moore** walter@licensedtosue.com, waltermooreinla@gmail.com
- **David M Poitras** dpoitras@bg.law
- **United States Trustee (SA)** ustpregion16.sa.ecf@usdoj.gov

**SERVED BY UNITED STATES MAIL**

SDRES Partners LLC
520 Newport Center Drive, Suite 480
Newport Beach, CA 92660

Joseph M. Rothberg
Levene, Neale, Bender, Yoo & Golubchik, LLP
2818 La Cienega Avenue
Los Angeles, California 90034

Cia Mackle
Brook E Wilson
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd 13th Fl
Los Angeles, CA 90067-4100