Byron Z. Moldo (SBN 109652)
bmoldo@ecjlaw.com
**ERVIN COHEN & JESSUP LLP**
9401 Wilshire Boulevard, 12th Floor
Beverly Hills, California 90212-2974
Telephone (310) 273-6333
Facsimile (310) 859-2325

State Court Receiver

ERVIN COHEN & JESSUP LLP

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION**

In re

SDRES PARTNERS, LLC,

Debtor.

Case No. 8:26-bk-11744-SC

**DECLARATION OF BYRON Z. MOLDO IN SUPPORT OF PREFERRED BANK MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND RELIEF FROM TURNOVER BY PREPETITION RECEIVER**

Date: September 16, 2026
Time: 1:30 p.m.
Location: Courtroom 5C – Virtual
411 West Fourth Street
Santa Ana, CA 92701

I, Byron Z. Moldo, declare as follows:

1. I am an attorney licensed to practice law in the State of California, and a partner in the law firm of Ervin Cohen & Jessup LLP. All of the statements contained in this declaration are true of my own personal knowledge, except as to those stated on information and belief.

2. I am the duly appointed, qualified, and acting State Court Receiver in the matter entitled Preferred Bank v. SDRES Partners LLC, Los Angeles County Superior Court Case Number 26NNCV01136 ("State Court Action").

3. On March 11, 2026, the Court in the State Court Action filed its Amended Ex Parte Order Appointing Receiver and Order to Show Cause and Temporary Restraining Order – Rents,

Issues, and Profits ("Order"). A copy of the Order is attached hereto as **Exhibit "A."** The Order was issued on the basis of the complaint filed by Preferred Bank ("Preferred"), and in part, the declaration of Steve Crist. Copies of the complaint and declaration are attached hereto as **Exhibits "B" and "C,"** respectively.

2. The Order appointed me as Receiver to take possession of the real properties located at 210, 244, and 248 South Orange Grove Boulevard, Pasadena, California (collectively "Properties").

3. In accordance with the Order, I employed Jalmar Properties, Inc. ("Jalmar") as manager of the Properties.

4. After qualifying, through Jalmar I assumed possession and control of the Properties. Each of the Properties was in deplorable condition, appeared to have been neglected for an extended period of time, and required substantial repairs and maintenance. I also discovered the following:

a. Property taxes were delinquent, and the current redemption amount is not less than $595,427.99 plus accruing penalties;

b. During rainstorms after my appointment, water was entering units in the 244 and 248 buildings, and based on a condition report obtained by Jalmar, the roofs on all three buildings need to be replaced. Until funds become available to replace the roofs, tarps have been installed on the 244 and 248 buildings;

c. The 244 and 248 buildings were infested with rodents. I was forced to incur a substantial expense to remedy the situation including removing all of the attic insultation in both buildings;

d. Several of the tenants informed me that due to the failure of the owner to pay for regular services such as trash removal, pool service, cleaning, flooding, etc., the tenants had paid for many of these services in order to maintain the Properties, and deducted the amounts paid from their monthly rent;

e. I was informed by the tenants that the City of Pasadena ("City") had issued citations to correct various conditions, and the required work to comply with the citations



ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

had not been performed. To be precise, none of the required work to address the conditions had commenced prior to my appointment;

f. Upon taking possession, the tenant occupying unit 102 in the 248 building had no hot water, heat, or air conditioning; and

g. The City informed me that certain tenants had been overcharged for rent, and the tenants were entitled to credits.

5. Following consultation with Jalmar, I concluded that the Properties were in desperate need of extensive repairs that would be costly. Further, due to the rodent infestation, I was concerned for the health and safety of the tenants. Also, based on the current condition of the properties, the reduction in rental income, the administrative expenses related to the receivership estate including Receiver and property management fees, it was my estimate that the current fair market value of the Properties was less than the outstanding amount owed to Preferred. Jalmar and I are working to correct the repair and maintenance issues as funds become available.

6. The Properties consist of the following:

a. 210 S. Orange Grove Boulevard – This property is a commercial building with one tenant – Clear Mind Full Heart ("Clear Mind"). A lease was executed by SDRES Partners LLC ("SDRES") with Clear Mind on or about June 5, 2023. The lease provides, in part, that SDRES shall complete specific work to the premises, and Clear Mind also agreed to perform certain work to the premises. I believe that possession of the property was provided to Clear Mind sometime in 2023 pursuant to an early occupancy agreement. Additionally, Clear Mind's obligation to pay rent according to the lease does not begin until one hundred twenty (120) days after the Commencement Date (as defined in the lease), and the lease will not commence until the landlord's work has been completed. Clear Mind claims that SDRES failed to perform any of the work specified in the lease. In addition, Clear Mind claims to have performed some of their required work, and some of the work required of SDRES. I am informed and believe that SDRES did not perform any of the work required by the terms of the lease with Clear Mind. Clear Mind has provided me with a document that lists various items allegedly paid

by Clear Mind totaling $122,437.70 that were the landlord's responsibility. I have contacted counsel for Clear Mind and requested a list of the specific work that Clear Mind contends must be performed by the landlord, but I have not received a response. I have also informed the attorney for Clear Mind that Jalmar and I intended to inspect the property on July 30, 2026 which I did. In addition, as provided in the lease, Clear Mind has entered into a Collective Membership Agreement pursuant to which individuals and/or entities have paid and continue to pay a membership fee to Clear Mind. At the present time, the lease has not commenced, and therefore, no rent has ever been paid by Clear Mind. On August 10, 2026, I prepared and sent a Lease Commencement Memorandum to Clear Mind having learned that the work that was to have been done pursuant to the lease is completed.

b. 244 and 248 S. Orange Grove Boulevard – These two properties consist of two 4-unit apartment buildings. There are two vacant units; one in each building. As set forth above, prior to my appointment, it appears that SDRES performed very little, if any, maintenance at the properties. I discovered that the tenants were paying various service providers for landscaping, pool maintenance, and general maintenance at the properties. Also, I was contacted by a representative of the City as certain tenants claimed that they had been overcharged by SDRES and paid excessive rent. The following tenants have been determined by the City to have been overcharged:

244 S. Orange Grove, #204

248 S. Orange Grove, #102

248 S. Orange Grove, #202

The City determined that the tenants of units 204 and 102 were entitled to credits of $668.93 and $1,925.32, respectively. These amounts were deducted from the amount of rent paid by these tenants for the month of July 2026. The City determined that the tenant of unit 202 was entitled to a large credit, and as a result, will not be paying rent until September 2026.

7. Shortly after my appointment, on March 17, 2026, an attorney in my office



ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

prepared and sent a letter to attorney Joseph Rothberg, who I was informed represented either SDRES or one of its members, that requested compliance with the terms of the Order, and turnover of various information, funds, and documents. A copy of the March 17, 2026 letter is attached hereto as **Exhibit "D."** I did not receive a response to the letter.

8. On April 20, 2026, Brandon Tran ("Tran"), counsel for Vierergruppe Group Management ("Vierergruppe"), the property manager for the Properties prior to my appointment, sent to me lease documents and an income statement. No funds were delivered to me.

9. In response to Tran's April 20, 2026 letter, on the same day, the same attorney in my office who sent the March 17, 2026 letter, prepared and sent a letter to Tran demanding that Vierergruppe produce various additional documents and information. A copy of the April 20, 2026 letter is attached hereto as **Exhibit "E."** On April 28, 2026, Tran forwarded to me the following documents:

a. List of insurance premium payments;

b. Tenant ledger;

c. List of security deposits; and

d. List of outstanding accounts receivable.

No funds were delivered to me.

10. On July 14, 2026, I was informed by Joe Chan of Eversafe Insurance, that WKFCC, the carrier that insured the 244 and 248 S. Orange Grove properties, required that the tree branches at both properties to be trimmed within thirty (30) days, and if the trees were not trimmed, the existing insurance coverage would be cancelled. Similarly, and shortly after my appointment, the City had also identified the trees as an issue that required attention. While I obtained an estimate from Bartlett Tree Experts ("Bartlett") to trim the trees shortly after my appointment, due to a lack of funds, I had not engaged Bartlett. Due to recent receipt of information from WKFCC that the trees must be trimmed by August 13, 2026, I immediately contacted Preferred and requested an advance of $17,922.00 to pay for the tree trimming. On July 23, 2026, Preferred advanced the funds to trim the trees, and they were trimmed.

11. I was recently contacted by Cathy Pumphrey ("Pumphrey") who resides at 200 S.

ERVIN COHEN & JESSUP LLP

Orange Grove Boulevard., Unit 107, Pasadena, CA, which is directly behind the 210 S. Orange Grove Boulevard property. Pumphrey advised me she was the chair of the Ambassador Gardens Landscaping Committee, and over the past year had received complaints about the trees and other landscaping issues at the 210 S. Orange Grove Boulevard property. Pumphrey specifically informed me that there were dead trees and broken tree branches that were hanging over the Ambassador West Master Association property that, in her opinion, posed a safety hazard for people walking along a pathway. In addition, Pumphrey advised me that there were several tree that hung over the roof of the 210 S. Orange Grove Boulevard property, some of which were growing in to the gutter. On July 30, 2026, I inspected the 210 S. Orange Grove Boulevard property, and observed the issues with the trees including dead, broken branches. I personally saw that some of the trees had grown within inches of the 210 S. Orange Grove Boulevard property, and were hanging extremely low in the parking lot area.

12. After observing the condition of the trees at the 210 S. Orange Grove Boulevard, property, I contacted Bartlett Tree Experts ("Bartlett"), the same company used by the AGLC to trim their trees, to inspect the 210 S. Orange Grove Boulevard property, and to provide me with an estimate to trim the trees. On or about August 3, 2026, I received a proposal from Bartlett to trim the trees at the 210 S. Orange Grove Boulevard property. On August 10, 2026, I contacted Preferred and requested an advance of $5,428.00 to pay for the tree trimming. On August 17, 2026, Preferred advanced the funds to trim the trees.

13. On Sunday, July 26, 2026, I was informed by Jalmar that a major plumbing/sewage backup issue occurred at the 244 building. Specifically, I was informed that the main drainage line in the 244 building was caused by tree roots. The issue was immediately addressed by Jalmar by retaining a plumber, but the basement to the 244 building needed to be cleaned and sanitized. Jalmar also arranged for ServePro to clean and sanitize the basement, all of which was completed the same day that the issue was reported. I was informed that the cause of the blockage in the main line was tree roots. I was also informed by the plumber that the main line was broken and needs to be replaced. Otherwise, the same problem may occur in the near future. The approximate known costs for this matter were the following:

Plumber - $1,247.38 (repair main drainage line)

ServePro - $5,990.03 (clean and sanitize basement)

ServePro - $10,349.38 (repair drywall)

Safeguard Environmental - $1,115.00 (test basement for asbestos and lead paint)

I contacted my insurance agent, and a claim was submitted for all expenses incurred that relate to the incident that occurred on July 26, 2026. There is a $5,000.00 deductible amount that the applicable insurance policy includes. On August 10, 2026, I contacted Preferred and requested an advance of $10,349.38 to pay for the drywall repair costs. On August 17, 2026, Preferred advanced the funds to repair the drywall.

14. As of July 31, 2026, I have spent the following amounts for repairs and maintenance which total $110,079.66:

a. Replaced water heater for 248-102 - $1,839.64

b. Labor to assist with water heater replacement 248-102 - $504.00

c. Replaced furnace for 248-102 - $7,200.00

d. Miscellaneous minor repairs to 244-103 - $440.00

e. HVAC repair 244-103 - $667.75

f. Rekey entry doors - $1,862.38

g. Plumbing repair 244-103 bathroom - $1,480.00

h. Tarping roofs 244 and 248 - $7,000.00

i. Roof Inspection Reports - $300.00

j. Deposit for rodent abatement - $1,000.00

k. HVAC service call 244-103 - $639.00

l. Remove washer/dryer; clean vent; attempt to repair unit; check water pressure 248-202 - $440.00

m. Remove door frame from laundry area so new unit could be installed 248-202 - $880.00

n. Replace washer/dryer for 244-204 - $1,910.87

o. Repair locks and keys to 244-204 - $65.00



ERVIN COHEN & JESSUP LLP

p. Bathroom plumbing repair 248-102 - $676.00

q. Replace washer/dryer for 248-202 - $2,294.45

r. Rodent remediation inspection - $350.00

s. Replaced HVAC 248-202 - $13,495.00

t. Rodent remediation - $26,360.00

u. Chimney and dryer vent cleaning 244-103, 203 and 204 - $1,839.00

v. Clean-up sewage waste water and material in basement of 248 - $103.75

w. Diagnose high pitch noise in bathroom of 248-102 - $103.75

x. Labor to meet vendors to service fire extinguishers 244 and 248 - $363.18

y. Labor to meet rodent control for building and unit inspections - $330.00

z. Labor to supervise and assist with major rodent abatement (2 full days) - $2,311.05

aa. Detailed roof condition reports for 210, 244 and 248 - $4,500.00

bb. Meet City inspector for complete inspection of 244 and 248 buildings - $660.00

cc. Install smoke detectors as required by Code for 244 and 248 - $880.00

dd. Plumbing repair 248-101 - $440.00

ee. Repair sink hole in area near 248 - $440.00

ff. Replace faucets and repair ceiling holes 244-204 - $385.00

gg. Inspect electrical charging station in parking lot which was reported as not working; check reported noise in 244-204 basement - $385.00

hh. Replace bathroom faucet 244-203 - $220.00

ii. Install smoke detectors in basements of 244 and 248 as required by City Inspector; also meet rodent abatement vendor; provide access; walk both properties, including basements, units and attic areas (2 days) - $1,723.28

jj. Replace inoperative hot water circulating pump 248 - $1,498.00

kk. Replace condensate pump causing water to accumulate in basement area of 248 - $750 (to be paid)

ll. Rekey building entry doors based on security and safety concern of tenants of 244 and 248 - $707.75

mm. Resurface bathroom tubs in 248-101 and 102 as required by City - $800 (to be paid)

nn. Install deadbolt locks in 248-102 based on safety concern of resident - $440.00 (tenant to deduct from August 2026 rent)

oo. 5/28/26 Replace Dryer Gas Valve 248, 6/1 Repair door handle 248 #202, 6/5 Kitchen plumbing repair 248 #101, 6/8 Refrigerator Repair, install garbage disposal 248 #101 - $1,716.31

pp. 6/12/26 Repair Toilet Flapper 244 #104, 6/12/26 Replace lights, smoke detector, window handle 248 #201, 6/18 6/25 Meet City Inspector, walk all units, follow up repairs - $1,385.39

qq. Manny's Heating and Air Conditioning - 244 #203 AC compressor $14,760; HVAC Permits 248 #102 $780; 244 compressor failure #103 $95; 248 condensate pump replacement $750

rr. 7/7/26 Meet HVAC Vendor and supervise work 244 #101 - $506.36

ss. Pasadena Locks – Rekey building exterior and duplicates - $707.75

tt. Tornado HVAC – Chimney cleaning 248 #102 - $545.00

uu. Microwave repair - 248 #101 - $150.00

vv. Bathtub refinishing – 248 #102 - $400.00

15. There are also many other items that require compliance and repairs. Due to the lack of funds, I have not been able to complete any of these items. The known items that require compliance and repair, together with the estimated costs, which total $425,286.00, are the following:

a. Tree trimming 244/248 buildings - $17,922.00 (funds were received from Preferred Bank, and the work was completed after July 31, 2026)

b. Replace roof on 210 building (includes estimated cost of permit) - $57,760.00



ERVIN COHEN & JESSUP LLP

c. Replace roofs on 244 and 248 buildings (includes estimated cost of permits) - $159,600.00

d. Replace insulation in attics of 244 and 248 buildings - $35,000.00

e. Permit fees for 1 water heater and unpermitted pool behind 244 building - $800.00. If unable to obtain permits, pool must be demolished and permits must be obtained to demolish pool and return area to previous condition.

f. Primo Electric – replace electrical breakers to bring panel to code standards - $4,850.00

g. Dryer vent and chimney cleaning - $3,000.00

h. HVAC maintenance - $1,800.00

i. Repair/replace water damaged flooring and ceiling in 248-202; 244-104, and 244-204 - $15,000.00

j. Testing for lead-based and paint and asbestos - $2,500.00

k. Repaint exteriors of 210, 244, and 248 buildings per code violation - $90,000.00

l. Cost to reglaze bathtubs in units 248-101 and 102 - $1,000.00

m. Cost to demolish walls and replace doors in unit 244-104 to open up access to basement and restore unit to code compliance - $10,000.00

n. Remove all vines growing through and over windows of buildings 244 and 248 - $2,500.00

o. Replace all broken window screens and secure all loose window screens in buildings 244 and 248 - $750.00

p. Service all air vents and change all air filters - $1,000.00

q. Repair broken window handle in east bedroom of unit 248-201 - $200.00

r. Replace missing patio light cover in 248-201 - $100.00

s. Replace broken, damaged clogged gutters and downspouts in 244 and 248 buildings - $7,500.00

t. Identify and repair source of water leaking into basement areas of 248

ERVIN COHEN & JESSUP LLP

ERVIN COHEN & JESSUP LLP

building - $10,000.00

u. Misc. minor repairs required for various units - $5,000.00

16. Delinquent property taxes, plus accruing penalties, total not less than $595,427.99.The homeowner association fees due to Ambassador West Master Association (pre-receivership) is $26,025.13.

17. As of July 31, 2026, as detailed in paragraph 14 above, I have spent $110,079.66 for repairs, maintenance, etc.

18. The total of the outstanding items that require repair, maintenance, and compliance as set forth in paragraph 15 is $425,286.00 (not including delinquent property taxes of not less than $595,427.99, plus accruing penalties and homeowner association fees of $26,025.13).

19. Through July 31, 2026, I have incurred Receiver fees of $78,823.50 and costs of $847.75. Thus far, the fees and costs incurred by me as Receiver through June 30, 2026 in the amount of $67,087.75 have been paid by Preferred, as there were no funds available from the Properties after payment of necessary expenses.

20. Through May 30, 2026, Jalmar has been paid management fees of $8,112.09. Management fees for the months of June 2026 and July 2026 have not been paid due to a shortage of funds. Jalmar also incurred maintenance fees itself for the Pasadena Properties totaling $38,562.38.

21. The amounts paid to me as Receiver, the amounts paid to Jalmar to manage the properties and for maintenance, and the amounts paid for repairs and maintenance, divided between pre and post-petition amounts based upon when the amount was paid, are as follows:

| | Pre-Petition | Post-Petition |
|---|---|---|
| Receiver | $0.00 | $67,087.75 |
| Jalmar Properties Management Fees | $3,112.09 | $5,000.00 |
| Jalmar Properties Maintenance Fees | $26,868.15 | $11,694.38 |
| Repairs/Maintenance | $77,433.88 | $36,246.78 |

| | | |
|---|---|---|
| TOTAL | $107,414.12 | $120,028.91 |

Total amount paid is $227,444.03. Due but unpaid amounts total $39,288.96.

22. The income received from the date that I assumed possession and control over the Properties through July 31, 2026 has been $104,906.92, which has not been sufficient to meet expenses.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States of America.

Executed this 25th day of August, 2026, at Beverly Hills, California.

Byron Z. Moldo

ERVIN COHEN & JESSUP LLP

# EXHIBIT "A"

RC-200

Electronically Received 03/10/2026 06:21 PM

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):*
John A. Moe, II (SBN 66893)
Dentons US LLP
601 S. Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
TELEPHONE NO.: (213) 623-9300 FAX NO. *(Optional):* (213) 623-9924
E-MAIL ADDRESS *(Optional):* john.moe@dentons.com
ATTORNEY FOR *(Name):* Preferred Bank

*FOR COURT USE ONLY*

FILED
Superior Court of California
County of Los Angeles
03/11/2026
David W. Slayton, Executive Officer / Clerk of Court
By: I. Yin Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 150 West Commonwealth
MAILING ADDRESS:
CITY AND ZIP CODE: Alhambra, CA 91801
BRANCH NAME: Northeast District – Alhambra Courthouse

PLAINTIFF: PREFERRED BANK

DEFENDANT: SDRES PARTNERS LLC

**AMENDED EX PARTE ORDER APPOINTING RECEIVER AND ORDER TO SHOW CAUSE ☒ AND TEMPORARY RESTRAINING ORDER—RENTS, ISSUES, AND PROFITS**

CASE NUMBER: 26NNCV01136

## NOTICE OF HEARING

| Date: April 3, 2026 | Time: 10:00 a.m. | Dept.: T | Room: |
|---|---|---|---|

The address of the court ☒ is shown above ☐ is *(specify):*

## ORDER TO SHOW CAUSE

1. **To defendant** *(name each):* SDRES Partners LLC

2. **THE COURT ORDERS** the defendants named in item 1 to appear in this court at the date, time, and place shown in the box above to give any legal reason
   a. Why a receiver should not be confirmed to
      (1) take possession and continue in possession of the property described in Attachment 2a *(attach a description of the real and personal property subject to the receivership) (the "property"),* and
      (2) manage the property in accordance with this order until further order of this court.
   b. Why you should not be prohibited from controlling or receiving any income from the property described in Attachment 2a.

## ORDER APPOINTING RECEIVER

**THE COURT ORDERS, pending the hearing on the Ex Parte Order to Show Cause, the following:**

3. **Receiver.** *(Name):* Byron Z. Moldo
   is appointed as receiver to take possession of the property described in Attachment 2a.

4. **Receiver's oath and bond.** The receiver shall immediately, and before performing any duties:
   a. execute and file a receiver's oath, and
   b. file the bond required by Code of Civil Procedure section 567(b) in the amount of: $ 10,000

5. **Receiver's fees.** The receiver may charge for the receiver's services no more than *(check all that apply):*
   a. ☒ $ 600.00 ☐ per month ☒ per hour ☐ other *(specify):*
   b. ☐ percent of gross monthly rents
   c. ☐ the greater of a or b
   d. ☐ $ as a one-time start-up fee





EXHIBIT A
Page 13

6. ☒ **Management company.** The receiver may employ the management company of *(name):* Jalmar Properties, Inc.
   a. ☒ The receiver may pay the company not more than
      (1) ☒ $ 2,500.00 ☒ per month ☐ per hour ☐ other *(specify):*
      (2) ☒ 5 percent of gross monthly rents
      (3) ☒ the greater of (1) or (2)
      (4) ☐ $ as a one-time start-up fee
   b. ☐ Management company fees are included in receiver's fees in item 5.

7. **Disclosure.** The receiver shall immediately disclose to all parties any financial relationship between the receiver and any company hired to assist in the management of the receivership property.

8. **Plaintiff's ex parte bond.** Plaintiff shall immediately file an applicant's bond under Code of Civil Procedure section 566(b) in the amount of: $ 10,000

9. **General duties.** After qualifying, the receiver
   a. shall take possession of and manage the property,
   b. shall collect the income from the property,
   c. shall care for the property and may incur the expenses necessary for that care, and
   d. may change the locks on the property.

10. **Prohibited agreements.** The receiver shall not enter into an agreement with any party to this action about the administration of the receivership or about any postreceivership matter.

11. **Inventory.** Within 30 days after qualifying, the receiver shall file an inventory of all property possessed under this order.

12. **Expenditures.** The receiver shall expend money coming into his or her possession to operate and preserve the property and only for the purposes authorized in this order. Unless the court orders otherwise, the receiver shall to the extent practical hold the balance in interest-bearing accounts in accordance with Code of Civil Procedure section 569.

13. **Leases and rentals.** The receiver may without court approval enter into leases for a term not exceeding one year, obtain and evict tenants, and set and modify the amounts and terms of leases.

14. **Security deposits.** Unless the security deposit has been turned over or paid to the receiver, the receiver shall not refund a deposit to a tenant.

15. **Monthly accounting of receiver's income, expenses, and fees.**
   a. The receiver shall each month prepare and serve on the parties, but not file, an accounting of the income and expenses incurred in the administration of the receivership property, including the receiver's fees and expenses.
   b. The receiver may pay the receiver's own fees and expenses only by the following procedures:
      (1) By serving on all parties a notice of intent to pay to which no objection is served on the receiver within 20 days of the date the notice is served.
      (2) By serving and filing a request for interim payment, which the court then approves.
      (3) By obtaining and filing an agreement among all the parties approving the payment, which the court then approves.
      (4) By filing the receiver's final accounting and report, which the court then approves.
   c. The receiver shall not reimburse the receiver for the receiver's general office administration expenses or overhead without court approval. These expenses include, for example, office supplies and employee payroll, benefits, and taxes.

16. **Management.**
   a. The receiver shall operate the property and take possession of all accounts relating to the property.
   b. The receiver may
      (1) employ agents, employees, clerks, accountants, and property managers to administer the receivership property, and
      (2) purchase materials, supplies, and services reasonably necessary to administer the receivership property.
   c. The receiver may do all the things, and incur the risks and obligations, ordinarily done or incurred by owners, managers, and operators of businesses and property similar to that possessed by the receiver; *except* the receiver shall not make any capital improvements to the property without prior court approval.

17. **Bank accounts.** The receiver
    a. may establish accounts at any financial institutions insured by an agency of the United States government that are not parties to this proceeding,
    b. shall deposit in those accounts funds received in connection with the receivership property, and
    c. shall deposit in interest-bearing accounts money not expended for receivership purposes.

18. **Court instructions.** The receiver and the parties may at any time apply to this court for further instructions and orders and for additional powers necessary to enable the receiver to perform the receiver's duties properly.

19. **Insurance.**
    a. The receiver shall determine upon taking possession of the property whether there is sufficient insurance coverage.
    b. The receiver shall notify the insurer that the receiver is to be named as an additional insured on each insurance policy on the property.
    c. If the receiver determines that the property does not have sufficient insurance coverage, the receiver shall immediately notify the parties and shall procure sufficient all-risk and liability insurance on the property (excluding earthquake and flood insurance).
    d. If the receiver does not have sufficient funds to obtain insurance, the receiver shall seek instructions from the court on whether to obtain insurance and how it is to be paid for.

20. **Employment of attorneys.**
    a. The receiver may employ unlawful detainer attorneys and eviction services without a court order.
    b. ☐ The receiver may employ counsel *(name):*
       at the hourly rate of: $
    c. ☒ Except as provided in items 20a and 27d, before employing counsel the receiver shall apply to the court for an order authorizing the receiver to employ counsel.

21. **Taxpayer ID numbers.** The receiver may use any federal taxpayer identification numbers relating to the property for any lawful purpose.

22. **Duty to turn over possession.** Upon receipt of a copy of a recorded trustee's deed upon foreclosure or written notice from plaintiff that defendant has cured the defaults existing under plaintiff's loan documents or that plaintiff has accepted a deed in lieu of foreclosure, the receiver shall, without further order of the court, turn over possession of the property to the successful purchaser or defendant or plaintiff respectively.

23. **Plaintiff's notification of termination.** Plaintiff shall notify the receiver in writing within 48 hours of any event within plaintiff's knowledge that terminates the receivership.

24. **Receiver's final report and account and discharge.**
    a. *Motion required.* Discharge of the receiver shall require a court order upon noticed motion for approval of the receiver's final report and account and exoneration of the receiver's bond.
    b. *Time.* Not later than 60 days after the receivership terminates, the receiver shall file, serve, and obtain a hearing date on a motion for discharge and approval of the final report and account.
    c. *Notice.* The receiver shall give notice to all persons of whom the receiver is aware who have potential claims against the receivership property.
    d. *Contents of motion.* The motion to approve the final report and account and for discharge of the receiver shall contain the following:
       (1) *Declaration or declarations. A* declaration or declarations: (i) stating what was done during the receivership, (ii) certifying the accuracy of the final accounting, (iii) stating the basis for the termination of the receivership (such as foreclosure or reinstatement), and (iv) stating the basis for an order for the distribution of any surplus or payment of any deficit.
       (2) *Accounting summary. A* summary of the receivership accounting, which shall include (i) the total revenues received, (ii) the total expenditures identified and enumerated by major categories, (iii) the net amount of any surplus or deficit, and (iv) evidence of necessary supporting facts.

| PLAINTIFF *(Name)*: PREFERRED BANK<br>DEFENDANT *(Name)*: SDRES PARTNERS LLC | CASE NUMBER:<br>26NNCV01136 |
|---|---|

25. **Plaintiff's notice to receiver.** Plaintiff shall promptly notify the receiver in writing of the names, addresses, and telephone numbers of all parties who appear in the action and their counsel. The parties shall give notice to the receiver of all events that affect the receivership.

26. **Bankruptcy Plaintiff's duty to give notice.** If a defendant files a bankruptcy case during the receivership, plaintiff shall give notice of the bankruptcy case to the court, to all parties, and to the receiver by the close of the next business day after the day on which plaintiff receives notice of the bankruptcy filing.

27. **Bankruptcy Receiver's duties.** If the receiver receives notice that a bankruptcy has been filed and part of the bankruptcy estate includes property that is the subject of this order, the receiver shall have the following duties:
   a. *Turn over property if no relief from stay will besought.* The receiver shall immediately contact the party who obtained the appointment of the receiver and determine whether that party intends to move in the bankruptcy court for an order for (1) relief from the automatic stay, and (2) relief from the receiver's obligation to turn over the property (11 U.S.C. § 543). If the party has no intention to make such a motion, the receiver shall immediately turn over the property to the appropriate entity either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession - and otherwise comply with 11 United States Code section 543.
   b. *Remain in possession pending resolution.* If the party who obtained the receivership intends to seek relief immediately from both the automatic stay and the receiver's obligation to turn over the property, the receiver may remain in possession and preserve the property pending the ruling on those motions (11 U.S.C. § 543(a)). The receiver's authority to preserve the property shall be limited as follows:
      (1) The receiver may continue to collect rents and other income;
      (2) The receiver may make only those disbursements necessary to preserve and protect the property;
      (3) The receiver shall not execute any new leases or other long-term contracts; and
      (4) The receiver shall do nothing that would effect a material change in the circumstances of the property.
   c. *Turn over property if no motion for relief is filed within 10 days after notice of the bankruptcy.* If the party who obtained the receivership fails to file a motion within 10 court days after his or her receipt of notice of the bankruptcy filing, the receiver shall immediately turn over the property to the appropriate entity either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession and otherwise comply with 11 United States Code section 543.
   d. *Retain bankruptcy counsel.* The receiver may petition the court to retain legal counsel to assist the receiver with issues arising out of the bankruptcy proceedings that affect the receivership.

28. **Failure to turn over property.** A receiver who fails to turn over the property in accordance with this order shall not be paid for time and expenses after the date on which the receiver should have turned the property over.

29. ☐ **Other orders.** *(Additional orders may include authority of the receiver to do any other acts arising from special circumstances.)* Other orders ☐ are specified in Attachment 29 ☐ are as follows *(specify):*

| PLAINTIFF *(Name)*: PREFERRED BANK<br>DEFENDANT *(Name)*: SDRES PARTNERS LLC | CASE NUMBER:<br>26NNCV01136 |
|---|---|

☒ **TEMPORARY RESTRAINING ORDER**

30. **THIS ORDER EXPIRES AT THE DATE AND TIME OF THE HEARING SHOWN IN THE BOX ON PAGE ONE (UNDER "NOTICE OF HEARING") UNLESS EXTENDED BY THE COURT.**

31. **THE COURT ORDERS DEFENDANT** to do the following:

a. **Turn over property.** Immediately turn over possession of the property described in Attachment 2a to the receiver when the appointment becomes effective, including any security deposits, prepaid rent, other rental or lease payments, and funds in property management bank accounts for the property.

b. **Turn over related items.** Immediately turn over to the receiver all keys, books, documents, and records relating to the property and advise the receiver of federal taxpayer identification numbers relating to the property.

c. **Insurance.**

(1) Immediately advise the receiver about the nature and extent of insurance coverage on the property;

(2) Immediately name the receiver as an additional insured on each insurance policy on the property; and

(3) DO NOT cancel, reduce, or modify the insurance coverage.

d. **Restraints.** Refrain from

(1) committing or permitting any waste on the property or any act on the property in violation of law or removing, encumbering, or otherwise disposing of any of the fixtures on the property;

(2) demanding, collecting, or in any other way diverting or using any of the rents from the property;

(3) interfering in any manner with the discharge of the receiver's duties under this order;

(4) selling, transferring, disposing, encumbering, or concealing the property without a prior court order; and

(5) doing any act that will impair the preservation of the property or plaintiff's interest in the property.

e. ☐ **Other** *(specify)*:

32. **THE COURT ORDERS PLAINTIFF** to immediately file a temporary restraining order bond under Code of Civil Procedure section 529 in the amount of: $ 10,000

33. ☐ **OTHER ORDERS** ☐ are specified in Attachment 33 ☐ are as follows *(specify)*:

**SERVICE AND BRIEFING SCHEDULE**

34. By *(date)*: March 13, 2026 **PLAINTIFF IS ORDERED** to personally serve on each defendant or counsel and any other appearing parties, and to file proof of service of, the summons and complaint, the memorandum of points and authorities, these orders, and all declarations and supporting papers.

35. By *(date)*: March 23, 2026 **DEFENDANT IS ORDERED** to personally serve on each plaintiff or counsel and any other appearing parties, and to file proof of service of, any opposition to these orders.

36. By *(date)*: March 30, 2026 **PLAINTIFF IS ORDERED** to personally serve on each defendant or counsel, and to file proof of service of, any reply to defendant's opposition to these orders.

37. Number of pages attached: 1

Date: March 11 , 2026

JUDGE OF THE SUPERIOR COURT

Ian C. Fusselman



**AMENDED EX PARTE ORDER APPOINTING RECEIVER AND ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER—RENTS, ISSUES, AND PROFITS (Receivership)**



EXHIBIT A

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

Attachment 2a to Amended Ex Parte Order Appointing Receiver and Order to Show Cause and Temporary Restraining Order – Rents, Issues, and Profits

210 South Orange Grove Boulevard, Pasadena, California

244 South Orange Grove Boulevard, California

248 South Orange Grove Boulevard, California

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California, I am over the age of 18 and not a party to the within action. My business address is: ☒ 601 So. Figueroa Street, Suite 2500, Los Angeles, CA 90017. ☐ ACE Attorney Service, 800 South Figueroa Street, Suite 900, Los Angeles, CA 90017.

On March 10, 2026, I served the foregoing document, described as **AMENDED EX PARTE ORDER APPOINTING RECEIVER AND ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER – RENTS, ISSUES, AND PROFITS** on the interested parties in this action, as follows:

Joe Rothberg
Levene, Neale, Bender, Yoo & Golubchik, LLP
2818 La Cienega Avenue
Los Angeles, California 90034
E-Mail: jmr@lnbyg.com
(BY E-MAIL AND U. S. MAIL)

Northwest Registered Agent, Inc.
Attn: Elle
2108 N Street, Suite N
Sacramento, CA 95816-5712
E-Mail: support@NorthwestAgent.com
(BY E-MAIL AND U. S. MAIL))

Walter Whitman Moore
248 South Orange Grove Avenue
Pasadena, California 91105
E-Mail: walter@licensedtosue.com
(BY E-MAIL AND U. S. MAIL))

☒ **(VIA ELECTRONIC MAIL)** I transmitted the above document(s) by electronic mail to the interested parties via the e-mail addresses listed above for each party.

☒ **(VIA MAIL)** I placed a true copy of the foregoing document in an envelope addressed to each interested party as set forth above. I sealed each such envelope, and placed same, with postage thereon fully prepaid, for collection and mailing at Dentons US LLP, Los Angeles, California 90017. I am readily familiar with Dentons US LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service. Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 10, 2026, at Los Angeles, California.

Alicia Aguilar

# EXHIBIT "B"

Walter Whitman Moore (SBN 115985)
Licensed to Sue®
248 S. Orange Grove Blvd., Unit 102
Pasadena, CA 91105
310.692.0397
Walter@LicensedToSue.com

Attorneys for Plaintiffs Judith Moore and Walter Whitman Moore

Electronically FILED by Superior Court of California, County of Los Angeles 2/20/2026 12:13 PM David W. Slayton, Executive Officer/Clerk of Court, By A. Llamas, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

LOS ANGELES COUNTY ~~– PASADENA COURTHOUSE~~

JUDITH MOORE and WALTER WHITMAN MOORE,

*Plaintiffs,*

vs.

SDRES PARTNERS LLC and DOES 1-50,

*Defendants.*

Case No. 26NNCV01267

COMPLAINT FOR BREACH OF CONTRACT

**FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT**

(Against All Defendants)

**Summary of the Action: Receiver Required for Historic Building**

1. The Court can and should appoint a receiver to take over the management of an historic apartment complex in Pasadena. The company that owns the property, defendant SDRES Partners LLC ("SDRES"), has stopped complying with its legal and contractual obligations and, aided by its unlicensed property manager, non-party Vierergruppe Management ("Vierergruppe"), has apparently diverted rental income to its principals rather than paying its bills. As a result, SDRES owes over $450,000 for property taxes; owes over $8.1 million to a bank after defaulting on a note; and has subjected the tenants to, *inter alia*, rat infestations, sewage back-ups, broken furnaces, and leaky roofs. The bank has filed an action to appoint a receiver. This action is filed by tenants who request a receiver and compensatory damages.

**Jurisdiction and Venue**

2. This Court has jurisdiction over the case and the parties, and venue is proper because the amount in controversy exceeds $35,000; the property in issue (*i.e.*, Villa Francesca, located at 244 and 248 South Orange Grove Boulevard, Pasadena) is in this judicial district; and the defendants breached their legal and contractual duties by, *inter alia*, failing to maintain the property in issue.

**Plaintiff Tenants: Moores**

3. Plaintiffs Judith Moore and Walter Whitman Moore are a married couple who leased an apartment in Villa Francesca in January 2013, and have lived there since February 2013. A copy of the lease is attached hereto as Exhibit 1.

**Defendant Property Owner: SDRES**

4. Defendant SDRES Partners LLC is a California limited liability company. SDRES purchased Villa Francesca in 2017. SDRES's "Principal Address," according to its most recent filing with the California Secretary of State, is 2549 Eastbluff Dr. #720, Newport Beach, California 92660. However, that is the address of a UPS Store, and, presumably, a mailbox at that store.

**Non-Party Property Manager: Vierergruppe**

5. Non-party Vierergruppe Management is a California corporation. Vierergruppe acts as SDRES's property manager by, *inter alia*, leasing apartments and collecting rents. However, Vierergruppe has not had a licensed real estate broker as a designated officer from March 21, 2025, to the present. Vierergruppe therefore could not and cannot lawfully lease apartments or collect rents on behalf of others, including SDRES.[1] Vierergruppe's "Principal Address," according to its most recent

---

[1] Bus. & Prof. Code § 10130 [unlawful to act as a real estate broker without a license]; Bus. & Prof. Code § 10131(b) [real estate broker is a person who, *inter alia*, "[l]eases or rents or offers to lease or rent. . . or collects rents from real property" for another]; Bus. & Prof. Code § 10159 ["When a corporation wishes to act as a real estate broker, the corporation shall be licensed by the department through qualified broker-officers. . . ."]; Cal. Code Regs., tit. 10, § 2740 ["No acts for which a real estate license is required may be performed for, or in the name of, a corporation when there is no officer of the corporation licensed under Section 10158 or 10211."]; Bus. & Prof. Code § 10158 ["When a real estate license is issued to a corporation, if it desires any of its officers other than the officer designated by it pursuant to Section 10211, to act under its license as a real estate broker, it shall procure an additional license to retain each of those additional officers]; Bus. & Prof. Code § 10211 [authorizing corporations to act as licensed brokers through one or more officers who are brokers].

filing with the Secretary of State, is 820 11th Street, Huntington Beach, California 92648. However, that address is a house in a residential neighborhood, and is the same address as that of Jennifer Lynn Lovelace, the company's Chief Executive Officer, Chief Financial Officer and Secretary. Lovelace is a real estate salesperson who is not affiliated with any broker. Hence, since March 21, 2025, Lovelace could not and cannot lawfully act as a property manager.[2] Vierergruppe does employ a broker named Jason Tung, but he is neither Vierergruppe's broker-officer nor Lovelace's supervising broker.

**Does 1-50: Unknown Persons Who Use SDRES as *Alter Ego***

6. Plaintiffs are informed and believe, and on that basis allege, that the individuals who own or control SDRES, whether directly or through intermediate companies, have used their ownership and control to divert rental income from SDRES and the property to themselves, thereby leaving SDRES undercapitalized and unable to pay ordinary expenses, including but not limited to payments due for property taxes, loan obligations, repairs, maintenance, trash pickup, and even gas bills. Plaintiffs do not know the names of these individuals and their intermediate companies, if any, and are therefore suing them under the fictitious names Does 1-50 pursuant to Code of Civil Procedure § 474.

7. Plaintiffs are informed and believe, and on that basis allege, that Does 1-50 used SDRES as a mere *alter ego* to shield themselves from personal responsibility, and that it would be inequitable to let them do so because, *inter alia*: (a) SDRES has not functioned as a separate company, but was instead operated as a mere instrumentality of Does 1-50; (b) Does 1-50 used SDRES to divert to themselves rental income that could have and should have been used to meet the legal, contractual and financial obligations of SDRES, thereby leaving SDRES insolvent and cheating vendors, lenders and its tenants; (c) Does 1-50 operated SDRES without adequate capital or staff, and rely instead on a handful of unqualified, unlicensed individuals in Orange County who have never even set foot on the property; (d) Does 1-50 have tried to conceal their activities and identities by, *inter alia*, having tenants make

---

[2] Bus. & Prof. Code § 10016 [" 'Real estate salesperson' means a natural person licensed as a salesperson under Chapter 3 of this part and who, for a compensation or in expectation of a compensation, is retained by a real estate broker to do one or more of the acts set forth in Sections 10131, 10131.1, 10131.2, 10131.3, 10131.4, and 10131.6."]; Bus. & Prof. Code § 10137 ["No real estate salesperson shall accept compensation for activity requiring a real estate license from any person other than the broker under whom he or she is at the time licensed."].

payments through an electronic portal and, alternatively, by making checks payable to SDRES *or* Viererguppe; (e) Does 1-50 have used SDRES to conduct unlawful activities, including using Vierergruppe to manage the property, even though Vierergruppe lacks the required licenses; and (f) Does 1-50 have treated SDRES's assets as their own personal assets. Plaintiffs accordingly allege that each defendant is liable for the obligations, debts, and conduct of each of the other defendants as alleged in this complaint.

**Contract: Lease for Historic Villa Francesca Apartment**

8. Plaintiffs entered into a lease for their apartment in January 2013, and, as noted above, a copy of their lease is attached hereto as Exhibit 1. Defendant SDRES is the successor-in-interest to the original lessor. The lease is for an apartment in an historic property in Pasadena known as the Villa Francesca.

9. Villa Francesca was designed by architect Leland A. Bryant and built in 1927 by Frank M. Hoffman on what was 380-390 Grove Street, which was later converted into a walkway, after Hoffman secured a special permit to build the complex in an area zoned for houses, including "Millionaires' Row" along South Orange Grove Boulevard. Villa Francesca was considered the first "luxury" apartment complex built in Pasadena, based on 1920s standards if not modern standards.

10. Villa Francesca comprises two two-story buildings separated by a shared courtyard that runs north to south. The building on the east is 244 South Orange Grove Boulevard; the building on the west is 248 South Orange Grove Boulevard. As noted above, the street on which Villa Francesca was built was later converted into a walkway. As a result, Villa Francesca is quieter and more private than apartments, condominiums and houses built along the two busy streets nearby, namely South Orange Grove Boulevard and West Del Mar Boulevard. The following aerial photo accurately depicts the location of the two buildings:




11. Entry to each building is made from the central courtyard. Each building has a single front entrance, through a covered archway to a locked door, behind which there is a lobby with a few steps up to the front doors of the ground floor units, and a wooden stairway leading up to the front doors of the upstairs units.

12. Each building has four apartments, and each apartment has two bedrooms, two bathrooms and a half-bathroom. Each apartment comprises approximately 2,000 square feet, and features striking architectural features, including arches, columns, wood ceiling beams, large fireplaces, walk-in closets and, in the upstairs units, vaulted ceilings. Six of the apartments have private balconies. The two ground-floor apartments on the southern side of each building have private porches that open onto small, private yards, and one of the two yards has a small private swimming pool for the occupants of that unit. The following pictures accurately depict some of these distinctive features:













13. When Plaintiffs rented their unit in January 2013, Villa Francesca was properly maintained and looked as shown in the following picture, which was taken in November 2012:



**Plaintiffs' Performance**

14. Plaintiffs performed all of their obligations under the lease, including but not limited to paying all rent in the right amount when due.

**Defendants' Breach and Other Conduct Necessitating Receiver**

15. **Habitability**. Defendants have breached the parties' contract within the past four years by failing to keep the Villa Francesca apartments in habitable condition despite repeated written complaints from tenants and, in some instances, despite warnings and citations from the City of Pasadena.[3]

a. **Rat Infestations**. Defendants failed to take reasonable steps to stop rat infestations; failed to remove dead rats and rat droppings from attics; failed to follow the written recommendations of their own vendor to trim away branches and vines that permit rats to climb into the attics; and failed to take any steps to "rat-proof" the attics by blocking entry to rats. As a result, the tenants at Villa Francesca have been subjected to rats scurrying through halls and dying in walls. The infestation has gotten so bad that tenants even have to beware of coyotes that have started coming to hunt for rats in the courtyard between the two buildings. The following pictures accurately depict rats inside and outside the building, plus a coyote who left behind a rat carcass in the courtyard:

[3] Civ. Code § 1941 ["lessor of a building intended for the occupation of human beings must, in the absence of an agreement to the contrary, put it into a condition fit for such occupation, and repair all subsequent dilapidations thereof, which render it untenantable…"]; Civ. Code § 1941.1 [dwelling is "untenantable" absent, *inter alia*, "[e]ffective waterproofing and weather protection," "[p]lumbing. . . maintained in good working order," "[h]eating facilities. . . maintained in good working order," "[b]uilding, grounds and appurtenances. . . kept in every part clean, sanitary, and free from all accumulations of debris, filth, rubbish, garbage, rodents, and vermin"]; Health & Safety Code § 17920.3 [building is "substandard" if it, *inter alia*, is infested with rodents; lacks adequate heating; lacks a connection to a required sewage disposal system; has deteriorated or ineffective waterproofing, including roofs and broken windows; has defective or lack of weather protection for exterior wall coverings, including lack of paint, or weathering due to lack of paint; or is subject to "[g]eneral dilapidation or improper maintenance"].












b. **<u>Raw Sewage Flooding Basement</u>**. Defendants stopped performing any routine plumbing maintenance, including in particular snaking the sewer line or even having it inspected on a regular basis. As a result, the basement of one of the two buildings (*i.e.*, 248 South Orange Grove) has filled up with raw sewage twice. Defendants delayed unreasonably in sending anyone to remedy the situation, thereby subjecting tenants to the resulting stench and health hazards for days longer than was necessary or reasonable.

c. **Raw Sewage Emptying Into Yard**. Raw sewage has also repeatedly emptied out of a pipe on the north side of 248 South Orange Grove. Defendants hired plumbers to repair that problem, but apparently refused to pay the plumbers, so the plumbers never finished the job. As a result, there is now a large hole in the yard, with exposed pipe and wiring, along with trash, that fills up with water when it rains. The following pictures accurately depict the hole as of February 17, 2026:






d. **Leaking Roofs**. Defendants have failed and refused to repair leaks in the roofs of both of the buildings in the Villa Francesca complex. Rather than hiring licensed contractors to repair or replace the roof, Defendants instead have subjected the tenants to the leaks, and have subjected the building to water and moisture in the attic, despite the risk of growing mold and rotting wood.

e. **No Heat for 15 Days**. Defendants unjustifiably and unreasonably "dragged their feet" when the furnace for one of the apartments stopped working in the winter of 2026. Rather than immediately sending a licensed HVAC contractor, Defendants delayed in sending

anyone at all. Defendants then sent a handyman, who could not figure out or remedy the problem. Defendants said they would send a different person, but no one showed up at the appointed time. When the tenants complained, Vierergruppe's Jason Tung claimed that the repairman had knocked at the tenants' door but no one had answered. The tenants responded by pointing out that Tung's assertion could not possibly be true, because the repairman would have had to ring the doorbell outside the locked lobby door before he could knock on an apartment door -- something that Tung would have known if he had ever actually set foot on the property. Defendants then sent a handyman who claimed he was knocking on the apartment door, but he was not even at the right building; he was at 200 South Orange Grove Boulevard rather than 248. The tenants went out and found the handyman who, to his credit, figured out the problem, then ordered a replacement part. By the time the heat was finally working again, 15 days had passed.

f. **General Dilapidation and Improper Maintenance**. Defendants have stopped performing any kind of routine maintenance, and it shows quite vividly, to the point where the tenants have gone from being proud of their homes to being somewhat embarrassed. Examples include but are not limited to the following: Wooden windows are cracked, peeling and warped; they need repair or replacement. The building exterior is filthy, and has developed cracks that Defendants have neither patched nor painted. The central fountain is broken. The trees in the courtyard are overgrown and block sunlight to the apartments. Vines have overgrown exterior walls, and any attempt to pull them down removes the paint from the building exterior. Drains in the courtyard and side yard have not been maintained, so both areas flood immediately after even a limited amount of rain. Air filters have gone years without being replaced. Defendants stopped paying a gardener to mow the grass and remove leaves each week; stopped paying a cleaning lady to sweep and mop the lobbies and common area stairways each week; stopped paying anyone to maintain the swimming pool. Nor did Defendants ever hire real gardeners to prune the shrubs in the courtyard. Instead, Defendants recently hired faux "gardeners" who ruined the once-beautiful landscaping in the courtyard by, *inter alia*, hacking mature, specimen-

size plants into a bizarre collection of ugly stubs. These pictures show some of the problems:



















16. **Rent Control Violations**. Defendants have violated Pasadena's rent control laws[4] within the past four years by, *inter alia*, increasing tenants' rents above the amounts permitted by law; failing to comply with the City's registration requirements; failing to refund rent overcharges; failing to provide accurate statements for rent owed and rent paid; issuing rent statements that are not only inaccurate, but contain patently irrelevant entries (*e.g.*, for estimates of utilities, even though the utilities are a fixed amount in tenants' leases); failing even to try to justify the numbers on their revised rent statements; and raising an octogenarian tenant's rent far in excess of the permissible maximum, and failing to refund the excess voluntarily, despite knowing full well that Defendants had violated the law by raising her rent, until after she was told by her neighbors that the rent increase violated the rent control laws.

17. **Anti-Gouging Violations**. Defendants violated state and county laws intended to protect victims of the Altadena and Pacific Palisades fires from price-gouging.[5] Defendants leased an apartment in Villa Francesca to a married couple who had to flee their home in Altadena due to the fire; charged them far more than the 10% maximum over the rent paid by the previous occupant; and have refused to refund the difference despite the couple's demand that they do so.

18. **Real Estate Licensing Violations**. Defendants, within the past four years, have violated California's real estate licensing laws, which are intended to protect consumers, by turning over management of Villa Francesca to Vierergruppe, which, as noted above, has not had a designated broker-officer since March 21, 2025, and has therefore been operating unlawfully since that date.

19. **Contractor Licensing and Tree Protection Ordinance Violations**. Defendants, within the past four years, have violated California's and Pasadena's laws on tree trimming, which are intended to protect not just consumers but also Pasadena's "urban forest."[6] Defendants did so by hiring unlicensed, unqualified gardeners to "hack off" limbs from trees on the property -- on a Sunday -- in response to a

---

[4] Pasadena City Charter art. XVIII, §§ 1806 *et seq*. [Pasadena Fair and Equitable Housing Charter Amendment]; Pasadena Rental Housing Board Regulations, ch. 3-11 [regulations adopted by Board].
[5] Pen. Code § 396 [prohibiting more than 10% price hike following declared emergency]; L.A. County Code of Ordinances, § 8.09.010 [same].
[6] Pasadena Mun. Code, ch. 8.52, §§ 8.52.010 *et seq*. [City Trees and Tree Protection Ordinance]; Bus. & Prof. Code §§ 7026, 7026.1, 7028 [definition of contractor, exceptions for gardeners, unlicensed contracting prohibition]; Cal. Code Regs., tit. 16, div. 8, art. 3, § C-49 [tree and palm contractor classification definition].

warning from the City of Pasadena to clear the trees away from the buildings. The gardeners stopped work when tenants pointed out that Pasadena prohibits yard work with power tools on Sundays, and requires that only licensed contractors trim trees. However, Defendants did not hire licensed tree trimmers until much later, and even then, told them only to cut away certain branches near one of the two buildings. Defendants have refrained from having licensed tree trimmers do any kind of routine or regular maintenance on the trees on the property, nor to inspect or remove a diseased tree.

20. **Voidable Transfers**. Plaintiffs are informed and believe, and on that basis allege, that Defendants have engaged in voidable transfers in violation of the Uniform Voidable Transactions Act (UVTA), Civil Code § 3439.04 within the past four years. Plaintiffs base this allegation on the fact that, despite the tenants having paid their rent in full, Defendants have failed to pay their creditors and failed to maintain and repair the property, and Defendants have instead apparently diverted the rental income to the Doe Defendants who are using SDRES as an *alter ego*, without SDRES receiving reasonably equivalent value, and thereby leaving SDRES insolvent. Supporting facts include the following:

a. **<u>Failure to Pay Property Taxes</u>.** Despite the tenants having fully paid all rent when due, Defendants have failed to pay the property taxes for Villa Francesca. Rather, as noted above, SDRES owes over $450,000 for property taxes.

b. **<u>Failure to Pay Lender</u>**. Despite the tenants having fully paid all rent when due, moreover, Defendants failed to make payments on a note secured by the property, thus triggering a default such that SDRES now owes over $8.1 million to its lender, Preferred Bank, which has filed an action seeking appointment of a receiver.

c. **<u>Failure to Pay Common Area Fees</u>**. Defendants have also failed to pay even the relatively modest fees that SDRES owes for upkeep of common areas and amenities shared and used by Villa Francesca and the condominium complexes adjacent to it, including a large, resort-style swimming pool to the north of the apartments. As a result,

the Ambassador West Master Association has recorded a lien for $6,812.83 against the property for assessments, late charges, interest and collection costs.

d. **Failure to Pay Gas Bills**. Defendants have even failed to pay gas bills for the Villa Francesca property, resulting in the tenants receiving notices from the gas company warning that gas will be cut off to the building unless those bills are paid.

e. **Diversion of Rental Income**. For years, Defendants instructed tenants to pay their rent through an electronic portal which, the tenants reasonably believed, would ensure that their rent payments would be received by the landlord. Defendants, however, recently told the tenants that the portal was "broken," and to send rent checks made payable to the order of SDRES *or* Vierergruppe. Some tenants complied with the instructions. Plaintiffs, however, told Vierergruppe that Plaintiffs would need some kind of written confirmation from SDRES to authorize this change, since checks made out as requested could be deposited into Vierergruppe's account, thereby depriving SDRES and its creditors of the funds. Vierergruppe said it would seek written confirmation from SDRES. However, Vierergruppe never provided any such authorization. Instead, tenants received an email on February 11, 2026, indicating that the electronic portal was now working again, and directing tenants to use the portal to make their rent payments. Plaintiffs are accordingly informed and believe, and on that basis allege, that Defendants have been intentionally, wrongfully and fraudulently diverting rental income away from SDRES to the principals of SDRES, and, in particular, to Does 1-50, rather than using that income to pay for taxes, loan payments, common area fees, maintenance and repairs.

**Harm to Plaintiffs**

21. As a direct and proximate result of Defendants' breach of contract, Plaintiffs have been harmed by, *inter alia*, enduring rat infestations; sewage backing up onto the floor of the basement under their apartment; a broken furnace during winter that Defendants took 15 days to repair; having to waste hours and hours, week after week, dealing with the chaos resulting from Defendants' failure to hire competent, licensed professionals to manage the property; a significant, objective, visible decline in the appearance of the property, including cracks in the building, dried-out, bent and flaking window frames,

broken Venetian blinds, and decimation of a once-beautiful garden by "gardeners" who hacked plants to bits (*e.g.*, chopping specimen-size plants and waist-high rose bushes down to a height of about one foot); and diminution in the value of their leasehold. Simply stated, Plaintiffs leased a large, lovely apartment in a stunning historic building, and Defendants have turned it into a run-down dump.

**Receiver**

22. Defendants' conduct has irreparably injured Plaintiffs, and continues to do so each day that Defendants retain control over the apartment buildings. As detailed above, Villa Francesca was unique due to its architecture, location, layout, landscaping and condition. It is also Plaintiffs' home, and has been for 13 years. Defendants' conduct has significantly lessened the value of Plaintiffs' leasehold, but a mere award of money damages will not remedy the problem, because Villa Francesca will still be run-down and continue to decline unless someone actually repairs and maintains it. Plaintiffs therefore ask the Court to appoint a receiver pursuant to Code of Civil Procedure § 564(b)(9), which authorizes courts to appoint receivers "where necessary to preserve the property or rights of any party."

23. In particular, Plaintiffs ask that the Court appoint as a receiver, a licensed, experienced real estate broker to: collect the rents from tenants; hire licensed professionals to bring the complex into compliance with all applicable state and local health, safety and building codes; hire vendors to perform all necessary and appropriate repairs, painting and landscaping to restore the building to good condition; and provide routine maintenance; ensure compliance with all applicable rent control laws; pay the property taxes; pay the vendors who rendered services in the past at the property but were not paid; pay the common area fees; and pay the remaining balance, if any, to the owner's lender and SDRES.

24. The Court should also authorize the receiver to recover from SDRES and Does 1-50 the rents that those defendants have received during the past four years, and should direct the receiver to use those funds to pay for repairs, maintenance and the other items listed above, with the remaining balance, if any, paid to SDRES.

**Damages**

25. Plaintiffs are entitled to, and hereby seek, an award of compensatory damages for the harm that they have suffered, and will have suffered by the time of trial, and for the diminution in the value of Plaintiffs' leasehold, as a direct and proximate result of Defendants' breach of contract. The amount of

compensatory damages will depend on whether the Court appoints a receiver prior to trial and, if so, whether the receiver restores Villa Francesca to good condition, *i.e.*, the condition it was in when Plaintiffs signed their lease.

26. Plaintiffs estimate that to compensate Plaintiffs for the harm that they have endured each month for the past four years, and for each additional month that Villa Francesca remains in its current condition, a damages award of at least $2,000 per month would be required. Hence, for the past four years, that works out to $96,000 (*i.e.*, 48 months x $2,000 per month); plus, assuming the case goes to trial two years after the filing of this action, additional damages in the amount of $48,000 (*i.e.*, 24 months x $2,000 per month); for a total of $144,000 (*i.e.*, $96,000 + $48,000). Those damages figures, however, assume that Villa Francesca is restored by the time of trial.

27. If the Court elects not to appoint a receiver, then Plaintiffs will also seek, and hereby do seek, additional compensatory damages, in an amount to be proved at trial, to give Plaintiffs the benefit of the bargain, *i.e.*, to put them in as good a position as they would be in if Defendants had performed all of their obligations under the lease. It is one thing to have a large, lovely, rent-controlled apartment for life in a beautiful, well-maintained historic apartment complex with stunning architecture and landscaping so impressive that people come to take pictures of it because they saw it on Instagram. It is quite another thing to have a life sentence to a dilapidated building where rat infestations, sewage overflow, leaking roofs and broken heaters are treated with indifference by the landlord; gardeners do not come; the yard floods; and vines and trees are allowed to envelop the building by growing over the walls and windows. Plaintiffs are therefore entitled to, and seek, an award sufficient to compensate them for the loss of the home that they would be enjoying but for Defendants' breach of contract.

28. Ordinarily, benefit-of-the-bargain damages would represent the additional rent needed to pay for a comparable apartment nearby. But there is no such animal: no rent-controlled apartments comparable to Plaintiffs' unit are available for rent. Nor would renting a condominium solve the problem, because condominiums are not subject to Pasadena's rent control laws. Hence, even if there were a condominium comparable to Plaintiffs' apartment for rent, there would be no protection against future rent increases, which is a valuable feature of Plaintiffs' leasehold.

29. Therefore, to make Plaintiffs whole through an award of money damages rather than injunctive relief, and to give Plaintiffs the benefit of the bargain, Plaintiffs would have to receive an award sufficient for them to purchase a condominium in one of the nearby complexes, with a size, layout and location comparable to their apartment, and to pay the associated taxes, homeowner association dues, insurance and other costs for the rest of their lives. To avoid excessive damages, however, the trier of fact must take into consideration Plaintiffs' obligation under the lease and the rent control laws to pay $4,300 per month, adjusted for inflation, for as long as they live in the apartment. Plaintiffs estimate that it would cost at least $3 million to buy a comparable condominium and pay the aforementioned costs for 30 years. Plaintiffs also estimate further that the present value of Plaintiffs' rental payments under the lease, for 30 years, would be approximately $1.3 million. Plaintiffs accordingly seek compensatory damages in the amount of at least $1.7 million (*i.e.*, $3 million - $1.3 million), or such other amount as is supported by the evidence.

30. If, for some reason, the Court were to deem that Plaintiffs cannot recover benefit-of-the-bargain damages as set forth above, Plaintiffs seek compensatory damages in the amount of at least $720,000 (*i.e.*, 30 years x 12 months per year x $2,000 per month) or such other amount as is supported by the evidence under any applicable alternative damages theory.

31. Plaintiffs are also entitled to and hereby seek nominal damages.

## Prayer

WHEREFORE, Plaintiffs pray for the entry of judgment against Defendants, jointly and severally, as follows:

1. For the appointment of a receiver to: collect the rents from tenants; recover rent previously diverted by Defendants to Does 1-50; hire licensed professionals to bring the complex into compliance with all applicable state and local health, safety and building codes; hire vendors to perform all necessary and appropriate repairs, painting and landscaping to restore the building to good condition; provide routine maintenance; ensure compliance with all applicable rent control laws; pay the property taxes; pay the common area maintenance fees; pay the vendors who rendered services in the past at the property but were not paid; and pay the remaining balance, if any, to the owner's lender and the owner.
2. For compensatory damages of $1,844,000, or such other amount according to proof;

3. Nominal damages;

4. For costs; and

5. For any and all other relief to which Plaintiffs are entitled, whether authorized by statute, equity, regulations, contract or case law.

Dated: February 20, 2026

LICENSED TO SUE®

Walter Whitman Moore
Attorney for Plaintiffs

# Exhibit 1

CALIFORNIA ASSOCIATION OF REALTORS®

# RESIDENTIAL LEASE OR MONTH-TO-MONTH RENTAL AGREEMENT

(C.A.R. Form LR, Revised 11/12)

Date *01/28/2013*, *BGM Pasadena, LLC* ("Landlord") and *Walter Whitman Moore, Judith A. Moore* ("Tenant") agree as follows:

1. **PROPERTY:**
   **A.** Landlord rents to Tenant and Tenant rents from Landlord, the real property and improvements described as: *248 S. Orange Grove Blvd. #102, Pasadena, CA 91105* ("Premises").
   **B.** The Premises are for the sole use as a personal residence by the following named person(s) **only**: *Walter Whitman Moore, Judith A. Moore* .
   **C.** The following personal property, maintained pursuant to paragraph 11, is included: *stove, refrigerator, washer, dryer, microwave, dishwasher* or ☐ (if checked) the personal property on the attached addendum.
   **D.** The Premises may be subject to a local rent control ordinance ________ .
2. **TERM:** The term begins on (date) *February 15, 2013* ("Commencement Date"), **(Check A or B):**
   ☐ **A. Month-to-Month:** and continues as a month-to-month tenancy. Tenant may terminate the tenancy by giving written notice at least 30 days prior to the intended termination date. Landlord may terminate the tenancy by giving written notice as provided by law. Such notices may be given on any date.
   ☒ **B. Lease:** and shall terminate on (date) *February 14, 2014* at *12:00* ☐ AM/ ☒ PM. Tenant shall vacate the Premises upon termination of the Agreement, unless: **(i)** Landlord and Tenant have extended this Agreement in writing or signed a new agreement; **(ii)** mandated by local rent control law; or **(iii)** Landlord accepts Rent from Tenant (other than past due Rent), in which case a month-to-month tenancy shall be created which either party may terminate as specified in paragraph 2A. Rent shall be at a rate agreed to by Landlord and Tenant, or as allowed by law. All other terms and conditions of this Agreement shall remain in full force and effect.
3. **RENT:** "Rent" shall mean all monetary obligations of Tenant to Landlord under the terms of the Agreement, except security deposit.
   **A.** Tenant agrees to pay $ *3,750.00* per month for the term of the Agreement.
   **B.** Rent is payable in advance on the **1st (or ☐ ______ ) day** of each calendar month, and is delinquent on the next day.
   **C.** If Commencement Date falls on any day other than the day Rent is payable under paragraph 3B, and Tenant has paid one full month's Rent in advance of Commencement Date, Rent for the second calendar month shall be prorated based on a 30-day period.
   **D.** PAYMENT: Rent shall be paid by ☒ personal check, ☐ money order, ☐ cashier's check, or ☒ other *online* , to (name) *BGM Pasadena, LLC* (phone) *(626)204-5200* at (address) *210 S. Orange Grove Blvd., Pasadena, CA 91105*, (or at any other location subsequently specified by Landlord in writing to Tenant) (and ☐ if checked, rent may be paid personally, between the hours of ______ and ______ on the following days ______ ). If any payment is returned for non-sufficient funds ("NSF") or because tenant stops payment, then, after that: (i) Landlord may, in writing, require Tenant to pay Rent in cash for three months and (ii) all future Rent shall be paid by ☐ money order, or ☐ cashier's check.
4. **SECURITY DEPOSIT:**
   **A.** Tenant agrees to pay $ *3,750.00* as a security deposit. Security deposit will be ☒ transferred to and held by the Owner of the Premises, or ☐ held in Owner's Broker's trust account.
   **B.** All or any portion of the security deposit may be used, as reasonably necessary, to: **(i)** cure Tenant's default in payment of Rent (which includes Late Charges, NSF fees or other sums due); **(ii)** repair damage, excluding ordinary wear and tear, caused by Tenant or by a guest or licensee of Tenant; **(iii)** clean Premises, if necessary, upon termination of the tenancy; and **(iv)** replace or return personal property or appurtenances. **SECURITY DEPOSIT SHALL NOT BE USED BY TENANT IN LIEU OF PAYMENT OF LAST MONTH'S RENT.** If all or any portion of the security deposit is used during the tenancy, Tenant agrees to reinstate the total security deposit within five days after written notice is delivered to Tenant. Within 21 days after Tenant vacates the Premises, Landlord shall: **(1)** furnish Tenant an itemized statement indicating the amount of any security deposit received and the basis for its disposition and supporting documentation as required by California Civil Code § 1950.5(g); and **(2)** return any remaining portion of the security deposit to Tenant.
   **C. Security deposit will not be returned until all Tenants have vacated the Premises and all keys returned. Any security deposit returned by check shall be made out to all Tenants named on this Agreement, or as subsequently modified.**
   **D.** No interest will be paid on security deposit unless required by local law.
   **E.** If the security deposit is held by Owner, Tenant agrees not to hold Broker responsible for its return. If the security deposit is held in Owner's Broker's trust account, **and** Broker's authority is terminated before expiration of this Agreement, **and** security deposit is released to someone other than Tenant, **then** Broker shall notify Tenant, in writing, where and to whom security deposit has been released. Once Tenant has been provided such notice, Tenant agrees not to hold Broker responsible for the security deposit.
5. **MOVE-IN COSTS RECEIVED/DUE:** Move-in funds made payable to *BGM Pasadena, LLC* shall be paid by ☐ personal check, ☒ money order, or ☒ cashier's check.

| Category | Total Due | Payment Received | Balance Due | Date Due |
|---|---|---|---|---|
| Rent from *02/15/2013* to *02/28/2013* (date) | *$2,025.00* | | *$2,025.00* | *02/01/2013* |
| *Security Deposit | *$3,750.00* | | *$3,750.00* | *02/01/2013* |
| Other *Pet Deposit* | *$250.00* | | *$250.00* | *02/01/2013* |
| Other *Key Deposit* | *$50.00* | | *$50.00* | *02/01/2013* |
| **Total** | *$6,075.00* | | *$6,075.00* | |

*The maximum amount Landlord may receive as security deposit, however designated, cannot exceed two months' Rent for unfurnished premises, or three months' Rent for furnished premises.

Tenant's Initials ( X ____ ) ( X ____ )     Landlord's Initials ( X aHa ) ( ____ )

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2012, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.



Reviewed by ______ Date ______

EQUAL HOUSING OPPORTUNITY



Agent: Gregory Stanton Phone: 626-644-4760 Fax: 626-628-3895 Prepared using zipForm® software
Broker: Teles Properties 210 S. Orange Grove Blvd. Pasadena , CA 91105

**6. LATE CHARGE; RETURNED CHECKS:**

**A.** Tenant acknowledges either late payment of Rent or issuance of a returned check may cause Landlord to incur costs and expenses, the exact amounts of which are extremely difficult and impractical to determine. These costs may include, but are not limited to, processing, enforcement and accounting expenses, and late charges imposed on Landlord. If any installment of Rent due from Tenant is not received by Landlord within **5 (or ☐ ______ ) calendar days** after the date due, or if a check is returned, Tenant shall pay to Landlord, respectively, an additional sum of $ ______ or 5.000 % of the Rent due as a Late Charge and $25.00 as a NSF fee for the first returned check and $35.00 as a NSF fee for each additional returned check, either or both of which shall be deemed additional Rent.

**B.** Landlord and Tenant agree that these charges represent a fair and reasonable estimate of the costs Landlord may incur by reason of Tenant's late or NSF payment. Any Late Charge or NSF fee due shall be paid with the current installment of Rent. Landlord's acceptance of any Late Charge or NSF fee shall not constitute a waiver as to any default of Tenant. Landlord's right to collect a Late Charge or NSF fee shall not be deemed an extension of the date Rent is due under paragraph 3 or prevent Landlord from exercising any other rights and remedies under this Agreement and as provided by law.

**7. PARKING: (Check A or B)**

☒ **A.** Parking is permitted as follows: two outdoor spaces to be identified ______.

The right to parking ☒ is ☐ is not included in the Rent charged pursuant to paragraph 3. If not included in the Rent, the parking rental fee shall be an additional $ ______ per month. Parking space(s) are to be used for parking properly licensed and operable motor vehicles, except for trailers, boats, campers, buses or trucks (other than pick-up trucks). Tenant shall park in assigned space(s) only. Parking space(s) are to be kept clean. Vehicles leaking oil, gas or other motor vehicle fluids shall not be parked on the Premises. Mechanical work or storage of inoperable vehicles is not permitted in parking space(s) or elsewhere on the Premises.

**OR** ☐ **B.** Parking is not permitted on the Premises.

**8. STORAGE: (Check A or B)**

☐ **A.** Storage is permitted as follows: ______
The right to separate storage space ☐ is, ☒ is not, included in the Rent charged pursuant to paragraph 3. If not included in the Rent, storage space fee shall be an additional $ ______ per month. Tenant shall store only personal property Tenant owns, and shall not store property claimed by another or in which another has any right, title or interest. Tenant shall not store any improperly packaged food or perishable goods, flammable materials, explosives, hazardous waste or other inherently dangerous material, or illegal substances.

**OR** ☐ **B.** Except for Tenant's personal property, contained entirely within the Premises, storage is not permitted on the Premises.

**9. UTILITIES:** Tenant agrees to pay for all utilities and services, and the following charges: $300 ______. except Internet and cable , which shall be paid for by Landlord. If any utilities are not separately metered, Tenant shall pay Tenant's proportional share, as reasonably determined and directed by Landlord. If utilities are separately metered, Tenant shall place utilities in Tenant's name as of the Commencement Date. Landlord is only responsible for installing and maintaining one usable telephone jack and one telephone line to the Premises. Tenant shall pay any cost for conversion from existing utilities service provider.

**10. CONDITION OF PREMISES:** Tenant has examined Premises and, if any, all furniture, furnishings, appliances, landscaping and fixtures, including smoke and carbon monoxide detector(s).

**(Check all that apply:)**

☐ **A.** Tenant acknowledges these items are clean and in operable condition, with the following exceptions: ______.

☐ **B.** Tenant's acknowledgment of the condition of these items is contained in an attached statement of condition (C.A.R. Form MIMO).

☐ **C.** **(i)** Landlord will Deliver to Tenant a statement of condition (C.A.R. Form MIMO) ☐ within **3 days** after execution of this Agreement; ☐ prior to the Commencement Date; ☐ within **3 days** after the Commencement Date.
**(ii)** Tenant shall complete and return the MIMO to Landlord within **3 (or ☐ ______ ) days** after Delivery. Tenant's failure to return the MIMO within that time shall conclusively be deemed Tenant's Acknowledgement of the condition as stated in the MIMO.

☒ **D.** Tenant will provide Landlord a list of items that are damaged or not in operable condition within **3 (or ☐ ______ ) days** after Commencement Date, not as a contingency of this Agreement but rather as an acknowledgment of the condition of the Premises.

☐ **E.** Other: ______.

**11. MAINTENANCE:**

**A.** Tenant shall properly use, operate and safeguard Premises, including if applicable, any landscaping, furniture, furnishings and appliances, and all mechanical, electrical, gas and plumbing fixtures, and keep them and the Premises clean, sanitary and well ventilated. Tenant shall be responsible for checking and maintaining all carbon monoxide and smoke detectors and any additional phone lines beyond the one line and jack that Landlord shall provide and maintain. Tenant shall immediately notify Landlord, in writing, of any problem, malfunction or damage. Tenant shall be charged for all repairs or replacements caused by Tenant, pets, guests or licensees of Tenant, excluding ordinary wear and tear. Tenant shall be charged for all damage to Premises as a result of failure to report a problem in a timely manner. Tenant shall be charged for repair of drain blockages or stoppages, unless caused by defective plumbing parts or tree roots invading sewer lines.

**B.** ☒ Landlord ☐ Tenant shall water the garden, landscaping, trees and shrubs, except: ______.

**C.** ☒ Landlord ☐ Tenant shall maintain the garden, landscaping, trees and shrubs, except: ______.

**D.** ☐ Landlord ☐ Tenant shall maintain ______.

**E.** Tenant's failure to maintain any item for which Tenant is responsible shall give Landlord the right to hire someone to perform such maintenance and charge Tenant to cover the cost of such maintenance.

**F.** The following items of personal property are included in the Premises without warranty and Landlord will not maintain, repair or replace them: ______.



Copyright © 1991-2012, CALIFORNIA ASSOCIATION OF REALTORS®, INC.

**12. NEIGHBORHOOD CONDITIONS:** Tenant is advised to satisfy him or herself as to neighborhood or area conditions, including schools, proximity and adequacy of law enforcement, crime statistics, proximity of registered felons or offenders, fire protection, other governmental services, availability, adequacy and cost of any wired, wireless internet connections or other telecommunications or other technology services and installations, proximity to commercial, industrial or agricultural activities, existing and proposed transportation, construction and development that may affect noise, view, or traffic, airport noise, noise or odor from any source, wild and domestic animals, other nuisances, hazards, or circumstances, cemeteries, facilities and condition of common areas, conditions and influences of significance to certain cultures and/or religions, and personal needs, requirements and preferences of Tenant.

**13. PETS:** Unless otherwise provided in California Civil Code § 54.2, no animal or pet shall be kept on or about the Premises without Landlord's prior written consent, except: 1 existing German Shepard dog.

**14.** [x] (If checked) **NO SMOKING:** No smoking of any substance is allowed on the Premises or common areas. If smoking does occur on the Premises or common areas, (i) Tenant is responsible for all damage caused by the smoking including, but not limited to stains, burns, odors and removal of debris; (ii) Tenant is in breach of this Agreement; (iii) Tenant, guests, and all others may be required to leave the Premises; and (iv) Tenant acknowledges that in order to remove odor caused by smoking, Landlord may need to replace carpet and drapes and paint the entire premises regardless of when these items were last cleaned, replaced, or repainted. Such actions and other necessary steps will impact the return of any security deposit. The Premises or common areas may be subject to a local non-smoking ordinance.

**15. RULES/REGULATIONS:**

**A.** Tenant agrees to comply with all Landlord rules and regulations that are at any time posted on the Premises or delivered to Tenant. Tenant shall not, and shall ensure that guests and licensees of Tenant shall not, disturb, annoy, endanger or interfere with other tenants of the building or neighbors, or use the Premises for any unlawful purposes, including, but not limited to, using, manufacturing, selling, storing or transporting illicit drugs or other contraband, or violate any law or ordinance, or commit a waste or nuisance on or about the Premises.

**B.** **(If applicable, check one)**

[x] **1.** Landlord shall provide Tenant with a copy of the rules and regulations within 5 days or ______.

**OR** [ ] **2.** Tenant has been provided with, and acknowledges receipt of, a copy of the rules and regulations.

**16.** [ ] (If checked) **CONDOMINIUM; PLANNED UNIT DEVELOPMENT:**

**A.** The Premises are a unit in a condominium, planned unit development, common interest subdivision or other development governed by a homeowners' association ("HOA"). The name of the HOA is ______. Tenant agrees to comply with all HOA covenants, conditions and restrictions, bylaws, rules and regulations and decisions ("HOA Rules"). Landlord shall provide Tenant copies of HOA Rules, if any. Tenant shall reimburse Landlord for any fines or charges imposed by HOA or other authorities, due to any violation by Tenant, or the guests or licensees of Tenant.

**B.** **(Check one)**

[ ] **1.** Landlord shall provide Tenant with a copy of the HOA Rules within ______ days or ______.

**OR** [ ] **2.** Tenant has been provided with, and acknowledges receipt of, a copy of the HOA Rules.

**17. ALTERATIONS; REPAIRS:** Unless otherwise specified by law or paragraph 29C, without Landlord's prior written consent, **(i)** Tenant shall not make any repairs, alterations or improvements in or about the Premises including: painting, wallpapering, adding or changing locks, installing antenna or satellite dish(es), placing signs, displays or exhibits, or using screws, fastening devices, large nails or adhesive materials; **(ii)** Landlord shall not be responsible for the costs of alterations or repairs made by Tenant; **(iii)** Tenant shall not deduct from Rent the costs of any repairs, alterations or improvements; and **(iv)** any deduction made by Tenant shall be considered unpaid Rent.

**18. KEYS; LOCKS:**

**A.** Tenant acknowledges receipt of (or Tenant will receive [x] prior to the Commencement Date, or [ ] ______):

[x] 2 key(s) to Premises, [ ] ______ remote control device(s) for garage door/gate opener(s),
[x] 1 key(s) to mailbox, [ ] ______,
[ ] ______ key(s) to common area(s), [ ] ______.

**B.** Tenant acknowledges that locks to the Premises [ ] have, [ ] have not, been re-keyed.

**C.** If Tenant re-keys existing locks or opening devices, Tenant shall immediately deliver copies of all keys to Landlord. Tenant shall pay all costs and charges related to loss of any keys or opening devices. Tenant may not remove locks, even if installed by Tenant.

**19. ENTRY:**

**A.** Tenant shall make Premises available to Landlord or Landlord's representative for the purpose of entering to make necessary or agreed repairs, (including, but not limited to, installing, repairing, testing, and maintaining smoke detectors and carbon monoxide devices, and bracing, anchoring or strapping water heaters), decorations, alterations, or improvements, or to supply necessary or agreed services, or to show Premises to prospective or actual purchasers, tenants, mortgagees, lenders, appraisers, or contractors.

**B.** Landlord and Tenant agree that 24-hour written notice shall be reasonable and sufficient notice, except as follows. 48-hour written notice is required to conduct an inspection of the Premises prior to the Tenant moving out, unless the Tenant waives the right to such notice. Notice may be given orally to show the Premises to actual or prospective purchasers provided Tenant has been notified in writing within 120 days preceding the oral notice, that the Premises are for sale and that oral notice may be given to show the Premises. No notice is required: **(i)** to enter in case of an emergency; **(ii)** if the Tenant is present and consents at the time of entry; or **(iii)** if the Tenant has abandoned or surrendered the Premises. No written notice is required if Landlord and Tenant orally agree to an entry for agreed services or repairs if the date and time of entry are within one week of the oral agreement.

**C.** [ ] (If checked) Tenant authorizes the use of a keysafe/lockbox to allow entry into the Premises and agrees to sign a keysafe/lockbox addendum (C.A.R. Form KLA).

**20. SIGNS:** Tenant authorizes Landlord to place FOR SALE/LEASE signs on the Premises.

**21. ASSIGNMENT; SUBLETTING:** Tenant shall not sublet all or any part of Premises, or assign or transfer this Agreement or any interest in it, without Landlord's prior written consent. Unless such consent is obtained, any assignment, transfer or subletting of Premises or this Agreement or tenancy, by voluntary act of Tenant, operation of law or otherwise, shall, at the option of Landlord, terminate this Agreement. Any proposed assignee, transferee or sublessee shall submit to Landlord an application and credit information for Landlord's approval and, if approved, sign a separate written agreement with Landlord and Tenant. Landlord's consent to any one assignment, transfer or sublease, shall not be construed as consent to any subsequent assignment, transfer or sublease and does not release Tenant of Tenant's obligations under this Agreement.

Tenant's Initials ( X ______ ) ( X ______ ) Landlord's Initials ( X DS aHa ) ( ______ )

Copyright © 1991-2012, CALIFORNIA ASSOCIATION OF REALTORS®, INC.



Reviewed by ______ Date ______

EQUAL HOUSING OPPORTUNITY

Premises: 248 S. Orange Grove Blvd. #102 Pasadena, CA 91105 Date: January 28, 2013

22. **JOINT AND INDIVIDUAL OBLIGATIONS:** If there is more than one Tenant, each one shall be individually and completely responsible for the performance of all obligations of Tenant under this Agreement, jointly with every other Tenant, and individually, whether or not in possession.

23. ☒ **LEAD-BASED PAINT (If checked):** Premises were constructed prior to 1978. In accordance with federal law, Landlord gives and Tenant acknowledges receipt of the disclosures on the attached form (C.A.R. Form FLD) and a federally approved lead pamphlet.

24. ☐ **MILITARY ORDNANCE DISCLOSURE:** (If applicable and known to Landlord) Premises are located within one mile of an area once used for military training, and may contain potentially explosive munitions.

25. ☐ **PERIODIC PEST CONTROL:** Landlord has entered into a contract for periodic pest control treatment of the Premises and shall give Tenant a copy of the notice originally given to Landlord by the pest control company.

26. ☐ **METHAMPHETAMINE CONTAMINATION:** Prior to signing this Agreement, Landlord has given Tenant a notice that a health official has issued an order prohibiting occupancy of the property because of methamphetamine contamination. A copy of the notice and order are attached.

27. **MEGAN'S LAW DATABASE DISCLOSURE:** Notice: Pursuant to Section 290.46 of the Penal Code, information about specified registered sex offenders is made available to the public via an Internet Web site maintained by the Department of Justice at www.meganslaw.ca.gov. Depending on an offender's criminal history, this information will include either the address at which the offender resides or the community of residence and ZIP Code in which he or she resides. (Neither Landlord nor Brokers, if any, are required to check this website. If Tenant wants further information, Tenant should obtain information directly from this website.)

28. **POSSESSION:**

A. Tenant is not in possession of the Premises. If Landlord is unable to deliver possession of Premises on Commencement Date, such Date shall be extended to the date on which possession is made available to Tenant. If Landlord is unable to deliver possession within **5 (or ☐ ________ ) calendar days** after agreed Commencement Date, Tenant may terminate this Agreement by giving written notice to Landlord, and shall be refunded all Rent and security deposit paid. Possession is deemed terminated when Tenant has returned all keys to the Premises to Landlord.

B. ☐ Tenant is already in possession of the Premises.

29. **TENANT'S OBLIGATIONS UPON VACATING PREMISES:**

A. Upon termination of this Agreement, Tenant shall: **(i)** give Landlord all copies of all keys or opening devices to Premises, including any common areas; **(ii)** vacate and surrender Premises to Landlord, empty of all persons; **(iii)** vacate any/all parking and/or storage space; **(iv)** clean and deliver Premises, as specified in paragraph C below, to Landlord in the same condition as referenced in paragraph 10; **(v)** remove all debris; **(vi)** give written notice to Landlord of Tenant's forwarding address; and **(vii)** ________________________________________.

B. All alterations/improvements made by or caused to be made by Tenant, with or without Landlord's consent, become the property of Landlord upon termination. Landlord may charge Tenant for restoration of the Premises to the condition it was in prior to any alterations/improvements.

C. **Right to Pre-Move-Out Inspection and Repairs: (i)** After giving or receiving notice of termination of a tenancy (C.A.R. Form NTT), or before the end of a lease, Tenant has the right to request that an inspection of the Premises take place prior to termination of the lease or rental (C.A.R. Form NRI). If Tenant requests such an inspection, Tenant shall be given an opportunity to remedy identified deficiencies prior to termination, consistent with the terms of this Agreement. **(ii)** Any repairs or alterations made to the Premises as a result of this inspection (collectively, "Repairs") shall be made at Tenant's expense. Repairs may be performed by Tenant or through others, who have adequate insurance and licenses and are approved by Landlord. The work shall comply with applicable law, including governmental permit, inspection and approval requirements. Repairs shall be performed in a good, skillful manner with materials of quality and appearance comparable to existing materials. It is understood that exact restoration of appearance or cosmetic items following all Repairs may not be possible. **(iii)** Tenant shall: **(a)** obtain receipts for Repairs performed by others; **(b)** prepare a written statement indicating the Repairs performed by Tenant and the date of such Repairs; and **(c)** provide copies of receipts and statements to Landlord prior to termination. Paragraph 29C does not apply when the tenancy is terminated pursuant to California Code of Civil Procedure § 1161(2), (3) or (4).

30. **BREACH OF CONTRACT; EARLY TERMINATION:** In addition to any obligations established by paragraph 29, in the event of termination by Tenant prior to completion of the original term of the Agreement, Tenant shall also be responsible for lost Rent, rental commissions, advertising expenses and painting costs necessary to ready Premises for re-rental. Landlord may withhold any such amounts from Tenant's security deposit.

31. **TEMPORARY RELOCATION:** Subject to local law, Tenant agrees, upon demand of Landlord, to temporarily vacate Premises for a reasonable period, to allow for fumigation (or other methods) to control wood destroying pests or organisms, or other repairs to Premises. Tenant agrees to comply with all instructions and requirements necessary to prepare Premises to accommodate pest control, fumigation or other work, including bagging or storage of food and medicine, and removal of perishables and valuables. Tenant shall only be entitled to a credit of Rent equal to the per diem Rent for the period of time Tenant is required to vacate Premises.

32. **DAMAGE TO PREMISES:** If, by no fault of Tenant, Premises are totally or partially damaged or destroyed by fire, earthquake, accident or other casualty that render Premises totally or partially uninhabitable, either Landlord or Tenant may terminate this Agreement by giving the other written notice. Rent shall be abated as of the date Premises become totally or partially uninhabitable. The abated amount shall be the current monthly Rent prorated on a 30-day period. If the Agreement is not terminated, Landlord shall promptly repair the damage, and Rent shall be reduced based on the extent to which the damage interferes with Tenant's reasonable use of Premises. If damage occurs as a result of an act of Tenant or Tenant's guests, only Landlord shall have the right of termination, and no reduction in Rent shall be made.

33. **INSURANCE:** Tenant's or guest's personal property and vehicles are not insured by Landlord, manager or, if applicable, HOA, against loss or damage due to fire, theft, vandalism, rain, water, criminal or negligent acts of others, or any other cause. **Tenant is advised to carry Tenant's own insurance (renter's insurance) to protect Tenant from any such loss or damage.** Tenant shall comply with any requirement imposed on Tenant by Landlord's insurer to avoid: **(i)** an increase in Landlord's insurance premium (or Tenant shall pay for the increase in premium); or **(ii)** loss of insurance.

34. **WATERBEDS:** Tenant shall not use or have waterbeds on the Premises unless: **(i)** Tenant obtains a valid waterbed insurance policy; **(ii)** Tenant increases the security deposit in an amount equal to one-half of one month's Rent; and **(iii)** the bed conforms to the floor load capacity of Premises.

Tenant's Initials ( X______ ) ( X______ )    Landlord's Initials ( X aHa ) ( ______ )

Reviewed by ________ Date ________

EQUAL HOUSING OPPORTUNITY

Copyright © 1991-2012, CALIFORNIA ASSOCIATION OF REALTORS®, INC.

Premises: 248 S. Orange Grove Blvd. #102 Pasadena, CA 91105 Date: January 28, 2013

**35. WAIVER:** The waiver of any breach shall not be construed as a continuing waiver of the same or any subsequent breach.

**36. NOTICE:** Notices may be served at the following address, or at any other location subsequently designated:

Landlord: BGM Pasadena, LLC
210 S. Orange Grove Blvd.
Pasadena, CA 91105

Tenant: Walter Whitman & Judith A. Moore
248 S. Orange Grove #102
Pasadena, CA 91105

**37. TENANT ESTOPPEL CERTIFICATE:** Tenant shall execute and return a tenant estoppel certificate delivered to Tenant by Landlord or Landlord's agent within **3 days** after its receipt. Failure to comply with this requirement shall be deemed Tenant's acknowledgment that the tenant estoppel certificate is true and correct, and may be relied upon by a lender or purchaser.

**38. REPRESENTATIONS:**

**A. TENANT REPRESENTATIONS; OBLIGATIONS REGARDING OCCUPANTS; CREDIT:** Tenant warrants that all statements in Tenant's rental application are accurate. Landlord requires all occupants 18 years of age or older and all emancipated minors to complete a lease rental application. Tenant acknowledges this requirement and agrees to notify Landlord when any occupant of the Premises reaches the age of 18 or becomes an emancipated minor. Tenant authorizes Landlord and Broker(s) to obtain Tenant's credit report periodically during the tenancy in connection with the modification or enforcement of this Agreement. Landlord may cancel this Agreement: **(i)** before occupancy begins; upon disapproval of the credit report(s); or **(ii)** at any time, upon discovering that information in Tenant's application is false. A negative credit report reflecting on Tenant's record may be submitted to a credit reporting agency if Tenant fails to fulfill the terms of payment and other obligations under this Agreement.

**B. LANDLORD REPRESENTATIONS:** Landlord warrants, that unless otherwise specified in writing, Landlord is unaware of **(i)** any recorded Notices of Default affecting the Premise; **(ii)** any delinquent amounts due under any loan secured by the Premises; and **(iii)** any bankruptcy proceeding affecting the Premises.

**39. MEDIATION:**

**A.** Consistent with paragraphs B and C below, Landlord and Tenant agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to court action. Mediation fees, if any, shall be divided equally among the parties involved. If, for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action.

**B.** The following matters are excluded from mediation: **(i)** an unlawful detainer action; **(ii)** the filing or enforcement of a mechanic's lien; and **(iii)** any matter within the jurisdiction of a probate, small claims or bankruptcy court. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a waiver of the mediation provision.

**C.** Landlord and Tenant agree to mediate disputes or claims involving Listing Agent, Leasing Agent or property manager ("Broker"), provided Broker shall have agreed to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to such Broker. Any election by Broker to participate in mediation shall not result in Broker being deemed a party to this Agreement.

**40. ATTORNEY FEES:** In any action or proceeding arising out of this Agreement, the prevailing party between Landlord and Tenant shall be entitled to reasonable attorney fees and costs, except as provided in paragraph 39A.

**41. C.A.R. FORM:** C.A.R. Form means the specific form referenced or another comparable form agreed to by the parties.

**42. OTHER TERMS AND CONDITIONS; SUPPLEMENTS:** ☐ Interpreter/Translator Agreement (C.A.R. Form ITA); ☐ Keysafe/Lockbox Addendum (C.A.R. Form KLA); ☐ Lead-Based Paint and Lead-Based Paint Hazards Disclosure (C.A.R. Form FLD); ☐ Landlord in Default Addendum (C.A.R. Form LID)

The following ATTACHED supplements are incorporated in this Agreement: ______

**43. TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the parties are incorporated in this Agreement. Its terms are intended by the parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed except in writing. This Agreement is subject to California landlord-tenant law and shall incorporate all changes required by amendment or successors to such law. This Agreement and any supplement, addendum or modification, including any copy, may be signed in two or more counterparts, all of which shall constitute one and the same writing.

**44. AGENCY:**

**A. CONFIRMATION:** The following agency relationship(s) are hereby confirmed for this transaction:
Listing Agent: (Print firm name) Teles Properties
is the agent of (check one): ☐ the Landlord exclusively; or ☒ both the Landlord and Tenant.
Leasing Agent: (Print firm name) Teles Properties
(if not same as Listing Agent) is the agent of (check one): ☐ the Tenant exclusively; or ☐ the Landlord exclusively; or ☒ both the Tenant and Landlord.

**B. DISCLOSURE:** ☐ (If checked): The term of this lease exceeds one year. A disclosure regarding real estate agency relationships (C.A.R. Form AD) has been provided to Landlord and Tenant, who each acknowledge its receipt.

**45.** ☐ **TENANT COMPENSATION TO BROKER:** Upon execution of this Agreement, Tenant agrees to pay compensation to Broker as specified in a separate written agreement between Tenant and Broker.

Tenant's Initials ( X______ ) ( X______ )    Landlord's Initials ( X AHA ) ( ______ )

Reviewed by ______ Date ______

EQUAL HOUSING OPPORTUNITY

Copyright © 1991-2012, CALIFORNIA ASSOCIATION OF REALTORS®, INC.

Premises: *248 S. Orange Grove Blvd. #102 Pasadena, CA 91105* Date: *January 28, 2013*

**46.** ☐ **INTERPRETER/TRANSLATOR:** The terms of this Agreement have been interpreted for Tenant into the following language: ______ . Landlord and Tenant acknowledge receipt of the attached interpreter/translator agreement (C.A.R. Form ITA).

**47. FOREIGN LANGUAGE NEGOTIATION:** If this Agreement has been negotiated by Landlord and Tenant primarily in Spanish, Chinese, Tagalog, Korean or Vietnamese, pursuant to the California Civil Code, Tenant shall be provided a translation of this Agreement in the language used for the negotiation.

**48. OWNER COMPENSATION TO BROKER:** Upon execution of this Agreement, Owner agrees to pay compensation to Broker as specified in a separate written agreement between Owner and Broker (C.A.R. Form LCA).

**49. RECEIPT:** If specified in paragraph 5, Landlord or Broker, acknowledges receipt of move-in funds.

Landlord and Tenant acknowledge and agree Brokers: **(a)** do not guarantee the condition of the Premises; **(b)** cannot verify representations made by others; **(c)** cannot provide legal or tax advice; **(d)** will not provide other advice or information that exceeds the knowledge, education or experience required to obtain a real estate license. Furthermore, if Brokers are not also acting as Landlord in this Agreement, Brokers: **(e)** do not decide what rental rate a Tenant should pay or Landlord should accept; and **(f)** do not decide upon the length or other terms of tenancy. Landlord and Tenant agree that they will seek legal, tax, insurance and other desired assistance from appropriate professionals.

**Tenant agrees to rent the Premises on the above terms and conditions.**

Tenant X ______ *Walter Whitman Moore* Date ______
Address ______ City ______ State ______ Zip ______
Telephone *(310)692-0397* Fax ______ E-mail *waltermoore@mac.com*

Tenant X ______ *Judith A. Moore* Date ______
Address ______ City ______ State ______ Zip ______
Telephone *(310)666-1795* Fax ______ E-mail *madamemoore@mac.com*

☐ **GUARANTEE:** In consideration of the execution of this Agreement by and between Landlord and Tenant and for valuable consideration, receipt of which is hereby acknowledged, the undersigned ("Guarantor") does hereby: **(i)** guarantee unconditionally to Landlord and Landlord's agents, successors and assigns, the prompt payment of Rent or other sums that become due pursuant to this Agreement, including any and all court costs and attorney fees included in enforcing the Agreement; **(ii)** consent to any changes, modifications or alterations of any term in this Agreement agreed to by Landlord and Tenant; and **(iii)** waive any right to require Landlord and/or Landlord's agents to proceed against Tenant for any default occurring under this Agreement before seeking to enforce this Guarantee.

Guarantor (Print Name) ______
Guarantor ______ Date ______
Address ______ City ______ State ______ Zip ______
Telephone ______ Fax ______ E-mail ______

**Landlord agrees to rent the Premises on the above terms and conditions.**

Landlord X DocuSigned by: *Alicia Azpell* Date 1/28/2013 Landlord ______ Date ______
*BGM Pasadena, LLC*
Address ______
Telephone ______ Fax ______ E-mail *aazpell@dornplatz.com*

**REAL ESTATE BROKERS:**

**A.** Real estate brokers who are not also Landlord under this Agreement are not parties to the Agreement between Landlord and Tenant.

**B.** Agency relationships are confirmed in paragraph 44.

**C. COOPERATING BROKER COMPENSATION:** Listing Broker agrees to pay Cooperating Broker (Leasing Firm) and Cooperating Broker agrees to accept: **(i)** the amount specified in the MLS, provided Cooperating Broker is a Participant of the MLS in which the Property is offered for sale or a reciprocal MLS; or **(ii)** ☐ (if checked) the amount specified in a separate written agreement between Listing Broker and Cooperating Broker.

Real Estate Broker (Listing Firm) *Teles Properties* DRE Lic. # *01830470*
By (Agent) DocuSigned by: *Greg Stanton* 90D9F6A075CE4D5... *Greg Stanton* DRE Lic. # *01482973* Date 1/28/2013
Address ______ City ______ State ______ Zip ______
Telephone *(626)644-4760* Fax ______ E-mail *greg.stanton@telesproperties.com*

Real Estate Broker (Leasing Firm) *Teles Properties* DRE Lic. # *01830470*
By (Agent) DocuSigned by: *Greg Stanton* 90D9F6A075CE4D5... *Greg Stanton* DRE Lic. # *01482973* Date 1/28/2013
Address ______ City ______ State ______ Zip ______
Telephone *(626)644-4760* Fax ______ E-mail *greg.stanton@telesproperties.com*

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by ______ Date ______

EQUAL HOUSING OPPORTUNITY

CALIFORNIA ASSOCIATION OF REALTORS®

# LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS DISCLOSURE, ACKNOWLEDGMENT AND ADDENDUM

## For Pre-1978 Housing Sales, Leases, or Rentals

(C.A.R. Form FLD, Revised 11/10)

The following terms and conditions are hereby incorporated in and made a part of the: ☐ California Residential Purchase Agreement, ☒ Residential Lease or Month-to-Month Rental Agreement, or ☐ Other: ______________________, dated ______________________, on property known as: *248 S. Orange Grove Blvd. #102, Pasadena, CA 91105* ("Property") in which ______________________ is referred to as Buyer or Tenant and *BGM Pasadena, LLC* is referred to as Seller or Landlord.

**LEAD WARNING STATEMENT (SALE OR PURCHASE)** Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligent quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**LEAD WARNING STATEMENT (LEASE OR RENTAL)** Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive federally approved pamphlet on lead poisoning prevention.

**EPA'S LEAD-BASED PAINT RENOVATION, REPAIR AND PAINTING RULE:** The new rule requires that contractors and maintenance professionals working in pre-1978 housing, child care facilities, and schools with lead-based paint be certified; that their employees be trained; and that they follow protective work practice standards. The rule applies to renovation, repair, or painting activities affecting more than six square feet of lead-based paint in a room or more than 20 square feet of lead-based paint on the exterior. Enforcement of the rule begins October 1, 2010. See the EPA website at www.epa.gov/lead for more information.

**1. SELLER'S OR LANDLORD'S DISCLOSURE**

I (we) have no knowledge of lead-based paint and/or lead-based paint hazards in the housing other than the following:
*The property was built in 1911.*

I (we) have no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing other than the following, which, previously or as an attachment to this addendum, have been provided to Buyer or Tenant:

I (we), previously or as an attachment to this addendum, have provided Buyer or Tenant with the pamphlet *"Protect Your Family From Lead In Your Home"* or an equivalent pamphlet approved for use in the State such as *"The Homeowner's Guide to Environmental Hazards and Earthquake Safety."*

For Sales Transactions Only: Buyer has 10 days, unless otherwise agreed in the real estate purchase contract, to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**I (we) have reviewed the information above and certify, to the best of my (our) knowledge, that the information provided is true and correct.**

X DocuSigned by: Alicia Azpell — 1/28/2013
Seller or Landlord *BGM Pasadena, LLC* Date

______________________
Seller or Landlord Date

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1996-2010, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.

FLD REVISED 11/10 (PAGE 1 OF 2)

Buyer's/Tenant's Initials ( X ______ ) ( X ______ )

Reviewed by ________ Date ________

EQUAL HOUSING OPPORTUNITY



| | | | |
|---|---|---|---|
| Agent: Gregory Stanton | Phone: 626-644-4760 | Fax: 626-628-3895 | Prepared using zipForm® software |
| Broker: Teles Properties 210 S. Orange Grove Blvd. Pasadena | | , CA 91105 | |

Property Address: 248 S. Orange Grove Blvd. #102 Pasadena, CA 91105 Date

## 2. LISTING AGENT'S ACKNOWLEDGMENT

Agent has informed Seller or Landlord of Seller's or Landlord's obligations under §42 U.S.C. 4852d and is aware of Agent's responsibility to ensure compliance.

**I have reviewed the information above and certify, to the best of my knowledge, that the information provided is true and correct.**

Teles Properties
(Please Print) Agent (Broker representing Seller or Landlord)

By Greg Stanton 1/28/2013
Associate-Licensee or Broker Signature Date
Greg Stanton

## 3. BUYER'S OR TENANT'S ACKNOWLEDGMENT

I (we) have received copies of all information listed, if any, in 1 above and the pamphlet *"Protect Your Family From Lead In Your Home"* or an equivalent pamphlet approved for use in the State such as *"The Homeowner's Guide to Environmental Hazards and Earthquake Safety."* **If delivery of any of the disclosures or pamphlet referenced in paragraph 1 above occurs after Acceptance of an offer to purchase, Buyer has a right to cancel pursuant to the purchase contract. If you wish to cancel, you must act within the prescribed period.**

For Sales Transactions Only: Buyer acknowledges the right for 10 days, unless otherwise agreed in the real estate purchase contract, to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; OR, (if checked) ☐ Buyer waives the right to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**I (we) have reviewed the information above and certify, to the best of my (our) knowledge, that the information provided is true and correct.**

X
Buyer or Tenant Date

X
Buyer or Tenant Date

## 4. COOPERATING AGENT'S ACKNOWLEDGMENT

Agent has informed Seller or Landlord, through the Listing Agent if the property is listed, of Seller's or Landlord's obligations under §42 U.S.C. 4852d and is aware of Agent's responsibility to ensure compliance.

**I have reviewed the information above and certify, to the best of my knowledge, that the information provided is true and correct.**

Teles Properties
Agent (Broker obtaining the Offer)

By Greg Stanton 1/28/2013
Associate-Licensee or Broker Signature Date
Greg Stanton

THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by ________ Date ________

EQUAL HOUSING OPPORTUNITY

CALIFORNIA ASSOCIATION OF REALTORS®

# WATER HEATER AND SMOKE DETECTOR STATEMENT OF COMPLIANCE

**(C.A.R. Form WHSD, Revised 11/10)**

Property Address: *248 S. Orange Grove Blvd. #102, Pasadena, CA 91105*

NOTE: A seller who is not required to provide one of the following statements of compliance is not necessarily exempt from the obligation to provide the other statement of compliance.

## WATER HEATER STATEMENT OF COMPLIANCE

1. **STATE LAW:** California Law requires that all new and replacement water heaters and existing residential water heaters be braced, anchored or strapped to resist falling or horizontal displacement due to earthquake motion. "Water heater" means any standard water heater with a capacity of no more than 120 gallons for which a pre-engineered strapping kit is readily available. (Health and Safety Code §19211d). Although not specifically stated, the statue requiring a statement of compliance does not appear to apply to a properly installed and bolted tankless water heater for the following reasons: There is no tank that can overturn; Pre-engineered strapping kits for such devices are not readily available; and Bolting already exists that would help avoid displacement or breakage in the event of an earthquake.
2. **LOCAL REQUIREMENTS:** Some local ordinances impose more stringent water heater bracing, anchoring or strapping requirements than does California Law. Therefore, it is important to check with local city or county building and safety departments regarding the applicable water heater bracing, anchoring or strapping requirements for your property.
3. **TRANSFEROR'S WRITTEN STATEMENT:** California Health and Safety Code §19211 requires the seller of any real property containing a water heater to certify, in writing, that the seller is in compliance with California State Law. If the Property is a manufactured or mobile home, Seller shall also file a required Statement with the Department of Housing and Community Development.
4. **CERTIFICATION:** Seller represents that the Property, as of the Close Of Escrow, will be in compliance with Health and Safety Code §19211 by having the water heater(s) braced, anchored or strapped in place, in accordance with those requirements.

Seller X DocuSigned by: *Alicia Azpell* (Signature) — *BGM Pasadena, LLC* (Print Name) — Date ~~09/18/2012~~ 1/28/2013

Seller ______ (Signature) ______ (Print Name) Date ______

The undersigned hereby acknowledges receipt of a copy of this document.

Buyer X ______ (Signature) — *Walter Whitman Moore* (Print Name) — Date ______

Buyer X ______ (Signature) — *Judith A. Moore* (Print Name) — Date ______

## SMOKE DETECTOR STATEMENT OF COMPLIANCE

1. **STATE LAW:** California Law requires that **(i)** every single-family dwelling and factory built housing unit sold on or after January 1, 1986, must have an operable smoke detector, approved and listed by the State Fire Marshal, installed in accordance with the State Fire Marshal's regulations (Health and Safety Code §13113.8) and **(ii)** all used manufactured or mobilehomes have an operable smoke detector in each sleeping room.
2. **LOCAL REQUIREMENTS:** Some local ordinances impose more stringent smoke detector requirements than does California Law. Therefore, it is important to check with local city or county building and safety departments regarding the applicable smoke detector requirements for your property.
3. **TRANSFEROR'S WRITTEN STATEMENT:** California Health and Safety Code §13113.8(b) requires every transferor of any real property containing a single-family dwelling, whether the transfer is made by sale, exchange, or real property sales contract (installment sales contract), to deliver to the transferee a written statement indicating that the transferor is in compliance with California State Law concerning smoke detectors. If the Property is a manufactured or mobile home, Seller shall also file a required Statement with the Department of Housing and Community Development (HCD).
4. **EXCEPTIONS:** Generally, a written statement of smoke detector compliance is not required for transactions for which the Seller is exempt from providing a transfer disclosure statement.
5. **CERTIFICATION:** Seller represents that the Property, as of the Close Of Escrow, will be in compliance with the law by having operable smoke detector(s) **(i)** approved and listed by the State Fire Marshal installed in accordance with the State Fire Marshal's regulations Health and Safety Code §13113.8 or **(ii)** in compliance with Manufactured Housing Construction and Safety Act (Health and Safety Code §18029.6) located in each sleeping room for used manufactured or mobilehomes as required by HCD and **(iii)** in accordance with applicable local ordinance(s).

Seller X DocuSigned by: *Alicia Azpell* (Signature) — *BGM Pasadena, LLC* (Print Name) — Date ~~09/18/2012~~ 1/28/2013

Seller ______ (Signature) ______ (Print Name) Date ______

The undersigned hereby acknowledge(s) receipt of a copy of this Water Heater and Smoke Detector Statement of Compliance.

Buyer X ______ (Signature) — *Walter Whitman Moore* (Print Name) — Date ______

Buyer X ______ (Signature) — *Judith A. Moore* (Print Name) — Date ______

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2010 CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by ______ Date ______

EQUAL HOUSING OPPORTUNITY



Agent: Gregory Stanton Phone: 626-644-4760 Fax: 626-628-3895 Prepared using zipForm® software
Broker: Teles Properties 210 S. Orange Grove Blvd. Pasadena , CA 91105

CALIFORNIA ASSOCIATION OF REALTORS®

# LEASE/RENTAL MOLD AND VENTILATION ADDENDUM

**(C.A.R. Form LRM, 4/05)**

The following terms and conditions are hereby incorporated in and made a part of the ☒ Residential Lease or Month-to-Month Rental Agreement, ☐ other __________, dated *January 28, 2013*, on property located at (Street Address) *248 S. Orange Grove Blvd. #102* (Unit/Apartment) __________ (City) *Pasadena* (State) *CA* (Zip Code) *91105* ("Premises"), in which *Walter Whitman Moore, Judith A. Moore* is referred to as is referred to as "Tenant" and *BGM Pasadena, LLC* is referred to as "Landlord" (the term "Landlord" includes Owner and agent).

**MOLD AND VENTILATION NOTIFICATION AND AGREEMENT:** Except as may be noted at the time of Tenant's move in inspection, Tenant agrees that the Premises is being delivered free of known damp or wet building materials ("mold") or mildew contamination. (If checked, ☐ the Premises was previously treated for elevated levels of mold that were detected.) Tenant acknowledges and agrees that (i) mold can grow if the Premises is not properly maintained; (ii) moisture may accumulate inside the Premises if it is not regularly aired out, especially in coastal communities; (iii) if moisture is allowed to accumulate, it can lead to the growth of mold; and (iv) mold may grow even in a small amount of moisture. Tenant further acknowledges and agrees that Tenant has a responsibility to maintain the Premises in order to inhibit mold growth and that Tenant's agreement to do so is part of Tenant's material consideration in Landlord's agreement to rent the Premises to Tenant. Accordingly, Tenant agrees to:

1. Maintain the Premises free of dirt, debris and moisture that can harbor mold;
2. Clean any mildew or mold that appears with an appropriate cleaner designed to kill mold;
3. Clean and dry any visible moisture on windows, walls and other surfaces, including personal property as quickly as possible;
4. Use reasonable care to close all windows and other openings in the Premises to prevent water from entering the Premises;
5. Use exhaust fans, if any, in the bathroom(s) and kitchen while using those facilities and notify Landlord of any inoperative exhaust fans;
6. Immediately notify Landlord of any water intrusion, including but not limited to, roof or plumbing leaks, drips or "sweating pipes";
7. Immediately notify Landlord of overflows from bathroom, kitchen or laundry facilities;
8. Immediately notify Landlord of any significant mold growth on surfaces in the Premises;
9. Allow Landlord, with appropriate notice, to enter the Premises to make inspections regarding mold and ventilation; and
10. Release, indemnify, hold harmless and forever discharge Landlord and Landlord's employees, agents, successors and assigns from any and all claims, liabilities or causes of action of any kind that Tenant, members of Tenant's household or Tenant's guests or invitees may have at any time against Landlord or Landlord's agents resulting from the presence of mold due to Tenant's failure to comply with this Lease/Rental Mold and Ventilation Addendum.

Tenant (Signature) X __________ Date __________

(Print Name) *Walter Whitman Moore*

Tenant (Signature) X __________ Date __________

(Print Name) *Judith A. Moore*

Tenant (Signature) __________ Date __________

(Print Name) __________

Landlord (Signature) DocuSigned by: *Alicia Azpell* A29447C755294A5... Date 1/28/2013

(Print Name) *BGM Pasadena, LLC*

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 2005-2006, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

Buyer's Initials ( X ) ( X )
Seller's Initials ( X DS AHA ) ( )

Reviewed by ______ Date ______

EQUAL HOUSING OPPORTUNITY

CALIFORNIA ASSOCIATION OF REALTORS®

# CARBON MONOXIDE DETECTOR NOTICE

**(C.A.R. Form CMD, 4/12)**

Property Address: *248 S. Orange Grove Blvd. #102, Pasadena, CA 91105*

**1. INSTALLATION OF CARBON MONOXIDE DETECTORS:**

**A. Requirements:** California law (Health and Safety Code sections 13260 to 13263 and 17296 to 17296.2) requires that as of July 1, 2011, all existing single-family dwellings have carbon monoxide detectors installed and that all other types of dwelling units intended for human occupancy have carbon monoxide detectors installed on or before January 1, 2013. The January 1, 2013 requirement applies to a duplex, lodging house, dormitory, hotel, condominium, time-share and apartment, among others.

**B. Exceptions:** The law does not apply to a dwelling unit which does not have any of the following: a fossil fuel burning heater or appliance, a fireplace, or an attached garage. The law does not apply to dwelling units owned or leased by the State of California, the Regents of the University of California or local government agencies. Aside from these three owner types, there are **no other owner exemptions** from the installation requirement; it applies to all owners of dwellings, be they individual banks, corporations, or other entities. There is no exemption for REO properties.

**2. DISCLOSURE OF CARBON MONOXIDE DETECTORS:** The Health and Safety Code does not require a disclosure regarding the existence of carbon monoxide detectors in a dwelling. However, a seller of residential 1-4 property who is required to complete a Real Estate Transfer Disclosure Statement, (C.A.R. Form TDS) or a Manufactured Home and Mobilehome Transfer Disclosure Statement (C.A.R. Form MHTDS) must use section II A of that form to disclose whether or not the dwelling unit has a carbon monoxide detector.

**3. COMPLIANCE WITH INSTALLATION REQUIREMENT:** State building code requires at a minimum, placement of carbon monoxide detectors in applicable properties outside of each sleeping area, and on each floor in a multi-level dwelling but <u>additional or different requirements may apply</u> depending on local building standards and manufacturer instructions. An owner who fails to install a carbon monoxide detector when required by law and continues to fail to install the detector after being given notice by a governmental agency could be liable for a fine of up to $200 for each violation. A transfer of a property where a seller, as an owner, has not installed carbon monoxide detectors, when required to do so by law, will not be invalidated, but the seller/owner could be subject to damages of up to $100, plus court costs and attorney fees. Buyer and Seller are each advised to consult with their own home inspector, contractor or building department to determine the exact location for installation of carbon monoxide detectors. Buyer is advised to consult with a professional of Buyer's choosing to determine whether the property has carbon monoxide detector(s) installed as required by law, and if not to discuss with their counsel the potential consequences.

**4. LOCAL REQUIREMENTS:** Some localities maintain their own retrofit or point of sale requirements which may include the requirement that a carbon monoxide detector be installed prior to a transfer of property. Therefore, it is important to check the local city or county building and safety departments regarding point of sale or retrofit requirements when transferring property.

The undersigned hereby acknowledge(s) receipt of a copy of this Carbon Monoxide Detector Notice.

1/28/2013

Seller X DocuSigned by: *Alicia Azpell* (Signature) — *BGM Pasadena, LLC* (Print Name) — Date ~~09/18/2012~~

Seller ______ (Signature) ______ (Print Name) Date ______

Buyer X ______ (Signature) — *Walter Whitman Moore* (Print Name) — Date ______

Buyer X ______ (Signature) — *Judith A. Moore* (Print Name) — Date ______

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 2012 CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
*a subsidiary of the California Association of REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by ______ Date ______

EQUAL HOUSING OPPORTUNITY



| | | | |
|---|---|---|---|
| **Agent:** Gregory Stanton | **Phone:** 626-644-4760 | **Fax:** 626-628-3895 | **Prepared using zipForm® software** |
| **Broker:** Teles Properties 210 S. Orange Grove Blvd. Pasadena , CA 91105 | | | |

CALIFORNIA ASSOCIATION OF REALTORS®

# DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP

(Listing Firm to Seller)
(As required by the Civil Code)
(C.A.R. Form AD, Revised 11/09)

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

## SELLER'S AGENT

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:

To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.

To the Buyer and the Seller:

(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
(b) A duty of honest and fair dealing and good faith.
(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

## BUYER'S AGENT

A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:

To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.

To the Buyer and the Seller:

(a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
(b) A duty of honest and fair dealing and good faith.
(c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties.

An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

## AGENT REPRESENTING BOTH SELLER AND BUYER

A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.

In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:

(a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
(b) Other duties to the Seller and the Buyer as stated above in their respective sections.

In representing both Seller and Buyer, the agent may not, without the express permission of the respective party, disclose to the other party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered.

The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction.

**This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully.**

**I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).**

☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant DocuSigned by: Alicia Aspell BGM Pasadena, LLC Date 11/5/2012

☐ Buyer ☐ Seller ☐ Landlord ☐ Tenant ______________ Date ______________

Agent Teles Properties DRE Lic. # 01830470
Real Estate Broker (Firm)

By DocuSigned by: Greg Stanton DRE Lic. # 01482973 Date 11/1/2012
(Salesperson or Broker-Associate) Greg Stanton

AGENCY DISCLOSURE COMPLIANCE (Civil Code §2079.14):

- When the listing brokerage company also represents Buyer/Tenant: The Listing Agent shall have one AD form signed by Seller/Landlord and a different AD form signed by Buyer/Tenant.
- When Seller/Landlord and Buyer/Tenant are represented by different brokerage companies: (i) the Listing Agent shall have one AD form signed by Seller/Landlord and (ii) the Buyer's/Tenant's Agent shall have one AD form signed by Buyer/Tenant and either that same or a different AD form presented to Seller/Landlord for signature prior to presentation of the offer. If the same form is used, Seller may sign here:

(SELLER/LANDLORD: DO NOT SIGN HERE) Seller/Landlord Date (SELLER/LANDLORD: DO NOT SIGN HERE) Seller/Landlord Date

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. Copyright © 1991-2009, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by ________ Date ________

EQUAL HOUSING OPPORTUNITY



Agent: Gregory Stanton Phone: 626-644-4760 Fax: 626-628-3895 Prepared using zipForm® software
Broker: Teles Properties 210 S. Orange Grove Blvd. Pasadena , CA 9110

## CIVIL CODE SECTIONS 2079.13 THROUGH 2079.24 (2079.16 APPEARS ON THE FRONT)

**2079.13** As used in Sections 2079.14 to 2079.24, inclusive, the following terms have the following meanings: **(a)** "Agent" means a person acting under provisions of title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. **(b)** "Associate licensee" means a person who is licensed as a real estate broker or salesperson under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code and who is either licensed under a broker or has entered into a written contract with a broker to act as the broker's agent in connection with acts requiring a real estate license and to function under the broker's supervision in the capacity of an associate licensee. The agent in the real property transaction bears responsibility for his or her associate licensees who perform as agents of the agent. When an associate licensee owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the associate licensee functions. **(c)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee. **(d)** "Dual agent" means an agent acting, either directly or through an associate licensee, as agent for both the seller and the buyer in a real property transaction. **(e)** "Listing agreement" means a contract between an owner of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer. **(f)** "Listing agent" means a person who has obtained a listing of real property to act as an agent for compensation. **(g)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the listing agent. **(h)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(i)** "Offer to purchase" means a written contract executed by a buyer acting through a selling agent which becomes the contract for the sale of the real property upon acceptance by the seller. **(j)** "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property which constitutes or is improved with one to four dwelling units, any leasehold in this type of property exceeding one year's duration, and mobile homes, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. **(k)** "Real property transaction" means a transaction for the sale of real property in which an agent is employed by one or more of the principals to act in that transaction, and includes a listing or an offer to purchase. **(l)** "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer, and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(m)** "Seller" means the transferor in a real property transaction, and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor. **(n)** "Selling agent" means a listing agent who acts alone, or an agent who acts in cooperation with a listing agent, and who sells or finds and obtains a buyer for the real property, or an agent who locates property for a buyer or who finds a buyer for a property for which no listing exists and presents an offer to purchase to the seller. **(o)** "Subagent" means a person to whom an agent delegates agency powers as provided in Article 5 (commencing with Section 2349) of Chapter 1 of Title 9. However, "subagent" does not include an associate licensee who is acting under the supervision of an agent in a real property transaction.

**2079.14** Listing agents and selling agents shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and, except as provided in subdivision (c), shall obtain a signed acknowledgement of receipt from that seller or buyer, except as provided in this section or Section 2079.15, as follows: **(a)** The listing agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. **(b)** The selling agent shall provide the disclosure form to the seller as soon as practicable prior to presenting the seller with an offer to purchase, unless the selling agent previously provided the seller with a copy of the disclosure form pursuant to subdivision (a). **(c)** Where the selling agent does not deal on a face-to-face basis with the seller, the disclosure form prepared by the selling agent may be furnished to the seller (and acknowledgement of receipt obtained for the selling agent from the seller) by the listing agent, or the selling agent may deliver the disclosure form by certified mail addressed to the seller at his or her last known address, in which case no signed acknowledgement of receipt is required. **(d)** The selling agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase, except that if the offer to purchase is not prepared by the selling agent, the selling agent shall present the disclosure form to the buyer not later than the next business day after the selling agent receives the offer to purchase from the buyer.

**2079.15** In any circumstance in which the seller or buyer refuses to sign an acknowledgement of receipt pursuant to Section 2079.14, the agent, or an associate licensee acting for an agent, shall set forth, sign, and date a written declaration of the facts of the refusal.

**2079.16** Reproduced on Page 1 of this AD form.

**2079.17 (a)** As soon as practicable, the selling agent shall disclose to the buyer and seller whether the selling agent is acting in the real property transaction exclusively as the buyer's agent, exclusively as the seller's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the selling agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the listing agent shall disclose to the seller whether the listing agent is acting in the real property transaction exclusively as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the listing agent prior to or coincident with the execution of that contract by the seller.

**(c)** The confirmation required by subdivisions (a) and (b) shall be in the following form.

**(DO NOT COMPLETE, SAMPLE ONLY)** is the agent of (check one): ☐ the seller exclusively; or ☐ both the buyer and seller.
(Name of Listing Agent)

**(DO NOT COMPLETE, SAMPLE ONLY)** is the agent of (check one): ☐ the buyer exclusively; or ☐ the seller exclusively; or ☐ both the buyer and seller.
(Name of Selling Agent if not the same as the Listing Agent)

**(d)** The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14.

**2079.18** No selling agent in a real property transaction may act as an agent for the buyer only, when the selling agent is also acting as the listing agent in the transaction.

**2079.19** The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

**2079.20** Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

**2079.21** A dual agent shall not disclose to the buyer that the seller is willing to sell the property at a price less than the listing price, without the express written consent of the seller. A dual agent shall not disclose to the seller that the buyer is willing to pay a price greater than the offering price, without the express written consent of the buyer. This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

**2079.22** Nothing in this article precludes a listing agent from also being a selling agent, and the combination of these functions in one agent does not, of itself, make that agent a dual agent.

**2079.23** A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

**2079.24** Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

Buyer's/Tenant's Initials ( ________ ) ( ________ )
Seller's/Landlord Initials ( X aa ) ( ________ )

Copyright © 1991-2009, CALIFORNIA ASSOCIATION OF REALTORS®, INC.



Reviewed by ________ Date ________

EQUAL HOUSING OPPORTUNITY



248 S. Orange

# EXHIBIT "C"

Courtesy Copy
RECEIVED
FEB 25 2026
NORTH CENTRAL GLENDALE

JOHN A. MOE, II (SBN 66893)
john.moe@dentons.com
DENTONS US LLP
601 South Figueroa Street
Suite 2500
Los Angeles, CA 90017-5704
Telephone: 213 623 9300
Facsimile: 213 623 9924

Attorneys for Plaintiff, Secured Creditor
Preferred Bank

Electronically FILED by Superior Court of California, County of Los Angeles
2/24/2026 3:33 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By A. Oliva, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES, NORTHEAST DISTRICT

| | |
|---|---|
| PREFERRED BANK, a California banking corporation,<br><br>Plaintiff,<br><br>v.<br><br>SDRES PARTNERS LLC, a California limited liability company,<br><br>Defendants. | Case No.: 26NNCV01136<br><br>Unlimited Civil Case<br><br>The Honorable Judge Ralph C. Hofer<br><br>**DECLARATION OF STEVE CRIST IN SUPPORT OF PLAINTIFF'S APPLICATION AND APPLICATION FOR THE EX PARTE APPOINTMENT OF A RENTS AND PROFITS RECEIVER AND FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND AN ORDER TO SHOW CAUSE REGARDING PRELIMINARY INJUNCTION**<br><br>[Filed concurrently with Notice Of Application And Application For The Ex Parte Appointment Of A Rents And Profits Receiver And For Issuance Of A Temporary Restraining Order And An Order To Show Cause Regarding Preliminary Injunction]<br><br>Date: February 26, 2026<br>Time: 11:00 a.m.<br>Department: D<br>600 East Broadway<br>Glendale, California 91206<br><br>Complaint Filed: February 13, 2026<br>Trial Date: Not Yet Assigned |

**DECLARATION OF STEVE CRIST**

I, Steve Crist, declare:

1. I am over 18 years of age and competent to testify. I make this declaration based on my personal knowledge and, where indicated, based on documents I have received or reviewed, which I can authenticate. I submit this declaration in support of Preferred Bank's *Application and Application for the Ex Parte Appointment of a Rents and Profits Receiver and for Issuance of Preliminary Injunction* over the properties located at 210 South Orange Grove Boulevard (the "**210 Building**") and 244 South Orange Grove Boulevard, Pasadena, California (the "**244-248 Buildings**", and together with the 210 Building shall hereinafter collectively be referred to as, the "**Properties**").

2. The 244-248 Building is comprised of two buildings adjacent to each other with two property address. One building has an address commonly known as 244 South Orange Grove Boulevard, Pasadena, California (the "**244 Building**") and the other building has an address commonly known as 248 South Orange Grove Boulevard, Pasadena, California (the "**248 Building**"). The 244-248 Buildings are 1920s-era residential buildings with eight total residential units between them, of which at least six were occupied as of late January 2026. The 210 S. Orange Grove property is a commercial building subject to a master lease with subtenants.

3. I have resided as a tenant in Unit #204 at the 244 Building for approximately seven years. My landlord is SDRES Partners, LLC ("**SDRES**"). I pay monthly rent in the amount of $4,601.25 and am current.

4. I am well acquainted with all of the tenants in the 244-248 Buildings as we share a common misery with the conditions we are all living in. I personally speak to all of the tenants in the 244-248 Buildings, take complaints and attempt to remedy the issues they report to me.

5. On December 1, 2025, the City of Pasadena Rent Stabilization Department issued a Rental Registration Certificate of Non-Compliance for APN 5713-027-065 (covering both the 244 Building and the 248 Building), reflecting the owner's non-compliance with the City's registration

requirements as of that date. As of the date of this Declaration, the property remains out-of-compliance. A true and correct copy of the Certificate of Non- is attached as **Exhibit SC-1**.

6. In addition to the registration non-compliance, SDRES has consistently violated Pasadena's rent control laws. The City of Pasadena has reviewed the rent amounts and confirmed violations. For example, Beth Andrews, a tenant in the 248 Building, has been charged more than is allowed under the post-fire anti-gouging laws. On January 3, 2026, Beth Andrews emailed the property management stating she has started reporting them to LA County for violating the fire rent price gouging moratorium.

7. Based on my personal discussions with the tenants in the 244-248 Buildings, it is my understanding that no tenant is behind in rent payments and SDRES receives $31,378.63 per month (including my rent but not including rent from the 210 Building).

8. Since approximately 2023, and progressively worsening in 2024 and 2025, the Properties have suffered serious deferred maintenance and habitability issues, including pervasive rat infestation, water intrusion, plumbing failures, raw sewage exposure, mold, peeling paint, broken floors, cracked windows, substandard lighting and repeated flooding of the basements during rain events. The City of Pasadena has inspected the Properties multiple times and issued citations and fines, including administrative citations for hazardous/unsanitary premises and hazardous plumbing violations. A true and correct copy of the deferred maintenance and habitability issues is attached as **Exhibit SC-2**.

9. The 244-248 Buildings have had a severe rat infestation over the past few years that has worsened significantly since 2024 to date.

a. Rats can be heard in the walls and attic at night and seen everywhere, including inside hallways, attics, walls, and basements. Trees on the property have active rat nests due to improper trimming. Rats have entered and damaged tenant vehicles in the parking lot. Ivy growing on the building walls provides a "ladder" for rats to reach the eaves and attic.

b. I have personally trapped rats, observed rats in common areas, and captured video and photographic evidence of rats in the buildings.

c. As of February 4, 2026, the rat problem had not been abated despite numerous complaints to management dating back to at least April 2024.

d. On February 3, 2026 at 1:08 pm, I emailed management regarding dead rats in the walls or attic of the 244 Building, reporting that the smell emanating from the stairwell was unbearable. In my email, I requested two urgent repairs: (1) a licensed exterminator to enter the attics and basements of both buildings to completely remove all rats and clean any dead rats or fecal matter from the premises; and (2) a licensed roofer to inspect the roofs of both buildings and seal any openings that continue to allow rats inside. I noted that no one had ever entered the large attics to address the rat problem, and that the infestation had become so severe that tenants were forced to email management weekly, if not daily, with rat reports. I also advised management that its continued failure to address the infestation constituted a violation of California Civil Code Section 1941.1, which establishes habitability standards for residential rental property.

e. I have personal knowledge that pest control has caught over ten rats in both buildings over the past several months, yet the infestation persists. I am in possession of multiple videos of rat infestation that I can produce as evidence if requested.

10. Water intrusion and plumbing failures are persistent.

a. On Christmas Day 2025, water came through the windows of my unit, streaming into my living room and damaging Christmas presents. Water has also come through ceilings onto wood floors in my unit, causing damage. Additionally, Beth Andrews, a tenant in the 248 Building, told me that water came through her kitchen ceiling on December 25, 2025 and on January 1, 2026, requiring licensed roofers for the Spanish tile roof.

b. Whenever it rains, the basements flood—sometimes up to several inches—because ground drains are broken or clogged and have not been repaired for many years despite repeated requests to management.

c. The basement flooding causes mold and poses health and safety concerns for myself, tenants and the buildings structure.

d. Multiple tenants have reported ongoing water pressure and temperature problems following plumbing repairs, including showers that sputter and temperatures that are difficult to control. On or about January 4-5, 2026, tenant Vincent Rojas, a tenant in the 248 Building, reported an emergency sewage backup in both bathrooms of his unit, with toilets and showers not draining and sewage water flooding his floors. I am in possession of multiple videos of water intrusion and plumbing failures that I can produce as evidence if requested.

11. On or about January 25–27, 2026, water service at the 244-248 Buildings was shut off without advance notice due to an emergency water main break reported by tenant Beth Andrews. All tenants, including myself, have been experiencing inadequate water pressure afterwards. I personally observed an open excavation with an exposed water main pipe that had been improperly modified using a plastic PVC component by an unlicensed worker to remedy the emergency water main issue. Per California Code of Regulations, Title 22, Section 64572, the PVC plastic water main line is not permitted near the sewer line, as shown in photographs taken on January 30, 2026. As of February 2, 2026, the open hole remains unfilled. True and correct copies of the email thread regarding the unannounced shutoff and photographs of the exposed water pipe are attached as **Exhibit SC-3**.

12. In addition to the trash service suspension, tenants have received shut-off notices for unpaid gas bills. Gas has been shut off multiple times. On January 16, 2026, I received another notice of service disconnection for SDRES' failure to pay for utilities. The notice indicated the average monthly gas bill for the account was $531.63. A true and correct copy of this notice is attached as **Exhibit SC-4**.

13. Vendors have personally complained to me and provided me with written notices of nonpayment by the owner/manager. For example, the pool/fountain maintenance vendor (Steve Vaughan Pool & Spa) issued a formal demand letter on January 22, 2026, demanding payment of an outstanding balance of $3,250.00 for invoices dating back to September 2025. The vendor warned of suspension due to health and safety risks of unmaintained water features at a multi-unit property, noting that improperly maintained pools and fountains present significant health hazards including bacterial growth, algae development, and unsafe water conditions, which create liability exposure and may result in code violations, fines, or mandated closure under City of Pasadena health and safety regulations. True and correct copies of those invoices and the vendor's January 22, 2026 notice are attached as **Exhibit SC-5**.

14. The Properties' landscaping and trees have not been properly maintained. In late 2025, after the City of Pasadena urgently contacted SDRES multiple times to ensure that landscaping and trees would be maintained in preparation for the Rose Parade, SDRES' manager performed "minimal" tree cutting that left historic trees lopsided and vegetation left overgrown. On December 9, 2025, the Code enforcement officer issued a weed/landscape violation against the 210 S. Orange Grove property. Trees on the property with active rat nests have not been removed as of February 2, 2026.

15. Athens Waste Services suspended trash collection service at 210 S. Orange Grove on January 1, 2026 due to non-payment, and Athens only agreed to resume trash service for 30 days after intervention.

16. The drain lines are frequently clogged. It is a persistent problem that has caused water to pool against the building and further flooding during storms. A true and correct copy of a picture of water pooling is attached as **Exhibit SC-6**.

17. Additionally, multiple instances of raw sewage have flowed inside and outside the 244-248 Buildings in recent months. On April 12, 2024, I was cc'd on an e-mail from Judy Moore, a tenant in the 248 Building to Jason Tung at Vierergruppe Management, Inc. (**"Vierergruppe"**) reporting rats, standing water, raw sewage in basement, raccoon issues, and overgrown trees. On

April 12, 2024, the City of Pasadena Code Enforcement Officer Yvonne Ramirez issued a 24-hour deadline for raw sewage remediation. On December 2, 2025, the City directed SDRES to remove sewage and stagnant water from the basement and front lawn and properly sanitize the areas by the compliance deadline. Management's response to sewage issues has been substandard and incomplete, and proper testing, cleaning, and remediation of sewage has not been performed as required by California law as of February 2, 2026.

18. The management company acting for the owner, Vierergruppe, has, since at least November, 2025, directed tenants to make rent payments to a JP Morgan Chase account held in the name of Vierergruppe (Routing: 322271627; Account: 2906385991) and to make rent checks payable to "SDRES Partners, LLC OR Vierergruppe Management Inc." This is a change from historic practice (rent payable to SDRES Partners, LLC, with deposits into Preferred Bank accounts). True and correct copies of the November 25, 2025 rent instruction email and the February 2026 rent statement with ACH/wire instructions to Vierergruppe's Chase account ONLY are attached as **Exhibit SC-7**.

19. I was cc'd on an e-mail from Walter Moore, a tenant in the 248 Building, requesting written proof of Vierergruppe's authority from SDRES to collect rent and to direct the payable name to "or Vierergruppe Management Inc." On January 27, 2026, Jason Tung, Assistant Property Manager at Vierergruppe, responded stating "checks must be made out this way or it will not clear Landlord's bank." Mr. Moore questioned the legal authority for adding "or" to the check payee, noting that "Putting 'or' on the check means someone other than the building owner can receive the funds" and that tenants had "not received any written authorization from the owner to pay rent to a third party." Mr. Tung stated he would "pass [the] request along to ownership to get something in writing and signed by ownership's representative," but as of February 2, 2026, no such written authorization has been provided. True and correct copies of these e-mail exchanges are attached as **Exhibit SC-8**.

20. Based on my review of the California Department of Real Estate (DRE) public license lookup, Vierergruppe Management, Inc. is in expired status and has no active supervising broker.

21. In addition to the nonpayment of vendors and utilities (including multiple shutoff notices in the past), I have received late notices for unpaid trash and other services. Vendors have told me they are not being paid for work on the Properties. There is also a recorded lien by the property association for unpaid community fees.

22. The current conditions present health and safety hazards, including rats, mold, raw sewage exposure, water shut-offs, unpermitted or unlicensed repairs to the water main in violation of California Code of Regulations, Title 22, Section 64572, broken floors that are trip and fall hazards with substandard flooring conditions inside and outside many or all units, cracked and peeling paint, cracked windows, broken window screens that allow air and water entry into living spaces, broken windows that may prohibit safe egress during an emergency, and substandard lighting in hallways and common areas which can lead to accidents, injury or death of residents. These conditions also threaten loss and impairment of the Properties through code enforcement penalties, potential tax sale due to delinquent property taxes, and deterioration of the structures.

23. The City of Pasadena has issued multiple administrative citations for violations including hazardous/unsanitary premises and hazardous plumbing, with compliance deadlines that have passed without full remediation. I personally know this because I have seen the citations myself. A true and correct copy of the two most recent citations are attached here as **Exhibit SC-9**.

24. The diversion of rents away from the owner's (SDRES) historic accounts to Vierergruppe's JP Morgan Chase account, without written authorization from SDRES and while Vierergruppe is unlicensed, creates a further risk of dissipation of the rental income stream that would otherwise be available to address taxes, insurance, and critical operations.

25. Immediate appointment of a receiver on an ex parte basis is necessary to preserve the Properties, protect my and the other tenants' health and safety, stabilize operations, sequester

and apply rents to urgent expenses (including delinquent taxes, insurance, utilities, maintenance, and repairs), and halt further diversion of assigned rents and mismanagement. Delay will risk additional code violations and fines, utility shutoffs, vendor service suspensions (including pool maintenance, which poses health and safety risks), further water and mold damage, and loss of collateral value. The 210 Building has been designated as a Historic Property by the City of Pasadena, and the 244 Building and the 248 Building are architecturally and historically significant 1920s-era structures that require proper maintenance to preserve their value.

26. I am willing and able to appear and testify if required. All exhibits referenced herein are true and correct copies of records I sent to Preferred Bank's counsel, or that I personally took or obtained. All exhibits referenced herein fairly and accurately depict the conditions and communications as of the dates indicated.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 24, 2026, at Pasadena, California.

[signature]

Steve Crist

# Exhibit SC-1

**EXHIBIT SC-1**

CITY OF PASADENA

# RENTAL REGISTRATION
## CERTIFICATE OF NONCOMPLIANCE

**CERTIFICATION NUMBER:**
RR2025-26144819

**ISSUANCE DATE:** 12/01/2025

**EXPIRATION DATE:** 08/31/2025

**SITE ADDRESS:**
244 S ORANGE GROVE BLVD PASADENA CA 91105

**ASSESSORS PARCEL NUMBER:**
5713027065

**THIS PROPERTY IS NOT REGISTERD**

The landlord has not substantially complied with their obligation to report information about the rental unit as required under the Pasadena Charter Article XVIII. Pursuant to Article XVIII, Section 1817(d), a landlord's failure to substantially comply with Article XVIII requirements may be raised as an affirmative defense by a tenant if an unlawful detainer action or other action is brought by the landlord to recover possession of the rental unit.

CITY OF PASADENA
RENT STABILIZATION DEPARTMENT
199 S. LOS ROBLES AVE, SUITE 350
PASADENA, CA 91101

To renew this certificate or for additional information, contact the Rent Stabilization Department at (626) 744-7999 or send us an e-mail at RentalRegistry@CityOfPasadena.net

# Exhibit SC-2

**EXHIBIT SC-2**









# Exhibit SC-3

**EXHIBIT SC-3**

On Sun, Jan 25, 2026, 1:47 PM Vincent Rojas <vincerojas@gmail.com> wrote:
Jennifer & Jason
Water is off in our apartment without any notice! What the hell is going on ???
Vincent Rojas
248 #101

On Sun, Jan 25, 2026 at 1:44 PM Walter Moore <walter@licensedtosue.com> wrote:
Dear Jennifer and Jason:

Our water is off, on a Sunday, without warning.

What is going on?

Sincerely,

Walter Whitman Moore
Licensed to Sue®
248 S. Orange Grove Blvd., Unit 102
Pasadena, CA 91105
310.692.0397
Walter@LicensedToSue.com

California Bar No. 115985
Texas Bar No. 24135529

On Jan 25, 2026, at 4:09 PM, Beth Andrews <beth.a.andrews7@gmail.com> wrote:

I just spoke to Albert. The main broke and the plumber won't come until tomorrow. This is an emergency and there needs to be ANY plumber called.

Beth
Sent from my iPhone

On Jan 25, 2026, at 2:59 PM, Jason Tung <jason@vgruppemanagement.com> wrote:

I was just notified that water was shut off to allow for emergency repairs.

Apologies for the lack of sufficient advance notice, and thank you for your attention to and understanding of this matter.

Jason Tung | Assistant Property Manager
Vierergruppe Management, Inc.
1932 East Deere Avenue, Suite 150
Santa Ana, CA 92705
(714) 442-0625 x403 (Voicemail ONLY) | (714) 442-1666 (Fax)
jason@vgruppemanagement.com

On Jan 27, 2026, at 15:47, Jason Tung <jason@vgruppemanagement.com> wrote:

Hi Judy,

Try running the water for a few minutes to allow trapped air to escape the system when the water line was depressurized after water was shut off to necessitate repairs. Once all the trapped air is let out, water flow should be consistent.

We're working on scheduling to send an assigned team back out to address issues brought to our attention.

As far as your monthly rental payment is concerned, please make payments out to as follows:

SDRES Partners, LLC or Vierergruppe Management Inc.
1932 E. Deere Ave. #150
Santa Ana, CA 92705

Sincerely,

Jason Tung | Assistant Property Manager
Vierergruppe Management, Inc.
1932 East Deere Avenue, Suite 150
Santa Ana, CA 92705
(714) 442-0625 x403 (Voicemail ONLY) | (714) 442-1666 (Fax)
jason@vgruppemanagement.com


EMERGENCY
GAS
SHUTOFF
VALVE

# Exhibit SC-4

**EXHIBIT SC-4**

SoCalGas.

## NOTICE OF SERVICE DISCONNECTION

JAN 16, 2026

**Dear Occupant:**

The gas service to the address listed below will be disconnected in approximately 15 days due to non-payment, unless payment of the full amount is received immediately from the Landlord.

**WHAT YOU CAN DO TO AVOID GAS SHUT-OFF**

Pursuant to California Public Utilities Code Section 777, if services are billed in your landlord's name, you have the right to become a customer of the utility, without paying for the past-due amount owing at this address. Tenants also have the right to deduct payment for such service from periodic rent payments.

If you decide to become a customer of the utility, you may need to establish credit by showing proof of prompt payment of rent, phone or cable utilities or payment on other acceptable kinds of debt over the last 12 months.

**DATE SERVICE WILL BE TERMINATED:**

**AVERAGE MONTHLY BILL FOR THIS ACCOUNT:** $531 63

**IF YOU NEED ASSISTANCE**

- **Contact your local Legal Aid Office for assistance.**
  9354 TELSTAR AVE
  EL MONTE, CA 91731
  (800) 433-6251

- **If you still have questions, please contact us at 1-800-427-2200 for assistance. We are available Monday-Friday, 7 a.m. ~ 8 p.m. and Saturday, 7 a.m. – 6p.m. We are closed Sundays and holidays. Representatives are available 24 hours, seven days a week (24/7), to handle emergency calls.**

063086.1 1.1.1733 1 Oz.

**Occupant**
248 S ORANGE GROVE BLVD
PASADENA CA 91105-3542

# Exhibit SC-5

**EXHIBIT SC-5**

From: Steve Vaughan <steve.vaughan127@gmail.com>
Date: On Thursday, January 22nd, 2026 at 10:23 AM
Subject: Urgent: Outstanding Balance & Safety Concerns – 244 S Orange Grove Blvd
To: Brenda Galeana <brenda@vgruppemanagement.com>, Jason Tung <jason@vgruppemanagement.com>
CC: susan.mcmurrayburnett@gmail.com <susan.mcmurrayburnett@gmail.com>, steve@stevecrist.com <steve@stevecrist.com>, madamemoore@mac.com <madamemoore@mac.com>, Doug Friedman <doug@yellowhappyface.com>

Hi Jason and Brenda,

We are writing to formally address the outstanding balance on the pool service account at 244 S Orange Grove Blvd, Pasadena, CA 91105. As of today, Thursday, January 22, we have not received payment for services rendered since September, despite continued maintenance and prior attempts to resolve this matter.

In addition to the unpaid balance, we must raise serious safety and compliance concerns.

Pools and fountains that are not properly maintained and chemically treated present significant health and safety risks, including bacterial growth, algae development, and unsafe water conditions. These hazards create liability exposure for residents, guests, property ownership, and property management.

The City of Pasadena enforces strict health and safety regulations for pools and spas at managed and multi-unit properties. Failure to maintain proper sanitation and water chemistry may result in code violations, fines, or mandated closure if unsafe conditions are identified.

At this time, we can no longer continue service under these circumstances.

**Immediate action is required:**

- Written response no later than Monday, January 26, and
- Full payment of the outstanding balance of $3,250.00 by Thursday, January 30

If we do not receive a response by January 26, or payment by January 30, we will be forced to suspend service at the property to avoid further liability and non-compliance with local health regulations.

This is not a step we take lightly; however, continued service without payment places both our company and the property at risk.

Please treat this matter with urgency and advise how you wish to proceed.

Sincerely,

Katrina Vaughan

Steve Vaughan Pool & Spa

626-241-4158

# Exhibit SC-6

**EXHIBIT SC-6**





# Exhibit SC-7

**EXHIBIT SC-7**

From: SDRES Partners, LLC <communications@vgruppe.mailer.appfolio.us>
Date: On Tuesday, January 27th, 2026 at 3:03 PM
Subject: February 2026 Rent Statement
To: gloriafowlercrist@gmail.com <gloriafowlercrist@gmail.com>, steve@stevecrist.com <steve@stevecrist.com>

Attached is your February 2026 Rent Statement.

Preferred Method – ACH / Bank Wire:
Bank: JPMorgan Chase
Routing: 322271627
Account: 2906385991
Account Holder: Vierergruppe Management Inc.

If paying by check:
Check payable to: Vierergruppe Management Inc.
Mail to: 1932 E. Deere Ave., Suite 150, Santa Ana, CA 92705.

Should you have any questions, please contact your property manager. Please do not respond to this email as it is not being monitored.

Thank you,

Vierergruppe Management, Inc

# Exhibit SC-8

**EXHIBIT SC-8**

On Jan 27, 2026, at 15:47, Jason Tung <jason@vgruppemanagement.com> wrote:

Hi Judy,

Try running the water for a few minutes to allow trapped air to escape the system when the water line was depressurized after water was shut off to necessitate repairs. Once all the trapped air is let out, water flow should be consistent.

We're working on scheduling to send an assigned team back out to address issues brought to our attention.

As far as your monthly rental payment is concerned, please make payments out to as follows:

SDRES Partners, LLC or Vierergruppe Management Inc.
1932 E. Deere Ave. #150
Santa Ana, CA 92705

Sincerely,

Jason Tung | Assistant Property Manager
Vierergruppe Management, Inc.
1932 East Deere Avenue, Suite 150
Santa Ana, CA 92705
(714) 442-0625 x403 (Voicemail ONLY) | (714) 442-1666 (Fax)
jason@vgruppemanagement.com

On Tue, Jan 27, 2026, 3:57 PM Walter Moore <walter@licensedtosue.com> wrote:

Dear Jason:

What is the legal or contractual authority for adding "or" to the check?

The building owner is entitled to rent. Putting "or" on the check means someone other than the building owner can receive the funds.

We have not received any written authorization from the owner to pay rent to a third party. Nor can I think of any legitimate reason for doing so.

If I were a creditor of the landlord -- which, actually, I probably am at this point -- I might interpret such a practice as a means to hinder my ability to collect on debts. I respectfully suggest that your firm get a licensed real estate broker, and then have the broker speak with an attorney. (Civ. Code §§ 3439-3439.14 [Uniform Voidable Transactions Act]; Pen. Code §§ 154-155 [fraudulent conveyances].)

Sincerely,

Walter Whitman Moore
Licensed to Sue®
248 S. Orange Grove Blvd., Unit 102
Pasadena, CA 91105
310.692.0397
Walter@LicensedToSue.com

California Bar No. 115985
Texas Bar No. 24135529

On Jan 27, 2026, at 16:05, Jason Tung <jason@vgruppemanagement.com> wrote:

Hi Walter,

Thank you for your response.

To be clear, I am facilitating information that was given to me by ownership.

I respect your decision to question this information, but checks must be made out this way or it will not clear Landlord's bank.

I can pass along ACH information for Landlord's bank account if paper check payment is objectionable.

Sincerely,

Jason Tung | Assistant Property Manager
Vierergruppe Management, Inc.
1932 East Deere Avenue, Suite 150
Santa Ana, CA 92705
(714) 442-0625 x403 (Voicemail ONLY) | (714) 442-1666 (Fax)
jason@vgruppemanagement.com

On Tue, Jan 27, 2026, 4:16 PM Walter Moore <walter@licensedtosue.com> wrote:

Dear Jason:

If you could get us something in writing, signed by the landlord, that would help.

The thing about agency is that the principal must confirm that the agent is, in fact, the principal's agent, and has authority to accept funds.

And it's going to need to be more than an email, obviously; something with a real signature from a person who is actually a manager of the LLC. That way, we, and any creditors, will have a paper trail as to who authorized the payment of checks to someone other than then entity that actually holds title to the property.

Walter Whitman Moore
Licensed to Sue®
248 S. Orange Grove Blvd., Unit 102
Pasadena, CA 91105
310.692.0397
Walter@LicensedToSue.com

California Bar No. 115985
Texas Bar No. 24135529

On Jan 27, 2026, at 16:23, Jason Tung <jason@vgruppemanagement.com> wrote:

Hi Walter,

I will pass your request along to ownership to get something in writing and signed by ownership's representative.

Sincerely,

Jason Tung | Assistant Property Manager
Vierergruppe Management, Inc.
1932 East Deere Avenue, Suite 150
Santa Ana, CA 92705
(714) 442-0625 x403 (Voicemail ONLY) | (714) 442-1666 (Fax)
jason@vgruppemanagement.com

Re: 244 and 248 S. Orange Grove - No Authorization Received from SDRES for Checks Payable to "SDRES or Vier...

WM Walter Moore <walter@licensedtosue.com>
To Jason Tung
Cc Judy Moore; Beth Andrews; Jennifer Lovelace; Vincent Rojas; Steve Crist; Jerome Andrews; Renée Dominique; Gloria Fowler Crist; Kathleen R; +5 others

Reply | Reply All | Forward | ...

Fri 1/30/2026 10:20 AM

(i) If there are problems with how this message is displayed, click here to view it in a web browser.

[WARNING: EXTERNAL SENDER]

Dear Jason:

This will confirm that I have received nothing in writing -- or orally, for that matter -- from SDRES that directs or authorizes tenants to make their rent checks out to "SDRES or Vierergruppe Management, Inc."

As I explained in my email below, putting the "or" on a check would allow Vierergruppe to cash the checks on its own, thereby possibly defrauding the creditors of SDRES.

Making matters worse, Vierergruppe, according to the Department of Real Estate's website today, still is not affiliated with any real estate broker. I know that you are a broker, but you apparently have opted against acting as Vierergruppe's designated broker. Nor has anyone else taken that position. It therefore seems to me that Vierergruppe cannot legally be acting as a property manager for SDRES or Vierergruppe. If I'm wrong about that, by all means, explain to me how or why Vierergruppe can engage in property management without having a designated broker.

Insofar as the rent for February is almost due, and I have received nothing from SDRES, the actual owner of the property, authorizing us to make checks payable to "SDRES or Vierergruppe Management, Inc.," we will be making the check out only to SDRES.

That said, if you ever do get a signed, written document from SDRES authorizing tenants to make checks out as you requested, please forward same to me and the other tenants.

Sincerely,

Walter Whitman Moore
Licensed to Sue®
248 S. Orange Grove Blvd., Unit 102
Pasadena, CA 91105
310.692.0397
Walter@LicensedToSue.com

# Exhibit SC-9

**EXHIBIT SC-9**

**City of Pasadena**
**Planning & Community Development**
**Code Compliance Division**
175 N Garfield Avenue
Pasadena, CA 91101

# Administrative Citation

**Order to Pay and Remedy**

**Case Number: CTP2025-02408**

**Date of Violation(s): 12/29/2025**

**Manager:** SDRES Partners, LLC c/o Vierergruppe Management, Inc
Attn: Brenda Galeana

**Citation/Invoice Number: INV0092604**

**Mailing Address**

SDRES Partners, LLC c/o Vierergruppe Management, Inc Attn: Brenda Galeana
1932 East Deere Avenue Suite 150
Santa Ana, CA 92705

| **Location of Code Violation(s):** | **Parcel** |
|---|---|
| 248 S ORANGE GROVE BLVD APARTMENT<br>PASADENA, CA 91105 | 5713-027-062 |

**Description of Violation(s):**

| |
|---|
| **Violation:** P.M.C. 14.12.640 - Hazardous Plumbing<br>Hazardous Plumbing: Hazardous plumbing is all plumbing except that which conformed with all applicable laws in effect at the time of installation and which has been maintained in good condition and which is free of cross-connections and siphonage between fixtures. |
| **Corrective Action:** All plumbing must be free of water leakage, corrosion, breaks, and be in conformance with applicable laws at the time of installation. Must repair all sewage leaks. |
| **Compliance Date:** 12/30/2025 |
| **3rd Citation:** $500.00 |
| **Violation:** P.M.C. 14.12.690 - Hazardous or Unsanitary Premises<br>Hazardous or Unsanitary Premises: Those premises on which an accumulation of weeds, vegetation, junk, dead organic matter, debris, garbage, offal, rat harborages, stagnant water, combustible materials and similar materials or conditions exist constitute fire, health or safety hazards. |
| **Corrective Action:** Must remove all sewage and stagnant water from basement and front lawn and properly sanitize the areas within 24 hours. |
| **Compliance Date:** 12/30/2025 |
| **3rd Citation:** $500.00 |

**Penalties Total Amount: $1,000.00**

Failure to correct the violation(s) by the date indicated may result in the imposition of additional citations (P.M.C. 1.26.060) and other remedies.

If you have questions, please contact :

*Yvonne Ramirez*

Yvonne Ramirez
Code Compliance Officer
Phone: (626) 744-6728
Email: yramirez@cityofpasadena.net

**City of Pasadena**
**Planning & Community Development**
**Code Compliance Division**
175 N Garfield Avenue
Pasadena, CA 91101

# Administrative Citation

**Order to Pay and Remedy**

**Case Number:** CTP2025-02408

**Date of Violation(s):** 1/2/2026

**Manager:** SDRES Partners, LLC c/o Vierergruppe Management, Inc
Attn: Brenda Galeana

**Citation/Invoice Number:** INV0092779

**Mailing Address**

SDRES Partners, LLC c/o Vierergruppe Management, Inc Attn: Brenda Galeana
1932 East Deere Avenue Suite 150
Santa Ana, CA 92705

| **Location of Code Violation(s):** | **Parcel** |
|---|---|
| 248 S ORANGE GROVE BLVD APARTMENT<br>PASADENA, CA 91105 | 5713-027-062 |

**Description of Violation(s):**

**Violation:** P.M.C. 14.12.690 - Hazardous or Unsanitary Premises
Hazardous or Unsanitary Premises: Those premises on which an accumulation of weeds, vegetation, junk, dead organic matter, debris, garbage, offal, rat harborages, stagnant water, combustible materials and similar materials or conditions exist constitute fire, health or safety hazards.

**Corrective Action:** Must remove all sewage and stagnant water from basement and front lawn and properly sanitize the areas within 24 hours.

**Compliance Date:** 1/4/2026

**4th Citation:** $1,000.00

**Penalties Total Amount: $1,000.00**

Failure to correct the violation(s) by the date indicated may result in the imposition of additional citations (P.M.C. 1.26.060) and other remedies.

If you have questions, please contact :

*Yvonne Ramirez*

Yvonne Ramirez
Code Compliance Officer
Phone: (626) 744-6728
Email: yramirez@cityofpasadena.net

# EXHIBIT "D"

ERVIN COHEN & JESSUP LLP

9401 Wilshire Blvd., 12th Floor
Beverly Hills, CA 90212-2944
dallen@ecjlaw.com
PH: 310.281.6356
File 13373-48

March 17, 2026

**VIA E-MAIL AND U.S. MAIL**

Joseph Rothberg, Esq.
Levene, Neale, Bender, Yoo & Golubchik, LLP
2818 La Cienega Avenue
Los Angeles, California 90034
E-Mail: jmr@lnbyg.com

Re: *PREFERRED BANK v. SDRES PARTNERS LLC.* (Case No. 26NNCV01136)
**Court-Appointed Receiver Byron Z. Moldo – Turnover and Cooperation Request**

Dear Mr. Rothberg:

This law firm represents Court-appointed Receiver Byron Z. Moldo (the "**Receiver**") in the above-referenced matter.

As you are aware, on March 11, 2026, the Court entered an Amended *Ex Parte* Order Appointing Receiver and Temporary Restraining Order (the "**Appointment Order**"), a copy of which is enclosed for your review. The Appointment Order provides that, among other things, the Receiver is authorized to take immediate possession and control over the following real properties (collectively, the "**Properties**"):

- 210 South Orange Grove Boulevard, Pasadena, California
- 244 South Orange Grove Boulevard, Pasadena, California
- 248 South Orange Grove Boulevard, Pasadena, California

The terms of the Appointment Order are unequivocal. The Receiver is authorized to operate the Properties and take possession of all accounts relating thereto. In addition, the Court has ordered Defendants to immediately turn over possession of the Properties, together with all related funds, records, and information, and to refrain from interfering with the Receiver's duties, including specific obligations set forth in Paragraph 31(a)–(c) of the Appointment Order.

Pursuant to the Appointment Order, the Receiver hereby requests that you and your client promptly comply with its provisions, and take all action and provide all information specified below:

1. **Funds**: Turn over all funds relating to the Properties, including without limitation any security deposits, prepaid rent, rental payments, and funds held in any property management or operating accounts. Please coordinate with the undersigned regarding transfer of such funds. Wiring instructions can be provided upon request, and the Receiver will also accept a check payable to "Byron Z. Moldo, Receiver" for deposit into the receivership account;

2. **Tax Identification Numbers/Social Security Numbers**: Provide any and all tax identification numbers utilized in connection with the Properties;

3. **Access To Properties**: Provide all keys, entry codes, security codes, or similar devices, in connection with the Properties;

4. **Utilities/Vendors/Property Management**: Provide access credentials and/or facilitate payment of all utilities, including internet/telecommunications (e.g., user identification information and passwords). Provide contact information for all vendors (e.g., janitorial, employees, property managers, agencies, as well as information regarding existing balances and amounts owed;

5. **Lease Agreements**: Provide copies of all lease and rental agreements (executory or non-executory, past or present), alternative lease agreements, amendments, supplemental information incorporated into lease agreements, and the contact information for each lessee;

6. **Insurance Policies/Insurance Agent**: Provide all information and documents establishing insurance policies, coverage, names of the insured parties, types of insurance, whether insurance and coverages were, in fact, obtained, the insurance payment information utilized in the regular course of business, and the contact information for the insurance agent or broker. Moreover, the Receiver must immediately be added to the policies as an additional insured. Please take all necessary steps to do so immediately and provide proof that the Receiver has been named as an additional insured;

7. **Records**: Provide any and all books, records, books of account, ledgers, operating statements, budgets, bills, contracts, and all other business records relating to the

Properties, wherever located, and in whatever mode maintained (e.g., computers, software), banking records, statements, and cancelled checks;

8. **Third Parties**: Direct third parties in possession of any of the above-mentioned items to immediately turn over such items to the Receiver.

To coordinate the efficient transfer of the above-referenced items, please contact the Receiver and/or his counsel, Dylan Allen:

Byron Z Moldo: bmoldo@ecjlaw.com or via telephone at (310) 281-6354.

Dylan Allen: dallen@ecjlaw.com or via telephone at (310) 281-6356.

The Receiver's objective is to facilitate an orderly transition consistent with the Court's directives. Your prompt cooperation is greatly appreciated.

We look forward to hearing from you.

Regards,

Dylan Allen

Enclosures: Appointment Order

cc: Byron Z. Moldo , Court-appointed Receiver

Electronically Received 03/10/2026 06:21 PM

RC-200

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):*
John A. Moe, II (SBN 66893)
Dentons US LLP
601 S. Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
TELEPHONE NO.: (213) 623-9300 FAX NO. *(Optional):* (213) 623-9924
E-MAIL ADDRESS *(Optional):* john.moe@dentons.com
ATTORNEY FOR *(Name):* Preferred Bank

*FOR COURT USE ONLY*

FILED
Superior Court of California
County of Los Angeles
03/11/2026
David W. Slayton, Executive Officer / Clerk of Court
By: I. Yin Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 150 West Commonwealth
MAILING ADDRESS:
CITY AND ZIP CODE: Alhambra, CA 91801
BRANCH NAME: Northeast District – Alhambra Courthouse

PLAINTIFF: PREFERRED BANK

DEFENDANT: SDRES PARTNERS LLC

**AMENDED EX PARTE ORDER APPOINTING RECEIVER AND ORDER TO SHOW CAUSE ☒ AND TEMPORARY RESTRAINING ORDER—RENTS, ISSUES, AND PROFITS**

CASE NUMBER: 26NNCV01136

## NOTICE OF HEARING

| Date: April 3, 2026 | Time: 10:00 a.m. | Dept.: T | Room: |
|---|---|---|---|

The address of the court ☒ is shown above ☐ is *(specify):*

## ORDER TO SHOW CAUSE

1. **To defendant** *(name each):* SDRES Partners LLC

2. **THE COURT ORDERS** the defendants named in item 1 to appear in this court at the date, time, and place shown in the box above to give any legal reason
   a. Why a receiver should not be confirmed to
      (1) take possession and continue in possession of the property described in Attachment 2a *(attach a description of the real and personal property subject to the receivership) (the "property"),* and
      (2) manage the property in accordance with this order until further order of this court.
   b. Why you should not be prohibited from controlling or receiving any income from the property described in Attachment 2a.

## ORDER APPOINTING RECEIVER

**THE COURT ORDERS, pending the hearing on the Ex Parte Order to Show Cause, the following:**

3. **Receiver.** *(Name):* Byron Z. Moldo
   is appointed as receiver to take possession of the property described in Attachment 2a.

4. **Receiver's oath and bond.** The receiver shall immediately, and before performing any duties:
   a. execute and file a receiver's oath, and
   b. file the bond required by Code of Civil Procedure section 567(b) in the amount of: $ 10,000

5. **Receiver's fees.** The receiver may charge for the receiver's services no more than *(check all that apply):*
   a. ☒ $ 600.00 ☐ per month ☒ per hour ☐ other *(specify):*
   b. ☐ percent of gross monthly rents
   c. ☐ the greater of a or b
   d. ☐ $ as a one-time start-up fee

6. ☒ **Management company.** The receiver may employ the management company of *(name):* Jalmar Properties, Inc.
   a. ☒ The receiver may pay the company not more than
      (1) ☒ $ 2,500.00 ☒ per month ☐ per hour ☐ other *(specify):*
      (2) ☒ 5 percent of gross monthly rents
      (3) ☒ the greater of (1) or (2)
      (4) ☐ $ as a one-time start-up fee
   b. ☐ Management company fees are included in receiver's fees in item 5.

7. **Disclosure.** The receiver shall immediately disclose to all parties any financial relationship between the receiver and any company hired to assist in the management of the receivership property.

8. **Plaintiff's ex parte bond.** Plaintiff shall immediately file an applicant's bond under Code of Civil Procedure section 566(b) in the amount of: $ 10,000

9. **General duties.** After qualifying, the receiver
   a. shall take possession of and manage the property,
   b. shall collect the income from the property,
   c. shall care for the property and may incur the expenses necessary for that care, and
   d. may change the locks on the property.

10. **Prohibited agreements.** The receiver shall not enter into an agreement with any party to this action about the administration of the receivership or about any postreceivership matter.

11. **Inventory.** Within 30 days after qualifying, the receiver shall file an inventory of all property possessed under this order.

12. **Expenditures.** The receiver shall expend money coming into his or her possession to operate and preserve the property and only for the purposes authorized in this order. Unless the court orders otherwise, the receiver shall to the extent practical hold the balance in interest-bearing accounts in accordance with Code of Civil Procedure section 569.

13. **Leases and rentals.** The receiver may without court approval enter into leases for a term not exceeding one year, obtain and evict tenants, and set and modify the amounts and terms of leases.

14. **Security deposits.** Unless the security deposit has been turned over or paid to the receiver, the receiver shall not refund a deposit to a tenant.

15. **Monthly accounting of receiver's income, expenses, and fees.**
    a. The receiver shall each month prepare and serve on the parties, but not file, an accounting of the income and expenses incurred in the administration of the receivership property, including the receiver's fees and expenses.
    b. The receiver may pay the receiver's own fees and expenses only by the following procedures:
       (1) By serving on all parties a notice of intent to pay to which no objection is served on the receiver within 20 days of the date the notice is served.
       (2) By serving and filing a request for interim payment, which the court then approves.
       (3) By obtaining and filing an agreement among all the parties approving the payment, which the court then approves.
       (4) By filing the receiver's final accounting and report, which the court then approves.
    c. The receiver shall not reimburse the receiver for the receiver's general office administration expenses or overhead without court approval. These expenses include, for example, office supplies and employee payroll, benefits, and taxes.

16. **Management.**
    a. The receiver shall operate the property and take possession of all accounts relating to the property.
    b. The receiver may
       (1) employ agents, employees, clerks, accountants, and property managers to administer the receivership property, and
       (2) purchase materials, supplies, and services reasonably necessary to administer the receivership property.
    c. The receiver may do all the things, and incur the risks and obligations, ordinarily done or incurred by owners, managers, and operators of businesses and property similar to that possessed by the receiver; *except* the receiver shall not make any capital improvements to the property without prior court approval.

| PLAINTIFF *(Name)*: PREFERRED BANK<br>DEFENDANT *(Name)*: SDRES PARTNERS LLC | CASE NUMBER:<br>26NNCV01136 |
|---|---|

17. **Bank accounts.** The receiver
    a. may establish accounts at any financial institutions insured by an agency of the United States government that are not parties to this proceeding,
    b. shall deposit in those accounts funds received in connection with the receivership property, and
    c. shall deposit in interest-bearing accounts money not expended for receivership purposes.

18. **Court instructions.** The receiver and the parties may at any time apply to this court for further instructions and orders and for additional powers necessary to enable the receiver to perform the receiver's duties properly.

19. **Insurance.**
    a. The receiver shall determine upon taking possession of the property whether there is sufficient insurance coverage.
    b. The receiver shall notify the insurer that the receiver is to be named as an additional insured on each insurance policy on the property.
    c. If the receiver determines that the property does not have sufficient insurance coverage, the receiver shall immediately notify the parties and shall procure sufficient all-risk and liability insurance on the property (excluding earthquake and flood insurance).
    d. If the receiver does not have sufficient funds to obtain insurance, the receiver shall seek instructions from the court on whether to obtain insurance and how it is to be paid for.

20. **Employment of attorneys.**
    a. The receiver may employ unlawful detainer attorneys and eviction services without a court order.
    b. ☐ The receiver may employ counsel *(name):*
       at the hourly rate of: $
    c. ☒ Except as provided in items 20a and 27d, before employing counsel the receiver shall apply to the court for an order authorizing the receiver to employ counsel.

21. **Taxpayer ID numbers.** The receiver may use any federal taxpayer identification numbers relating to the property for any lawful purpose.

22. **Duty to turn over possession.** Upon receipt of a copy of a recorded trustee's deed upon foreclosure or written notice from plaintiff that defendant has cured the defaults existing under plaintiff's loan documents or that plaintiff has accepted a deed in lieu of foreclosure, the receiver shall, without further order of the court, turn over possession of the property to the successful purchaser or defendant or plaintiff respectively.

23. **Plaintiff's notification of termination.** Plaintiff shall notify the receiver in writing within 48 hours of any event within plaintiff's knowledge that terminates the receivership.

24. **Receiver's final report and account and discharge.**
    a. *Motion required.* Discharge of the receiver shall require a court order upon noticed motion for approval of the receiver's final report and account and exoneration of the receiver's bond.
    b. *Time.* Not later than 60 days after the receivership terminates, the receiver shall file, serve, and obtain a hearing date on a motion for discharge and approval of the final report and account.
    c. *Notice.* The receiver shall give notice to all persons of whom the receiver is aware who have potential claims against the receivership property.
    d. *Contents of motion.* The motion to approve the final report and account and for discharge of the receiver shall contain the following:
       (1) *Declaration or declarations. A* declaration or declarations: (i) stating what was done during the receivership, (ii) certifying the accuracy of the final accounting, (iii) stating the basis for the termination of the receivership (such as foreclosure or reinstatement), and (iv) stating the basis for an order for the distribution of any surplus or payment of any deficit.
       (2) *Accounting summary. A* summary of the receivership accounting, which shall include (i) the total revenues received, (ii) the total expenditures identified and enumerated by major categories, (iii) the net amount of any surplus or deficit, and (iv) evidence of necessary supporting facts.

| PLAINTIFF *(Name)*: PREFERRED BANK<br>DEFENDANT *(Name)*: SDRES PARTNERS LLC | CASE NUMBER:<br>26NNCV01136 |
|---|---|

25. **Plaintiff's notice to receiver.** Plaintiff shall promptly notify the receiver in writing of the names, addresses, and telephone numbers of all parties who appear in the action and their counsel. The parties shall give notice to the receiver of all events that affect the receivership.

26. **Bankruptcy Plaintiff's duty to give notice.** If a defendant files a bankruptcy case during the receivership, plaintiff shall give notice of the bankruptcy case to the court, to all parties, and to the receiver by the close of the next business day after the day on which plaintiff receives notice of the bankruptcy filing.

27. **Bankruptcy Receiver's duties.** If the receiver receives notice that a bankruptcy has been filed and part of the bankruptcy estate includes property that is the subject of this order, the receiver shall have the following duties:
    a. *Turn over property if no relief from stay will besought.* The receiver shall immediately contact the party who obtained the appointment of the receiver and determine whether that party intends to move in the bankruptcy court for an order for (1) relief from the automatic stay, and (2) relief from the receiver's obligation to turn over the property (11 U.S.C. § 543). If the party has no intention to make such a motion, the receiver shall immediately turn over the property to the appropriate entity either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession - and otherwise comply with 11 United States Code section 543.
    b. *Remain in possession pending resolution.* If the party who obtained the receivership intends to seek relief immediately from both the automatic stay and the receiver's obligation to turn over the property, the receiver may remain in possession and preserve the property pending the ruling on those motions (11 U.S.C. § 543(a)). The receiver's authority to preserve the property shall be limited as follows:
        (1) The receiver may continue to collect rents and other income;
        (2) The receiver may make only those disbursements necessary to preserve and protect the property;
        (3) The receiver shall not execute any new leases or other long-term contracts; and
        (4) The receiver shall do nothing that would effect a material change in the circumstances of the property.
    c. *Turn over property if no motion for relief is filed within 10 days after notice of the bankruptcy.* If the party who obtained the receivership fails to file a motion within 10 court days after his or her receipt of notice of the bankruptcy filing, the receiver shall immediately turn over the property to the appropriate entity either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession and otherwise comply with 11 United States Code section 543.
    d. *Retain bankruptcy counsel.* The receiver may petition the court to retain legal counsel to assist the receiver with issues arising out of the bankruptcy proceedings that affect the receivership.

28. **Failure to turn over property.** A receiver who fails to turn over the property in accordance with this order shall not be paid for time and expenses after the date on which the receiver should have turned the property over.

29. ☐ **Other orders.** *(Additional orders may include authority of the receiver to do any other acts arising from special circumstances.)* Other orders ☐ are specified in Attachment 29 ☐ are as follows *(specify):*

| PLAINTIFF *(Name)*: PREFERRED BANK<br>DEFENDANT *(Name)*: SDRES PARTNERS LLC | CASE NUMBER:<br>26NNCV01136 |
|---|---|

## ☒ TEMPORARY RESTRAINING ORDER

30. **THIS ORDER EXPIRES AT THE DATE AND TIME OF THE HEARING SHOWN IN THE BOX ON PAGE ONE (UNDER "NOTICE OF HEARING") UNLESS EXTENDED BY THE COURT.**

31. **THE COURT ORDERS DEFENDANT** to do the following:
   a. **Turn over property.** Immediately turn over possession of the property described in Attachment 2a to the receiver when the appointment becomes effective, including any security deposits, prepaid rent, other rental or lease payments, and funds in property management bank accounts for the property.
   b. **Turn over related items.** Immediately turn over to the receiver all keys, books, documents, and records relating to the property and advise the receiver of federal taxpayer identification numbers relating to the property.
   c. **Insurance.**
      (1) Immediately advise the receiver about the nature and extent of insurance coverage on the property;
      (2) Immediately name the receiver as an additional insured on each insurance policy on the property; and
      (3) DO NOT cancel, reduce, or modify the insurance coverage.
   d. **Restraints.** Refrain from
      (1) committing or permitting any waste on the property or any act on the property in violation of law or removing, encumbering, or otherwise disposing of any of the fixtures on the property;
      (2) demanding, collecting, or in any other way diverting or using any of the rents from the property;
      (3) interfering in any manner with the discharge of the receiver's duties under this order;
      (4) selling, transferring, disposing, encumbering, or concealing the property without a prior court order; and
      (5) doing any act that will impair the preservation of the property or plaintiff's interest in the property.
   e. ☐ **Other** *(specify)*:

32. **THE COURT ORDERS PLAINTIFF** to immediately file a temporary restraining order bond under Code of Civil Procedure section 529 in the amount of: $ 10,000

33. ☐ **OTHER ORDERS** ☐ are specified in Attachment 33 ☐ are as follows *(specify)*:

## SERVICE AND BRIEFING SCHEDULE

34. By *(date)*: March 13, 2026 **PLAINTIFF IS ORDERED** to personally serve on each defendant or counsel and any other appearing parties, and to file proof of service of, the summons and complaint, the memorandum of points and authorities, these orders, and all declarations and supporting papers.

35. By *(date)*: March 23, 2026 **DEFENDANT IS ORDERED** to personally serve on each plaintiff or counsel and any other appearing parties, and to file proof of service of, any opposition to these orders.

36. By *(date)*: March 30, 2026 **PLAINTIFF IS ORDERED** to personally serve on each defendant or counsel, and to file proof of service of, any reply to defendant's opposition to these orders.

37. Number of pages attached: 1

Date: March 11, 2026

JUDGE OF THE SUPERIOR COURT

Ian C. Fusselman



**AMENDED EX PARTE ORDER APPOINTING RECEIVER AND ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER—RENTS, ISSUES, AND PROFITS (Receivership)**

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

Attachment 2a to Amended Ex Parte Order Appointing Receiver and Order to Show Cause and Temporary Restraining Order – Rents, Issues, and Profits

210 South Orange Grove Boulevard, Pasadena, California

244 South Orange Grove Boulevard, California

248 South Orange Grove Boulevard, California

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

# PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California, I am over the age of 18 and not a party to the within action. My business address is: ☒ 601 So. Figueroa Street, Suite 2500, Los Angeles, CA 90017. ☐ ACE Attorney Service, 800 South Figueroa Street, Suite 900, Los Angeles, CA 90017.

On March 10, 2026, I served the foregoing document, described as **AMENDED EX PARTE ORDER APPOINTING RECEIVER AND ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER – RENTS, ISSUES, AND PROFITS** on the interested parties in this action, as follows:

Joe Rothberg
Levene, Neale, Bender, Yoo & Golubchik, LLP
2818 La Cienega Avenue
Los Angeles, California 90034
E-Mail: jmr@lnbyg.com
(BY E-MAIL AND U. S. MAIL)

Northwest Registered Agent, Inc.
Attn: Elle
2108 N Street, Suite N
Sacramento, CA 95816-5712
E-Mail: support@NorthwestAgent.com
(BY E-MAIL AND U. S. MAIL))

Walter Whitman Moore
248 South Orange Grove Avenue
Pasadena, California 91105
E-Mail: walter@licensedtosue.com
(BY E-MAIL AND U. S. MAIL))

☒ **(VIA ELECTRONIC MAIL)** I transmitted the above document(s) by electronic mail to the interested parties via the e-mail addresses listed above for each party.

☒ **(VIA MAIL)** I placed a true copy of the foregoing document in an envelope addressed to each interested party as set forth above. I sealed each such envelope, and placed same, with postage thereon fully prepaid, for collection and mailing at Dentons US LLP, Los Angeles, California 90017. I am readily familiar with Dentons US LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service. Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 10, 2026, at Los Angeles, California.

[signature]
Alicia Aguilar

# EXHIBIT “E”

ERVIN COHEN & JESSUP LLP

9401 Wilshire Blvd., 12th Floor
Beverly Hills, CA 90212-2944
dallen@ecjlaw.com
PH: 310.281.6356
13373.48

April 20, 2026

**VIA E-MAIL AND U.S. MAIL**

Brandon Q. Tran, Esq.
Dhillon Law Group Inc.
4675 MacArthur Court, Suite 1410
Newport Beach, California 92660
E-Mail: btran@dhillonlaw.com

Re: *PREFERRED BANK v. SDRES PARTNERS LLC.* (Case No. 26NNCV01136)
**Court-Appointed Receiver Byron Z. Moldo – Demand for Financial Records and Information**

Dear Mr. Tran:

As you are aware, pursuant to the Court's Amended Ex Parte Order Appointing Receiver and Temporary Restraining Order entered on March 11, 2026 (the "Appointment Order"), the Receiver has been granted authority to take possession and control of all accounts, records, and financial information relating to the subject properties (the "Properties"), and Defendants and their agents, including Vierergruppe Group Management ("Vierergruppe"), are required to fully cooperate and turn over such materials. See a true and correct copy of the Appointment Order attached hereto.

Vierergruppe served as the property manager for the Properties prior to the Receiver's appointment, and is therefore in possession of financial records and information necessary for the Receiver to discharge his duties.

Accordingly, on behalf of the Receiver, we hereby demand that you and your client produce the following additional documents and information:

1. A detailed general ledger for the Properties from January 1, 2026 through the present;
2. A written explanation and supporting documentation regarding the "other income" in the amount of approximately $80,000 received in or about January 2026;
3. A current list of all outstanding accounts payable;

4. A current list of all outstanding accounts receivable, including amounts owed by tenants;
5. Tenant ledgers for all current and former tenants;
6. A complete accounting of all security deposits received from tenants, together with immediate turnover of those funds to the Receiver; and
7. Copies of all insurance policies relating to the Properties.

The foregoing materials are required to allow the Receiver to accurately assess the financial condition of the Properties and to ensure compliance with the Court's orders.

Please provide all responsive documents and information no later than April 27, 2026. Production may be made electronically. If your client contends that any responsive information is unavailable, please provide a written explanation identifying what is missing and why.

We appreciate your attention to this matter and look forward to your timely response.

Regards,

Dylan Allen

cc: Byron Z. Moldo , Court-appointed Receiver

RC-200

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)*: | *FOR COURT USE ONLY* |
|---|---|
| John A. Moe, II (SBN 66893)<br>Dentons US LLP<br>601 S. Figueroa Street, Suite 2500<br>Los Angeles, CA 90017-5704<br>TELEPHONE NO.: (213) 623-9300 FAX NO. *(Optional)*: (213) 623-9924<br>E-MAIL ADDRESS *(Optional)*: john.moe@dentons.com<br>ATTORNEY FOR *(Name)*: Preferred Bank | |
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**<br>STREET ADDRESS: 150 West Commonwealth<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: Alhambra, CA 91801<br>BRANCH NAME: Northeast District – Alhambra Courthouse | |
| PLAINTIFF: PREFERRED BANK<br><br>DEFENDANT: SDRES PARTNERS LLC | |
| **AMENDED EX PARTE ORDER APPOINTING RECEIVER AND ORDER TO SHOW CAUSE ☒ AND TEMPORARY RESTRAINING ORDER—RENTS, ISSUES, AND PROFITS** | CASE NUMBER:<br>26NNCV01136 |

**NOTICE OF HEARING**

| Date: April 3, 2026 | Time: 10:00 a.m. | Dept.: T | Room: |
|---|---|---|---|

The address of the court ☒ is shown above ☐ is *(specify)*:

**ORDER TO SHOW CAUSE**

1. **To defendant** *(name each)*: SDRES Partners LLC

2. **THE COURT ORDERS** the defendants named in item 1 to appear in this court at the date, time, and place shown in the box above to give any legal reason
   a. Why a receiver should not be confirmed to
      (1) take possession and continue in possession of the property described in Attachment 2a *(attach a description of the real and personal property subject to the receivership) (the "property"),* and
      (2) manage the property in accordance with this order until further order of this court.
   b. Why you should not be prohibited from controlling or receiving any income from the property described in Attachment 2a.

**ORDER APPOINTING RECEIVER**

**THE COURT ORDERS, pending the hearing on the Ex Parte Order to Show Cause, the following:**

3. **Receiver.** *(Name)*: Byron Z. Moldo
   is appointed as receiver to take possession of the property described in Attachment 2a.

4. **Receiver's oath and bond.** The receiver shall immediately, and before performing any duties:
   a. execute and file a receiver's oath, and
   b. file the bond required by Code of Civil Procedure section 567(b) in the amount of: $ 10,000

5. **Receiver's fees.** The receiver may charge for the receiver's services no more than *(check all that apply)*:
   a. ☒ $ 600.00 ☐ per month ☒ per hour ☐ other *(specify)*:
   b. ☐ percent of gross monthly rents
   c. ☐ the greater of a or b
   d. ☐ $ as a one-time start-up fee

6. ☒ **Management company.** The receiver may employ the management company of *(name):*
Jalmar Properties, Inc.
   a. ☒ The receiver may pay the company not more than
      (1) ☒ $ 2,500.00 ☒ per month ☐ per hour ☐ other *(specify):*
      (2) ☒ 5 percent of gross monthly rents
      (3) ☒ the greater of (1) or (2)
      (4) ☐ $ as a one-time start-up fee
   b. ☐ Management company fees are included in receiver's fees in item 5.

7. **Disclosure.** The receiver shall immediately disclose to all parties any financial relationship between the receiver and any company hired to assist in the management of the receivership property.

8. **Plaintiff's ex parte bond.** Plaintiff shall immediately file an applicant's bond under Code of Civil Procedure section 566(b) in the amount of: $ 10,000

9. **General duties.** After qualifying, the receiver
   a. shall take possession of and manage the property,
   b. shall collect the income from the property,
   c. shall care for the property and may incur the expenses necessary for that care, and
   d. may change the locks on the property.

10. **Prohibited agreements.** The receiver shall not enter into an agreement with any party to this action about the administration of the receivership or about any postreceivership matter.

11. **Inventory.** Within 30 days after qualifying, the receiver shall file an inventory of all property possessed under this order.

12. **Expenditures.** The receiver shall expend money coming into his or her possession to operate and preserve the property and only for the purposes authorized in this order. Unless the court orders otherwise, the receiver shall to the extent practical hold the balance in interest-bearing accounts in accordance with Code of Civil Procedure section 569.

13. **Leases and rentals.** The receiver may without court approval enter into leases for a term not exceeding one year, obtain and evict tenants, and set and modify the amounts and terms of leases.

14. **Security deposits.** Unless the security deposit has been turned over or paid to the receiver, the receiver shall not refund a deposit to a tenant.

15. **Monthly accounting of receiver's income, expenses, and fees.**
   a. The receiver shall each month prepare and serve on the parties, but not file, an accounting of the income and expenses incurred in the administration of the receivership property, including the receiver's fees and expenses.
   b. The receiver may pay the receiver's own fees and expenses only by the following procedures:
      (1) By serving on all parties a notice of intent to pay to which no objection is served on the receiver within 20 days of the date the notice is served.
      (2) By serving and filing a request for interim payment, which the court then approves.
      (3) By obtaining and filing an agreement among all the parties approving the payment, which the court then approves.
      (4) By filing the receiver's final accounting and report, which the court then approves.
   c. The receiver shall not reimburse the receiver for the receiver's general office administration expenses or overhead without court approval. These expenses include, for example, office supplies and employee payroll, benefits, and taxes.

16. **Management.**
   a. The receiver shall operate the property and take possession of all accounts relating to the property.
   b. The receiver may
      (1) employ agents, employees, clerks, accountants, and property managers to administer the receivership property, and
      (2) purchase materials, supplies, and services reasonably necessary to administer the receivership property.
   c. The receiver may do all the things, and incur the risks and obligations, ordinarily done or incurred by owners, managers, and operators of businesses and property similar to that possessed by the receiver; *except* the receiver shall not make any capital improvements to the property without prior court approval.

| PLAINTIFF *(Name)*: PREFERRED BANK<br>DEFENDANT *(Name)*: SDRES PARTNERS LLC | CASE NUMBER:<br>26NNCV01136 |
|---|---|

17. **Bank accounts.** The receiver
   a. may establish accounts at any financial institutions insured by an agency of the United States government that are not parties to this proceeding,
   b. shall deposit in those accounts funds received in connection with the receivership property, and
   c. shall deposit in interest-bearing accounts money not expended for receivership purposes.

18. **Court instructions.** The receiver and the parties may at any time apply to this court for further instructions and orders and for additional powers necessary to enable the receiver to perform the receiver's duties properly.

19. **Insurance.**
   a. The receiver shall determine upon taking possession of the property whether there is sufficient insurance coverage.
   b. The receiver shall notify the insurer that the receiver is to be named as an additional insured on each insurance policy on the property.
   c. If the receiver determines that the property does not have sufficient insurance coverage, the receiver shall immediately notify the parties and shall procure sufficient all-risk and liability insurance on the property (excluding earthquake and flood insurance).
   d. If the receiver does not have sufficient funds to obtain insurance, the receiver shall seek instructions from the court on whether to obtain insurance and how it is to be paid for.

20. **Employment of attorneys.**
   a. The receiver may employ unlawful detainer attorneys and eviction services without a court order.
   b. ☐ The receiver may employ counsel *(name):*
      at the hourly rate of: $
   c. ☒ Except as provided in items 20a and 27d, before employing counsel the receiver shall apply to the court for an order authorizing the receiver to employ counsel.

21. **Taxpayer ID numbers.** The receiver may use any federal taxpayer identification numbers relating to the property for any lawful purpose.

22. **Duty to turn over possession.** Upon receipt of a copy of a recorded trustee's deed upon foreclosure or written notice from plaintiff that defendant has cured the defaults existing under plaintiff's loan documents or that plaintiff has accepted a deed in lieu of foreclosure, the receiver shall, without further order of the court, turn over possession of the property to the successful purchaser or defendant or plaintiff respectively.

23. **Plaintiff's notification of termination.** Plaintiff shall notify the receiver in writing within 48 hours of any event within plaintiff's knowledge that terminates the receivership.

24. **Receiver's final report and account and discharge.**
   a. *Motion required.* Discharge of the receiver shall require a court order upon noticed motion for approval of the receiver's final report and account and exoneration of the receiver's bond.
   b. *Time.* Not later than 60 days after the receivership terminates, the receiver shall file, serve, and obtain a hearing date on a motion for discharge and approval of the final report and account.
   c. *Notice.* The receiver shall give notice to all persons of whom the receiver is aware who have potential claims against the receivership property.
   d. *Contents of motion.* The motion to approve the final report and account and for discharge of the receiver shall contain the following:
      (1) *Declaration or declarations. A* declaration or declarations: (i) stating what was done during the receivership, (ii) certifying the accuracy of the final accounting, (iii) stating the basis for the termination of the receivership (such as foreclosure or reinstatement), and (iv) stating the basis for an order for the distribution of any surplus or payment of any deficit.
      (2) *Accounting summary. A* summary of the receivership accounting, which shall include (i) the total revenues received, (ii) the total expenditures identified and enumerated by major categories, (iii) the net amount of any surplus or deficit, and (iv) evidence of necessary supporting facts.

| PLAINTIFF *(Name)*: PREFERRED BANK<br>DEFENDANT *(Name)*: SDRES PARTNERS LLC | CASE NUMBER:<br>26NNCV01136 |
|---|---|

25. **Plaintiff's notice to receiver.** Plaintiff shall promptly notify the receiver in writing of the names, addresses, and telephone numbers of all parties who appear in the action and their counsel. The parties shall give notice to the receiver of all events that affect the receivership.

26. **Bankruptcy Plaintiff's duty to give notice.** If a defendant files a bankruptcy case during the receivership, plaintiff shall give notice of the bankruptcy case to the court, to all parties, and to the receiver by the close of the next business day after the day on which plaintiff receives notice of the bankruptcy filing.

27. **Bankruptcy Receiver's duties.** If the receiver receives notice that a bankruptcy has been filed and part of the bankruptcy estate includes property that is the subject of this order, the receiver shall have the following duties:
    a. *Turn over property if no relief from stay will besought.* The receiver shall immediately contact the party who obtained the appointment of the receiver and determine whether that party intends to move in the bankruptcy court for an order for (1) relief from the automatic stay, and (2) relief from the receiver's obligation to turn over the property (11 U.S.C. § 543). If the party has no intention to make such a motion, the receiver shall immediately turn over the property to the appropriate entity either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession - and otherwise comply with 11 United States Code section 543.
    b. *Remain in possession pending resolution.* If the party who obtained the receivership intends to seek relief immediately from both the automatic stay and the receiver's obligation to turn over the property, the receiver may remain in possession and preserve the property pending the ruling on those motions (11 U.S.C. § 543(a)). The receiver's authority to preserve the property shall be limited as follows:
        (1) The receiver may continue to collect rents and other income;
        (2) The receiver may make only those disbursements necessary to preserve and protect the property;
        (3) The receiver shall not execute any new leases or other long-term contracts; and
        (4) The receiver shall do nothing that would effect a material change in the circumstances of the property.
    c. *Turn over property if no motion for relief is filed within 10 days after notice of the bankruptcy.* If the party who obtained the receivership fails to file a motion within 10 court days after his or her receipt of notice of the bankruptcy filing, the receiver shall immediately turn over the property to the appropriate entity either to the trustee in bankruptcy if one has been appointed or, if not, to the debtor in possession and otherwise comply with 11 United States Code section 543.
    d. *Retain bankruptcy counsel.* The receiver may petition the court to retain legal counsel to assist the receiver with issues arising out of the bankruptcy proceedings that affect the receivership.

28. **Failure to turn over property.** A receiver who fails to turn over the property in accordance with this order shall not be paid for time and expenses after the date on which the receiver should have turned the property over.

29. ☐ **Other orders.** *(Additional orders may include authority of the receiver to do any other acts arising from special circumstances.)* Other orders ☐ are specified in Attachment 29 ☐ are as follows *(specify):*

| PLAINTIFF *(Name)*: PREFERRED BANK<br>DEFENDANT *(Name)*: SDRES PARTNERS LLC | CASE NUMBER:<br>26NNCV01136 |
|---|---|

## ☒ TEMPORARY RESTRAINING ORDER

30. **THIS ORDER EXPIRES AT THE DATE AND TIME OF THE HEARING SHOWN IN THE BOX ON PAGE ONE (UNDER "NOTICE OF HEARING") UNLESS EXTENDED BY THE COURT.**

31. **THE COURT ORDERS DEFENDANT** to do the following:
   a. **Turn over property.** Immediately turn over possession of the property described in Attachment 2a to the receiver when the appointment becomes effective, including any security deposits, prepaid rent, other rental or lease payments, and funds in property management bank accounts for the property.
   b. **Turn over related items.** Immediately turn over to the receiver all keys, books, documents, and records relating to the property and advise the receiver of federal taxpayer identification numbers relating to the property.
   c. **Insurance.**
      (1) Immediately advise the receiver about the nature and extent of insurance coverage on the property;
      (2) Immediately name the receiver as an additional insured on each insurance policy on the property; and
      (3) DO NOT cancel, reduce, or modify the insurance coverage.

   d. **Restraints.** Refrain from
      (1) committing or permitting any waste on the property or any act on the property in violation of law or removing, encumbering, or otherwise disposing of any of the fixtures on the property;
      (2) demanding, collecting, or in any other way diverting or using any of the rents from the property;
      (3) interfering in any manner with the discharge of the receiver's duties under this order;
      (4) selling, transferring, disposing, encumbering, or concealing the property without a prior court order; and
      (5) doing any act that will impair the preservation of the property or plaintiff's interest in the property.

   e. ☐ **Other** *(specify)*:

32. **THE COURT ORDERS PLAINTIFF** to immediately file a temporary restraining order bond under Code of Civil Procedure section 529 in the amount of: $ 10,000

33. ☐ **OTHER ORDERS** ☐ are specified in Attachment 33 ☐ are as follows *(specify)*:

## SERVICE AND BRIEFING SCHEDULE

34. By *(date)*: March 13, 2026 **PLAINTIFF IS ORDERED** to personally serve on each defendant or counsel and any other appearing parties, and to file proof of service of, the summons and complaint, the memorandum of points and authorities, these orders, and all declarations and supporting papers.

35. By *(date)*: March 23, 2026 **DEFENDANT IS ORDERED** to personally serve on each plaintiff or counsel and any other appearing parties, and to file proof of service of, any opposition to these orders.

36. By *(date)*: March 30, 2026 **PLAINTIFF IS ORDERED** to personally serve on each defendant or counsel, and to file proof of service of, any reply to defendant's opposition to these orders.

37. Number of pages attached: 1

Date: March ___, 2026

_______________________________
JUDGE OF THE SUPERIOR COURT
Ian C. Fusselman

Attachment 2a to Amended Ex Parte Order Appointing Receiver and Order to Show Cause and Temporary Restraining Order – Rents, Issues, and Profits

210 South Orange Grove Boulevard, Pasadena, California

244 South Orange Grove Boulevard, California

248 South Orange Grove Boulevard, California

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
213 623 9300

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California, I am over the age of 18 and not a party to the within action. My business address is: ☒ 601 So. Figueroa Street, Suite 2500, Los Angeles, CA 90017. ☐ ACE Attorney Service, 800 South Figueroa Street, Suite 900, Los Angeles, CA 90017.

On March 10, 2026, I served the foregoing document, described as **AMENDED EX PARTE ORDER APPOINTING RECEIVER AND ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER – RENTS, ISSUES, AND PROFITS** on the interested parties in this action, as follows:

Joe Rothberg
Levene, Neale, Bender, Yoo & Golubchik, LLP
2818 La Cienega Avenue
Los Angeles, California 90034
E-Mail: jmr@lnbyg.com
(BY E-MAIL AND U. S. MAIL)

Northwest Registered Agent, Inc.
Attn: Elle
2108 N Street, Suite N
Sacramento, CA 95816-5712
E-Mail: support@NorthwestAgent.com
(BY E-MAIL AND U. S. MAIL))

Walter Whitman Moore
248 South Orange Grove Avenue
Pasadena, California 91105
E-Mail: walter@licensedtosue.com
(BY E-MAIL AND U. S. MAIL))

☒ **(VIA ELECTRONIC MAIL)** I transmitted the above document(s) by electronic mail to the interested parties via the e-mail addresses listed above for each party.

☒ **(VIA MAIL)** I placed a true copy of the foregoing document in an envelope addressed to each interested party as set forth above. I sealed each such envelope, and placed same, with postage thereon fully prepaid, for collection and mailing at Dentons US LLP, Los Angeles, California 90017. I am readily familiar with Dentons US LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service. Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 10, 2026, at Los Angeles, California.

Alicia Aguilar

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
ERVIN COHEN & JESSUP LLP
9401 Wilshire Boulevard, 12thFloor
Beverly Hills, California 90212-2974
Telephone (310) 273-6333
Facsimile (310) 859-2325

A true and correct copy of the foregoing document entitled (*specify*): DECLARATION OF BYRON Z. MOLDO IN SUPPORT OF PREFERRED BANK MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND RELIEF FROM TURNOVER BY PREPETITION RECEIVER

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 25, 2026 , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) August 25, 2026 , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) August 25, 2026 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**BY MESSENGER**
Hon. Scott C. Clarkson
U. S. Bankruptcy Court
Ronald Reagan Federal Building
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| August 25, 2026 | Sydney Carson | */s/ Sydney Carson* |
| *Date* | *Printed Name* | *Signature* |

**SERVED VIA NOTICE OF ELECTRONIC FILING (NEF)**

- **Kyra E Andrassy** kandrassy@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Jessica L Bagdanov** jbagdanov@bg.law, ecf@bg.law
- **Ira David Kharasch** ikharasch@pszjlaw.com
- **Kenneth Misken** Kenneth.M.Misken@usdoj.gov
- **John A Moe** john.moe@dentons.com, kathryn.howard@dentons.com;derry.kalve@dentons.com;DOCKET.GENERAL.LIT.LOS@dentons.com
- **Byron Z Moldo** bmoldo@ecjlaw.com, aantonio@ecjlaw.com,dperez@ecjlaw.com,scarson@ecjlaw.com
- **Walter Whitman Moore** walter@licensedtosue.com, waltermooreinla@gmail.com
- **David M Poitras** dpoitras@bg.law
- **United States Trustee (SA)** ustpregion16.sa.ecf@usdoj.gov

**SERVED BY UNITED STATES MAIL**

SDRES Partners LLC
520 Newport Center Drive, Suite 480
Newport Beach, CA 92660

Joseph M. Rothberg
Levene, Neale, Bender, Yoo & Golubchik, LLP
2818 La Cienega Avenue
Los Angeles, California 90034

Cia Mackle
Brook E Wilson
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd 13th Fl
Los Angeles, CA 90067-4100